# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALEXANDRE PELLETIER, Individually and on Behalf of All Others Similarly Situated | : : : : | CIVIL ACTION |
| v. | : : | |
| ENDO INTERNATIONAL PLC, RAJIV KANISHKA LIYANAARCHIE DE SILVA, SUKETU P. UPADHYAY and PAUL V. CAMPANELLI | : : : : | NO. 17-5114 |

## MEMORANDUM OPINION

**Savage, J.**                                                                                        June 19, 2018

In this private securities fraud action, we must appoint lead plaintiffs and lead counsel under 15 U.S.C.A. § 78u-4. In doing so, we are confronted with two competing principles for determining the lead plaintiffs -- the presumptive lead plaintiff rule and the preference for appointing institutional investors. We must also choose the appropriate method for calculating who has the larger financial interest.

Even if we use the measure proposed by the two individuals seeking appointment, their aggregate financial interest is only minimally greater than the institutional investor. Under these circumstances, we conclude the institutional investor preference outweighs the presumptive lead plaintiff rule.

On November 14, 2017, Alexandre Pelletier filed a class action complaint asserting that the defendants, Endo International plc, its former and present CEOs, and its CFO violated Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5. The complaint alleges that Par Pharmaceutical Holdings, Inc. ("Par"), a wholly-owned subsidiary of Endo, conspired with

several other pharmaceutical companies to fix generic drug prices in violation of the federal antitrust laws. It alleges that Endo and its officers made false or misleading public statements and failed to disclose or actively concealed material adverse facts about Endo's business, operations, prospects and revenue, artificially inflating Endo's share prices. The complaint asserts a fraud-on-the-market theory of loss causation, alleging that each of three corrective disclosures made on November 3, 2016,[1] March 1, 2017,[2] and October 31, 2017[3] caused the market value of Endo's securities to drop.

Contemporaneously with filing his complaint, Pelletier caused notice of the pending class action to be published on PR Newswire. On January 16, 2018, two motions for appointment of lead plaintiffs and lead counsel were filed. Wayne A. Wingard and Nathan Joseph Dole moved for appointment as lead plaintiffs, and the appointment of Pomerantz LLP as lead counsel, and Pribanic and Pribanic LLC as liaison counsel.[4] Park Employees' Annuity and Benefit Fund of Chicago (the "Fund") moved for appointment as lead plaintiff and the appointment of Bleichmar Fonti & Auld LLP as lead counsel.[5]

### *Analysis*

A court must appoint a lead plaintiff whom it "determines to be most capable of adequately representing the interests of class members." 15 U.S.C.A. § 78u-4(a)(3)(B)(i). Determining "the most adequate plaintiff" requires a two-step process. First, the court must identify the presumptive lead plaintiff, the person or group having the largest

---

[1] Compl. ¶¶ 6, 7, 39 and 40.
[2] Compl. ¶¶ 8, 9, 41 and 42.
[3] Compl. ¶¶ 10, 11, 43 and 44.
[4] Mot., Doc. No. 10.
[5] Mot., Doc. No. 11.

2

financial interest. Second, it then determines whether the presumption has been rebutted by any member of the putative class. *In re Cendant Corp. Litig.*, 264 F.3d 201, 262 (3d Cir. 2001) (citing 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) & (II)).

There are three criteria for identifying the presumptive lead plaintiff. First, the person or group selected must either have filed the complaint or made a timely motion in response to the published notice of the pending class action. 15 U.S.C. § 78u-4(a)(3)(A)(i)(I) & (II), § 78u-4(a)(3)(B)(iii)(I) & (II)). Second, the court must identify the movant having the "largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). Third, the party with the largest financial interest must satisfy the adequacy and the typicality requirements of Rule 23.[6]

There is no dispute that the movants satisfy the first and third criteria. The disputed issue is who has the larger financial interest. The movants calculate their respective financial interest differently.

### *Largest Financial Interest*

The three relevant factors in the financial interest analysis are: (1) the number of shares purchased during the class period; (2) the total net funds expended by the plaintiffs during the class period; and (3) the approximate losses suffered by the plaintiffs. *Cendant*, 264 F.3d at 262 (citing *Lax v. First Merch. Acceptance Corp.*, Nos. 97 C 2715, *et seq.*, 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997); *In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998) (citing *Lax* for these factors).

Calculated under the *Lax–Olsten* factors approved by *Cendant* and using LIFO and FIFO accounting methods, Wingard and Dole together claim an aggregate loss of

---
[6] 15 U.S.C. § 78u-4(a)(3)(B)(iii)(cc).

$118,603, and the Fund's loss at $112,536.[7] Thus, under this method, it appears the Wingard-Dole group's aggregated loss is $6,000.00 greater than the Fund's.

The Fund argues that the loss causation formula used in *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005), is the appropriate calculus. According to this formula, only those losses that are proximately caused by the defendant's fraud are recoverable. Consequently, losses incurred before disclosure of the relevant misrepresentation are not included in recoverable loss.

We agree with the Fund. What the plaintiffs lost is what they may recover. Including losses that were incurred before any disclosure could not have been caused by any disclosures and are not recoverable. Thus, those shares are not included in the "largest financial interest" calculus.

Under the *Dura* analysis, the Fund calculates its loss to be $187,000 and the Wingard-Dole group's loss at $132,000, giving the Fund the larger financial interest. Excluding from the calculation those shares purchased at inflated prices and sold at inflated prices before disclosure of the relevant misrepresentation, the Fund purchased 20,000 more shares of Endo stock than the Wingard-Dole group. Hence, applying a *Dura* analysis, the Fund's net loss is greater than that of the Wingard-Dole group.

The *Lax* factors, adopted by the Third Circuit, are the (1) number of shares

---

[7] LIFO (last in, first out) and FIFO (first in, first out) are accounting methods, which have been used to calculate damages in securities actions. LIFO assumes that the first stocks to be sold are the stocks purchased most recently. On the other hand, FIFO assumes that the first stocks to be sold are the stocks that were acquired first. *Sallustro v. CannaVest Corp.*, 93 F. Supp. 3d 265, 270 n.5 (S.D.N.Y. 2015); *accord In re LightInTheBox Holding Co., Ltd. Sec. Litig.*, No. 13 Civ. 6016, 2013 WL 6145114, at *3 (S.D.N.Y. Nov. 21, 2013). Using LIFO or FIFO, each purchase of securities is matched or assigned to a specific sale of securities to calculate the trading loss or gain on each transaction during the class period. Because FIFO and LIFO use different sorting principles, these methods can produce significantly different results.

purchased during the putative class period; (2) the total net funds expended by the plaintiffs during that period; and the approximate losses suffered by the plaintiffs. *Cendant*, 264 F.3d at 262 (citing *Lax v. First Merchants Acceptance Corp.*, 1997 WL 461036 at *5 (N.D. Ill., Aug. 11, 1997).

Under the *Lax–Olsten* factors, which do not address whether losses are proximately caused by the alleged securities fraud, the Fund's net expenditures are $180,000.00 more than the Wingard-Dole group's expenditures. The Wingard-Dole group purchased 65,605 shares during the class period, which is 4,769 more shares that the Fund purchased during the class period. However, the 65,605 shares purchased by the Wingard-Dole group include 38,730 shares that were not affected by the disclosures.

The PSLRA does not provide any guidance as to the method for calculating the largest financial interest. It speaks of the "largest financial interest in the relief sought." It does not reference loss, but references damages -- "the relief sought."

The calculation of financial interest is impacted by the statutory limitation imposed on damages. In the PSLRA, Congress placed a cap on damages recoverable in a private securities fraud action. Section 21D of the Act, 15 U.S.C. § 78u–4 sometimes referred to as the "look back" or "bounce back" provision, states that

> in any private action . . . in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90–day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market.

*Id.* § 78u–4(e)(1). The "mean trading price" is defined as the "average of the daily trading

5

price of that security, determined as of the close of the market each day during the 90–day period" following the disclosure. *Id.* § 78u–4(e)(3). If the plaintiffs sell their securities prior to the close of the 90–day period, the mean trading price is calculated for the period beginning immediately after the corrective disclosure and ending on the date of sale of the security:

> [I]f the plaintiff sells or repurchases the subject security prior to the expiration of the 90–day period . . . the plaintiff's damages shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the security and the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which the plaintiff sells or repurchases the security.

Id. § 78u–4(e)(2). *See In re Oxford Health Plans, Inc. Sec. Litig.*, 244 F. Supp. 2d 247, 250 (S.D.N.Y. 2003) (construing this provision to apply to "a sale or repurchase during the ninety day period, in which case the Plaintiffs' damages shall not exceed the difference between the actual price, paid or received, and the mean trading price of the security during the Lookback period").

As the Second Circuit explained, the "PSLRA's legislative history indicates that Congress imposed this limitation because it believed that '[c]alculating damages based on the date corrective information is disclosed may substantially overestimate plaintiff's actual damages.' . . . It intended the 'bounce back' provision to have the effect of 'limiting damages to those losses caused by the fraud and not by other market conditions.'" *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 39 (2d Cir. 2012) (quoting S.Rep. No. 104–98, at 20 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 699). "In essence, this provision 'does not calculate damages based on the single day decline in

6

price, but instead allows the security an opportunity to recover' over a period of 90 days."
*Id.* (quoting *In re Veritas Software Corp. Sec. Litig.*, 496 F.3d 962, 967 n.3 (9th Cir. 2007)).
*See also In re Royal Dutch/Shell Transp. Sec. Litig.*, 404 F. Supp. 2d 605, 609 (D.N.J. 2005) (noting that the bounce back provision "is consistent with the out-of-pocket loss measure of damages traditionally applied by courts"). Explaining the practical operation of the PSLRA's limitation on damages, the court stated:

> "Thus, if the mean trading price of a security during the 90–day period following the correction is greater than the price at which the plaintiff purchased his stock then that plaintiff would recover nothing under the PSLRA's limitation on damages." . . . But if the mean trading price during the 90–day period is less than the plaintiff's purchase price, then the plaintiff may recover out-of-pocket damages up to the difference between her purchase price and the mean trading price.

*Acticon*, 592 F.3d at 39 (quoting *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 461 (9th Cir. 2000) (emphasis omitted)).

In sum, the PSLRA provides that the damages shall not exceed the difference between the purchase or sale price and the mean trading price of the security during the 90–day period that commences on the date on which correcting information is disseminated to the market. 15 U.S.C. § 78u–4(e)(1). If the plaintiff sold the securities during the 90–day period, the period for determining the mean trading price is shortened, ending on the date on which the plaintiff sells the security. *Id.* § 78u–4(e)(2).

In this case, for securities held at the time of the first corrective disclosure, the PSLRA's 90–day period for calculating the mean trading price begins on November 3, 2016, and ends on February 1, 2017. For those held at the time of the second disclosure, the 90–day period begins on March 1, 2017, and ends on May 29, 2017.

7

Each of the movants sold some or all of their Endo shares prior to expiration of the applicable 90–day period.

The movants have not submitted historical data about daily trading prices for Endo's shares during that period. Consequently, on this record, we cannot apply the "bounce back" calculation to accurately determine each movant's recoverable damages.

The parties do not dispute the mean trading price for Endo securities for 90 days following the second disclosure on March 1. The Wingard-Dole group estimates the mean trading price at $11.4006. We cannot calculate the mean trading price for securities sold before expiration of the 90-day period because the mean trading price is an average of the securities daily closing prices and movants have not provided the daily trading prices for Endo securities.

Movants cite and apply only the 90-day period following the second disclosure on March 1, 2017. The Wingard–Dole group's loss chart has a column headed, "90–Day Mean Price $11.4006 Estimated Value," which is proffered as the estimated daily average mean trading price under the PSLRA § 78u–(e)(3).[8] The chart shows the estimated mean price for the 90–day period following the second disclosure on March 1, 2017. Without further explanation, the chart applies the estimated mean trading price only to Dole's transactions and lists a sum-total figure of $29,927.00, used as a deduction from Dole's gross total losses.

Similarly, the Fund "values" its shares under the PSLRA's limitation of damages.[9] As to the 49,274 shares that the Fund retained at the end of the class period on February

---

[8] See Wingard–Dole Mot., Ex. C, loss chart & n.* (Doc. No. 10-6) (listing the "90-Day Mean Price $11,4006 Estimated Value," explained as the "Av[erage] Closing Prices from March 1, 2017 to May 30, 2017").
[9] See Fund Mot., Ex. B, loss chart, nn.1, 2 (Doc. No. 11-5).

28, 2017, the Fund values those shares "at the average price from March 1, 2017 to May 26, 2017."[10] The Fund sold those 49,274 retained shares on April 17, 2017, and the Fund values those sales "at the maximum sale price and the average price up to the date of sale."[11] For those shares, however, the Fund lists the actual sales price at $10.9285, which presumably would be adjusted separately to reflect the mean trading price under § 78u–4(e)(2),(3) ending on the date of sale of the shares, April 17, 2017.

The Fund and Wingard sold all the shares they held before the first disclosure on November 3, 2016. However, they reentered the market, the Fund purchasing Endo shares on November 3, 2016 and later, and Wingard purchasing and then selling them in December, 2016. Wingard later purchased shares on January 6, 2017, all of which he sold on May 19, 2017. As to Wingard's in-and-out transactions during December, 2016, made more than a month after the first disclosure, the price of Endo shares had already been corrected by the first disclosure and reflected in the market price that Wingard paid. In other words, the purchase price had adjusted for the first disclosure.

On April 17, 2017, the Fund sold all of its retained shares at prices lower than what it had paid to purchase the shares. The Fund sold at $10.9285 per share. Whether or not this is more or less than the PSLRA mean trading price is not clear. The Fund sold the shares before expiration of the 90-day period following the second disclosure and we do not have the average mean daily trading price for that period. On May 9, 2017, Wingard sold all of his remaining shares at $12.5200 per share, a price lower than what

---

[10] *Id.*, loss chart, n.1. March1 through May 26, 2017 adds up to 87 days, and the markets were closed for the Memorial Day holiday, Saturday–Monday, May 27-29, 2017, which adds up to the statutory 90–day period.
[11] *Id.*, loss chart, n.2.

9

he had paid to purchase them. Again, whether this is more or less than the PSLRA mean trading price is not clear. Wingard sold his shares before expiration of the 90-day period following the second disclosure. He has not provided the average mean daily trading price for that period. However, in light of the Wingard-Dole group's estimated mean trading price for the full 90-day period, $11.4006, it appears that Wingard sold his shares on May 9, 2017, at prices above the PSLRA mean trading price, resulting in no recoverable loss on those shares.

Dole's loss is more complicated. Dole sold 650 shares before the first disclosure on November 3, 2016. On November 2, 2016, he held 3,300 shares. The following day, the date of the first disclosure, he purchased 3,875 more shares. On February 27, 2017, he sold 1,500 shares. As of the second disclosure on March 1, 2017, he held 5,675 shares. On March 15 and March 29, 2017, Dole sold 3,050 shares prior to expiration of the PSLRA's 90–day period for the second disclosure, which began on March 1, 2017. Accordingly, for the most part, Dole's losses are limited by a specific mean trading price for the period that begins on March 1, 2017, and ends on the date he sold his shares on March 15 and March 29, 2017.[12]

The Fund proposes that under the Dura analysis, "all shares bought and sold prior to the November 3rd disclosure should be excluded from the movants' loss calculations as unrelated to the fraud."[13] The Fund also proposes that "purchases and sales that occur in between the corrective disclosures should be excluded." Id. Applying these methods to the facts presented here, the Fund maintains:

---

[12] It also appears that Dole may have been harmed by the third disclosure on October 31, 2017, because he still holds 2,625 shares that have not been sold. However, none of the movants address this issue.
[13] Fund Resp. at 5.

> Wingard completely sold out of his Endo position before the November 3rd disclosure. After that disclosure he purchased additional shares, and then sold them numerous times before the March 1, 2017 disclosure. The losses or gains from those in-and-out transactions are unrelated to any injury from the fraud and should not be considered.[14]

On four separate transactions, March 21, March 23 (two transactions), and May 6, 2016, Wingard purchased a total of 14,780 shares. He sold all those shares in three separate transactions, on April 21 (two transactions) and August 3, 2016. He had no Endo shares before the first disclosure on November 3, 2016.

Wingard purchased 43,000 shares during the period December 15, 2016, through January 6, 2017, before the second disclosure on March 1, 2017. He completed two "in-and-out" transactions before the second disclosure on March 1, 2017. On December 15, 2016, he purchased 10,000 shares, and sold them the following day. On December 21, 2016, he purchased another 10,000 shares and sold them two days later. After each in-and-out transaction, Wingard held no shares.

The Fund contends that losses should be calculated using the traditional measure of out-of-pocket damages—that is, the difference between the purchase price and the true value of the securities after disclosure of the fraud, adjusted for the mean trading price under the PSLRA. The Fund uses FIFO/LIFO methods to match purchases with sales to derive losses. Specifically, the Fund first excludes all gains and losses on shares bought and sold before the first disclosure on November 3, 2016, resulting in excluding all gains and losses on its June 7, June 10, and June 24, 2016 purchases, all of which shares the Fund sold on August 9 and August 16, 2016. The Fund applies LIFO

---

[14] *Id.*

and FIFO accounting methods to the remaining *Dura* eligible purchases of 49,274 shares that it made during the class period between November 3, 2016, and December 22, 2017, all of which were sold on April 17, 2017. Those trades result in the Fund's *Dura* FIFO/LIFO loss of $187,273.00.

Whether we accept the Wingard-Dole calculation of loss as resulting in its having an approximately greater loss of $6,000 or the Fund's calculation that it has a greater loss of $55,000, we conclude the Fund's status as an institutional investor favors it over the two individual investors whose apparent aggregate loss, by their own calculations, is slightly greater than the Fund's. The Fund is more capable of representing the interests of the loss members.

### *Individual Investor Preference*

After Pomerantz LLP published notice of the class action on *Globe Newswire*, Wingard and Dole separately contacted the firm's New York office about joining the litigation.[15] Pomerantz introduced Wingard and Dole to each other. *Id.* Neither Wingard nor Dole had previously been a client of the firm.[16]

When the movant is a "group of persons," we ask whether the way the group was formed would preclude it from doing its job. In other words, will it fairly and adequately represent the interests of the class?

*Cendant* instructs that in "assessing whether the movant satisfies Rule 23's adequacy requirement, courts should consider whether it 'has the ability and incentive to represent the claims of the class vigorously, [whether it] has obtained adequate counsel,

---

[15] Hr'g Tr., Feb. 22, 2018, 24:20–26:5.
[16] *Id.*, 26:5–27:3, 29:22–30:2.

12

and [whether] there is [a] conflict between the movant's claims and those asserted on behalf of the class.'"  264 F.3d at 265 (alteration in original) (quoting *Hassine v. Jeffes*, 846 F.2d 169, 179 (3d Cir. 1988)); Fed. R. Civ. P. 23(a)(4) (whether the representative party will "fairly and adequately protect the interests of the class").

The adequacy inquiry involves consideration of "whether 'the interests of the named plaintiffs [are] sufficiently aligned with those of the absentees.'"  *Cendant*, 264 F.3d at 265 (quoting *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 630 (3d Cir. 1996)). The inquiry also involves consideration of "whether 'class counsel [is] qualified and [will] serve the interests of the *entire* class.'"  *Id.* (emphasis in original) (quoting *In re Gen Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 769, 800 (3d Cir. 1995)).  *See also* 15 U.S.C. § 78u-4(a)(3)(B)(i) (lead plaintiff should be "most capable of adequately representing the interests of class members").

There is no question that the proposed lead counsel satisfy the adequacy of representation requirement.  Both firms have the requisite ability and qualifications to litigate a fraud-on-the-market securities action.  The issue is whether the Fund or the Wingard-Dole group is the more adequate plaintiff.

Because one of the "most important functions" of a lead plaintiff is to "select and retain" lead counsel, 15 U.S.C. § 78u-4(a)(3)(B)(v), *Cendant* requires consideration of two additional factors.  The first additional factor is "whether the movant has demonstrated a willingness and ability to select competent class counsel and to negotiate a reasonable retainer agreement with that counsel."  264 F.3d at 265.  The second additional factor arises only when the movant is a group rather than an individual person

13

or entity. It considers how the group seeking to be lead plaintiff was formed or the way it is constituted. *Id.* at 266.

The PSLRA permits a "group of persons" to serve as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). However, *Cendant* cautions that if

> the way in which a group was formed or the manner in which it is constituted would preclude it from fulfilling the tasks assigned to a lead plaintiff, the court should disqualify the movant on the grounds that it will not fairly and adequately represent the interests of the class.

264 F.3d at 266. This second additional factor is the focus of the Fund's challenge to the appointment of the Wingard-Dole group as lead plaintiff.

In essence, the Fund primarily objects to the appointment of the Wingard-Dole group because they were "improperly banded together by counsel to win . . . appointment as lead counsel."[17] *Cendant* counsels against appointment of a group that has been "created by the efforts of lawyers hoping to ensure their eventual appointment as lead counsel." 264 F.3d at 266-67 (citing *In re Razorfish, Inc. Sec. Litig.*, 143 F. Supp. 2d 304, 307-08 (S.D.N.Y. 2001) (refusing to appoint a group that was "simply an artifice cobbled together by cooperating counsel for the obvious purpose of creating a large enough grouping of investors to qualify as 'lead plaintiff,' which can then select the equally artificial grouping of counsel as 'lead counsel'")). It appears the attorneys recruited Wingard and Dole as clients rather than Wingard and Dole selecting the attorneys.

The Wingate-Dole group maintains that "their losses demonstrate that they have a sufficient interest in the outcome of this litigation" to serve as representatives for the

---

[17] Fund Resp. at 3, 9, 13-14.

14

class.[18] Further, they state that "Wingate and Dole constitute a small, cohesive partnership of two like-minded investors, each of whom incurred a significant loss."[19] "In the event that a disagreement should arise between [them], they have agreed to be bound by the decision of Wingard."[20] They have participated in one "conference call to discuss their strategy for prosecuting this case."[21] Yet, they do not have the sophistication or the involvement of the Fund.[22]

Even if the financial interest of the Wingard-Dole group, as calculated by the group, is a mere $6,000.00 greater than the Fund's, we factor in the preference for appointing institutional investors as lead plaintiffs. See, *Cendant*, 264 F.3d at 273. Where there is a slight variance in the respective losses, we balance the difference between the respective losses against the preference for institutional investors. In this case, the Fund is a sophisticated investor who has an ongoing relationship with its proposed lead counsel, a law firm that is engaged in monitoring the Fund's securities. The Wingard-Dole group had no prior contact nor relationship with each other, and had no prior attorney-client relationship with its proposed lead counsel.

Under these circumstances, the scale tips in favor of the Fund. Therefore, we appoint the Fund as lead plaintiff and its attorneys as lead counsel.

---

[18] Wingate-Dole Br. at 9.
[19] Wingate-Dole Resp. at 6; Wingate-Dole Joint Decl., ¶ 4.
[20] *Id.* ¶ 6.
[21] *Id.* ¶ 7.
[22] *Id.* ¶ 4.