## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALEXANDRE PELLETIER, Individually and On Behalf of All Others Similarly Situated,<br><br>                      Plaintiff,<br><br>         - v. -<br><br>ENDO INTERNATIONAL PLC, RAJIV KANISHKA LIYANAARCHCHIE DE SILVA, SUKETU P. UPADHYAY, AND PAUL V. CAMPANELLI<br><br>                 Defendants. | Hon. Timothy J. Savage<br><br>No. 2:17-cv-05114-TJS<br><br>**JURY TRIAL DEMANDED**<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br><br>ELECTRONICALLY FILED |

## <u>TABLE OF CONTENTS</u>

I.     SUMMARY OF THE ACTION ............................................................................... 1

II.    JURISDICTION AND VENUE ............................................................................ 7

III.   PARTIES ............................................................................................................. 8

     A.    Lead Plaintiff ............................................................................................. 8

     B.    Defendants ................................................................................................ 8

IV.   SUBSTANTIVE SECURITIES FRAUD ALLEGATIONS ................................. 9

     A.    Pre-Class Period Allegations ................................................................... 10

          1.   Pre-2013, Endo's Share Price Suffers, De Silva Joins As CEO And Announces  Growth-By-Acquisition Strategy ................................. 10

          2.   Defendants Concealed That De Silva Implemented An Anticompetitive Price Increase Scheme ................................................................... 11

          3.   Defendants Personally Tracked The Anticompetitive Price Increases Through Frequent Reports And Conference Calls............................ 13

          4.   Defendants Face Growing Public And Law Enforcement Attention To Generic Price Increases.......................................................... 15

     B.    The Class Period Begins: Defendants Fraudulently Conceal Anticompetitive Price Increase Scheme and Inflated Profits ........................................... 16

          1.   Year-End 2014 Results Announced, Defendants Fraudulently Emphasize Competition And Sustainable Sources Of Earnings ......................... 16

          2.   Defendants Respond To Investors' Concerns About Price Increases With Deception ................................................................................ 17

          3.   Defendants Announce The Par Acquisition...................................... 18

          4.   Defendants Make Three Additional Price Increases To Sustain The Inflated Share Price Before Closing The Par Acquisition ................. 19

          5.   Defendants Concealed That Campanelli And Par Also Made Anticompetitive Price Increases ...................................................... 20

          6.   Third Quarter 2015, Inflated Profits Peak........................................ 20

i

7.  December 2015: Connecticut AG Serves Subpoena, Which Defendants Do Not Disclose ................................................ 21

8.  First Half 2016: Endo's Financial Performance Starts To Suffer, Defendants Conceal History Of Anticompetitive Practices .............................. 21

9.  The Truth Leaks Out: Executive Resignations;  Endo Becomes A Law Enforcement Target And Is Forced To Take A $2.85 Billion Permanent Writedown .................................................................. 24

C.  Summary Of Confidential Witness Allegations ....................................... 26

D.  Empirical Evidence That Defendants Deliberately Did Not Compete On Price, Resulting In Inflated Profits That Were A Material Driver Of Endo's Profits During The Class Period ................................................. 31

1.  Inflated Drugs ................................................................. 32

2.  Inflated Drugs That Endo Acquired From DAVA ........................... 40

3.  Inflated Drugs That Endo Acquired From Par ............................. 43

4.  Inflated Profit Analysis ..................................................... 47

E.  Additionally, Evidence Also Establishes That Endo Actively Agreed To Fix Prices And Allocate Markets ...................................................... 49

1.  Long-Established Indicators Demonstrate That Defendants Engaged In Illegal Agreements Not To Compete .................................... 49

2.  Inter-Firm Communications Facilitated And Enabled Defendants To Coordinate With Competitors ............................................. 55

3.  The State AGs' Wide-Ranging Civil Antitrust Action Against Defendants And The DOJ's Criminal Investigation Into Many Of Endo's Inflated Drugs Further Corroborate Lead Plaintiff's Allegations ................... 56

V.   DEFENDANTS' ACTIONABLE FALSE AND MISLEADING STATEMENTS AND OMISSIONS ............................................................................. 60

A.  Full-Year 2014 False And Misleading Statements And Omissions ...................... 61

B.  First Quarter 2015 False And Misleading Statements And Omissions .................. 64

C.  Second Quarter 2015 False And Misleading Statements And Omissions .............. 65

D.  Third Quarter 2015 False And Misleading Statements And Omissions ................. 68

E.    Fourth Quarter and Full-Year 2015 False And Misleading Statements And Omissions ............................................................................................ 70

F.    First Quarter 2016 False And Misleading Statements And Omissions ................... 75

G.    Second Quarter 2016 False And Misleading Statements And Omissions .............. 77

H.    Third Quarter 2016 False And Misleading Statements And Omissions ................. 79

VI.    ADDITIONAL ALLEGATIONS OF SCIENTER .......................................................... 81

A.    De Silva And Campanelli Were Personally Involved In And Responsible For Price Increases At Endo And Par ....................................................................... 81

B.    The Individual Defendants Tracked And  Discussed The Price Increases And Profits ............................................................................................................... 81

C.    Defendants Had Access To Information Concerning The Anticompetitive Price Increases ................................................................................................... 82

D.    Defendants Spoke Repeatedly About Price Increases, The Purported Reasons For Them, Their Impact On Endo's Bottom Line, And, In 2016, About The Pricing Pressure That Endo Faced ...................................................................... 83

E.    The Inflated Profits Were Material To Endo Over An Extended Period Of Time ................................................................................................................... 84

F.    Defendants Were Motivated To Inflate The Price Of Endo's Stock To Consummate A Transformational Deal ............................................................... 85

G.    De Silva Deliberately "Locked Up" Supply Of Endo's Generic Drugs To Manipulate Their Price ...................................................................................... 87

H.    The 2014 Congressional Letter To Endo .............................................................. 87

I.    The 2015 CT AG Subpoena To Endo .................................................................... 87

J.    De Silva and Upadhyay Scienter Regarding Methotrexate And Doxazosin (The DAVA Drugs) ........................................................................................... 88

K.    Individual Defendants' Scienter Regarding Isosorbide, Divalproex, Cholestyramine And Digoxin (The Par Drugs) .................................................... 88

L.    Corporate Scienter ................................................................................................ 89

VII.    DEFENDANTS ENGAGED IN ADDITIONAL ANTICOMPETITIVE PRACTICES THAT ALSO RENDERED DEFENDANTS' STATEMENTS AND OMISSIONS MATERIALLY FALSE AND MISLEADING ................................................................. 90

A.     Defendants Routinely Restricted The Sale Of Qualitest's Drugs To Create Shortages And Then Released Those Drugs At Inflated Prices ............................. 90

B.     Defendants' Lock-up/Blast Strategy Further Rendered Their Statements Materially False And Misleading............................................................................ 91

VIII.   LOSS CAUSATION.................................................................................................... 92

A.     November 3, 2016.............................................................................................. 94

B.     February 28, 2017 - March 1, 2017 ................................................................. 95

IX.     APPLICABILTY OF THE PRESUMPTION OF RELIANCE....................................... 97

X.      CLASS ACTION ALLEGATIONS ........................................................................... 97

XI.     NO SAFE HARBOR .............................................................................................. 100

XII.    CLAIMS FOR RELIEF .......................................................................................... 100

XIII.   PRAYER FOR RELIEF .......................................................................................... 102

APPENDIX A ...................................................................................................................... 1

## GLOSSARY OF TERMS

| Term | Definition |
|---|---|
| Actavis | Actavis Generics, a company that produces generic pharmaceuticals and was acquired by Teva from Allergan plc in August 2016 |
| Adjusted Income | Adjusted income from continuing operations before income tax, as used in Endo's Annual Reports on Forms 10-K, Quarterly Reports on Forms 10-Q, and Current Reports on Forms 8-K, all of which Endo filed with the SEC during the Class Period |
| AG | Attorney General |
| Anda | Anda, Inc., the fourth largest U.S. distributor of generic pharmaceuticals that Teva acquired from Allergan plc on October 3, 2016 |
| Apotex | Apotex Inc., a company that produces generic pharmaceuticals |
| Auxilium | Auxilium Pharmaceuticals, Inc., a specialty pharmaceuticals company acquired by Endo on January 29, 2015 |
| Boca | Boca Pharmacal, a generic pharmaceuticals company acquired by Endo on February 3, 2014 |
| Campanelli | Paul V. Campanelli, Endo's CEO and President since September 2016, the President of Par – then Endo's generic pharmaceuticals business segment – from September 2015 until September 2016, and Par's CEO prior to Endo's acquisition of Par, from September 2012 until September 2015 |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| Class | All persons and entities who purchased or otherwise acquired the ordinary shares of Endo during the Class Period and were damaged thereby |
| Class Period | March 2, 2015 to February 27, 2017, inclusive |
| Inflated Drugs | The thirteen generic drugs from which Endo profited as a result of Defendants' anticompetitive price |
| DAVA | DAVA Pharmaceuticals, Inc., a generic pharmaceuticals company acquired by Endo on August 6, 2014 |
| Defendants | Endo International plc, Rajiv Kanishka Liyanaarchchie De Silva, Suketu P. Upadhyay, and Paul V. Campanelli |
| DOJ | U.S. Department of Justice |
| ECI | ECI Pharmaceuticals, LLC, a company that produces generic pharmaceuticals |
| Endo or the Company | Endo International PLC, headquartered in Dublin, Ireland with U.S. headquarters at 1400 Atwater Drive, Malvern, Pennsylvania |
| ERP | Enterprise Resource Planning, the integrated management software system for core business processes |
| FDA | U.S. Food and Drug Administration |
| CW | Former Employees of Endo who are confidential witnesses are referenced herein and identified as CW- |

| | |
|---|---|
| Glazer | Jeffrey Glazer, former CEO of Heritage Pharmaceuticals Inc. |
| GphA | Generic Pharmaceutical Association (now the Association for Accessible Medicines or AAM), a trade association representing manufacturers and distributors of generic prescription drugs that hosted trade shows, conferences, and other industry events attended by Endo and other generic manufacturers during the Class Period |
| HDMA | Healthcare Distribution Management Association (now the Healthcare Distribution Alliance), a trade association representing primary pharmaceutical distributors that hosted trade shows, conferences, and other industry events attended by Endo and other generic manufacturers during the Class Period |
| Heritage | Heritage Pharmaceuticals Inc., a company that produces generic pharmaceuticals |
| Impax | Impax Laboratories LLC, a company that produces generic pharmaceuticals |
| Individual Defendants | Defendants De Silva, Upadhyay, and Campanelli |
| Inflated Profits | The amount of Endo profits generated solely as a result of anticompetitive price increases as calculated through Lead Counsel's and Lead Counsel's expert's econometric and empirical analysis |
| JD Edwards | An ERP software system produced by Oracle Corporation |
| Lannett | Lannett Company, Inc., company that produces generic pharmaceuticals |
| Lead Plaintiff or Chicago Park Employees | Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago |
| Malek | Jason Malek, former President of Heritage Pharmaceuticals Inc. |
| MAPICS | Manufacturing, Accounting and Production Information Control Systems, an ERP software system developed by IBM |
| Mylan | Mylan N.V., a company that produces generic pharmaceuticals |
| NACDS | National Association of Chain Drug Stores, a trade association representing the chain community pharmacy industry that hosted trade shows, conferences, and other industry events attended by Endo and other generic manufacturers during the Class Period |
| NASDAQ | NASDAQ Global Select Market |
| NDC Code | National Drug Code, a unique three-segment product identifier for drugs required by the Food, Drug, and Cosmetic Act (21 U.S.C. § 360) |

| | |
|---|---|
| Northstar | NothstarRx LLC, a company that produces generic pharmaceuticals |
| Pack | PACK Pharmaceuticals, a company that produces generic pharmaceuticals |
| Par | Par Pharmaceutical Holdings, Inc., a generic pharmaceuticals company acquired by Endo on September 28, 2015 |
| Par Acquisition | Endo's $8.05 billion acquisition of Par Pharmaceutical Holdings Inc., which was completed on September 28, 2015 |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| Qualitest | Qualitest Pharmaceuticals, a generic pharmaceuticals company acquired by Endo on December 1, 2010 that thereafter became Endo's generic pharmaceutical business segment |
| SEC | Securities and Exchange Commission |
| De Silva | Defendant Rajiv Kanishka Liyanaarchchie De Silva, Endo's CEO and President from March 2013 to September 2016 |
| Sandoz | Sandoz International GmbH, a company that produces generic pharmaceuticals |
| SAP | An ERP software system produced by SAP SE |
| SOX | The Sarbanes-Oxley Act of 2002 |
| State AGs | The Attorneys General of 47 States who have filed suit against a number of generic pharmaceuticals companies and their executives, including Endo by virtue of naming its generics segment, Par, alleging antitrust violations arising from agreements among generic pharmaceutical manufacturers to fix the prices of, and allocate the markets for, certain generic pharmaceuticals |
| Teva | Teva Pharmaceutical Industries Ltd., a company that produces generic pharmaceuticals |
| Upadhyay | Suketu P. Upadhyay, Endo's CFO and Executive Vice President from September 2013 to November 2016 |
| Upsher-Smith | Upsher-Smith Laboratories, LLC, a company that produces generic pharmaceuticals |
| VP | Vice President |
| WAC | Wholesale Acquisition Cost, the list price of a generic manufacturer's drug for sale to a wholesaler or a direct purchaser without discounts |
| West-Ward | West-Ward Pharmaceuticals Corp., a company that produces generic pharmaceuticals |
| **Financial Periods, Reports, and Earnings Calls (chronologically)** | |
| Q1 2014 | First quarter 2014 |
| Q2 2014 | Second quarter 2014 |
| Q3 2014 | Third quarter 2014 |
| Q4 2014 | Fourth quarter 2014 |
| 2014 10-K | Endo's Annual Report on Form 10-K reporting Endo's full-year 2014 results that Endo filed with the SEC on March 2, 2015 |
| Q1 2015 | First quarter 2015 |

| | |
|---|---|
| Q1 2015 Earnings Call | The investor earnings call held by Defendants on May 11, 2015 to discuss Endo's first quarter 2015 results |
| Q1 2015 10-Q | Endo's Quarterly Report on Form 10-Q reporting Endo's first quarter 2015 results that Endo filed with the SEC on May 11, 2015 |
| Q2 2015 | Second quarter 2015 |
| Q2 2015 Earnings Call | The investor earnings call held by Defendants on August 10, 2015 to discuss Endo's second quarter 2015 results |
| Q2 2015 10-Q | Endo's Quarterly Report on Form 10-Q reporting Endo's second quarter 2015 results that Endo filed with the SEC on August 10, 2015 |
| Q3 2015 | Third quarter 2015 |
| Q3 2015 Earnings Call | The investor earnings call held by Defendants on November 5, 2015 to discuss Endo's third quarter 2015 results |
| Q3 2015 10-Q | Endo's Quarterly Report on Form 10-Q reporting Endo's third quarter 2015 results that Endo filed with the SEC on November 9, 2015 |
| Q4 2015 | Fourth quarter 2015 |
| Q4/FY 2015 Earnings Call | The investor earnings call held by Defendants on February 29, 2016 to discuss Endo's fourth quarter 2015 and full-year 2015 results |
| Q4/FY 2015 Press Release | The press release filed by Endo with the SEC on February 29, 2016 as an attachment to a Form 8-K announcing Endo's fourth quarter 2015 and full-year 2015 results |
| 2015 10-K | Endo's Annual Report Form 10-K reporting Endo's full-year 2015 results that Endo filed with the SEC on February 29, 2016 |
| Q1 2016 | First quarter 2016 |
| Q1 2016 Earnings Call | The investor earnings call held by Defendants on May 5, 2016 to discuss Endo's first quarter 2016 results |
| Q1 2016 10-Q | Endo's Quarterly Report on Form 10-Q reporting Endo's first quarter 2016 results that Endo filed with the SEC on May 6, 2016 |
| Q2 2016 | Second quarter 2016 |

| Q2 2016 Earnings Call | The investor earnings call held by Defendants on August 8, 2016 to discuss Endo's second quarter 2016 results |
|---|---|
| Q2 2016 10-Q | Endo's Quarterly Report on Form 10-Q reporting Endo's second quarter 2016 results that Endo filed with the SEC on August 9, 2016 |
| Q3 2016 | Third quarter 2016 |
| Q3 2016 Earnings Call | The investor earnings call held by Defendants on November 8, 2016 to discuss Endo's third quarter 2016 results |
| Q3 2016 10-Q | Endo's Quarterly Report on Form 10-Q reporting Endo's third quarter 2016 results that Endo filed with the SEC on November 8, 2016 |
| Q4 2016 | Fourth quarter 2016 |

Lead Plaintiff Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago ("Chicago Park Employees" or "Lead Plaintiff"), brings this action individually and on behalf of all other persons and entities who purchased or otherwise acquired the stock of Endo International PLC ("Endo" or the "Company"), between March 2, 2015 and February 27, 2017, inclusive (the "Class Period"), and were injured thereby (the "Class"). The allegations are based upon personal knowledge as to Lead Plaintiff and its own acts, and upon information and belief as to all other matters based on Lead Counsel's investigation. Lead Counsel's investigation included, among other things, a review and analysis of Endo's SEC filings, transcripts of Endo's public conference calls, press releases Endo issued, analysis of Endo's non-public generic drug pricing and sales, and interviews with former employees of Endo that Lead Counsel, and/or investigators retained by Lead Counsel, conducted.[1]

I.      **SUMMARY OF THE ACTION**

1.      Endo is among the top ten generic drug manufacturers in the world. The generics industry is designed to be highly competitive in order to drive down health care costs. By law, each generic drug must be functionally identical; thus, price is the only way to compete. The economics of a market for such commodities dictates that if one drug manufacturer raises its prices significantly above those of its competitors, that manufacturer will quickly lose market share to lower-priced rivals. From a shareholder's perspective, relying on profits from generic drug price increases is an inherently risky strategy. Profits can vanish as quickly as they appear.

2.      This securities class action arises from Defendants' false and misleading statements during the Class Period. Defendants claimed Endo was earning record profits, despite "fac[ing] intense competition," and attributed their results to sustainable business practices like

---

[1] Capitalized terms, including those not otherwise defined herein, have the meaning ascribed in the Glossary of Terms attached hereto.

corporate acquisitions and new products.  In reality, Endo and Par (which Endo acquired in September 2015) engaged in a concealed, high-risk, multi-year scheme to generate hundreds of millions in profits by deliberately not competing on price.  As detailed herein, Defendants' false statements concealed their strategy to increase and maintain drug prices by extraordinary amounts, always in tandem with Endo's so-called competitors.  For certain drugs, Defendants also ceded market share to existing manufacturers and to new entrants to avoid competition that would drive down inflated prices.  Lead Counsel's proprietary investigation and econometric analysis of Endo's non-public pricing and sales data identified at least 13 generic drugs that were the subject of the anticompetitive price increases (the "Inflated Drugs").  All told, by the end of the Class Period, Defendants generated as much as $620 million in additional profits attributed solely to this anticompetitive scheme (the "Inflated Profits").  *See* Section IV.D.

3.     Defendants' underlying conduct is now the focus of a sweeping Department of Justice ("DOJ") criminal investigation and the subject of the civil antitrust litigation brought by 47 State Attorneys General ("State AGs"), which alleges that Endo's generic segment Par, among numerous manufacturers, illegally agreed to fix prices, allocate markets, and rig bids.  As the State AGs recently informed the Hon. Cynthia Rufe, who presides over the antitrust MDL, 2:16-md-02724-CMR, theirs "could be the largest cartel case in the history of the United States." Independently, the facts that Lead Counsel's investigation assembled established that Endo illegally colluded with competitors.  *See* Section IV.E.

4.     This securities fraud case, however, does not turn on whether Defendants' anticompetitive conduct arose from criminal or illegal agreements under the antitrust laws. Instead, as alleged herein, Defendants are liable to Lead Plaintiff and the Class of shareholders because Defendants' statements concealed that a material portion of Endo's profits resulted from

extraordinary price increases, after which Defendants did not compete with their historic cut-throat rivals.  Shareholders did not know that, contrary to Defendants' false statements, Endo was in fact not competing, and the touted profits were highly at risk of vanishing if competition resumed.  As would come to pass, once Endo was the subject of a law enforcement subpoena in December 2015, Defendants' ability to sustain the scheme, let alone make more anticompetitive price increases, ceased; the once steady flow of Inflated Profits began to evaporate.

5.      Defendants were motivated to deploy the scheme because, leading into 2013, the Company was struggling, overly reliant on the sales of opioids and a handful of drugs with expiring patents, and enormously exposed to product liability litigation.  Endo's share price hovered near $30.  Defendant De Silva was named CEO in February 2013 with the mission to turn around the Company.  He immediately announced his strategy to grow Endo by acquiring other generic manufacturers and to ultimately seek a "transformative" deal that would dramatically increase Endo's size and revenues.

6.      What De Silva concealed, however, was that to boost Endo's profits and share price, he launched a scheme to deliberately increase generic drug prices to generate material profits.  Quarter after quarter, the anticompetitive scheme delivered ever-increasing profits, inflating Endo's share price.  By the end of 2015, the Inflated Drugs were generating roughly *one-third* of the generic segment's Adjusted Income, as determined by Lead Counsel's proprietary investigation and econometric analysis.

7.      Defendants knew they had to conceal even the suggestion that they were not competing with peers.  By 2014, public concern was starting to brew over excessive prescription drug prices.  In reaction to news reports in the summer of 2014, the Connecticut Attorney General initiated its investigation into why drug prices were rising.  By October 2014, Congress

sent letters to certain manufacturers, including Endo, asking them to explain the leap in prices; Endo never responded. In November 2014, the DOJ opened its criminal grand jury investigation in the Eastern District of Pennsylvania.

8. The Class Period begins on March 2, 2015 with the reporting of Endo's year-end 2014 financial results. Defendants fraudulently asserted that Endo "face[d] intense competition" from generics manufacturers, namely "Actavis, Teva, Mylan Technologies Inc., and Sandoz, Inc." They also reported that Endo's record profits were attributable to sustainable sources like new product launches. These statements were false. As specifically alleged in Section IV.D., Defendants' scheme required that Endo deliberately not compete with its purported competitors.

9. Lead Counsel's investigation also confirmed that Defendants made their false statements with fraudulent scienter. De Silva personally asked for and reviewed lists of opportunities for increasing generic drug prices and personally approved each price increase. In addition, De Silva and CFO Upadhyay tracked the profits from the price increases through detailed monthly reports that identified the pricing, sales, and revenues for each of Endo's products on a drug-by-drug basis. Defendants specifically asked for and received a spreadsheet that reflected any variance in price over 25%, whether an increase or decrease. The report also required "comments" explaining the reasons for each change. This spreadsheet was marked in red to allow Defendants to track the variances more easily. At least monthly, De Silva held pre-arranged conference calls with the finance personnel in Endo's generics segmet, during which he thoroughly reviewed profits and losses, often referring to drug-specific pricing and revenue data. Once Defendant Campanelli joined Endo in 2015 as head of the generics segment following the Par acquisition, he personally reviewed and approved not only every increase, but also every

decrease.  He, like De Silva and Upadhyay, received the monthly reports and participated in the conference calls to discuss generic drug pricing and profits.

10.     Despite their personal knowledge of the price increases and the Inflated Profits, Defendants fraudulently claimed that "we are ***not relying on price increases*** for our strategic plan."  Defendants further falsely claimed that the price increases occurred only when the market's "supply-demand situation" dictated and that, at most, the increases were "short-lived." Contrary to this, Lead Counsel's analysis confirms that none of the 13 Inflated Drugs were subject to supply or demand issues, shortages, or market disruptions.  Tellingly, each increase was sustained over time.  In truth, at the start of the Class Period, Defendants had already earned 30% of their generics profits from the Inflated Drugs, only to earn hundreds of millions more in 2015, as the table below illustrates.

| Table 1: Inflated Profits Versus Adjusted Generics Income ($ millions) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | FY 2014 | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 | FY 2015 | Total |
| Inflated Profit | $141 | $49 | $52 | $71 | $64 | $235 | $376 |
| Adjusted Generics Income | $464 | $183 | $146 | $178 | $234 | $742 | $1,205 |
| Percentage | 30% | 27% | 36% | 40% | 27% | 32% | 31% |

11.     These Inflated Profits drove Endo's share price to an all-time high above $90 by the spring of 2015.  With the inflated stock as "currency" in hand, in May 2015 De Silva was able to finally announce his "transformational" deal: the $8 billion acquisition of Par.  But Endo only had $375 million of cash on hand.  Accordingly, Defendants could not pay for Par without using $3.6 billion worth of inflated Endo shares, and $4.2 billion in debt.  To keep the Inflated Profits flowing – and the share price inflated – simultaneous with the deal's announcement, Defendants made three more undisclosed price increases.  The scheme's Inflated Profits peaked as the deal closed on September 28, 2015.  Chart at ¶ 85.

5

12.     Defendants' statement about the acquisition, however, concealed that Par was engaged in the same type of unsustainable and risky price increases as Endo.  Since 2013, Par and its then-CEO, Campanelli, had also conducted price increases in tandem with its competitors regarding at least three drugs, which had contributed as much as $124 million of Inflated Profits to Par's bottom line before the acquisition.  Those increases generated an additional $72 million to Endo's Inflated Profits once the companies were merged.  Campanelli, who became CEO of Endo's generics business after the acquisition, was paid nearly $70 million as a result of the deal.

13.     Despite Defendants' efforts to conceal their anticompetitive scheme, the end was near.  In December 2015, the Company was served with a subpoena and interrogatories from the Connecticut Attorney General (the "CT AG Subpoena").  Though Defendants would conceal this very fact until May 2016, the CT AG Subpoena marked the beginning of the end for Defendants' scheme.  It also meant that the earlier anticompetitive hikes would come under increasing pricing pressure as Endo could no longer stifle competition as law enforcement had begun probing.  As the scheme fell apart, on September 23, 2016, De Silva was terminated and, on October 21, 2016, CFO Upadhyay was also ousted.

14.     On November 3, 2016, shareholders first learned that Endo was implicated in anticompetitive conduct.  In an article that *Bloomberg* published, Endo was identified among the companies that both the DOJ and the Connecticut Attorney General ("CT AG" / "Connecticut AG") were targeting in a fresh challenge to the generics industry over suspected price fixing and market allocation.  Endo remains a target; the State Attorneys General named Endo (through its generics division, Par) in their Amended Complaint.  The DOJ intervened in the MDL civil antitrust suits against Endo, stating that there are "significant overlaps between [DOJ's] criminal investigation" and Endo's misconduct alleged in those civil actions.

15.     Without the anticompetitive scheme, Endo's profits dried up, crushing the entire generics segment's value.  The day after the Class Period closed on February 28, 2017, Defendants announced fourth quarter and year-end 2016 results and, on March 1, 2017, Endo filed its year-end 2016 financial statements, announcing a $3.5 billion charge against earnings, with $2.85 billion tied specifically to the permanent impairment of Endo's generics business to reflect its true value.  Endo's shares fell in reaction, closing at $12.82.

16.     For the reasons set forth herein, this securities fraud class action seeks to recover for shareholders the damage Defendants inflicted through their deception.

## II.     JURISDICTION AND VENUE

17.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and the rules and regulations promulgated thereunder, including SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) ("Rule 10b-5").

18.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), and under 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States.

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1391(b) because Defendant Endo conducts business in this District and also maintains its administrative headquarters in this District.

20.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone and electronic communications, and the facilities of a national securities exchange.

### III.    PARTIES

#### A.    Lead Plaintiff

21.    Created in 1919 by an act of the Illinois State Legislature, Chicago Park Employees is a single-employer, defined benefit public pension plan covering the eligible public employees of the Chicago Park District, who are employed in the City of Chicago's parks, recreation and event facilities, beaches, museums, and public gardens.  Chicago Park Employees is an institutional investor and experienced fiduciary, with approximately $365 million in assets under management as of June 30, 2018.

#### B.    Defendants

22.    Defendant Endo develops, manufactures, markets, and distributes pharmaceutical products and generic drugs primarily in the U.S. and Canada.  Endo was founded in 1997 when it acquired certain pharmaceutical products, related rights, and assets from The DuPont Merck Pharmaceutical Company.  To avoid paying U.S. taxes, the Company reincorporated in Ireland in 2014, and is technically headquartered in Dublin, Ireland.  Its U.S. headquarters are located at 1400 Atwater Drive, Malvern, Pennsylvania.  Endo's stock trades on the NASDAQ Global Select Market ("NASDAQ") in the U.S. under the ticker symbol "ENDP."

23.    In December 2010, Endo acquired Qualitest Pharmaceuticals ("Qualitest"), which became Endo's generics division.  On September 28, 2015, Endo acquired Par Pharmaceutical Holdings, Inc. ("Par") (the "Par Acquisition").  In 2016, Endo was the eighth largest generic manufacturer by revenue.

24.    Defendant Rajiv Kanishka Liyanaarchchie De Silva ("De Silva") served as Endo's CEO and President between March 2013 and September 2016.  De Silva signed and certified Endo's allegedly false and misleading reports on Forms 10-K and 10-Q filed with the SEC during the Class Period, until his tenure at the Company ended.  De Silva also made false

and misleading statements on numerous conference calls with investors and analysts, as alleged specifically herein.

25.     Defendant Suketu P. Upadhyay ("Upadhyay") served as Endo's Chief Financial Officer and Executive Vice President from September 23, 2013 to November 22, 2016. Upadhyay signed and certified Endo's allegedly false and misleading reports on Forms 10-K and 10-Q filed with the SEC during the Class Period, until his tenure at the Company ended. Upadhyay also made false and misleading statements on conference calls with investors and analysts, as alleged specifically herein.

26.     Defendant Paul V. Campanelli ("Campanelli"), prior to Endo's acquisition of Par, served as CEO of Par from September 2012 until September 2015.  Upon joining Endo, Campanelli served as the President of Endo's generics division, then named Par, from September 2015 until his promotion to CEO of Endo in September 2016.

27.     As the President of Endo's generics segment, Campanelli possessed the power and authority to, and in fact did approve and control the contents of the relevant Company SEC filings alleged herein to be false and misleading.  After becoming CEO of Endo, Campanelli signed and certified Endo's allegedly false and misleading reports on Forms 10-Q filed with the SEC until the end of the Class Period.  Campanelli also made false and misleading statements on numerous conference calls with investors and analysts, as alleged specifically herein.

28.     Defendants De Silva, Upadhyay and Campanelli are sometimes collectively referred to herein as the "Individual Defendants."

## IV.   SUBSTANTIVE SECURITIES FRAUD ALLEGATIONS

29.     The allegations herein are based on Lead Counsel's investigation, which included interviews with numerous former employees of Endo conducted by attorneys and/or investigators retained by Lead Counsel.  Several former Endo employees have provided

information demonstrating that Defendants' Class Period statements were false and misleading and that Defendants knew or recklessly disregarded the false or misleading nature of the statements.  The former employees identified herein provided information on a confidential basis and are specifically described in Section IV.C. by job description and responsibility, and duration of employment, thereby providing sufficient details to establish their reliability and personal knowledge  (the "Confidential Witnesses" or "CWs")  Allegations attributed to a particular Former Employee are designated as such by reference to their "CW-__" designation or job description.

      **A.**     **Pre-Class Period Allegations**

           **1.**     **Pre-2013, Endo's Share Price Suffers,**
                   **De Silva Joins As CEO And Announces**
                   **Growth-By-Acquisition Strategy**

30.     Prior to 2013, Endo's overall business was stagnating, and its outlook was weak. Endo's branded pharmaceutical business, its flagship unit and primary source of income at the time, was heavily reliant on only a few products, several of which were approaching the end of their patents and would soon be subject to competition from generic manufacturers.  Endo also faced significant exposure to product liability litigation from the Company's medical devices business.

31.     And most importantly, Endo's generic division, acquired in 2010, was  stagnating due to price competition.  Indeed, because generic drugs are required by federal law to be completely substitutable, the only means by which manufacturers can compete is on price. Historically, the generics markets had been hotly competitive, with Endo's customers soliciting competitive bids for the lowest price, and manufacturers working to underbid their rivals to gain market share.

32.     Against this backdrop, in February 2013, De Silva stepped in as Endo's President and CEO with the mandate to turn the Company around.  From the outset, De Silva focused on growing revenues through "acquisition opportunities," the same growth strategy he deployed at his prior firm, Valeant, then a high-flying branded drug manufacturer.  In particular, De Silva was on the lookout for "larger, more transformative deals" that could dramatically increase Endo's size and revenues.  By June 2013, De Silva was emphasizing that, because Endo's generics business had "been a key growth driver," acquiring companies in the generics business "would be the most logical place for us to look."

33.     Endo, however, had limited cash on hand to accomplish transactions, let alone a transformative deal.  De Silva needed to use Endo's shares as "currency," but Endo's stock price had been languishing at near $30 per share before he took over.  To begin, De Silva explained that Endo would start by undertaking smaller transactions, effectively buying revenues that would boost the stock price.  By January 2015, the Company had made five acquisitions, mostly of generic drug manufacturers, for a total of $7.1 billion, nearly all of which was paid for either in stock or cash raised from the sale of securities to investors.  These deals would soon be credited as increasing Endo's revenues, helping to push Endo's stock price up to over $70 by the end of 2014.

**2.     Defendants Concealed That De Silva**
**Implemented An Anticompetitive**
**Price Increase Scheme**

34.     Though they touted the acquisition strategy, Defendants concealed from investors that, upon his arrival, De Silva implemented another strategy.  The concealed strategy was his scheme to make extraordinarily large, anticompetitive price increases and to concede market share for specific generic drugs, rather than compete with Endo's peers.  Endo had never previously engaged in such practices.  As detailed in Section IV.D., contrary to how generics

11

markets are supposed to work, Endo raised prices drastically – always by more than 60% and by as much as 250%.  This scheme delivered hundreds of millions in Inflated Profits to Endo's bottom line.

35.     From the outset, De Silva took over responsibility for Endo's generics division, then known as Qualitest.  He reorganized the reporting structure and had the two most senior Qualitest executives, Vice Presidents Trey Propst and Michael Reiney, report directly to him. (CW-1).  Under De Silva, Endo controlled Qualitest's pricing and sales systems and processes. (CW-2).

36.     De Silva demanded regular reviews of Qualitest's drugs to identify opportunities for price increases.  (CW-5).  Reiney and Propst therefore regularly provided De Silva with lists of generics drugs that presented opportunities for price hikes, as well as analysis for why a price increase was feasible; the three of them consulted and decided which increases to implement. (CW-5).  De Silva and CFO Upadhyay received documents on a monthly basis that identified any large price increases, and reflected the significant revenues that those price increases generated.  (CW-2).

37.     In 2013, De Silva implemented anticompetitive price increases on at least two drugs (Oxybutynin and Prednisone).  As detailed in Section IV.E., each of these price increases shared the same characteristics: they involved well-established generic drugs with a long, steady history of low pricing; each of the major manufacturers of the drugs increased their price to near the same level; and each price increase, defying competitive dynamics, persisted indefinitely as no manufacturer sought to undercut another's price.  Tellingly, the drugs were not subject to any market shortages or supply constraints.

38.     De Silva continued the anticompetitive strategy in 2014, directing additional price increases on Baclofen and Amitriptyline.  Like the 2013 increases, these followed the same pattern, moving in lock-step with peers to the same price, and without any shortage.  *See* Section IV.D.

39.     Adding to the profits, as part of De Silva's acquisition strategy, in August 2014 Endo purchased generic drug maker DAVA, which also secretly engaged in the same type of anticompetitive price increases on its leading drug Methotrexate, which generated 70% of DAVA's revenues, and on Doxazosin, a drug for which DAVA had just recently entered the market, and for which Endo had high hopes.  De Silva acknowledged that he was intimately familiar with Methotrexate's market dynamic, competitive landscape, and market environment in response to a Goldman Sachs analyst during a July 31, 2014 investor earnings call.  After Endo purchased DAVA, Defendants sustained these anticompetitive prices, again choosing not to compete for market share by lowering price.  *See* Section IV.D.2.

### 3.     Defendants Personally Tracked The Anticompetitive Price Increases Through Frequent Reports And Conference Calls

40.     Defendants De Silva, CFO Upadhyay, and later Campanelli (after joining as CEO of Endo's generics segment in September 2015) tracked the price increases with precision and frequency.  They received reports at least monthly and hosted internal telephone conferences to discuss price increases and track profits, among other matters.  (CW-2).

41.     The information Defendants reviewed came from Endo's enterprise resource planning system ("ERP").  (CW-2).  Once De Silva, Propst, and Reiney decided on making a price increase (CW-5), Propst and Reiney dictated the increase to the Qualitest generics pricing team, which then recorded it in the Company's ERP systems.  (CW-6).

13

42.     At least monthly, Qualitest's Vice President of Finance Philip Cupero, and later Patrick Raimer, who replaced Cupero on an interim basis in late 2015, collected financial data from the ERP system concerning pricing, sales, revenue, and profit data on a drug-by-drug basis down to the unit-price level.  (CW-2).  Cupero and Raimer used this data to populate a large Excel file that included various spreadsheets with Endo's entire pricing and sales history for each drug.  (CW-2).  The data also included pricing information for drugs that Endo acquired, including the two DAVA drugs subject to anticompetitive price increases.  (CW-2).

43.     Cupero and Raimer delivered this spreadsheet to De Silva, Upadhyay, Propst, and Reiney, among others.  (CW-2).  De Silva and Upadhyay specifically requested that the Excel file contain a spreadsheet that identified all price increases or decreases greater than 25% for the current month, as well as historically.  (CW-2).  The tab for this spreadsheet was marked red for Defendants' ease of reference in the Excel file.  (CW-2).  This spreadsheet also included a column that required "comments" explaining the reasons for each price increase or price decrease of 25% or more, for De Silva and Upadhyay to review.  (CW-2).  These Excel spreadsheets were circulated on a monthly and quarterly basis throughout at least 2014 through 2016.  (CW-2).  Once Campanelli arrived at Endo in September 2015, he also received the Excel file that Cupero and Raimer created.  (CW-2).  After receiving the spreadsheets, the recipients, including De Silva, Campanelli, and  Upadhyay discussed their contents in prescheduled meetings.  (CW-2).

44.     Likewise, De Silva also received monthly profit and loss ("P&L") statements that provided revenues by product line. Substantial portions of that revenue consisted of revenues from the anticompetitive price increases.  (CW-3).  De Silva then held pre-scheduled monthly internal conference calls with Endo's finance personnel to discuss the P&L statements.  (CW-3).

14

De Silva and Cupero participated in these conference calls.  After Endo acquired Par in September 2015, Campanelli also participated.  (CW-3).  During the calls, De Silva asked questions concerning specific products, and readily referenced detailed drug-by-drug pricing information from the ERP system, to which he had access.  (CW-3).

### 4.  Defendants Face Growing Public And Law Enforcement Attention To Generic Price Increases

45.     Defendants knew they had to conceal even the perception that they were undertaking these anticompetitive price hikes.  Even if not illegal, public concern started to brew over seemingly inexplicable and excessive prescription drug price increases in 2014, particularly increases to branded and specialty pharmaceuticals.

46.     In April 2014, Bloomberg reported that prices of branded drugs had surged in recent years and were "defying the law of gravity."  By July 2014, members of the Senate Finance Committee requested information from Gilead Sciences, Inc. in connection with that company's staggering pricing of the branded hepatitis C drug Sovaldi.

47.     During the summer of 2014, the Connecticut Attorney General ("AG") also initiated a non-public investigation seeking information concerning pricing for Digoxin, a generic heart drug, and soon issued subpoenas, but not to Endo.  Because Congress could not ascertain the underlying grounds for generic price changes, it commissioned the Government Accountability Office to undertake a multi-year study to determine the breadth and impact of "extraordinary" generic drug price increases.  In November 2014, the DOJ opened a grand jury investigation in the Eastern District of Pennsylvania, and issued subpoenas to Lannett, Impax, and Par (which Endo later acquired in 2015), seeking communications with competitors regarding generic drugs and information regarding the pricing of certain products.  Also that month, the Congressional oversight committees sent letters to certain manufacturers, including

Endo, asking for an explanation for price increases on specific drugs.  Endo never responded.  In

December 2014, the DOJ served Par with a subpoena also concerning Digoxin and another

generic drug.

48.     With this backdrop, when Wall Street analysts asked about the significance of

price increases to Endo's bottom line, Defendants deliberately minimized the impact.  For

example, during an investor earnings call held on July 31, 2014, shortly after the Connecticut AG

served subpoenas on Endo's peers, De Silva explained, in response to a question regarding the

generic pricing environment, that Endo only made price increases under "certain specific

situations and market opportunities," and to the extent they happen, the increases "are sometimes

short-lived."

49.     Similarly, on November 5, 2014, during Endo's next earnings call and soon after

Endo received the letter from Congress, in responding to a question regarding Endo's outlook on

generic pricing for 2015, De Silva told investors, "[W]e are ***not relying on price increases*** for

our strategic plan…. [W]e expect the bulk of [our growth] to come from volume and mix as we

launch our new [drug applications] and ***not by net price***."

**B.      The Class Period Begins: Defendants Fraudulently
         Conceal Anticompetitive Price Increase Scheme
         and Inflated Profits**

       **1.      Year-End 2014 Results Announced, Defendants
         Fraudulently Emphasize Competition And
         Sustainable Sources Of Earnings**

50.     The Class Period begins on March 2, 2015 when Defendants made their first

actionable misstatements in Endo's 2014 Annual Report on Form 10-K.  Specifically,

Defendants emphasized the competitive nature of the generic drug market, stating that Endo

"face[d] intense competition from other generic drug manufacturers," and listing "Actavis, Teva,

Mylan Technologies Inc., and Sandoz, Inc." as Endo's "competitors."  They explained that

"[g]eneric competition is one of the Company's leading challenges."  Despite this supposed

competition, Endo announced remarkable growth in generics, with Adjusted Income from the

generics business increasing 140% to $464 million, compared to 2013.  Defendants attributed

this success to acquired revenues and other sustainable causes like the launch of a new drug

Lidoderm.

      51.     As illustrated in Section IV.D., far from facing "intense competition," or

competing with the likes of Actavis, Teva, Mylan, and Sandoz, Endo's success was due to not

competing with them on price or market share.  In fact, by then Teva, Mylan, Sandoz or Actavis

had each made an anticompetitive price increase in tandem with Endo in at least one of the

Inflated Drugs to date.   Defendants further concealed that Endo had generated as much as $141

million, 30% of Endo's generics profits, from their anticompetitive strategy in 2014 alone.

### 2. Defendants Respond To Investors' Concerns About Price Increases With Deception

      52.     Shareholders and Wall Street analysts had no way to determine if – or how – price

increases were impacting Endo's business, except to ask Defendants.  When they did, however,

Defendants responded with lies and half-truths.  Indeed, analysts would come to refer to Endo's

generic segment as "a black hole" (Jan. 6, 2015 Goldman Sachs Healthcare Conference); a

characterization Defendants never sought to correct.

      53.     When Wall Street analysts pressed for some transparency regarding Endo's price

increases, Defendants refused to respond.  For instance, during the May 11, 2015 investor

earnings call announcing Q1 2015 results, a UBS analyst asked De Silva for specifics regarding

potential price increases; De Silva retorted: "We are not going to talk about which ones they

are."  To the extent De Silva acknowledged any price increases occurred, he explained that due

to contract terms, any profits would be pushed off until "late 2015 and into 2016," and thus should be of little interest to investors.

54.     In connection with that May 11, 2015 call, Endo also released stellar financial results, including $183 million of Adjusted Income from generics for the first quarter.  What they concealed was that $49 million, or 27%, was generated from the seven anticompetitive price increases Defendants then had in place.

55.     With investors in the dark about Defendants' anticompetitive strategy, the record-breaking profits continued to inflate Endo's share price, which quickly exceeded $90 by April 2015.  Now, with this inflated "currency" in hand, Defendants continued to deceive investors as they moved toward a transformative acquisition.

### 3.     Defendants Announce The Par Acquisition

56.     De Silva closed in on his goal of making a transformative acquisition.  Analysts accurately predicted that the "potential for more transformational deals [is] on the table."  (RBC, Mar. 3, 2015.)  They would not have to wait.  Days after the report of exceptional Q1 2015 results, Defendants announced on May 18, 2015 that Endo had entered into a definitive agreement to acquire Par, a privately-held pharmaceutical company specializing in generic drugs in a transaction valued at $8.05 billion.

57.     The purchase price was steep; it amounted to nearly 30 times Endo's generics average Adjusted Income over the past three years.  With only approximately $375 million in cash on hand as of the end of Q1 2015, Endo could only pay for Par using $3.6 billion of its shares – $1.3 billion in shares paid to Par's shareholders and $2.3 billion raised by a secondary share offering – along with various other financing arrangements.  The acquisition increased Endo's overall debt by roughly $4.2 billion, to $8.7 billion.

58.      Nonetheless, Defendants claimed that the deal would place Endo among the top

five generics manufacturers, and would grow the Company's "enterprise value" by 40% to

$28 billion, with annual revenues growing from $2.9 billion to more than $4 billion.  As part of

the deal, Par's CEO, Defendant Campanelli, joined Endo to lead its newly expanded generics

business, which was expected to more than double its 2014 revenues.  Campanelli also was paid

nearly $70 million in consideration from Endo's acquisition of Par.

> **4.      Defendants Make Three Additional Price Increases
> To Sustain The Inflated Share Price Before Closing
> The Par Acquisition**

59.      In order to execute the transaction, Defendants had to ensure that Endo's stock

price remained inflated.  To that end, Defendants made three more anticompetitive price

increases in Q2 2015, specifically on Butalbital, Phenobarbital, and Propranolol.

60.      Contemporaneously, Defendants continued to conceal the scheme.  While

Defendants again acknowledged an occasional price increase, in connection with announcing

Endo's stellar Q2 2015 results, they made specific false claims that any increase was driven by

"the competitive set and the ***supply-demand situation*** in the market at any given time."

(De Silva, Aug. 10, 2015).  None of the three drugs hiked in the second quarter suffered from

market shortages.  Defendants also falsely minimized any perceived impact, stating that they

"don't count on pricing very much because we do expect that pricing will continue to be spotty."

(De Silva, Aug. 10, 2015).  Like the other anticompetitive price increases, these had an

immediate impact on Endo's bottom line.

61.      With Endo's share price buoyed by Defendants' final drug price hikes, on

September 28, 2015, Endo announced the close of the Par Acquisition.  Analysts remained

impressed and confident in the future of Endo's generic segment; for instance, J.P. Morgan

wrote, "We see Endo's generics business driving sustained double-digit top-line growth."

### 5.   Defendants Concealed That Campanelli And Par Also Made Anticompetitive Price Increases

62.   Defendants further concealed that Par had also implemented anticompetitive price increases in lock-step with competitors.  During Campanelli's tenure at Par, that company had implemented at least three anticompetitive generic drug price increases with competitors, of as much as 600%, as detailed in Section IV.D.

63.   Specifically, in March 2013, Par raised its price of Isosorbide 600%, to match Sandoz's price increase from several months prior.  In the summer of 2013, Par raised its price on Cholestyramine, again in lock-step with Sandoz.  In January 2014, Par set its price for Digoxin to match the price increases by Lannett and Impax during the fall of 2013.

64.   Importantly, when Campanelli joined Endo and took over its newly expanded generics segment, he implemented the same business model that he followed at Par: Campanelli approved *all* of Endo's pricing changes, whether up or down.  (CW-5)  After taking the helm at Endo, Campanelli maintained the inflated prices, choosing not to compete on price for market share.  *See* Section IV.D.

### 6.   Third Quarter 2015, Inflated Profits Peak

65.   With Endo's ten and Par's three anticompetitive price increases now contributing to Endo's bottom line, the scheme's Inflated Profit hit an all-time peak in Q3 2015 (illustrated at ¶ 10).  Specifically, on November 5, 2015, Defendants announced Q3 results including adjusted income of $178 million from the combined generics business.  They concealed that as much as $71 million, or 40%, was attributable to the scheme.

66.   Instead, Defendants fraudulently reiterated that Endo had "not been dependent on pricing," as such price increases "don't last very long." (De Silva, Nov. 5, 2015).  The reality was quite different; from the start of the Class Period through the Q3 2015, Defendants had

reaped as much as $360 million in Inflated Profit from their concealed anticompetitive scheme, accounting for nearly one-third of Endo's Adjusted Income reported in that period.

### 7. December 2015: Connecticut AG Serves Subpoena, Which Defendants Do Not Disclose

67.     Going into Q4 2015, Endo's generics segment was continuing its banner year, generating more revenue than at any other time in Endo's history.  In December, however, Defendants suddenly found themselves ensnared in the government investigations.  Specifically, the CT AG Subpoena was served on Endo, requesting information regarding the pricing and market allocation matters.

68.     Though Defendants did not disclose the CT AG Subpoena for *five* months, its receipt sounded the death knell for Defendants' anticompetitive scheme.  With law enforcement seeking information, Defendants could not – and did not – implement any new price increases. Moreover, with law enforcement probing Endo and many of its peers, the anticompetitive price increases that Defendants had implemented began to unravel as competition resumed.

### 8. First Half 2016: Endo's Financial Performance Starts To Suffer, Defendants Conceal History Of Anticompetitive Practices

69.     On February 29, 2016, Defendants announced fourth quarter 2015 earnings, filing Endo's 2015 Annual Report on Form 10-K.  Specifically, Defendants announced that Endo's Adjusted Income from generics was $741.8 million, an increase of 60% mainly attributed to the Par Acquisition.  What Defendants did not disclose was that $210 million of Endo's generics segment profit in 2015 was generated from Endo's anticompetitive price increases strategy and another $24 million was from Par's participation in the scheme.

70.     Notably, for the first time, Defendants warned investors that Endo "may" face pricing pressure, but claimed the risk was "due to social or political pressure" and "increased

21

public and governmental scrutiny of the cost of drugs." They explained specifically that "U.S. federal prosecutors recently issued subpoenas to *a pharmaceutical company* seeking information about its drug pricing practices, among other issues, and members of the U.S. Congress have sought information *from certain pharmaceutical companies* relating to post-acquisition drug-price increases."

71.     This supposed risk warning concerning "certain" other companies was, at best, a fraudulent half-truth. By this point, Defendants had had the CT AG Subpoena in hand for at least two months, but had not publicly disclosed it. Moreover, Endo already faced "pricing pressure" because, with the ongoing investigations, they could no longer make new anticompetitive price hikes, and it was increasingly difficult to maintain the 13 already made. What Defendants purportedly warned about was already a reality.

72.     Instead, Defendants attributed "increasing pricing pressure" on Endo's legacy generic products to normal market factors like "increased competition" and a "mild cold and flu season." (De Silva, Feb. 29, 2016). Defendants further downplayed any future impact from pricing pressure, stating they were "prepared for [it]. It's part of our 2016 forecast" (Campanelli, Feb. 29, 2016). De Silva added, Defendants "still see very strong generics growth."

73.     Securities analysts, unaware of the existence of Defendants' anticompetitive strategy, let alone its abrupt termination, were mollified by Defendants' statements. For example, in a February 29, 2016 report, Cowen and Company concluded "generic pricing [is] (not a concern of ours) …." Likewise, J.P. Morgan wrote, "[W]e see continued growth for Endo's generic business despite 4Q headwinds."

74.     On May 6, 2016, Defendants finally disclosed the CT AG Subpoena for the first time. The day before, Endo announced disappointing financial results for its generics business

22

for Q1 2016.  Defendants explained that price "erosion [was] significantly deeper than we expected … driven by continued pricing and competitive pressures" on Endo's legacy generic drug portfolio.

75.     Defendants, however, continued to mislead investors, providing false explanations for the generics results.  In an attempt to explain away Endo's turn for the worse, Defendant Campanelli launched into a prepared list of five reasons (including three sub-parts), pointing to seemingly normal market factors like "competitors are taking aggressive pricing actions to gain market share," and "delays in expected FDA actions."  De Silva echoed the themes.  Of course, Defendants failed to acknowledge that they had engaged in anticompetitive practices.  Defendants knew that any new anticompetitive price increases were not feasible and the existing price hikes were coming under pricing pressure.  In other words, pricing pressure was not a result of normal market competitive forces, but rather the result of the unraveling of Defendants' ability to continue the scheme.

76.     For Q2 2016, Defendants continued to mislead investors concerning Endo's poor results.  On August 8, 2016, Endo announced its Q2 2016 financials, with lackluster U.S. generics revenues of $565 million, primarily attributable to "the acquisition of Par."  Sales on its legacy products declined by approximately 5% overall compared to Q1 2016.

77.     Defendants continued to misleadingly attribute these declines in generic revenue to normal and fully-anticipated market dynamics, while concealing their inability to make additional anticompetitive price increases or sustain the Inflated Profits from the 13 Inflated Drugs.  For example, in the Q2 2016 conference call with analysts, Campanelli explained that the pricing pressure the Company was experiencing was "***driven by consortium pricing pressures and competitive generic entrants***."

78.     Analysts were misled and continued to credit Defendants' explanations.  For example, Piper Jaffray noted "Sales for the base generics business declined by around 5% in 2Q16 versus 1Q16, due to continued pricing pressure and competition (as ENDP had cited previously)."  J.P. Morgan noted that "while management expects continued pricing pressure from purchasing consortiums over time, Endo's assumption of ~5% sequential erosion for the base business … through 2016 and ~10% annual erosion for the base business in 2017+ remains unchanged."

79.     This purported stabilization of Endo's generics business segment was a façade.  In reality, because Defendants were no longer able to implement anticompetitive price hikes or sustain profits from the thirteen Inflated Drugs, Endo's financial condition was materially deteriorating.

> **9.     The Truth Leaks Out: Executive Resignations;
> Endo Becomes A Law Enforcement Target And Is
> Forced To Take A $2.85 Billion Permanent Writedown**

80.     With Endo's anticompetitive business strategy evaporating, its primary architects were forced out.  On September 22, 2016, Endo unexpectedly and without any stated reason announced that, effective immediately, De Silva had stepped down as CEO of the Company.  Campanelli replaced him, and became a member of Endo's Board of Directors.  On October 21, 2016, Endo announced that CFO Upadhyay was out effective November 22, 2016.

81.     Only two weeks after De Silva's termination, on November 3, 2016, the market first began to learn that Defendants were embroiled in allegations of anticompetitive, if not illegal, practices; Defendants had become fresh targets of potential criminal and civil charges involving antitrust violations.  That day, *Bloomberg* published an article, which specifically referenced Endo, titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year End," concerning the DOJ's two-year long investigation into the prescription drug industry arising out

of apparent increases in drug pricing.  The article, citing sources familiar with the matter, explained that "U.S. prosecutors are bearing down on generic pharmaceutical companies," that the investigation "now spans more than a dozen companies and about two dozen drugs," and that "the first charges could emerge by the end of the year."  The article also stated that the Connecticut AG, pursuant to its investigation, was seeking to lead a group of states in a civil antitrust enforcement action to recover damages arising from price-fixing and collusive conduct.

82.     Shareholders reacted harshly, driving Endo shares down immediately upon release of this article.  Between the opening and closing of trading on November 3, 2016, the price of Endo stock plummeted $3.61 or 19.8%, to close at $14.63 per share on heavy trading volume.

83.     Only five days later, on November 8, 2016 and in connection with the Company's Q3 2016 financial results, Endo reported that revenues from its legacy generics business were down a staggering 20% compared to Q2 2016.  Nonetheless, despite the recent revelation that Endo was a target of criminal and civil antitrust investigations, Defendants again continued to falsely attribute the deterioration in Endo's generic revenues to pricing pressure due to normal market dynamics like "higher than anticipated pressure from the consortiums" and "the impact of new competition." (Campanelli, Nov. 8. 2016).

84.     On February 28, 2017, before the start of trading, Endo announced its financial results for Q4 and full-year 2016 in a Form 8-K dated that day.  The following day, March 1, 2017, Endo filed its 2016 Annual Report on Form 10-K dated that day.  Endo disclosed that it had taken a massive $3.2 billion impairment charge in Q4 2016, $2.85 billion of which was associated with a 40% write-down of goodwill and intangible assets primarily related to the Company's generic segment and dramatically lowered financial guidance.

85.     As the figure below illustrates, by the end of 2015, Endo's Inflated Profits from

Defendants' anticompetitive practices had collapsed.  The precipitous decline began in Q4 2015, upon the receipt of the CT AG Subpoena.  The trend only accelerated into 2016.  By year-end 2016, quarterly Inflated Profits were 42% below the peak.



86.     Defendants had to face the reality that now that Endo was a target of law enforcement, and that the Inflated Profits were never coming back.  The impairment charges were a recognition of that fact.  Without the ability to make these anticompetitive price hikes for over a year, Endo's U.S. generic sales imploded, and the size of its business shrunk materially, jeopardizing the Company's immediate future.

87.     Following the release of this news, the price of Endo ordinary shares fell. Between the close of trading on February 27, 2017 and the close of trading on March 1, 2017, the share price fell $.47 or 3.5%, to close at $12.82 on heavy trading volume.

**C.     Summary Of Confidential Witness Allegations**

88.     Several former Endo employees provided information on a confidential basis establishing that the statements Defendants made as alleged herein materially misstated and

omitted the truth, and further supporting a strong inference that the Defendants made these

misstatements and omissions with scienter.  The confidential witnesses ("CWs") identified

herein include individuals formerly employed at Endo's generics division, known as Qualitest,

before Endo's acquisition of Par.  The witnesses are described by job description, their respective

responsibilities, and tenure, thereby providing sufficient detail to establish their reliability and

personal knowledge.

89.    **CW-1 – Inside Sales Representative**:  CW-1 worked at Endo's generics segment

Qualitest from July 2012 to October 2015 as an Inside Sales Representative.  CW-1 serviced

Qualitest's customers located in the Southeast, including retail and larger long-term care

pharmacies.  CW-1 reported to three inside sales managers.  CW-1 provided the following

relevant information:

(a) When De Silva became CEO, Endo effectively took over the management of
Qualitest.  Endo established control of Qualitest's inventory management and
pricing systems and processes, and began raising the prices on Qualitest's
generic drugs.  Qualitest's inside sales representatives believed that De Silva
directed the price increases at Qualitest.  De Silva personally oversaw
management at Qualitest, including its most senior management, Vice
Presidents Propst and Reiney.

(b) The sales managers at Qualitest would inform the inside sales representatives
of price increases during meetings.  Often, Endo raised prices on older generic
drugs.  Once the prices for those older generic drugs were raised, the price
never dropped back down to their original level prior to the increase.

(c) After De Silva took control over Qualitest, it was common for Endo to
deliberately constrain the supply of Qualitest's generic drugs by ordering that
a product be "locked up," meaning that Qualitest employees were prohibited
from selling the product for several weeks, despite having sufficient
inventory.  The "lock-up" created a shortage of the drug, thereafter allowing
Endo to dramatically increase the product's price to customers in need.  Sales
managers told the inside sales representatives which drugs were subject to the
"lock-up" and to whom the drugs could be sold.  The sales management
system used by the sales representatives to store and access customer
information, including pricing information, was programed to reflect which
products were subject to the "lock-ups," and identified the customers eligible
to purchase the drug at the increased price.

(d) The inside sales representatives believed that the strategy of drastically raising generic drugs prices was not sustainable and would eventually have a negative impact on Endo.

90.     **CW-2 – Manager Of Government Contracts**: CW-2 worked at Qualitest from February 2012 to September 2016, in a number of roles, including as a Government Programs Analyst from August 2013 to January 2016, reporting to James Bendickson, Manager of Government Contracts, who reported to Senior Manager of Finance Kacie Bryant, who reported to Stewart Williams, the Director of Finance.  Williams reported to Qualitest's CFO, Phil Cupero, who was replaced by Pat Raimer after Endo acquired Par in 2015.  As a Government Programs Analyst, CW-2 analyzed government purchasing of generic drugs and functioned as part of Qualitest's finance department.  In January 2016, CW-2 replaced Bendickson as Manager of Government Contracts and remained in that position until leaving Endo in September 2016. CW-2 provided the following relevant information:

(a) Defendant De Silva controlled Qualitest's operations, and stripped Vice Presidents Propst and Reiney of much of their authority.  De Silva had "his hand in everything Qualitest did."

(b) On a monthly and quarterly basis, the finance team generated internal financial reports on their respective areas of responsibility.  The information originated in the ERP system (defined at ¶ 41).  The reports would pull all sales data per month and for each quarter on a price-per-pill-level, and reflect the units sold.

(c) Cupero, and later Raimer, consolidated those reports into Excel files, which they sent to De Silva  Upadhyay, Propst, Reiney, Director of Market Insights Jeremy Tatum, and Warren Pefley.  The Excel files, which CW-2 saw and reviewed, reflected average manufacturer prices, and sales and revenue information for each of Qualitest's generic drugs, on a national drug code ("NDC") and on a per-pill level of granularity, for each month since Endo began selling the product.  The Excel files tracked historic pricing and reflected the price increases that Endo implemented on a drug-by-drug basis, and the profits generated.  The Excel file also reflected pricing information for the drugs that Endo acquired, including those bought from DAVA and Boca. The Excel files were created at least from 2014 through 2016.

(d) De Silva and Campanelli received the Excel file that Cupero and Raimer created.  De Silva and Campanelli were both interested in and received updates on details about Qualitest's average manufacturing price for products on a drug-by-drug level.  At their request, the Excel file included a spreadsheet that reflected price increases and decreases that exceeded 25% of the original price.  The tab for this spreadsheet was colored red for ease of identification for De Silva and Campanelli.  The spreadsheet also required that "comments" be include to explain the reason for the price variance.

(e) At least monthly, the recipients of the Excel file (including De Silva, Upadhyay, Propst, Reiney, and Campanelli) would meet to discuss in detail the drug pricing, sales, revenue, and profit information reflected therein.  Those who were present at the Qualitest office in Huntsville, Alabama, attended in person.  Those not present, attended by telephone.

(f) Before Endo acquired it, Qualitest relied on the Mapics ERP system to store pricing, revenues and sales information.  After Endo acquired Qualitest, it switched over to SAP.  When Endo purchased Par, Qualitest replaced SAP with JD Edwards.  The finance team used these systems to create the financial reports.  Access to these systems was readily available to employees who required the information to perform their jobs, including Defendants.

91. **CW-3 – Accountant**: CW-3 was a contractor assigned to work at Qualitest from October 2014 to approximately August 2015 as an accountant involved in a remediation project relating to data and revenue reporting discrepancies resulting from Qualitest's transition between ERP systems.  CW-3 reported to Williams, who reported to Cupero, who reported directly to De Silva.  CW-3 provided the following relevant information:

(a) Each month, after Qualitest closed its books, Endo held a conference call to discuss Qualitest's financial performance.  De Silva, Cupero, Williams and other Qualitest employees, including CW-3, participated in these pre-scheduled calls.

(b) During the calls, which ordinarily lasted from half an hour to an hour, De Silva specifically discussed Qualitest's P&L reports, which provided revenue by product line.  De Silva acknowledged that he reviewed the P&L report and asked questions about the revenues from specific products.  De Silva also made reference to detailed and granular revenue and other data from SAP used to support the P&L reports, confirming that he had access to drug-by-drug level pricing and revenue data in the ERP system.

92.     **CW-4 – National Accounts Pricing Team Trainee**: CW-4 worked at Qualitest from June to August 2015 as a trainee on Qualitest's national accounts pricing team.  CW-4 was responsible for, among other things, sending notifications to customers about pricing issues. CW-4 reported to Lankford.  CW-4 provided the following relevant information.

    (a) Qualitest would "shelve" drugs, meaning that they purposefully held back available stock of the drug from sale to customers, thereby creating a shortage. The pricing team then sent a "blast" of notifications to customers to announce the re-release of drugs that Qualitest had "shelved."

    (b) In regard to the "shelved" products, the blasts always announced a price increase, sometimes by as much as 150 or 300%.  Propst, Reiney, and Cupero informed Minnihan of these price increases.  Minnihan then informed Lankford, who passed it on to her team to execute the blasts.  Once sent, the blasts were printed, scanned, and saved to Qualitest's server.  Lankford conducted meetings three times a week to identify the drugs, pricing, and timing for upcoming blasts.

    (c) CW-4 accessed Qualitest's pricing data from an Excel master spreadsheet saved on a shared drive.  Only Minnihan could make changes to the spreadsheet, and only with the approval of Propst or Reiney.

93.     **CW-5 – Head of Sales and Customer Operations**:  CW-5 worked at Qualitest from October 2010 to January 2016 as the Head of Sales and Customer Operations, and was responsible for customer contracts and pricing.  CW-5 reported to Propst and Reiney.  CW-5 provided the following relevant information.

    (a) De Silva directed that a regular review of Qualitest's generic drug products be undertaken to determine whether Qualitest could increase prices.  Propst and Reiney regularly provided De Silva with lists that identified generic drugs that presented opportunities for price increases, along with analysis for why those price increases were feasible.  Then, De Silva, Propst, and Reiney would decide which generic drug price increases would be made.

    (b) Campanelli, once he became the head of Endo's generics segment, required that he personally sign off on each price change at Endo, whether it was a price increase or decrease.  Campanelli carried over this practice from Par, where Campanelli had the same business model of approving all of Par's price changes while he was CEO of Par.

94.   **CW-6 – Senior Pricing Analyst**:  CW-6 was a Business Analyst at Qualitest from June 2011 until around November 2012, when he was promoted to Senior Pricing Analyst, a position CW-6 held until leaving Endo in April 2014.  As a Senior Pricing analyst, CW-6 was responsible for profit and loss analysis in response to bid requests, specifically analyzing manufacturing costs and other data to arrive at a drugs profitable sale price for Endo.  CW-6 provided the following relevant information.

(a) Reiney and Propst directed Pricing Analysts to enter price increases into Qualitest's systems.

(b) Qualitest pricing analysts had access to "confidential" competitor pricing through Anda.  The pricing analysts would have to log into Anda's system to access this data.  Specifically, the Anda system provided Qualitest's pricing analysts the price at which Anda sold the generic drugs that Anda purchased from Endo's competitors.  This data provided the pricing analysts a rough idea of the prices that other manufacturers charged Anda.

**D.     Empirical Evidence That Defendants Deliberately Did Not Compete On Price, Resulting In Inflated Profits That Were A Material Driver Of Endo's Profits During The Class Period**

95.   Each of the Inflated Drugs was an established generic, meaning that it had been on the market for years.  In each instance, the price was low and stable, as would be expected in a competitive generic drug market with multiple manufacturers.  This is the typical pattern in markets for generic drugs because federal law requires each generic to be effectively identical to each other.  *See* Section IV.E.1.

96.   As alleged above, upon De Silva's arrival in 2013, Endo began implementing sudden, dramatic price increases in lock-step with competitors.  While the strategy proved very profitable for Defendants, it was highly risky and tenuous.  The Company was reliant on its ability to sustain price increases on products that, by design, are interchangeable, and the only means of competition is on price.  Thus, Defendants' price increases could be easily undercut and without warning.

31

97.     Following a vast empirical and statistical analysis of multiple non-public sources of pricing and sales for Endo drugs, *see* Section IV.D.4, Lead Counsel identified thirteen prices increases on generic drugs in which Defendants deliberately did not to compete on price with other manufacturers.  There was no alternative economic explanation for the price increases, such as a supply shortage or a sudden demand increase.  The paragraphs below highlight Defendants' deliberate and concealed practices and the Inflated Profits generated with respect to each Inflated Drug, and provide line graphs that show the sudden and steep price increases effected by Endo and its supposed competitors.

### 1.     Inflated Drugs

98.     **Phenobarbital Oral Elixir**  Since 2010, Phenobarbital Oral Elixir pricing had exhibited the pattern of stability typical in an established generic drug market.  Endo, together with Pack Pharma dominated the Phenobarbital market.  In the spring of 2013, Pack Pharma dramatically increased prices over 450%.  Simultaneously, Endo raised its price to nearly the exact same level, rather than compete for more market share.

99.     The graph below demonstrates Defendants' deliberate decision not to compete with Pack on price, contrary to the competitive function of the generics market.  *See* Section IV.E.1.  It further reflects that the price increases were sustained for a significant period.  Consistent with this lack of price competition, Endo's relative share of the Phenobarbital Oral Elixir market became more stable after the price increases.  Just prior to the price increases, Endo had been hemorrhaging market share to Pack.  That trend stopped in the immediate aftermath of the price increase, with the relative market shares staying stable.



100.    As a result of Defendants' anticompetitive price increase and deliberate choice not to compete in the Phenobarbital Oral Elixir market, Endo earned as much as $11 million in Inflated Profit by the end of the Class Period.

101.    **Prednisone**  Since at least 2010, Prednisone pricing had exhibited the pattern of stability typical in an established generic drug market.  Endo, together with West-Ward and Actavis, dominated the market for Prednisone.  In August 2013, Endo dramatically increased its price over 100% to $0.18, to approximately the same price that West-Ward set in July.  Actavis soon after increased its price to the same level.

102.    The graph below demonstrates Defendants' deliberate decision not to compete with West-Ward and Actavis on price, contrary to the competitive function of the generics market.  It further reflects that the price increases were sustained for a significant period.  Consistent with this lack of price competition, Endo's relative share of the Prednisone market became more stable after the price increases.  Indeed, Endo experienced growth in its market share.

33



103.    As a result of Defendants' anticompetitive price increase and deliberate choice

not to compete in the Prednisone market, Endo earned as much as $24 million in Inflated Profit

by the end of the Class Period.

104.    **Oxybutynin**  Since at least 2009, Oxybutynin pricing had exhibited the pattern of

stability typical in an established generic drug market.  Endo, Upsher-Smith, and Teva

dominated the market for this drug.  In or about the third quarter of 2013, all three companies

increased their prices dramatically, on the order of 200%, to approximately the same level.

105.    The graph below demonstrates Defendants' deliberate decision not to compete

with Teva or Upsher-Smith on price, contrary to the competitive function of the generics market.

It further reflects that the price increases were sustained for a significant period.



106.    The market for Oxybutynin shows additional markers of deliberate anticompetitive conduct.  For example, although Endo, Upsher-Smith and Teva increased prices to approximately the same level, Endo ceded significant market share to Teva, and to Upsher-Smith.  Tellingly, in ceding this market share, Endo never sought to compete with Teva or Upsher-Smith by lowering its price, let alone lowering price to its former level.  This behavior runs contrary to basic economic principles, indicating that Endo's loss of market share, without any attempt to compete on price, was further to Defendants' anticompetitive scheme.

107.    Despite Defendants' ceding market share to the others, Oxybutynin was Endo's second-most profitable Inflated Drug.  As a result of Defendants' anticompetitive price increase and deliberate choice not to compete in the Oxybutynin market, Endo earned as much as $133 million in Inflated Profit by the end of the Class Period.

108.    **Amitriptyline**  Since 2011, Amitriptyline pricing had exhibited the pattern of stability typical in an established generic drug market.  Endo, Sandoz, and Mylan controlled the market for this drug.  In or about the third quarter of 2014, all three dramatically increased their prices, with Endo and Sandoz in particular moving in virtual lock-step.

109.   The graph below, which by way of example shows the pricing for a 100-count package of 25 milligram Amitriptyline tablets, demonstrates Defendants' deliberate decision not to compete with Sandoz or Mylan on price, contrary to the competitive function of the generics market.  It further reflects that the price increases were sustained for a significant period. Consistent with the strategy not to compete, after the price increase, the market shares of Endo, Sandoz, and Mylan remained stable relative to each other.  The following chart is an example of the pricing patterns for the markets for Amitriptyline tablets.



110.   The market for Amitriptyline shows additional markers of deliberate anticompetitive conduct.  Specifically, after Endo, Sandoz, and Mylan raised their prices, a new manufacturer, Northstar, entered the market.  Northstar charged prices approximately equivalent to those charged by Endo, Sandoz, and Mylan.  Endo, and the two other established manufacturers, ceded significant market share to Northstar, and did not compete on price.  This behavior runs contrary to basic economic principles, indicating that Endo's loss of market share to Northstar, without any attempt to compete on price, was further to Defendants' anticompetitive scheme.

36

111.    Despite Defendants' ceding market share to the others, Amitriptyline was Endo's most profitable Inflated Drug.  As a result of Defendants' anticompetitive price increase and deliberate choice not to compete in the Amitriptyline market, Endo earned as much as $170 million in Inflated Profit by the end of the Class Period.

112.    **Baclofen**   Since at least 2010, Baclofen pricing exhibited the pattern of stability typical in an established generic drug market.  Endo, Upsher-Smith, and Teva dominated this market.  In 2014, all three dramatically increased their prices to approximately the same level.

113.    The graph below demonstrates Defendants' deliberate decision not to compete with Teva or Upsher-Smith on price, contrary to the competitive function of the generics market. It further reflects that the price increases were sustained for a significant period.  The market share of each competitor also became more stable after the price increases, further evidencing a deliberate lack of competition.



114.    As a result of Defendants' anticompetitive price increase and deliberate choice not to compete in the Baclofen market, Endo earned nearly $50 million in Inflated Profit by the end of the Class Period.

115.   **Butalbital/Acet/Caff**  Endo and Lannett dominated this market.  In the spring of 2015, after a year-long period of price stability, both drastically increased their prices within two weeks of each other, to precisely the same level.

116.   The graph below demonstrates Defendants' deliberate decision not to compete on price with Lannett or, later, with Mayne, contrary to the competitive function of the generics market.  It further reflects that the price increases were sustained for a significant period.



117.   The market for Butalbital-Acet-Caff shows additional markers of deliberate anticompetitive conduct.  Specifically, after the price increase, Endo lost market share to Lannett, despite the fact that the two companies charged the same price.  Additionally, Mayne entered the market for Butalbital-Acet-Caff soon after Defendants' price increase.  Tellingly, Mayne gained significant market share from Endo, but not Lannett.  This behavior runs contrary to basic economic principles, indicating that Endo's loss of market share to Lannett and Mayne, without any attempt to compete on price, was further to Defendants' anticompetitive scheme.

118.    As a result of Defendants' anticompetitive price increase and deliberate choice not to compete in the Butabital-Acet-Caff market, Endo earned as much as $23 million in Inflated Profit by the end of the Class Period.

119.    **Phenobarbital Tablets**  In late 2014, generics manufacturer ECI joined the market for Phenobarbital Tablets, in which Endo had been the dominant participant.  In May 2015, Endo raised its price over 200%.  By October, ECI matched Endo's price.

120.    The graph below demonstrates Defendants' deliberate decision not to compete with ECI on price, contrary to the competitive function of the generics market.  It further reflects that the price increases were sustained for a significant period.  This course of conduct also evidences that Endo deliberately allocated ECI a portion of the market for Phenobarbital Tablets, rather than compete on price.



121.    As a result of Defendants' anticompetitive price increase and deliberate choice not to compete in the market for Phenobarbital Tablets, Endo earned as much as $46 million in Inflated Profit by the end of the Class Period.

122.   **Propranolol Tablets**   Since at least 2009, Propranolol pricing had exhibited the pattern of stability typical in an established generic drug market.  Endo, along with Teva, Actavis, Mylan, and Heritage dominated the market.  In 2015, Teva, Actavis, Mylan, Endo, and Heritage dramatically increased their prices, with all approximately tripling their prices.

123.   The graph below demonstrates Defendants' deliberate decision not to compete with the other four manufacturers on price, contrary to the competitive function of the generics market.  It further reflects that the price increases were sustained for a significant period.  Also contrary to expected market patterns is the fact that the market shares for each competitor became more stable after the large price increases.



124.   As a result of Defendants' anticompetitive price increase and deliberate choice not to compete in the Propranolol market, Endo earned as much as $28 million in Inflated Profit by the end of the Class Period.

### 2.   Inflated Drugs That Endo Acquired From DAVA

125.   Endo purchased DAVA in August 2014.  Prior to the acquisition, in the third quarter of 2013 and the first quarter of 2014, DAVA executed two sudden, anticompetitive price

increases.  As with Endo's own increases, DAVA raised prices at the same time and to the same

level as the competitors with which it controlled the relevant markets.  After the acquisition,

Defendants maintained the inflated pricing and did not compete.

126.   **Methotrexate**  Since at least 2009, Methotrexate pricing had exhibited the pattern

of stability typical in an established generic drug market.  DAVA, West-Ward, Teva, and Mylan

controlled this market.  In the first half of 2013, all four manufacturers more than doubled their

Methotrexate prices.

127.   The graph below demonstrates Defendants' deliberate decision not to compete

with the other three manufacturers on price, contrary to the competitive function of the generics

market.  It further reflects that the price increases were sustained for a significant period.

Notably, even when prices declined, those moves occurred in tandem, with little variance,

indicating a decision not to compete.



128.   The market for Methotrexate shows additional markers of deliberate

anticompetitive conduct.  Specifically, after the price increase, DAVA ceded market share to

Mylan over time, but under Defendants' leadership never lowered its price.  This behavior runs

contrary to basic economic principles, indicating that Endo's concession of market share to Mylan (as Endo did for Butalbital), without any attempt to compete on price, was further to Defendants' anticompetitive scheme.

129.    As a result of Defendants' deliberate choice not to compete in the Methotrexate market, Endo earned as much as $35 million in Inflated Profit between the DAVA acquisition and the end of the Class Period.

130.    **Doxazosin**  Since at least 2010, Doxazosin pricing had been stable, as is typical in an established generic drug market.  Through 2013, Mylan, Apotex, and Teva, controlled the market for Doxazosin.  That summer, those three manufacturers dramatically increased their prices to approximately the same level.  In or about January 2014, DAVA entered the Doxazosin market for the first time.  Instead of competing for market share on price, it virtually matched the prices set by Mylan, Apotex, and Teva.

131.    The graph below demonstrates that following the acquisition of DAVA, Defendants made a deliberate decision not to compete with the other three manufacturers on price, contrary to the competitive function of the generics market.  It further reflects that the price increases were sustained for a significant period.



132.    The market for Doxazosin shows additional markers of deliberate anticompetitive conduct.  Specifically, after entering the market for the first time, DAVA gained significant market share despite charging the same price as its competitors, running counter to the competitive behavior in generic markets, in which new market entrants compete for market share by charging lower prices than their competitors.  Defendants continued the same pricing strategy after Endo acquired DAVA.  It is, therefore, consistent with Defendants' Defendants' anticompetitive scheme.

133.    As a result of Defendants' deliberate choice not to compete in the Doxazosin market, Endo earned as much as $27 million in Inflated Profit between the DAVA acquisition and the end of the Class Period.

### 3.    Inflated Drugs That Endo Acquired From Par

134.    Prior to Endo's acquisition of Par in September 2015, Par similarly executed sudden, dramatic price increases, in lock-step with competitors, on at least three drug products.  After the acquisition, Endo maintained the pricing and did not compete.

135.   **Isosorbide**   Since at least 2012, Isosorbide pricing had exhibited the pattern of stability typical in an established generic drug market.  Par and Sandoz controlled this market.  In 2012, Sandoz more than quintupled its price.  Early in 2013, Par did the same, raising its price to approximately equal that of Sandoz.

136.   The graph below demonstrates Defendants' deliberate decision not to compete with Sandoz on price, contrary to the competitive function of the generics market.  It further reflects that the price increases were sustained for a significant period.  Contrary to the expected pattern in a competitive market, each manufacturer's relative share of the Isosorbide market became more stable after the price increases through 2014.



137.   The market for Isosorbide shows additional markers of deliberate anticompetitive conduct.  Specifically, West-Ward, a manufacturer that had to this point kept only a small toehold in the market, expanded its market share in 2015.  Though West-Ward offered a lower list price, Par/Endo's market share was not materially affected.  This behavior is consistent with Defendants' deliberate choice to allocate markets and not compete.

44

138.    As a result of Defendants' anticompetitive price increase and deliberate choice not to compete in the Isosorbide market, Endo earned as much as $26 million in Inflated Profit between the Par acquisition and the end of the Class Period.

139.    **Cholestyramine**  Since 2011, Cholestyramine pricing had exhibited the pattern of stability typical in an established generic drug market.  Par and Sandoz controlled this market.  In the summer of 2013, Sandoz and Par dramatically increased their prices for Cholestyramine (in both the form combined with sugar and the less widely-used "light" form combined with aspartame), to the same level, within one month of each other.

140.    The graph below demonstrates Defendants' deliberate decision not to compete with Sandoz on price, contrary to the competitive function of the generics market.  It further reflects that the price increases were sustained for a significant period.  Consistent with this lack of price competition, each manufacturer's relative share of the Cholestyramine market became more stable after the price increases.



45

141.    As a result of Defendants' anticompetitive price increase and deliberate choice not to compete in the Cholestyramine market, Endo earned as much as $21 million in Inflated Profit between the Par acquisition and the end of the Class Period.

142.    **Digoxin**  Since at least 2009, Digoxin pricing had exhibited the pattern of stability typical in an established generic drug market.  In October 2013, however, Lannett and Impax – which had for years controlled the market alongside West-Ward – dramatically increased their prices.  In or about January 2014, Par entered the Digoxin market for the first time.  But instead of competing for market share on price, it matched the Lannett/Impax price to the penny.  In April, West-Ward matched this pricing structure

143.    The graph below demonstrates Defendants' deliberate decision not to compete with the other four manufacturers on price, contrary to the competitive function of the generics market.  It further reflects that the price increases were sustained for a significant period.  Consistent with this lack of price competition, once Par had established itself in the market, each manufacturer's relative share of the Digoxin market became more stable.  When new manufacturers – Par and, later, Mylan – joined the market, neither they nor the previously-established manufacturers competed on price.  Instead, Lannett and Impax simply ceded the market share in a roughly equal amount.  This behavior runs contrary to basic economic principles, and was further to  Defendants' anticompetitive scheme.



144.    As a result of Defendants' deliberate choice not to compete in the Digoxin

market, Endo earned as much as $23 million in Inflated Profit between the Par acquisition and

the end of the Class Period.

*                    *                    *

145.    The above analysis, at a minimum, establishes that Defendants deliberately chose

not to compete with Endo's peers on specific generic drugs, rendering false and actionable

Defendants' repeated statements that Endo was operating in a hotly competitive marketplace for

generic drugs, when in fact it was not.  Likewise, the hundreds of millions of Inflated Profits that

Defendants generated from their anticompetitive scheme further render false Defendants'

statements attributing Endo's financial success to other reasons.

### 4.    Inflated Profit Analysis

146.    Endo did not disclose profits, revenues, or pricing for individual generic drugs,

nor was that information otherwise public.  Lead Counsel therefore undertook an investigation

and engaged econometric experts, working at Lead Counsel's direction, to calculate and isolate

the profit that Endo earned from its anticompetitive price increases.  The investigation comprised

multiple distinct econometric analyses, including regression analyses, that ultimately took into account thousands of data points.

147.     The analysis screened most of Endo's generic drug portfolio during the relevant period to identify price increases of at least 50%.  Lead Counsel and their experts drew on a variety of data sources in this analysis, including private, subscription-only databases costing tens of thousands of dollars annually, and raw Medicaid reimbursement data that took dozens of hours to manipulate into a usable form.  Any price increases plausibly connected to supply shortages or other economic anomalies were removed from the set.

148.     Lead Counsel and its experts then identified price increases in markets that reflected a clear lack of competition on price by Endo and its competitors, as well as factors that courts traditionally view as supportive of the existence of an illegal agreement among competitors in a marketplace.

149.     To isolate Inflated Profit for each these drugs, the analysis first determined the drug's price per unit had Endo not made the increase.  To do so, the drug's specific pricing history was analyzed using a regression analysis that determined the price through the relevant period had prevailing drug-specific pricing trends continued.  The analysis further took into account CPI inflation for prescription drugs and empirical measures of the trend in average pricing for prescription drugs over the past five years.

150.     Calculating Inflated Profit, *i.e.*, the difference between Endo's actual revenues (with the price increase) and the revenues that would have been earned at each drug's price without the increase, involved accounting on a month-by-month basis for (i) Endo's sales quantities; and (ii) the discounts and rebates, unique to each drug, that Endo would provide to customers, which varied over time.

151.    Sales volumes were derived by reference to figures reported in a subscription database.  Through another regression analysis, it was confirmed that the price and volume for each drug exhibited no statistically meaningful relationship, meaning that as pricing changed, volume of sales did not change.

Endo's discounts and rebates are unavailable by any means of which Lead Counsel is aware. Thus, the level of discounts and rebates was determined by analyzing, on a month-by-month basis over the relevant period, multiple data points from a number of subscription and other industry datasets that reflected average pricing and sales volume data.  This analysis was unique for each drug and captured fluctuations over time.

**E.    Additionally, Evidence Also Establishes That Endo Actively Agreed To Fix Prices And Allocate Markets**

152.    In addition to the allegations that Defendants concealed their unilateral and deliberate decision not to compete, however, the analysis herein further establishes that Defendants were engaged in industry-wide illegal agreements to fix prices and allocate markets.

**1.    Long-Established Indicators Demonstrate That Defendants Engaged In Illegal Agreements Not To Compete**

153.    Long-established indicators for determining collusive behaviors support the conclusion that Defendants acted through agreements to fix prices and allocate market share.  In particular, and as detailed below, these factors include: (i) market factors that presented the opportunity to engage in anticompetitive market-distorting activity; (ii) price increases against apparent self-interest; (iii) motive to increase prices; and (iv) numerous interfirm communications.

a)   **The Structure Of Generic Drug Markets
Facilitated Defendants' Illegal Agreements**

154.   The markets for the Inflated Drugs are all characterized by factors that, as a
matter of market fundamentals, present the opportunity for agreements to fix prices and allocate
market share, which is illegal.

155.   <u>High Market Concentration</u>: The market for each Inflated Drug was an oligopoly
controlled by a handful of manufacturers.  As reflected in the table below, in most instances, just
two or three manufacturers controlled the relevant market, and in no instance were more than
five involved.  Also significant is the concentration across markets, with just four manufacturers
– Teva, Mylan, Sandoz, and West-Ward – involved in nine of the thirteen Inflated Drugs.

**Manufacturers Involved With Inflated Drugs**

| | Endo | Teva | Mylan | Sandoz | West-Ward | Upsh.-Smith | Actavis | Others |
|---|---|---|---|---|---|---|---|---|
| Isosorbide | √ | | | √ | | | | |
| Methotrexate | √ | √ | √ | | √ | | | |
| Phenobarbital Elixir | √ | | | | | | | (1) |
| Oxybutynin | √ | √ | | | | √ | | |
| Doxazosin | √ | √ | √ | | | | | (1) |
| Prednisone | √ | | | | √ | | √ | |
| Cholestyramine | √ | | | √ | | | | |
| Digoxin | √ | | √ | | √ | | | (2) |
| Baclofen | √ | √ | | | | √ | | |
| Amitriptyline | √ | | √ | √ | | | | (1) |
| Butalbital-Acet-Caff | √ | | | | | | | (2) |
| Phenobarbital Tablets | √ | | | | | | | (1) |
| Propranolol | √ | √ | √ | | | | √ | (1) |

156.     Such market concentration facilitates agreement to fix prices and allocate market share because it reduces the number of negotiating partners and increases per-firm illegal profits. Concentration also significantly increases the stability of a cartel.

157.     One of the primary difficulties cartels face is cheating: each member has an individual incentive to lower prices slightly below the agreed upon cartel price to capture significant market share.  In a concentrated market, however, cheating is more easily prevented because each member of the cartel can more easily monitor the others and enforce compliance with the price fixing and market allocation agreement.  As the analysis in Section IV.D. illustrates, once the price of the Inflated Drugs went up, Endo and its peers did not compete on price.

158.     High Barriers To Market Entry: The presence of significant barriers to entry facilitates the operation of a cartel.  Barriers to entry increase a market's susceptibility to an agreement to maintain supra-competitive prices because it is difficult for new suppliers to enter the market and destabilize agreed upon competitors' pricing.

159.     Entering a generic pharmaceutical market requires significant lead time for development and regulatory approval.  The cost is significant and the process of obtaining regulatory approval alone can cost millions.  Regulatory approval could be denied or delayed for months or years.  During the relevant period the FDA was significantly "backlogged," and, thus, potential market entrants could have to wait years for approval.

160.     Lack of Alternative Products: Doctors choose to prescribe specific drugs to their patients for reasons related to the specific pharmacological distinctions among the drugs in a particular class and, consequently, they cannot simply substitute one product for another when price varies.  Many patients are unable to substitute the drugs discussed herein for other

medications.  In some cases, those drugs are the only effective treatment for their conditions.

For instance, Methotrexate is unique in its ability to treat rheumatoid arthritis while enhancing

the effects of other medications.

161.    <u>Demand Inelasticity</u>: Elasticity of demand is a measure of how demand for a

product reacts to a change in price.  For example, demand is said to be "inelastic" if an increase

in the price of a product results in only a small decline, if any, in the quantity sold of that

product.  In other words, customers have nowhere to turn for alternative, cheaper products of

similar quality, and so continue to purchase the product despite the price increase.

162.    The Inflated Drugs are all important, and in many cases absolutely critical, to the

end-consumer's health and well-being.  Naturally, then, demand for such drugs is inelastic, *i.e.*,

the quantity demanded does not vary significantly as price changes, as the consumer cannot

simply walk away as prices rise.  Another factor contributing to demand inelasticity is that health

insurance plans typically will pay for medications regardless of price, so long as the drug is on

the plan's approved list.  For each of the Inflated Drugs, despite the price increases, preexisting

trends in demand for the drugs did not materially change.

### b) Without An Agreement, Price Increases Were Against Endo's Self-Interest

163.    Endo and the manufacturers who collectively dominated the markets for the

Inflated Drugs repeatedly implemented and maintained dramatic price increases, routinely

doubling, tripling, even quintupling prices in a single day.  Absent an agreement, such significant

price increases would otherwise have been against their self-interest.  Indeed, if Endo's

anticompetitive conduct was not the result of an illegal agreement among competitors, the

scheme would be that much more risky and unsustainable, relying on nothing other than

momentarily perceived self-interest among long-time, cut-throat rivals, and yet highly likely to draw law enforcement scrutiny.

164.    In a market free of anticompetitive activities, if one generic drug marketer raises its prices significantly above those of its competitors, that competitor will lose market share.  As a result, ordinarily, a price increase would be against a drug manufacturer's self-interest. Nonetheless, as Section IV.D. illustrates, with respect to each Inflated Drug, multiple manufacturers were able to substantially increase prices to the same level, and maintain those price increases over time, even where there were new entrants in certain of the markets.

165.    Tellingly, for each Inflated Drug, the price increases were implemented instantaneously, not gradually "phased in."  Neither Endo, nor any of its competitors, sought to seize market share by undercutting the other market participants' price.  Instead the price charged by each manufacturer stabilized at the higher level, with little, if any, variance among the prices charged by the pertinent manufacturers.

166.    There was no reasonable commercial or economic justification for the price increases, absent an agreement among the manufactures to fix prices and allocate market share. In no case was a shortage reported during the relevant period for any of the Inflated Drugs, nor any sudden significant increase in demand, events that Federal law requires drug manufacturers to report to the FDA.

167.    Given these realities, the large, sudden and unexplained price increases that Defendants made with their competitors are a strong indicator of illegal price fixing and market allocation.  Indeed, this is particularly true because the price increases were extremely significant.  Oligopolists seeking to test price increases would ordinarily need to take a much more measured approach.

168.     A competitive market participant, without the certainty that its ostensible competitors would follow, would not make such large and sudden price increases.  Absent an agreement among Endo and its competitors, a manufacturer that acted alone to enact significant price increases ran a tremendous risk of losing all, or most, of its market share if competitors undercut the suddenly-inflated price.

> c)     **Collusive Motive To Agree To Price Increases And Market Allocation: The Only Way For Defendants To Increase Profits From The Inflated Drugs Was To Increase Price**

169.     As alleged above, Endo was suffering financially leading into 2013.  The generics segment was generating some modest profit, but competition had taken a toll.  Because federal law requires each generic drug to be effectively identical to each other, pricing for established generic drugs precipitously declines and stabilizes near the marginal costs of production.  As illustrated in Section IV.D., for each of the Inflated Drugs, the prices had stabilized for months if not years before the price hike.  At those low, stable prices, profits from each drug also declined, giving Endo and its peers a common motive to conspire to increase profits.

170.     Indeed, because the markets for each of the Inflated Drugs is inelastic, meaning that changes in price do not affect the total quantity demanded, the only means of increasing profits from the sales of these drugs was to increase price.  Given that generic drugs are completely substitutable, the best means to increase price, and not expose each competitor to the enormous risk of losing substantial market share, was for each competitor to agree to fix prices and allocate market share.

171.     Moreover, once prices, and thus profits, were inflated to levels well beyond those attainable in a competitive market, as new entrants came into the market, Defendants were motivated to allocate market share to them, rather than allow competition on price.  As alleged in

Section IV.D., this is precisely what happened with regard to six of the Inflated Drugs, namely

Oxybutynin (¶ 106), Amitriptyline (¶ 110), Butalbital-Acet-Caff (¶ 117), Phenobarbital Tablets

(¶ 120), Methotrexate (¶ 128), and Doxazosin (¶ 132).

### 2. Inter-Firm Communications Facilitated And Enabled Defendants To Coordinate With Competitors

172.     Endo and Par engaged in extensive direct communication with other

manufacturers.  Lead Counsel's investigation identified a multitude of trade shows and

conferences that afforded Endo and Par employees an opportunity to interact with their

counterparts at other manufacturers during the relevant period, many of which occurred in close

proximity to the price increases that Endo and/or another manufacturers implemented.  These

conferences and attendees identified through Lead Counsel's investigation are summarized in the

timeline attached hereto as Appendix A.

173.     The State AGs have specifically alleged that these trade shows were in fact used

to facilitate agreements to fix prices and allocate market share in the generic drug industry.  "At

these various conferences and trade shows, sales representatives from many generic drug

manufacturers … interact with each other and discuss their respective businesses and customers

… using] these opportunities to discuss and share competitively-sensitive information

concerning upcoming bids, specific generic drug markets, pricing strategies and pricing terms in

their contracts with customers."  Manufacturers would "refine[] and coordinate[]" their

"anticompetitive agreements" via "frequent telephone calls, emails and text messages."

174.     For example, as alleged by the State AGs, early in February 2013, Heritage,

which was the market leader in the tablet form of Doxycycline Monohydrate (or "Doxy Mono"),

decided to raise its price for the drug.  In order to ensure a successful increase, Heritage reached

out to its competitors, Par (which Endo would later acquire), Mylan, and Lannett.  On numerous

occasions during 2013 and 2014, these competitors spoke, texted, or met in person, including at

industry conferences, about the pricing for DoxyMono, including the following:

- Lannett increased its pricing for Doxy Mono effective June 12, 2013. In and around this date, a key sales/pricing employee of Lannett was in contact with his or her counterpart at Par. The two were friends who frequently spoke in person at trade shows and customer conferences.

- This individual at Par, in turn, was in frequent communication with Mylan during June and July 2013, speaking numerous times, including several calls on June 7 and June 13.

- Heritage's point person on Doxy Mono met in person with two individuals from Par during a conference in Arizona on August 1-2, 2013. This meeting was followed by a flurry of communications among the four "competitors" in August 2013. On August 13, following receipt of a text message from Lannett, an email circulated internally at Par with certain instructions pertaining to Doxy Mono.

- In 2014, Heritage turned its eye toward a much larger, across-the-board increase on Doxy Mono prices. On June 2, 2014, Par and Heritage communicated by phone regarding two drugs for price increase: Methimazole and Doxy Mono. The next day, while at a conference, at least one key sales/pricing employee of Par met with counterparts from the Doxy Mono "competitors" Heritage and Lannett.

175. This series of connections evidences the nature of Defendants' interfirm

communication. Moreover, as alleged above to the extent Par agreed to a price increase with

Heritage CEO Campanelli would have approved that price increase.

### 3. The State AGs' Wide-Ranging Civil Antitrust Action Against Defendants And The DOJ's Criminal Investigation Into Many Of Endo's Inflated Drugs Further Corroborate Lead Plaintiff's Allegations

176. The law enforcement investigations and legal actions substantially corroborate

that Endo's activities in the markets for the Inflated Drugs alleged herein were not only

anticompetitive, but were illegal and collusive because they were based on actual agreements

among drug manufacturers. Defendants are directly implicated in the State AGs' wide-ranging

and ongoing civil investigation and lawsuit. The DOJ has intervened in civil actions involving

four of the Inflated Drugs, stating to the Court that the grand jury's investigation pending in this

District has significant overlap with the misconduct alleged in those civil actions.

177.     Endo is a Defendant in the State AGs' civil action, along with nearly every manufacturer involved in the markets for the Inflated Drugs.  Based on information from documents, emails and texts obtained pursuant to multiple subpoenas, and from cooperating witnesses, the State AGs have filed a complaint for the violation of state and federal antitrust laws against Endo's generics unit Par, Mylan CEO Rajiv Malik, Emcure CEO Satish Mehta and 15 other drug companies.  While the State AGs' complaint focuses on conspiracies involving Heritage's former executives, Malek and Glazer, who have admitted anticompetitive as part of their settlement and cooperation agreements, they also allege that the conspiracies involving Heritage are just a small part of a broader industrywide "overarching conspiracy," which started before 2013 and last through at least 2016.

178.     The State AGs allege illegal conspiracies as to 15 generic drug products, the purpose of which was to avoid price erosion, and to maintain and inflate pricing.  Manufacturers executed the illegal conspiracy in a variety of ways, including by: (i) agreeing to raise prices in coordination without competing for market share; (ii) agreeing to not compete for each others' market share, even if one manufacturer raised price while its supposed competitors did not; and (iii) agreeing to allocate market share among themselves across numerous drugs without competing on price, including by allocating market share to new manufacturers when they entered a market in return for an agreement not to compete on price.  Although the conspiracy took many different forms, these agreements were made pursuant to an overarching understanding among manufacturers that they must "play nice in the sandbox" rather than compete, so each could enjoy its "fair share" of the generic drug markets.

179.    The anticompetitive conduct (whether by agreement or not) that Lead Counsel alleges herein is consistent with the pattern of agreed upon price increases, and market share allocation, described in the State AGs' complaint, including the four drugs identified in the CT AG subpoena to Endo.  In regard to the four drugs that were the subject of the State AGs' subpoena, in addition to anticompetitive price increases, Lead Counsel's investigation independently identified that each was consistent with Defendants' decision to allocate market share among new and existing manufacturers.  *See* ¶ 110 (Amitriptyline), ¶ 132 (Doxazosin), ¶ 128 (Methotrexate), and ¶ 106 (Oxybutynin).

180.    The State AGs have indicated that they will file additional complaints concerning additional conspiracies to fix prices and allocate the markets of specific drugs, and that they are investigating upwards of 200 generic drug markets.  As the State AGs recently stated to Judge Rufe, of this Court, the evidence reveals that the industry-wide conspiracy by generic drug makers "could be the largest cartel case in the history of the United States."

181.    The DOJ's Investigation into the same alleged industry-wide conspiracy began in late 2014 when the DOJ empaneled a grand jury in connection with its criminal investigation. The DOJ's investigation overlaps with many of the drug markets that Lead Counsel has identified as ones in which Defendants conducted anticompetitive activities, and implicates nearly every manufacturer in those markets.

182.    The grand jury issued Par (prior to Endo's acquisition) a subpoena for documents and information in December 2014.  The subpoena identified the drug Digoxin, for which Lead Counsel has independently confirmed anticompetitive activity that is also consistent with Defendants' agreement with competitors.  ¶ 143.

183.    The DOJ investigation has additionally resulted in guilty pleas to federal criminal

charges by Malek and Glazer.  Their company Heritage also participated in anticompetitive conduct with Endo in connection with the markets for Propranolol and Doxy Mono.

184.    Certain of the Inflated Drugs that Lead Counsel identified are also the subject of the DOJ's investigation.  The DOJ intervened in civil antitrust cases against Endo on the basis that there are "significant overlaps between [its] criminal investigation and the cases" consolidated in the MDL, including the cases involving Amitriptyline, Baclofen, Propranolol, and Digoxin.  U.S.' Mot. To Stay Discovery (ECF No. 279), *In re: Generic Pharms. Pricing Antitrust Litig.*, 2:16-md-02724 (E.D. Pa. May 1, 2017).  As Lead Counsel independently determined, in addition to Defendants' anticompetitive price increases and deliberate decision not to compete, each of these drug markets is also consistent with Defendants' agreement with competitors to allocate market share among new and existing manufactures, rather than to compete on price.  ¶ 110 (Amitriptyline), ¶ 113 (Baclofen), ¶ 123 (Propranolol), and ¶ 143 (Digoxin).

185.    The grand jury has also issued subpoenas to many of the manufacturers who participate in those markets, as well as the manufacturers in the generic drug markets in which Defendants conducted anticompetitive activities as identified by Lead Counsel's investigation, including Teva, Impax, Allergan (parent of Actavis), Mayne, Mylan, and Lannett.  The FBI raided Mylan's offices in connection with the DOJ's investigation.  On April 24, 2018, *Bloomberg* reported that multiple sources indicated that "[a]t least two companies are on track to be indicted in the coming months," and that according to sources knowledgeable of the investigation, "[a]nother company could agree to plead guilty before then."

## V.   DEFENDANTS' ACTIONABLE FALSE AND MISLEADING STATEMENTS AND OMISSIONS

186.   During the Class Period, Defendants made at least three types of false and

misleading statements or omissions on conference calls with investors and in SEC filings.

(a)   <u>Statements Explaining the Market:</u> Endo's Annual Reports on Forms 10-K contained descriptions of the U.S. generic pharmaceutical market in which Defendants characterized the market as subject to "intense competition" on price.  These statements were false and misleading because they failed to disclose that Defendants did not compete on price with other generic manufacturers in several generic drug markets in which Defendants made and sustained very large price increases and, for certain drugs, Defendants ceded market share to existing manufacturers and to new entrants to avoid competition that would drive down the inflated prices, conduct that was highly likely, at a minimum, to raise regulatory scrutiny.  As an independent and separate basis for falsity, the statements failed to disclose that Endo was engaged in an illegal agreement to fix prices, rig bids, and allocate markets for generic drugs.  These statements are set forth in ¶¶ 188, 189, 190, 205, 206, 207, 208, 209.

(b)   <u>Statements Explaining Income:</u> Defendants made statements during investor conference calls, in Endo's Annual Reports on Forms 10-K, in Quarterly Reports on Forms 10-Q, and in Current Reports on Forms 8-K describing the sources of the financial performance of Endo's generics business segment.  These statements were false and misleading because they failed to disclose that Endo's risky and unsustainable anticompetitive activity in generic drug markets materially contributed to the income from its generics segment, and that, in the latter part of the Class Period, the financial performance of Endo's generics business segment was materially and negatively affected by Endo's inability to further engage in anticompetitive activity.  As an independent and separate basis for falsity, the statements failed to disclose that Endo's generic segment profits were derived in material part from Endo's engagement in an illegal agreement to fix prices, rig bids, and allocate markets for generic drugs. These statements are set forth in ¶¶ 191, 194, 198, 201, 204, 211, 212, 213, 215, 216, 218, 219.

(c)   <u>Statements Explaining Price Increases:</u>  Defendants made statements during investor conference calls indicating that Endo's price increases on generic drugs were the result of normal market dynamics.  These statements were false and misleading because, in increasing the prices of certain generic drugs, Defendants did not compete on price with other generic manufacturers in several generic drug markets in which Defendants made and sustained very large price increases.  As an independent and separate basis for falsity, the statements failed to disclose that Endo was engaged in an illegal agreement to

fix prices, rig bids, and allocate markets for generic drugs.  These statements are set forth in ¶¶ 192, 196, 199.

**A.     Full-Year 2014
        False And Misleading Statements And Omissions**

187.    On March 2, 2015, Endo filed its 2014 10-K with the SEC reporting Endo's full-year 2014 financial results.  The 2014 10-K was signed by De Silva and Upadhyay and contained certifications pursuant to SOX signed by De Silva and Upadhyay, stating that the financial information contained in the 2014 10-K did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading;" fairly presented in all material respects the financial condition and results of operations of Endo; and disclosed any material changes to the Company's internal control over financial reporting.

188.    In the 2014 10-K, Endo stated, in part:

> In the generic pharmaceutical market, we face intense competition from other generic drug manufacturers, brand name pharmaceutical companies through authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. In the market for generic pharmaceuticals, our competitors, including Actavis, Teva, Mylan Technologies Inc., and Sandoz, Inc., vary depending on product category and dosage strength….

These statements that Endo faced "intense competition" from other generic drug manufacturers were false and misleading because Endo did not compete on price with other generic manufacturers in several generic drug markets in which Defendants made and sustained very large price increases and, for certain drugs, Defendants ceded market share to existing manufacturers and to new entrants to avoid competition that would drive down the inflated prices.  Indeed, Endo, by that time, had implemented price increases in tandem with each of the generics manufacturers with whom Endo asserted it was locked in "intense competition," *i.e.*, Actavis, Teva, Mylan, and Sandoz.  ¶¶ 102, 105, 109, 113, 123, 127, 131.  As an independent

and separate basis for falsity, the statements failed to disclose that Endo was engaged in an

illegal agreement to fix prices, rig bids, and allocate markets for generic drugs.

189.     In the 2014 10-K, Endo also stated, in part:

> Our business model continues to focus on being a low cost producer
> of products in categories with high barriers to entry and lower levels
> of competition. Our U.S. Generic Pharmaceuticals segment is
> focused in categories where there are fewer challenges from low-
> cost operators in markets such as China and India, with
> approximately 36% of our generic product portfolio being
> comprised of controlled substances, which cannot be manufactured
> offshore and imported into the U.S. In addition, approximately 7%
> of our generic product portfolio is made up of liquids, which are
> uneconomical to ship to the U.S….

These statements describing Endo's supposed "business model" were false and misleading

because, having put that topic at issue, Endo failed to disclose its business strategy since 2013 of

generating material revenues and profits by not competing on price with other generic

manufacturers in several generic drug markets in which Defendants made and sustained very

large price increases and, for certain drugs, Defendants ceded market share to existing

manufacturers and to new entrants to avoid competition that would drive down the inflated

prices.  As an independent and separate basis for falsity, the statements failed to disclose that

Endo was engaged in an illegal agreement to fix prices, rig bids, and allocate markets for generic

drugs.

190.     In the 2014 10-K, Endo also stated, in part:

> As competition from other generic products increases, selling prices
> for all participants typically decline. Consequently, the maintenance
> of profitable operations in generic pharmaceuticals depends, in part,
> on our ability to select, develop and launch new generic products in
> a timely and cost efficient manner and to maintain efficient, high
> quality manufacturing relationships.

These statements that "competition from other generic products" causes "prices for all

participants [to] typically decline" were misleading because they indicated that the markets for

Endo's generic drugs were functioning as they were intended, with competition driving down price toward marginal cost, when in fact Endo did not compete on price with other generic manufacturers in several generic drug markets in which Defendants made and sustained very large price increases and, for certain drugs, Defendants ceded market share to existing manufacturers and to new entrants to avoid competition that would drive down the inflated prices.  As an independent and separate basis for falsity, the statements failed to disclose that Endo was engaged in an illegal agreement to fix prices, rig bids, and allocate markets for generic drugs.

191.    The 2014 10-K reported generic segment Adjusted Income had increased 140% to $464 million compared to full-year 2013, with the attribution that the increase was:

> primarily due to the Boca and DAVA acquisitions, the May 2014 launch of our authorized generic of Lidoderm® and certain pricing increases.

During a March 2, 2015 investor earnings call that Defendants held, De Silva echoed these statements of attribution, claiming:

> Growth in our US Generics business this quarter benefited from the additions of Boca Pharmacal and DAVA Pharmaceuticals.  Sales of LIDODERM AG were a strong source of new growth as well.

These statements attributing Endo's financial results to various sources were false and misleading because, having put this topic at issue, they failed to disclose that Endo's generic segment Adjusted Income was achieved in material part because Endo did not compete on price with other generic manufacturers in several generic drug markets in which Defendants made and sustained very large price increases and, for certain drugs, Defendants ceded market share to existing manufacturers and to new entrants to avoid competition that would drive down the inflated prices.  As an independent and separate basis for falsity, the statements failed to disclose

63

that Endo's generic segment profits were derived in material part from Endo's engagement in an

illegal agreement to fix prices, rig bids, and allocate markets for generic drugs.

192.     During that same March 2, 2015 investor earnings call, De Silva, in his opening

remarks regarding Endo's generics business segment, stated:

> [W]hile we cannot plan for them, we will maintain our opportunistic
> approach to supply and demand imbalances that lead to volume and
> price opportunities for US Generics.

These statements that Endo's pricing strategy was "opportunistic," and that Endo increased

prices as a result of naturally occurring "supply and demand imbalances" in generic drug

markets, were false and misleading because they indicated that the markets for Endo's generic

drugs were functioning as they were intended, with competition driving down price toward

marginal cost, when in fact Endo did not compete on price with other generic manufacturers in

several generic drug markets in which Defendants made and sustained very large price increases

and, for certain drugs, Defendants ceded market share to existing manufacturers and to new

entrants to avoid competition that would drive down the inflated prices.  As an independent and

separate basis for falsity, the statements failed to disclose that Endo was engaged in an illegal

agreement to fix prices, rig bids, and allocate markets for generic drugs.

### B.     First Quarter 2015
### First Quarter 2015 False And Misleading Statements And Omissions

193.     On May 11, 2015, Endo filed its Q1 2015 10-Q with the SEC reporting Endo's

Q1 2015 financial results, and Defendants held the Q1 2015 Earnings Call.  The Q1 2015 10-Q

was signed by De Silva and Upadhyay and contained certifications pursuant to SOX signed by

De Silva and Upadhyay, stating that the financial information contained in the Q1 2015 10-Q did

"not contain any untrue statement of a material fact or omit to state a material fact necessary to

make the statements made, in light of the circumstances under which such statements were made,

not misleading;" fairly presented in all material respects the financial condition and results of

operations of Endo; and disclosed any material changes to the Company's internal control over

financial reporting.

194.    The Q1 2015 10-Q reported that generic segment Adjusted Income had increased

149% to $183.5 million compared to Q1 2014, with the attribution that the increase was:

> primarily due to the DAVA acquisition, the May 2014 launch of our
> authorized generic of Lidoderm® and overall increases in demand.

During the Q1 2015 Earnings Call, De Silva echoed these statements of attribution, claiming:

> First-quarter results benefited from the acquisition of DAVA
> Pharmaceuticals which closed in August 2014, and the partial-
> quarter contribution of Boca Pharmacal, which was acquired in
> February of 2014.  Sales of LIDODERM AG were a strong source
> of new growth, as well.

These statements attributing Endo's financial results to various sources were false and

misleading because, having put this topic at issue, they failed to disclose that Endo's generic

segment Adjusted Income was achieved in material part because Endo did not compete on price

with other generic manufacturers in several generic drug markets in which Defendants made and

sustained very large price increases and, for certain drugs, Defendants ceded market share to

existing manufacturers and to new entrants to avoid competition that would drive down the

inflated prices.  As an independent and separate basis for falsity, the statements failed to disclose

that Endo's generic segment profits were derived in material part from Endo's engagement in an

illegal agreement to fix prices, rig bids, and allocate markets for generic drugs.

### C.    Second Quarter 2015
### False And Misleading Statements And Omissions

195.    On May 18, 2015, Endo announced that it had entered into an agreement to

acquire Par, and Defendants held an investor conference call to discuss the acquisition.

196.    During his opening statements on that call, Upadhyay stated, in part:

> Growth across both Companies resulted from a combination of
> volume, new products, prudent pricing strategies and accretive
> acquisitions. In addition to impressive revenue growth, both
> Companies have realized meaningful margin gains since 2011 as a
> result of greater manufacturing efficiencies, favorable mix and
> through the optimization of pricing across a more specialized
> product portfolios.

The statements characterizing the pricing strategies at Endo and Par as "prudent," and as the

benign "optimization of pricing across a more specialized product portfolio," were false and

misleading because they indicated that the markets for Endo's and Par's generic drugs were

functioning as they were intended, with competition driving down price toward marginal cost,

when in fact Endo and Par did not compete on price with other generic manufacturers in several

generic drug markets in which Defendants made and sustained very large price increases and, for

certain drugs, Defendants ceded market share to existing manufacturers and to new entrants to

avoid competition that would drive down the inflated prices.  As an independent and separate

basis for falsity, the statements failed to disclose that Endo and Par were engaged in an illegal

agreement to fix prices, rig bids, and allocate markets for generic drugs.

197.    On August 10, 2015, Endo filed its Q2 2015 10-Q with the SEC reporting Endo's

Q2 2015 financial results, and Defendants held the Q2 2015 Earnings Call.  The Q2 2015 10-Q

was signed by De Silva and Upadhyay and contained certifications pursuant to SOX signed by

De Silva and Upadhyay, stating that the financial information in the Q2 2015 10-Q did "not

contain any untrue statement of a material fact or omit to state a material fact necessary to make

the statements made, in light of the circumstances under which such statements were made, not

misleading;" fairly presented in all material respects the financial condition and results of

operations of Endo; and disclosed any material changes to the Company's internal control over

financial reporting.

198.    The Q2 2015 10-Q reported that generic segment Adjusted Income had increased 39% to $146.1 million compared to Q2 2014, with the attribution that the increase was:

> primarily due to the DAVA acquisition, the May 2014 launch of our authorized generic of Lidoderm® and overall increases in demand.

During the Q2 2015 Earnings Call, De Silva echoed these statements of attribution, claiming:

> Our year-to-date 2015 results primarily benefit from organic growth and a number of value creating acquisitions as well as Lidoderm AG which was a strong source of growth as well.

These statements attributing Endo's financial results to various sources were false and misleading because, having put this topic at issue, they failed to disclose that Endo's generic segment Adjusted Income was achieved in material part because Endo did not compete on price with other generic manufacturers in several generic drug markets in which Defendants made and sustained very large price increases and, for certain drugs, Defendants ceded market share to existing manufacturers and to new entrants to avoid competition that would drive down the inflated prices.  As an independent and separate basis for falsity, the statements failed to disclose that Endo's generic segment profits were derived in material part from Endo's engagement in an illegal agreement to fix prices, rig bids, and allocate markets for generic drugs.

199.    During the Q2 2015 Earnings Call, a J.P. Morgan analyst asked, "First, just on the generic pricing environment, can you just elaborate a little bit more there … ?  I know one of your competitor[s] said some cautious comments last week and just interested in how you are seeing the pricing environment play out in that part of the market?"  De Silva responded:

> We are prudent and opportunistic when we take price increases and not all controlled substances lend themselves to price increases. It all depends on the competitive set and the supply-demand situation in the market at any given time. However, we have a very broad portfolio so we have at least 700 SKUs that we market and manage and at any given quarter we do have opportunities to take price and this second quarter was no different.

These statements that Endo's pricing strategy was "prudent and opportunistic," and that Endo increased prices as a result of the naturally occurring "competitive set and the supply-demand situation in the market at any given time," were false and misleading because they indicated that the markets for Endo's generic drugs were functioning as they were intended, with competition driving down price toward marginal cost, when in fact Endo did not compete on price with other generic manufacturers in several generic drug markets in which Defendants made and sustained very large price increases and, for certain drugs, Defendants ceded market share to existing manufacturers and to new entrants to avoid competition that would drive down the inflated prices.  As an independent and separate basis for falsity, the statements failed to disclose that Endo was engaged in an illegal agreement to fix prices, rig bids, and allocate markets for generic drugs.

> ### D.   Third Quarter 2015
> ### False And Misleading Statements And Omissions

200.   On November 9, 2015, Endo filed its Q3 2015 10-Q with the SEC reporting Endo's Q3 2015 financial results.  These results had been announced on November 5, 2015, and Defendants held the Q3 2015 Earnings Call that same day.  The Q3 2015 10-Q was signed by De Silva and Upadhyay and contained certifications pursuant to SOX signed by De Silva and Upadhyay, stating that the financial information contained in the Q3 2015 10-Q did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading;" fairly presented in all material respects the financial condition and results of operations of Endo; and disclosed any material changes to the Company's internal controls over financial reporting.

201.   The Q3 2015 10-Q reported that generic segment Adjusted Income had increased 28% to $178 million compared to Q3 2014, with the attribution that the increase was:

> primarily due to the DAVA acquisition, the May 2014 launch of our authorized generic of Lidoderm® and overall increases in demand.

During the Q3 2015 Earnings Call, De Silva echoed these statements of attribution, claiming:

> Our year-to-date 2015 results primarily benefited from organic growth, including new product launches and a number of value creating acquisitions.

These statements attributing Endo's financial results to various sources were false and misleading because, having put this topic at issue, they failed to disclose that Endo's generic segment Adjusted Income was achieved in material part because Endo did not compete on price with other generic manufacturers in several generic drug markets in which Defendants made and sustained very large price increases and, for certain drugs, Defendants ceded market share to existing manufacturers and to new entrants to avoid competition that would drive down the inflated prices.  As an independent and separate basis for falsity, the statements failed to disclose that Endo's generic segment profits were derived in material part from Endo's engagement in an illegal agreement to fix prices, rig bids, and allocate markets for generic drugs.

202.   On the November 5, 2015 earnings call, an analyst from Stifel Nicolaus asked, "And on the generic side, what has allowed you to take advantage of certain pricing opportunities where other competitors in the same areas have not been able to?"  In response, De Silva stated, in part:

> The controlled substance space has been one where there's been events that allow for price increases, like the oxycodones or the hydrocodones, and the small products are an area where oftentimes the supply-demand dynamics are such that there are opportunities for pricing, because many of these don't last very long, and they are temporary, but net-net they contribute to Qualitest growth.

These statements were false and misleading because Endo had not competed on price with other generic manufacturers in the markets for several generic drugs that were not controlled substances or "small products" and for which Defendants had made and sustained very large price increases and, for certain drugs, Defendants ceded market share to existing manufacturers and to new entrants to avoid competition that would drive down the inflated prices.  None of the markets for those drugs, or the rest of the Inflated Drugs, experienced competitive market "supply-demand dynamics" that provided opportunities for price increases.  As an independent and separate basis for falsity, the statements failed to disclose that Endo was engaged in an illegal agreement to fix prices, rig bids, and allocate markets for generic drugs.

### E.   Fourth Quarter and Full-Year 2015 False And Misleading Statements And Omissions

203.    On February 29, 2016, Endo filed the Q4/FY 2015 Press Release disclosing its Q4 2015 and full-year 2015 financial results and the 2015 10-K reporting Endo's full-year 2015 financial results.  That same day, Defendants held the Q4/FY 2015 Earnings Call.  The 2015 10-K was signed by De Silva and Upadhyay and contained certifications pursuant to SOX signed by De Silva and Upadhyay, stating that the financial information contained in the 2015 10-K did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading;" fairly presented in all material respects the financial condition and results of operations of Endo; and disclosed any material changes to the Company's internal control over financial reporting.

204.    The Q4/FY 2015 Press Release reported that generic segment revenues had increased 81% to $609 million compared to Q4 2014, with the attribution that the increase was:

> primarily attributable to growth from the addition of sales from the
> Company's September 2015 acquisition of Par, as well as
> underlying growth of certain products.

The 2015 10-K reported that generic segment Adjusted Income had increased 60% to

$741.8 million compared to full-year 2014, with the attribution that the increase was:

> primarily due to the DAVA and Par acquisitions and the resulting
> incremental adjusted income from continuing operations before
> income tax. In addition, adjusted income from continuing operations
> before income tax increased as a result of new product launches and
> an increase in demand for generic pain products.

These statements attributing Endo's financial results to various sources were false and

misleading because, having put this topic at issue, they failed to disclose that Endo's generic

segment revenues and Adjusted Income were achieved in material part because Endo did not

compete on price with other generic manufacturers in several generic drug markets in which

Defendants made and sustained very large price increases and, for certain drugs, Defendants

ceded market share to existing manufacturers and to new entrants to avoid competition that

would drive down the inflated prices.  As an independent and separate basis for falsity, the

statements failed to disclose that Endo's generic segment revenues and profits were derived in

material part from Endo's engagement in an illegal agreement to fix prices, rig bids, and allocate

markets for generic drugs.

205.    In the 2015 10-K, Endo also stated, in part:

> In the generic pharmaceutical market, we face intense competition
> from other generic drug manufacturers, brand name pharmaceutical
> companies through authorized generics, existing brand equivalents
> and manufacturers of therapeutically similar drugs. In the market for
> generic pharmaceuticals, our competitors, including Teva
> Pharmaceutical Industries (Teva), Mylan, Inc. (Mylan), and Impax
> Laboratories, Inc. (Impax), vary depending on product category and
> dosage strength….

These statements that Endo faced "intense competition" from other generic drug manufacturers were false and misleading because Endo did not compete on price with other generic manufacturers in several generic drug markets in which Defendants made and sustained very large price increases and, for certain drugs, Defendants ceded market share to existing manufacturers and to new entrants to avoid competition that would drive down the inflated prices.  Indeed, Endo, by that time, had implemented price increases in tandem with each of the generics manufacturers with whom Endo asserted it was locked in "intense competition," *i.e.*, Teva, Mylan, and Impax.  ¶¶ 105, 109, 113, 123, 127, 131, 143.  As an independent and separate basis for falsity, the statements failed to disclose that Endo was engaged in an illegal agreement to fix prices, rig bids, and allocate markets for generic drugs.

206.    In the 2015 10-K, Endo also stated, in part:

> Our primary strategy is to compete in the generic product market with a focus on high-value, first-to-file or first-to-market opportunities, regardless of therapeutic category, and products that present significant barriers to entry for reasons such as complex formulation, regulatory or legal challenges or difficulty in raw material sourcing….

These statements describing Endo's supposed "primary strategy" were false and misleading because, having put that topic at issue, Endo failed to disclose its business strategy since 2013 of generating material revenues and profits by not competing on price with other generic manufacturers in several generic drug markets in which Defendants made and sustained very large price increases and, for certain drugs, Defendants ceded market share to existing manufacturers and to new entrants to avoid competition that would drive down the inflated prices.  As an independent and separate basis for falsity, the statements failed to disclose that Endo was engaged in an illegal agreement to fix prices, rig bids, and allocate markets for generic drugs.

207.    In the 2015 10-K, Endo also stated, in part:

> Newly introduced generic products with limited or no other generic competition typically garner higher prices. At the expiration of the exclusivity period, other generic distributors may enter the market, resulting in a significant price decline for the drug. Consequently, the maintenance of profitable operations in generic pharmaceuticals depends, in part, on our ability to select, develop and launch new generic products in a timely and cost efficient manner and to maintain efficient, high quality manufacturing capabilities.

These statements that the entry into a generic drug market by "other generic distributors …

result[s] in a significant price decline for the drug" were misleading because they indicated that

the markets for Endo's generic drugs were functioning as they were intended, with competition

driving down price toward marginal cost, when in fact Endo did not compete on price with other

generic manufacturers in several generic drug markets in which Defendants made and sustained

very large price increases and, for certain drugs, Defendants ceded market share to existing

manufacturers and to new entrants to avoid competition that would drive down the inflated

prices.  As an independent and separate basis for falsity, the statements failed to disclose that

Endo was engaged in an illegal agreement to fix prices, rig bids, and allocate markets for generic

drugs.

208.    Under the Risk Factors section of the 2015 10-K, Endo stated, in part:

> **We operate in a highly competitive industry.**
>
> The pharmaceutical industry is intensely competitive, and we face competition in our branded and generic pharmaceutical business and our medical devices business. In addition to product development, safety, efficacy, commercialization, marketing and promotion, other competitive factors include product quality and price, reputation, service and access to scientific and technical information. Many of our competitors, including Abbott, Allergan, Purdue, Jazz, Shire, Horizon, Mallinckrodt, Teva, Mylan, and Impax, among others, may have greater resources than we do. It is possible that our competitors may make greater research and development investments and that their new products may make our products or technologies uncompetitive or obsolete. If we fail to compete successfully, our

73

business, results of operations, financial condition and cash flows
could be materially adversely affected.

These statements that Endo's generic segment operated in a "highly competitive industry," and

that Endo "face[d] competition" from other generic drug manufacturers on a number of

"competitive factors," including "price," were false and misleading because Endo did not

compete on price with other generic manufacturers in several generic drug markets in which

Defendants made and sustained very large price increases and, for certain drugs, Defendants

ceded market share to existing manufacturers and to new entrants to avoid competition that

would drive down the inflated prices.  Indeed, Endo, by that time, had implemented price

increases in tandem with many of the generics manufacturers with whom Endo asserted it was

locked in a "highly competitive industry," including Teva, Allergan, Mylan, and Impax.  ¶¶ 102,

105, 109, 113, 123, 127, 131, 143.  As an independent and separate basis for falsity, the

statements failed to disclose that Endo was engaged in an illegal agreement to fix prices, rig bids,

and allocate markets for generic drugs.

209.  Under the Risk Factors section of the 2015 10-K, Endo also stated, in part:

> **We may experience pricing pressure on the price of our
> products due to social or political pressure to lower the cost of
> drugs, which would reduce our revenue and future profitability.**
>
> … Recent events have resulted in increased public and
> governmental scrutiny of the cost of drugs, especially in connection
> with price increases following companies' acquisitions of the rights
> to certain drug products. In particular, U.S. federal prosecutors
> recently issued subpoenas to a pharmaceutical company seeking
> information about its drug pricing practices, among other issues, and
> members of the U.S. Congress have sought information from certain
> pharmaceutical companies relating to post-acquisition drug-price
> increases. Our revenue and future profitability could be negatively
> affected if these inquiries were to result in legislative or regulatory
> proposals that limit our ability to increase the prices of our products.
>
> Pressure from social activist groups and future government
> regulations may also put downward pressure on the price of drugs,

74

which could result in downward pressure on the prices of our
products in the future.

These statements were false and misleading because they indicated that Endo had not yet

experienced "pricing pressure" caused by "governmental scrutiny," such as, for example, when

"federal prosecutors recently issued subpoenas to a pharmaceutical company seeking information

about its drug pricing practices."  In fact, Endo was, at that time, facing pricing pressure as a

result of having received, in December 2015, the undisclosed CT AG Subpoena requesting

information on Endo's pricing of certain generic drugs.  After Endo received the CT AG

Subpoena, Endo was unable to either (i) implement any further anticompetitive price increases in

tandem with other generic manufacturers, or (ii) maintain the anticompetitive price increases that

Endo had already implemented.

### F.     First Quarter 2016
###         False And Misleading Statements And Omissions

210.    On May 6, 2016, Endo filed its Q1 2016 10-Q with the SEC reporting Endo's

Q1 2016 financial results.  Endo had announced those results on May 5, 2016, and Defendants

held the Q1 2016 Earnings Call that same day.  The Q1 2016 10-Q was signed by De Silva and

Upadhyay and contained certifications pursuant to SOX signed by De Silva and Upadhyay,

stating that the financial information contained in the Q1 2016 10-Q did "not contain any untrue

statement of a material fact or omit to state a material fact necessary to make the statements

made, in light of the circumstances under which such statements were made, not misleading;"

fairly presented in all material respects the financial condition and results of operations of Endo;

and disclosed any material changes to the Company's internal control over financial reporting.

211.    The Q1 2016 10-Q reported that generic segment Adjusted Income had increased

15% to $211.8 million compared to Q1 2015, with the attribution that the increase was:

- "primarily due to the Par acquisition on September 25, 2015," which in turn was "partially offset by a decrease resulting from competitive pressure on commoditized generic products and charges to increase excess inventory reserves of approximately $18 million at our U.S. Generic Pharmaceuticals segment due to the underperformance of certain products."

These statements attributing Endo's financial results to various sources were false and misleading because, having put this topic at issue, they failed to disclose that: (i) Endo's generic segment Adjusted Income was achieved in material part because Endo did not compete on price with other generic manufacturers in several generic drug markets in which Defendants made and sustained very large price increases and, for certain drugs, Defendants ceded market share to existing manufacturers and to new entrants to avoid competition that would drive down the inflated prices; (ii) as an independent and separate basis for falsity, the statements failed to disclose that Endo's generic segment profits were derived in material part from Endo's engagement in an illegal agreement to fix prices, rig bids, and allocate markets for generic drugs; and (iii) that the "competitive pressure" Endo was experiencing was due in significant part to the fact that, after Endo received the CT AG Subpoena, Endo was unable to either implement any further anticompetitive price increases in tandem with other generic manufacturers, or maintain the anticompetitive price increases that Endo had already implemented.

212.    During the Q1 2016 Earnings Call, Campanelli, in his opening statements, purported to explain the factors driving decreased performance in Endo's generics business:

> First, we have seen a steep and rapid price erosion caused by pair consolidation that has been more even profound than anticipated…. Second, coupled with this consolidation and new payer environment, competitors are taking aggressive pricing actions to gain market share…. Third, there's been a rapid erosion of the pain segment driven by three things: one, continued market contraction; two, increased competitive capacity and pressure; and three, while still too early to judge the full impact, we believe the recently issued CDC guidelines will continue to put pressure on a already soft pain market…. Fourth, there's been a recent and marked acceleration of FDA approval for generic products…. Fifth and finally, delays in

76

> expected FDA actions related to our 505(b)(2) products means that
> we have yet to see the anticipated removal of unapproved
> competitive products from the market.

These statements describing the factors negatively affecting Endo's generics business were false

and misleading because, having put this topic at issue, Campanelli failed to disclose that Endo

was, at that time, facing pricing pressure as a result of having received, in December 2015, the

yet undisclosed CT AG Subpoena requesting information on Endo's pricing of certain generic

drugs.  After Endo received the CT AG Subpoena, Endo was unable to either (i) implement any

further anticompetitive price increases in tandem with other generic manufacturers, or (ii)

maintain the anticompetitive price increases that Endo had already implemented.

213.    During the Q1 2016 Earnings Call, De Silva, in his opening statements, purported

to explain the factors driving decreased performance in Endo's generics business:

> This was driven by continued pricing and competitive pressures on
> our commoditized and pain products.

These statements describing the factors negatively affecting Endo's generics business were false

and misleading because, having put this topic at issue, De Silva failed to disclose that Endo was,

at that time, facing pricing pressure as a result of having received, in December 2015, the yet

undisclosed CT AG Subpoena requesting information on Endo's pricing of certain generic drugs.

After Endo received the CT AG Subpoena, Endo was unable to either (i) implement any further

anticompetitive price increases in tandem with other generic manufacturers, or (ii) maintain the

anticompetitive price increases that Endo had already implemented.

### G.    Second Quarter 2016
### False And Misleading Statements And Omissions

214.    On August 9, 2016, Endo filed its Q2 2016 10-Q with the SEC reporting Endo's

Q2 2016 financial results.  Endo had announced those results on August 8, 2016, and Defendants

held the Q2 2016 Earnings Call that same day.  The Q2 2016 10-Q was signed by De Silva and

Upadhyay and contained certifications pursuant to SOX signed by De Silva and Upadhyay,

stating that the financial information contained in the Q2 2016 10-Q did "not contain any untrue

statement of a material fact or omit to state a material fact necessary to make the statements

made, in light of the circumstances under which such statements were made, not misleading;"

fairly presented in all material respects the financial condition and results of operations of Endo;

and disclosed any material changes to the Company's internal control over financial reporting.

     215.    The Q2 2016 10-Q reported that generic segment Adjusted Income had increased

by 47% to $215 million compared to Q2 2015, with the attribution that the increase was:

- "primarily due to the Par acquisition on September 25, 2015," which in turn was "partially offset by a decrease resulting from competitive pressure on commoditized generic products and charges to increase excess inventory reserves of approximately $26 million at our U.S. Generic Pharmaceuticals segment due to the underperformance of certain products."

These statements attributing Endo's financial results to various sources were false and

misleading because, having put this topic at issue, they failed to disclose that: (i) Endo's generic

segment Adjusted Income was achieved in material part because Endo did not compete on price

with other generic manufacturers in several generic drug markets in which Defendants made and

sustained very large price increases and, for certain drugs, Defendants ceded market share to

existing manufacturers and to new entrants to avoid competition that would drive down the

inflated prices; (ii) as an independent and separate basis for falsity, the statements failed to

disclose that Endo's generic segment profits were derived in material part from Endo's

engagement in an illegal agreement to fix prices, rig bids, and allocate markets for generic drugs;

and (iii) that the "competitive pressure" Endo was experiencing was due in significant part to the

fact that, after Endo received the CT AG Subpoena, Endo was unable to either implement any

further anticompetitive price increases in tandem with other generic manufacturers, or maintain

the anticompetitive price increases that Endo had already implemented.

216.    During the Q2 2016 Earnings Call, Campanelli claimed that the performance of Endo's generics business was negatively affected by:

consortium pricing pressures and competitive generic entrants.

These statements describing the factors negatively affecting Endo's generics business were false and misleading because, having put this topic at issue, Campanelli failed to disclose that, after Endo received the CT AG Subpoena, Endo faced pricing pressure in that it was unable to either (i) implement any further anticompetitive price increases in tandem with other generic manufacturers, or (ii) maintain the anticompetitive price increases that Endo had already implemented.

### H.    Third Quarter 2016
### False And Misleading Statements And Omissions

217.    On November 8, 2016, Endo filed its Q3 2016 10-Q with the SEC reporting Endo's Q3 2016 financial results, and Defendants held the Q3 2016 Earnings Call.  The Q3 2016 10-Q was signed by Campanelli and Upadhyay and contained certifications pursuant to SOX signed by Campanelli and Upadhyay, stating that the financial information contained in the Q3 2016 10-Q did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading;" fairly presented in all material respects the financial condition and results of operations of Endo; and disclosed any material changes to the Company's internal control over financial reporting.

218.    The Q3 2016 10-Q reported that generic segment Adjusted Income had increased 29% to $228.7 million compared to Q3 2015, with the attribution that the increase was:

- "primarily due to the Par acquisition on September 25, 2015," which in turn was "partially offset by a decrease resulting from competitive pressure on commoditized generic products and charges to increase excess inventory

reserves of approximately $42 million at our U.S. Generic Pharmaceuticals
segment due to the underperformance of certain products."

These statements attributing Endo's financial results to various sources were false and
misleading because, having put this topic at issue, they failed to disclose that: (i) Endo's generic
segment Adjusted Income was achieved in material part because Endo did not compete on price
with other generic manufacturers in several generic drug markets in which Defendants made and
sustained very large price increases and, for certain drugs, Defendants ceded market share to
existing manufacturers and to new entrants to avoid competition that would drive down the
inflated prices; (ii) as an independent and separate basis for falsity, the statements failed to
disclose that Endo's generic segment profits were derived in material part from Endo's
engagement in an illegal agreement to fix prices, rig bids, and allocate markets for generic drugs;
and (iii) that the "competitive pressure" Endo was experiencing was due in significant part to the
fact that, after Endo received the CT AG Subpoena, Endo was unable to either implement any
further anticompetitive price increases in tandem with other generic manufacturers, or maintain
the anticompetitive price increases that Endo had already implemented.

219.    During the Q3 2016 Earnings Call, Campanelli claimed that the performance of
Endo's generics business was negatively affected by:

> higher than expected consortium pricing pressures, evolved
> consortium structure, and certain competitive generic entrants late
> in the quarter.

220.    These statements describing the factors negatively affecting Endo's generics
business were false and misleading because, having put this topic at issue, Campanelli failed to
disclose that, after Endo received the CT AG Subpoena, Endo faced pricing pressure in that it
was unable to either (i) implement any further anticompetitive price increases in tandem with

other generic manufacturers, or (ii) maintain the anticompetitive price increases that Endo had already implemented.

## VI.   ADDITIONAL ALLEGATIONS OF SCIENTER

221.   Together with the facts alleged herein, the Individual Defendants acted with scienter in that each knew or recklessly disregarded the true facts in making the materially false and misleading statements identified herein.

### A.   De Silva And Campanelli Were Personally Involved In And Responsible For Price Increases At Endo And Par

222.   De Silva was personally involved in and responsible for Endo's price increases on the Inflated Drugs.  De Silva asked for and regularly received lists from Propst and Reiney of generic drugs that presented opportunities for price increases along with analysis as to why those price hikes were feasible.  (CW-5)  De Silva, Propst, and Reiney would then decide whether or not to make those price increases.  (CW-5)  Propst and Reiney did not have the authority to order the price increases on generic drugs without first obtaining De Silva's approval.  (CW-1; CW-5)

223.   Campanelli, as CEO of Par, approved all price changes, increases or decreases, as a matter of business model.  (CW-5)  Once Campanelli became the head of Endo's generics segment, he personally sign off on each price change at Endo, adopting his business model while at Par.  (CW-5)

### B.   The Individual Defendants Tracked And Discussed The Price Increases And Profits

224.   On a monthly and quarterly basis, Cupero, and later Raimer, provided De Silva and Upadhyay with Excel spreadsheets that contained pricing, sales, revenue, and profit data on a drug-by-drug basis down to the unit-price level.  (CW-2)  Campanelli also received these spreadsheets after he took over as the head of Endo's generics unit.  (CW-2)

225.    At the request of De Silva and Upadhyay, the Excel spreadsheets included a tab for a spreadsheet that identified and provided explanations for any price increases or decreases in excess of 25%. (CW-2). The tab was colored red for De Silva's and Upadhyay's ease of reference. Each month and quarter, after receiving the spreadsheets, Upadhyay, De Silva, and Campanelli held a conference call with Qualitest's management to discuss their contents. (CW-2).

226.    For De Silva and Upadhyay, these documents tracked Endo's anticompetitive prices increases of Prednisone, Oxybutynin, Amitriptyline, Baclofen, Butalbital, Phenobarbital, and Propranolol. Each price increase was well over the 25% threshold for inclusion on the red tab; indeed, the price increases were extraordinary, ranging from 60% to 350%.

227.    The Excel spreadsheets informed De Silva and Upadhyay of the material amount of profits from these Inflated Drugs. Prednisone, Oxybutynin, Amitriptyline, Baclofen, Butalbital, Phenobarbital, and Propranolol cumulatively contributed $488 million in Inflated Profit to Endo's bottom line through the end of 2016.

228.    The Excel spreadsheets additionally reflected material profits from Methotrexate and Doxazosin after Endo acquired DAVA in August 2014, as well as from Digoxin, Isosorbide, and Cholestyramine after Endo acquired Par in September 2015. These drugs cumulatively contributed $134 million in Inflated Profits.

**C.    Defendants Had Access To Information Concerning The Anticompetitive Price Increases**

229.    At all relevant times, each of the Individual Defendants had access to Endo's ERP systems which contained all of Qualitest's internal pricing, sales, and revenue data. (CW-1; CW-2). The data stored in the ERP system was extremely detailed on a drug-by-drug level and

an NDC-code level of granularity.  This data was used to create the Excel spreadsheets provided

to De Silva, Upadhyay, and Campanelli monthly and quarterly.  (CW-2).

       **D.**      **Defendants Spoke Repeatedly About Price Increases, The
Purported Reasons For Them, Their Impact On Endo's
Bottom Line, And, In 2016, About The Pricing Pressure That
Endo Faced**

230.     The Individual Defendants' self-proclaimed personal involvement in, and

knowledge of, Endo's generic drug price increases, their impact on Endo's financial condition,

and the pricing pressure that Endo faced, supports a strong inference that they possessed

knowledge of the true state of affairs of the business and, thus, were at least reckless in making

their misleading representations.

231.     De Silva repeatedly claimed knowledge of the circumstances in which Endo

would take price increases, falsely asserting that they occurred only when market conditions,

namely changes in supply or demand, dictated.  For example, on March 2, 2015, De Silva stated

that "while we cannot plan for [price increases], we will maintain our opportunistic approach to

supply and demand imbalances that lead to volume and price opportunities for US Generics."

Similarly, on August 10, 2015, De Silva stated, "We are prudent and opportunistic when we take

price increases ….  It all depends on the competitive set and the supply-demand situation in the

market at any given time."

232.     De Silva also claimed to have intimate knowledge of the impact of price increases

on Endo's financial performance and profitability.  In these statements, he misleadingly

diminished the impact of price increases on Endo's financial success.  For example, on July 31,

2014, De Silva stated, "If you look at the growth of our Generics business on a year-over-year

basis, much [of] our growth is driven by volume, not by price."  Then, on March 2, 2015, De

Silva stated, "In 2015, we expect strong double digit growth for US Generics as a result of consistent volume growth supplemented by recent pricing opportunities."

233.    Towards the end of the Class Period, as pricing pressure increased, and Endo's generic profits declined, De Silva and Campanelli both attributed the pricing pressure to normal market dynamics, concealing that the collapse of Defendants' anticompetitive scheme was the true cause.  For instance, on May 5, 2016, both Campanelli and De Silva provided lengthy and detailed explanations for the sources of the pricing pressure Endo's was facing, attributing it to market factors such as customer consolidation.  Likewise, on August 8, 2016, Campanelli, in discussing pricing pressure, misleadingly explained that it was "driven by consortium pricing pressures and competitive generic entrants."

   E.    **The Inflated Profits Were Material To Endo**
         **Over An Extended Period Of Time**

234.    The sheer size and importance of the Inflated Profits weighs heavily towards an inference that the Defendants made their false and misleading statements with scienter.  It would have been at least reckless for Defendants to be unaware that the critical source of Endo's financial were anticompetitive price increases on just 13 drugs.

235.    Defendants' anticompetitive pricing practices generated as much as $521 million in Inflated Profits through the end of 2016.  These Inflated Profits were critical to Endo's reported success from 2014 through 2016, as the generics segment was the only major segment of Endo's business that consistently contributed to the Company's growth.  The Inflated Profit made up a significant portion of the Company's adjusted income from its generics segment.

84

|  | **2014** | **2015** | **2016** |
|---|---|---|---|
| **Inflated Profit ($ millions)** | $141 | $235 | $199 |
| **Generics Adjusted Income ($ millions)** | $464 | $742 | $1,079 |
| **Inflated Profit / Generics Adjusted Income** | **30%** | **32%** | **18%** |

236.     Moreover, Defendants repeatedly touted the positive results from Endo's generic

segment, recognizing that generic sales were driving the Company's growth and profits, and

focusing analysts on the division.  For example, on May 11, 2015, De Silva stated, "US Generic

Pharmaceutical delivered strong underlying growth in first-quarter 2015 …. The relative strength

of revenues from our US Generics Pharmaceuticals business in the first quarter was a highlight

of the value of our increasingly diversified business."  Focused by management on those results,

that same day, an analyst with Canaccord Genuity reported that "[Endo's] generic business

continues to be the primary top-line driver …."

      **F.**      **Defendants Were Motivated To Inflate The Price Of Endo's**
                    **Stock To Consummate A Transformational Deal**

237.     Defendants were motivated to make false statements and omissions to inflate the

price of Endo stock in order to undertake and pay for a "transformational" acquisition.

Immediately after he joined Endo in March 2013, De Silva announced his intent to fuel a

growth-by-acquisition strategy, and his desire for a transformative acquisition.  Acquiring

revenue was necessary for the Company's survival, as its other segments were struggling and

Endo was exposed to massive surgical mesh product-liability exposure.

238.     Because Endo did not have the cash on hand, however, De Silva's acquisition

strategy required that De Silva drive Endo's stock price higher so that it could be used as

currency to purchase other companies.  Defendants would inflate the stock price by increase

Inflated Profits from anticompetitive price hikes.

239.    In early 2013, Endo's stock sold for around $30, too low to use as currency to

make a truly transformational acquisition.  As De Silva ordered anticompetitive price increases,

and Inflated Profits started flowing, simultaneously, Endo's stock price also started a steep and

steady climb.  This allowed De Silva to use Endo's stock as currency to embark on an acquisition

spree of smaller companies.  By January 2015, Endo had purchased five companies for

$7.1 billion, nearly all of which was paid for either in stock or cash raised from the sale of Endo

securities to investors.

240.    Bolstered by the Inflated Profits, by April 2015 Endo's stock traded near an all-

time high of over $90.  With the stock price sufficiently inflated, on May 18, 2015, De Silva

announced the transformative transaction he long desired; the acquisition of Par for

approximately $8 billion.  Endo estimated the acquisition would grow its "enterprise value" by

40% to $28 billion, with annual revenues growing from $2.9 billion to more than $4 billion.

241.    Without sufficient cash, Defendants could not close the Par deal with the inflated

Endo shares.  Defendants, therefore, were motivated to ensure that the price of Endo's stock

remained as high as possible.  Accordingly, just before and after announcing the transaction,

Defendants made three additional anticompetitive price hikes.  Ultimately, Endo funded the Par

acquisition, which was completed on September 28, 2015, by paying $1.33 billion in Endo stock,

and raising $2.3 billion from a secondary stock offering, along with various financing

arrangements.

### G.   De Silva Deliberately "Locked Up" Supply Of Endo's Generic Drugs To Manipulate Their Price

242.    The strong inference of scienter is further supported by an additional deliberate, and undisclosed, scheme to manipulate the markets for generic drugs to increase their prices. Specifically, after De Silva took control over Qualitest, Endo intentionally began to systematically constrain the supply of certain Qualitest generic drugs by prohibiting employees from selling those products, despite Endo having sufficient inventory to make sales.  (CW-1). These product "lock-ups" intentionally created market shortages for the drugs.  Within weeks, Endo could dramatically increase their prices, (CW-1) sometimes up to 300%.  (CW-4).  The lock-ups happened frequently and were specifically noted in Endo's ERP system.  (CW-1; CW-4).  As with other price increases, only Propst and Reiney could direct sales employees when to re-release the supply and at what price.  (CW-4).

### H.   The 2014 Congressional Letter To Endo

243.    On October 2, 2014, Congress sent Endo a letter seeking answers to "the underlying causes of recent increases in the prices of [Endo's] drugs."  This letter placed Defendants on alert to investigate the reasons behind any recent price increases by Endo, including whether Endo was not competing on price with other generic drug manufacturers, and to what extent.  Although the letter was addressed to the head of Endo's branded vision, De Silva and Upadhyay would be informed of a letter from Congress to Endo concerning an ongoing legislative investigation.

### I.   The 2015 CT AG Subpoena To Endo

244.    In December 2015, the Connecticut AG served a subpoena on Endo seeking information on Endo's pricing practices regarding Amitriptyline, Doxazosin, Methotrexate, and Oxybutynin.  The subpoena placed the Individual Defendants on notice of Endo's

anticompetitive price increases in regard to those drugs.  Thus, Defendants were at least reckless when they misleadingly stated in Endo's 2015 10-K that Endo faced risk as a result of other certain companies receiving government subpoenas and Congressional inquiries, when in fact Defendants had already received the same.  *See* ¶ 209.

### J.   De Silva and Upadhyay Scienter Regarding Methotrexate And Doxazosin (The DAVA Drugs)

245.   At the time Endo announced its purchase of DAVA on June 24, 2014, Methotrexate made up more than 70% of DAVA's sales.  It was the most valuable component of the $590 million acquisition.  De Silva and Upadhyay, therefore, understood that DAVA and its competitors had made a 200% price increase on the drug in the first half of 2013.  Indeed, De Silva demonstrated his familiarity with the pricing and competitive environment for Methotrexate in his July 2014 remarks discussing the acquisition.  ¶ 39.  Doxazosin was an important drug for which DAVA had just entered the market.

246.   Thus, there is a strong inference that De Silva and Upadhyay understood, or recklessly ignored, that the profits derived from Methotrexate and Doxazosin were generated, in substantial part, from anticompetitive price increases.  Moreover, after Endo purchased DAVA, the Individual Defendants deliberately chose not to compete on price for Methotrexate.

### K.   Individual Defendants' Scienter Regarding Isosorbide, Divalproex, Cholestyramine And Digoxin (The Par Drugs)

247.   Several additional facts support a strong inference of scienter that the Individual Defendants knew or were reckless in not knowing of the Inflated Profits generated by the anticompetitive price increases at Par.

248.   In 2013, Par implemented a 187% price hike on Cholestyramine, and a 600% increase on Isosorbide, both in tandem with its competitors.  Then, in 2014, Par entered the

market for Digoxin at a price inflated by a recent anticompetitive price increase.  Pursuant to Campanelli's business model as CEO at Par, he personally approved each increase.  (CW-5).

249.    These anticompetitive pricing actions collectively generated approximately $124 million prior to when Endo purchased Par in September 2015.  That Inflated Profit contributed 11% of Par's reported overall profits over that period of time.  The size of the Inflated Profits, and their impact on Par's bottom line, support a strong inference that De Silva and Upadhyay knew of these price increases, and how they contributed to Par's profits, before Endo purchased Par for $8 billion.

250.    Moreover, in December 2014, the DOJ subpoenaed Par to testify before the criminal grand jury empaneled in the Eastern District of Pennsylvania, and to produce documents concerning Par's communications with competitors in the market for Digoxin.  This placed Campanelli, as CEO of Par, on notice to investigate whether Par was involved in anticompetitive conduct regarding Digoxin and Par's other drugs.  It also placed De Silva and Upadhyay on notice to conduct a similar investigation before Endo purchased Par.

## L.    Corporate Scienter

251.    Endo possessed scienter by virtue of the fact that the Individual Defendants acted with scienter.  In addition, Endo, itself, had scienter because senior corporate executives at Qualitest, acting within the scope of their authority, possessed scienter such that their intent is imputed to the Company.  Propst and Reiney were the highest level of management at Qualitest and, thus, had responsibility for and control over Qualitest's financial reporting.  They were also personally involved in identifying and approving the price increases for the Inflated Drugs; the then tracked the price increases and Inflated profits through the various reports they each received.  As a result, their scienter can be imputed to Endo in regard to the false statements made in Endo's SEC filings, described above (*See* Section V.).

252.     Even beyond Propst and Reiney, it can be inferred from the size and significance of the anticompetitive price increases that some as yet unidentified person at Endo who approved the alleged false and misleading statements in Endo's financial statements and Defendants' conference calls knew or was reckless in not knowing that Endo was engaged in anticompetitive practices and that a material portion of Endo's profits from its generics segment resulted from Defendants' anticompetitive pricing practices.

## VII.     DEFENDANTS ENGAGED IN ADDITIONAL ANTICOMPETITIVE PRACTICES THAT ALSO RENDERED DEFENDANTS' STATEMENTS AND OMISSIONS MATERIALLY FALSE AND MISLEADING

### A.     Defendants Routinely Restricted The Sale Of Qualitest's Drugs To Create Shortages And Then Released Those Drugs At Inflated Prices

253.     In addition to making anticompetitive price increases on generic drugs, throughout the Class Period, Defendants deliberately implemented other anticompetitive practices meant to manipulate the market and increase the prices of generic drugs.

254.     One practice that also began when De Silva arrived at Endo was the intentional "lock-up" of the sale of specified drugs to create artificial supply shortages.  (CW-1).  Once inventory of these drugs was constrained and demand had reached a strategically significant level, Qualitest would re-launch these shelved products at higher prices, "blasting" notifications to Qualitest's customers by email indicating that Qualitest would again be selling the drugs but at prices increased by as much as 300%.  (CW-4).  This strategy was deployed frequently, as often as several times a month by the summer of 2015.  (CW-4).

255.     To implement the strategy, Endo employed a formalized, top-down process, beginning with Qualitest's senior-most executives authorizing which drugs would be subject to the lock-up and eventual price increases. (CW-4).  Then, Manager of Pricing and Analysis, Lori

Minnihan ("Minnihan"), met with Vice Presidents Propst and Reiney, and another senior

Qualitest executive, during which these three executives informed Minnihan which drugs would

be blasted and the price increases to be made.  (CW-4).  Minnihan then informed Qualitest's

Manager of Pricing, Stacy Lankford ("Lankford"), who in turn passed these instructions on to the

pricing team during meetings held three times per week.  (CW-4).  The pricing team then

prepared an emailed individualized PDF letters to each customer that Qualitest managers

designated, informing them of the price increases.  (CW-4).

### B.    Defendants' Lock-up/Blast Strategy Further Rendered Their Statements Materially False And Misleading

256.    Throughout the Class Period, during investor conference calls, Defendants made

materially false and misleading statements and omissions representing that competitive supply

and demand dynamics were the driver of any price increases, while concealing that Defendants

were actually engineering market shortages by refusing to sell generic drugs, thereby creating the

opportunity to dramatically increase prices.  Specifically, these statements include:

- De Silva stated during Endo's March 2, 2015 Earnings Call that "while we cannot plan for [price increases], we will maintain our opportunistic approach to supply and demand imbalances that lead to volume and price opportunities for US Generics."

- De Silva stated during Endo's August 10, 2015 Earnings Call that the Company would take price increases dependent on "the competitive set and the supply-demand situation in the market at any given time."

- De Silva, during the January 11, 2016 J.P. Morgan Healthcare Conference, and responding to the J.P. Morgan analyst's question about why Endo's pricing forecasts for 2016 were more favorable than other generic drug manufacturers, stated that "One is opportunistically, right, if there are situations where the supply shortages that we can potentially benefit from, we may consider those, but those are really not built into our plan. Those are upsides to our plan."

Each of these statements was materially false and misleading because, under De Silva's supervision, senior Qualitest executives intentionally shelved drugs to create shortages, thereby providing Endo with the opportunity to dramatically increase prices by as much as 300%. As alleged specifically above in Section V., Defendants made other statements and omissions, rendered false and misleading for the additional reason that Defendants implemented the lock-up/blast strategy.  For example, Defendants' statements in Endo's Forms 10-K concerning the "intense competition" and the purported "business model" Endo deployed to give it an advantage over other drug manufacturers, as well as Defendants' statements during investor conference calls representing that Defendants were "prudent and opportunistic" when they took price increases (¶¶ 188, 189, 196, 199, 205, 206, 208) were false and misleading because they indicated that the markets for Endo's generic drugs were functioning without manipulation, when in fact Endo planned for, controlled, and dictated the prices of certain generic drugs by creating shortages and then seizing on those shortages to make extraordinary price increases. Likewise, Defendants' statements in Endo's Forms 10-K, 10-Q, and 8-K, as well as on conference calls, explaining the sources of income generated from Endo's generics business and attributing it to purportedly competitive market causes (¶¶ 191, 194, 198, 201, 204, 211, 215, 218) were false and misleading because Defendants failed to disclose that Endo's generic segment Adjusted Income was achieved in significant part as a result of Defendants' implementing the lock-up/blast strategy.

## VIII.   LOSS CAUSATION

257.    Defendants' fraudulent conduct alleged herein directly and proximately caused the Class to suffer substantial losses as a result of purchasing Endo's stock at artificially inflated prices during the Class Period and to be damaged thereby.

258.     Defendants, through each category of false and misleading statements and

omissions, concealed the truth about Endo's deliberate practice to raise prices and allocate

markets in tandem with competitors, and that this anticompetitive scheme materially contributed

to the Company's financial and operational success during the Class Period.  By concealing,

among other things, Defendants' anticompetitive scheme, Defendants also concealed the

numerous and related risks associated with their false statements and omissions, including, but

not limited to, the risks that:

- the anticompetitive scheme and its underlying practices of raising prices and allocating markets in tandem with competitors was highly risky and not sustainable;

- by their nature, especially when done in tandem with competitors, price increases and allocation of market share might appear to arise from collusive conduct, whether proven illegal or not, and thus draw the attention of government investigators and law enforcement investigations of possible antitrust law violations, legal actions, civil liabilities, and criminal sanctions;

- law enforcement scrutiny of price increases and market allocation would undermine Endo's ability to sustain profits from already implemented price increases and market allocations, or to implement new ones, which would significantly reduce profits from Endo's generic segment;

- if the anticompetitive scheme ceased, Endo would be susceptible to a rapid and material decline in generic profits, resulting in poor financial results, material reductions in forecasted financial guidance, and material accounting charges that would permanently write down the value of its generics business; and

- if pricing pressure or competition increased, Endo would be far more susceptible to a rapid and material decline in profits, resulting in poor financial results and undercutting reported and forecasted profits.

259.     Beginning no later than November 2016, the truth began to be partially disclosed

concerning Defendants' misstatement through two negative events and disclosures that revealed,

on a piecemeal basis, the false and misleading nature of Defendants' Class Period statements and

omissions.  The risks that Defendants had concealed also began to materialize.  As the relevant

truth leaked out into the market from November 2016 to March 2017, the Class suffered losses, which were foreseeable and caused by the Defendants' concealed fraudulent conduct.

### A.      November 3, 2016

260.     During the trading day on November 3, 2016, new information was revealed to the market regarding Endo's anticompetitive pricing of its generic drugs.  At or around 2:10 p.m. ET, *Bloomberg* published an article titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year-End," which, relying on sources familiar with the investigations, described the DOJ's "sweeping criminal investigation into suspected price collusion, a fresh challenge for an industry that's already reeling from public outrage over the spiraling costs of some medicines."  The article also explained that "[w]hile attention [from the public sector] so far has been focused mainly on branded drugs … the Justice Department probe is now bringing the generics industry into the fray."

261.     The article identified Endo as among the DOJ's targets for potential criminal charges, and explained that the "grand jury probe is examining whether some executives agreed with one another to raise prices."  It specifically referenced anticompetitive conduct surrounding two drugs (digoxin and doxycycline), and identified Endo's generics segment Par as among the manufacturers in question.  Though the "timing could slip," the article noted that the DOJ "may bring the first cases by the end of December," and that the "investigation is likely to continue after the first cases are filed."  The article also described the Connecticut AG's investigation into the generic drug industry, and reported that the AG was seeking to lead a group of states "to probe the industry, which could result in cases seeking damages."  This news began to reveal the truth concerning Defendants' fraudulent conduct and the risks that Defendants concealed during the Class Period began to materialize.

262.   As a result of this news, the price of Endo stock declined.  Between the opening and closing of trading on November 3, 2016, the price of Endo stock fell $3.54, or 19.48%, to close at $14.36 per share on heavy trading volume.

263.   Analysts and news media tied the disclosure to the drop in Endo's stock.  For example, in a report that entitled "More Pricing Headwinds: DOJ Probe A Likely Overhang For Several Qtrs," an analyst at Leerink, explained that "[l]ate during trading hours the [] pharma group saw a massive sell-off due to fears stoked by a Bloomberg report that the US DOJ may be close to bringing its first charges (indictment) against one or more of the 12 generic pharma companies listed in the report."  Similarly, in an article that day entitled "News of Charges in Price-Fixing Inquiry Sends Pharmaceuticals Tumbling," *The New York Times* reported that "the generic drug industry was jolted on Thursday [November] as shares of many major companies tumbled after a news report said that a federal inquiry into drug price-fixing was wider than previously believed and could lead to charges by the end of the year."

**B.     February 28, 2017 - March 1, 2017**

264.   Before the start of trading on February 28, 2017, Endo released its financial results for Q4 2016 on a Form 8-K, reporting a massive loss of $14.96 per share on a GAAP basis.  The Company attributed its financial results primarily to poor performance in its U.S. generics business (with reported generic segment revenues 23% below those of Q4 2015 and 30% below FY 2015, far below analysts' expectations) as a result of "continued pricing pressure due to competition."  Because of this poor performance in U.S. generics, Endo was required to take a $3.5 billion impairment charge, $2.85 billion of which was due to the permanent decline in the value of Endo's U.S. Generics business segment.  This "impairment" was driven by a reduction in expected cash flow due to pricing pressure, wiping out 40% of the goodwill associated with Endo's U.S. generics business' value.  The Company also provided disappointing 2017 guidance, forecasting revenues

of $3.45 billion to $3.6 billion, compared to the $4.32 to $4.52 billion range provided for FY 2016, and an EPS of $3.45 - $3.75, compared to an EPS of $5.85 to $6.20 for FY 2016 – as a result of "pressures in [the Company's] generics brand."  In other words, because of continued pricing pressure due to the end of the anticompetitive scheme, the Company anticipated making approximately $1 billion less in 2017 than in 2016.  On March 1, 2017, before trading opened, Endo filed with the SEC its 2016 annual report on Form 10-K.  This news further revealed the truth concerning Defendants' fraudulent conduct and the risks that Defendants had concealed during the Class Period further materialize.

265.   As a result of this news, the price of Endo stock fell.  Between the close of trading on February 27, 2017 and the close of trading on March 1, 2017, the price of Endo stock fell $0.47 or 3.5%, to close at $12.82 on heavy trading.

266.   Investors, news media and analysts, finally aware of the true financial condition and value of Endo's generics business, effectively gave up on Endo for the foreseeable future.  For example, in an article dated February 28, 2017, FiercePharma noted that "Struggling Endo takes $3.5B body blow as generics pricing heads south," and that the pricing pressure, which caused the decline of 23% in the fourth quarter "slammed into Endo," and would result in further massive declines of approximately 30% in 2017.  Likewise, in a report dated March 1, 2017 entitled, "Endo Takes Large Impairment in 4Q; Outlook Remains Challenging in 2017," analysts from Morningstar explained that Endo "recognized a $3.5 billion noncash impairment charge in the fourth quarter stemming from the lackluster performance in the firm's generics business."  The analyst concluded that "Endo looks poorly positioned in the … generics segment[]" and that "Management's outlook confirms our view that Endo faces a difficult road ahead."

## IX.    APPLICABILTY OF THE PRESUMPTION OF RELIANCE

267.    Lead Plaintiff and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine.  At all relevant times, the market for Endo's stock was efficient for the following reasons, among others: (i) Endo's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market; (ii) Endo's stock traded at high weekly volumes during the Class Period; (iii) as a regulated issuer, Endo filed periodic reports with the SEC and NASDAQ; (iv) during the class period, Endo was eligible to file registration statements with the SEC on Form S-3, (v) Endo regularly communicated with public investors via established market communication mechanisms, including through earnings conference calls, regular disseminations of press releases on the national circuits of major newswire services, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and (vi) Endo was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to those brokerage firms' sales forces and certain customers.  Each of these reports was publicly available and entered the public market place.

268.    As a result, the market for Endo stock promptly digested current information regarding Endo from all publicly available sources and reflected such information in Endo's stock price.  The material misrepresentations alleged herein induced reasonable investors to misjudge the value of Endo's stock.  Under these circumstances, all purchasers of Endo stock during the Class Period suffered similar injury through their purchase of Endo stock at artificially inflated prices, and a presumption of reliance applies.

## X.    CLASS ACTION ALLEGATIONS

269.    The Endo stock at issue are ordinary shares registered on the NASDAQ.

270.    Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and b(3) of the Federal Rules of Civil Procedure, on behalf a class consisting of all persons and entities who purchased the ordinary shares of Endo from March 2, 2015 through and including February 27, 2017 and were damaged thereby.

271.    Excluded from the Class are (i) Defendants and any affiliates or subsidiaries thereof, (ii) present and former officers and directors of Endo and its subsidiaries or affiliates, and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. § 229.404, Instructions (1)(a)(iii) & (1)(b)(ii)); (iii) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (iv) any entity in which any Defendant had or has had a controlling interest; (v) Endo's employee retirement and benefits plan(s); and (vi) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding five categories.

272.    The Class is so numerous that joinder of all members in impracticable.  Plaintiff believes that Class members number at least in the thousands.  Throughout the Class Period, Endo ordinary shares had an average daily volume on the NASDAQ of approximately 5,400,000. As of February 27, 2017, Endo had 222,957,922 ordinary shares outstanding.  These shares traded actively in the United States during the Class Period.

273.    Lead Plaintiff's claims are typical of the claims of Class members.  All Class members are similarly situated in that they sustained damages by acquiring Endo securities at prices artificially inflated by the wrongful conduct complained of herein.

274.    Lead Plaintiff will fairly and adequately protect the interests of the Class.  Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.  Lead Plaintiff has no interests that conflict with those of the Class.

275.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  The questions of law and fact common to the Class include, but are not limited to, the following:

    (a)  Whether the federal securities laws were violated by Defendants' conduct as alleged herein;

    (b)  Whether Defendants made any untrue statements of material fact or omitted to state any material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading;

    (c)  Whether Endo and the Individual Defendants acted with the requisite level of scienter under Section 10(b) of the 34 Act;

    (d)  Whether the Individual Defendants were controlling persons of the Company under Section 20(a) of the 34 Act;

    (e)  Whether and to what extent the prices of Endo ordinary shares were artificially inflated or maintained during the Class Period due to the misstatements and non-disclosures complained of herein;

    (f)  Whether reliance is presumed under the fraud-on-the-market-doctrine; and

    (g)  Whether and to what extent Class members have sustained damages as a result of the conduct complained of herein, and if so, the proper measure damages.

276.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

277.    There will be no difficulty in the management of this action as a class action. Class members may be identified from records maintained by the Company or its transfer agent(s), or by other means, and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

## XI.   NO SAFE HARBOR

278.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Endo who knew that the statement was false when made.

## XII.   CLAIMS FOR RELIEF

### COUNT I
### For Violation of Section 10(b) Of The 34 Act And Rule 10b-5

279.   Lead Plaintiff incorporates ¶¶ 1-278 by reference as if fully set forth herein.

280.   During the Class Period, Defendants made, disseminated or approved the false and misleading statements specified above, which they knew or recklessly disregarded were false and misleading in that the statements contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

281.   Defendants violated Section 10(b) of the 34 Act and Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Endo ordinary shares during the Class Period.

282.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Endo ordinary shares. Lead Plaintiff and the Class would not have purchased Endo ordinary shares at the prices they paid, or at all, if they had been aware that the market prices of those securities had been artificially inflated by the Defendants' misleading statements.

283.    As a direct and proximate result of the Defendants' wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their purchases of Endo ordinary shares during the Class Period.

**COUNT II**
**For Violation Of Section 20(a) Of The 34 Act**

284.    Lead Plaintiff incorporates ¶¶ 1-278 by reference as if fully set forth herein.

285.    During the Class Period, the Individual Defendants acted as controlling person of Endo within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about Endo, the Individual Defendants had the power and ability to control the actions of Endo and its employees.  Moreover, the Individual Defendants materially participated in or concealed the disclosure of the conduct underlying the fraud alleged herein.  Endo controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the 34 Act.

## XIII.  PRAYER FOR RELIEF

286.    WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

(d) Declaring this action to be a proper class action pursuant to Rule 23 of the
Federal Rules of Civil Procedure;

(e) Awarding Lead Plaintiff and the Class damages, including interest;

(f) Awarding Lead Plaintiff and the Class their reasonable costs and expenses
incurred in this action, including attorneys' fees and experts' fees; and

(g) Granting such other and further relief as the Court may deem just and
proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

**DATED: AUGUST 3, 2018**

Respectfully submitted,

**ELLIOTT GREENLEAF, P.C.**

**BLEICHMAR FONTI & AULD LLP**

  /s/ *Timothy T. Myers*                    
John M. Elliott
Thomas J. Elliott
James C. Crumlish, III
Timothy T. Myers
925 Harvest Drive, Suite 300
Blue Bell, PA 19422
Telephone: (215) 977-1000
Facsimile: (215) 977-1099
jme@elliottgreenleaf.com
tje@elliottgreenleaf.com
jccrumlish@elliottgreenleaf.com
ttm@elliottgreenleaf.com

  /s/ *Joseph A.Fonti*                   
Joseph A. Fonti (Admitted *Pro Hac Vice*)
Javier Bleichmar (Admitted *Pro Hac Vice*)
Wilson Meeks (Admitted *Pro Hac Vice*)
7 Times Square, 27th Floor
New York, NY 10036
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jfonti@bfalaw.com
jbleichmar@bfalaw.com
wmeeks@bfalaw.com

*Co-Counsel for the Park Employees' and
Retirement Board Employees' Annuity and
Benefit Fund of Chicago*

*Co-Counsel for the Park Employees' and
Retirement Board Employees' Annuity and
Benefit Fund of Chicago and
Lead Counsel For The Class*

**KEHOE LAW FIRM, P.C.**
John A Kehoe (*Pro Hac Vice* To Be Submitted)
Two Penn Center Plaza
1500 JFK Boulevard, Suite 1020
Philadelphia, PA 19012
Telephone: (215) 792-6676
jkehoe@kehoelawfirm.com

*Additional Counsel for the Park Employees'
and Retirement Board Employees' Annuity and
Benefit Fund of Chicago*

## APPENDIX A

## TIMELINE OF INDUSTRY EVENTS

| Date | Event | Pertinent Attendees |
|---|---|---|
| Oct. 1-3, 2012 | GPhA Technical Conference | Endo, Par, Actavis, Heritage, Lannett, Mylan, Pack Pharma, Sandoz, Teva |
| Feb. 20-22, 2013 | GPhA Annual Meeting | Endo, Par, Actavis, Apotex, Heritage, Mylan, Pack Pharma, Sandoz, Teva, Upsher-Smith |
| April 20-23, 2013 | NACDS Annual Meeting | Endo, Par (including Campanelli), Actavis, Apotex, Mylan, Sandoz, Teva, Upsher-Smith |
| June 2-5, 2013 | HDMA Leadership Conference | Endo, Par, Actavis, Apotex, Heritage, Impax, Lannett, Mylan, Sandoz, Teva, Upsher-Smith, West-Ward |
| Aug. 10-13, 2013 | NACDS Total Store Expo | Endo (including Propst, Reiney, Tatum, and Minnihan), Par, Actavis, Apotex, Heritage, Impax, Lannett, Mylan, Sandoz, Teva, Upsher-Smith, West-Ward |
| Oct. 28-30, 2013 | GPhA Technical Conference | Endo, Par, Actavis, Apotex, Heritage, Impax, Lannett, Mylan, Sandoz, Teva, Upsher-Smith |
| Feb. 19-21, 2014 | GPhA Annual Meeting | Endo, Par, Actavis, Apotex, Heritage, Impax, Mylan, Sandoz, Teva, Upsher-Smith |
| April 26-29, 2014 | NACDS Annual Meeting | Endo, Par (including Campanelli and Pera), Actavis, Apotex, Heritage, Mylan, Sandoz, Teva, Upsher-Smith |
| June 1-4, 2014 | HDMA Leadership Conference | Endo (including Reiney and Propst), Par (including Campanelli and Pera), Apotex, Heritage, Impax, Lannett, Mylan, Sandoz, Teva, Upsher-Smith, West-Ward |
| Aug. 23-26, 2014 | NACDS Total Store Expo | Endo (including Propst, Reiney, Tatum, and Minnihan), Par, Actavis, Apotex, Heritage, Impax, Lannett, Mayne, Mylan, Sandoz, Teva, Upsher-Smith, West-Ward |
| Oct. 27-29, 2014 | GPhA Technical Conference | Endo, Par, Actavis, Heritage, Impax, Lannett, Mylan, Sandoz, Teva, Upsher-Smith, West-Ward |
| Feb. 9-11, 2015 | GPhA Annual Meeting | Endo, Par, Actavis, Apotex, Heritage, Impax, Mylan, Sandoz, Teva, Upsher-Smith, West-Ward |
| April 14, 2015 | HDMA CEO Roundtable | Par, Mylan, Sandoz, Teva |

| Date | Event | Pertinent Attendees |
|---|---|---|
| April 25-28, 2015 | NACDS Annual Meeting | Par (including Pera), Actavis, Mylan, Teva, Upsher-Smith |
| June 7-10, 2015 | HDMA Leadership Conference | Endo (including Propst and Reiney), Par, Actavis, Heritage, Mylan, Teva, Upsher-Smith |
| Aug. 22-25, 2015 | NACDS Total Store Expo | (not available) |
| Nov. 2-4, 2015 | GPhA Technical Conference | Endo, Actavis, Apotex, Heritage, Lannett, Mylan, Sandoz, Upsher-Smith, West-Ward |

## CERTIFICATION

I, Dean J. Niedospial, on behalf of Lead Plaintiff Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago ("Chicago Park Employees" or "Lead Plaintiff"), as Executive Director, hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Lead Plaintiff. The securities subject to this litigation are or were held in title of and owned by Lead Plaintiff.

2.      I have reviewed Lead Plaintiff's Amended Class Action Complaint against Endo International plc ("Endo"), Rajiv Kanishka Liyanaarchchie De Silva, Suketu P. Upadhyay, and Paul V. Campanelli concerning the period of March 2, 2015 through February 27, 2017, inclusive (the "Class Period").

3.      Lead Plaintiff did not purchase or sell securities of Endo at the direction of counsel in order to participate in any private action under the federal securities laws.

4.      Having been appointed Lead Plaintiff in this matter on June 19, 2018, Chicago Park Employees has been and continues to be willing to serve as a representative plaintiff on behalf of the Class in this matter, including providing testimony at deposition and trial, if necessary.

5.      Lead Plaintiff's transactions in Endo securities during the Class Period are reflected in Exhibit A, attached hereto.

6.      Other than this litigation, Chicago Park Employees has not sought to serve as a representative plaintiff in a class action filed under the federal securities laws during the last three years.

7.      Beyond its *pro rata* share of any recovery, Chicago Park Employees will not

accept payment for serving as Lead Plaintiff on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 3 day of August, 2018.

Dean J. Niedospial
*Executive Director*
*Park Employees' and Retirement Board*
*Employees' Annuity and Benefit Fund of*
*Chicago*

## EXHIBIT A

### PARK EMPLOYEES' AND RETIREMENT BOARD EMPLOYEES' ANNUITY AND BENEFIT FUND OF CHICAGO TRANSACTIONS IN ENDO INTERNATIONAL PLC
for the Class Period of March 2, 2015 through February 27, 2017

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 06/07/2016 | 4,136.00 | 16.76 | ($69,339.63) |
| Purchase | 06/10/2016 | 4,766.00 | 16.73 | ($79,718.98) |
| Purchase | 06/24/2016 | 2,660.00 | 14.97 | ($39,828.71) |
| Sale | 08/09/2016 | -6,911.00 | 21.97 | $151,834.67 |
| Sale | 08/15/2016 | -4,651.00 | 24.04 | $111,790.04 |
| Purchase | 11/03/2016 | 10,265.00 | 16.60 | ($170,347.68) |
| Purchase | 11/04/2016 | 5,728.00 | 15.07 | ($86,292.89) |
| Purchase | 11/08/2016 | 6,084.00 | 14.24 | ($86,663.54) |
| Purchase | 12/07/2016 | 6,085.00 | 14.95 | ($90,942.15) |
| Purchase | 12/08/2016 | 1,895.00 | 15.23 | ($28,855.73) |
| Purchase | 12/09/2016 | 4,301.00 | 15.88 | ($68,293.43) |
| Purchase | 01/18/2017 | 7,384.00 | 12.92 | ($95,388.73) |
| Purchase | 02/22/2017 | 7,532.00 | 13.14 | ($98,979.52) |

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I caused a true and correct copy of the foregoing to be filed using the Court's Electronic Filing System ("ECF System"). The document is available for viewing and downloading via the ECF System, and will be served by operation of the ECF System upon all counsels of record.


Dated: August 3, 2018                          **ELLIOTT GREENLEAF, P.C.**

                                               /s/ *Timothy T. Myers*
                                               Timothy T. Myers

## <u>CERTIFICATE OF SERVICE</u>

I, Timothy T. Myers, Esquire, hereby certify that on this date that the forgoing Amended

Complaint has been served on all counsel of record for Defendants via Federal Express.


 /s/ Timothy T. Myers
Timothy T. Myers


Dated: August 6, 2018