# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALEXANDRE PELLETIER, Individually and On Behalf Of All Others Similarly Situated,<br><br>                      Plaintiff,<br><br>       v.<br><br>ENDO INTERNATIONAL PLC, RAJIV KANISHKA LIYANAARCHCHIE DE SILVA, SUKETU P. UPADHYAY, and PAUL V. CAMPANELLI,<br><br>                    Defendants. | Hon. John R. Padova<br><br>No. 2:17-cv-05114-JRP<br><br>**CLASS ACTION**<br><br><br>**ORAL ARGUMENT REQUESTED** |

## LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Preliminary Statement..........................................................................................................1

Summary Of The Complaint's Factual Allegations...........................................................5

Argument .........................................................................................................................12

I.     THE COMPLAINT ALLEGES VIOLATIONS OF SECTION 10(b) OF THE
EXCHANGE ACT AND SEC RULE 10b-5.........................................................13

      A.     The Complaint Alleges Actionable Misstatements And Omissions.....................14

            1.     Defendants' Misstatements Are False And Misleading As A Matter
Of Fact .....................................................................................................15

                  a.     Defendants' Misleading Statements Explaining
Competition Are Actionable...........................................................15

                  b.     Defendants' Misleading Statements Explaining The
Sources Of Endo's Income Are Actionable.....................................17

                  c.     Defendants' Misleading Statements Explaining Price
Increases Are Actionable ...............................................................20

            2.     Defendants Engaged In Anticompetitive Collusion, Further
Rendering Their Misstatements Actionable...............................................22

            3.     Defendants' Remaining Arguments Fail ...................................................30

      B.     The Complaint Alleges A Strong Inference Of Scienter .......................................33

            1.     Defendants' Active Participation In Endo's Drug Pricing Supports
A Strong Inference Of Scienter..................................................................34

             2.     Defendants Repeatedly Spoke About The Subject Matter Of The
Fraud Because It Was Critically Important To Endo And
Shareholders.............................................................................................40

            3.     The Magnitude Of The Fraud Supports A Strong Inference Of
Scienter .....................................................................................................41

             4.     Defendants Were Motivated To Commit The Fraud .................................42

             5.     Executive Resignations And Governmental Investigations
Strengthen The Inference Of Scienter........................................................43

i

6.     Allegations Based On Confidential Witnesses Support A Strong
       Inference Of Scienter ................................................................................44

7.     Defendants' Proposed Competing Inference Fails ....................................47

II.    THE COMPLAINT ALLEGES CONTROL PERSON LIABILITY ..............................47

Conclusion ...........................................................................................................................48

Glossary of Terms .......................................................................................................... G-1

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*Asher v. Baxter Int'l, Inc.*, 377 F.3d 727 (7th Cir. 2004)................................................. 43

*Aviva Partners LLC v. Exide Techs.*, 2007 WL 789083 (D.N.J. Mar. 13, 2007) ........................ 45

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .............................................................. 12, 23

*Burtch v. Milberg Factors, Inc.*, 662 F.3d 212 (3d Cir. 2011) ............................................. 25, 28

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004)................................... 46

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012) ........................................................................ 33, 41

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
   442 F. App'x 672 (3d Cir. 2011) ............................................................................... 36

*Fleming v. Impax Labs. Inc.*, 2018 WL 4616291 (N.D. Cal. Sept. 7, 2018) ............................... 39

*Freed v. Universal Health Servs., Inc.*, 2005 WL 1030195 (E.D. Pa. May 3, 2005) ................... 46

*Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017) ....................................................................... 42

*Galati v. Commerce Bancorp, Inc.*, 220 F. App'x 97 (3d Cir. 2007) ....................................... 31

*GSC Partners CDO Fund v. Washington*, 368 F.3d 228 (3d Cir. 2004) ..................................... 42

*Hammerstone NV v. Hoffman*, 2010 WL 882887 (S.D.N.Y. Mar. 10, 2010)............................... 19

*Hogan v. Pilgrim's Pride Corp.*, 2018 WL 1316979 (D. Colo. Mar. 14, 2018) ......................... 30

*In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935 (E.D. Pa. 1999)........................................... passim

*In re Amarin Corp. PLC*, 2015 WL 3954190 (D.N.J. June 29, 2015)......................................... 43

*In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576 (S.D.N.Y. 2006)............. 30, 38

*In re Baby Food Antitrust Litig.*, 166 F.3d 112 (3d Cir. 1999)............................................. 25, 28

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) .................................. 12

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
   2018 WL 2382600 (S.D.N.Y. May 24, 2018) .............................................................. 46

*In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383 (3d Cir. 2015)....................... 25, 26

*In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004) ...................................... 31

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
2013 WL 11319408 (S.D.N.Y. 2013)........................................................................ 32

*In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346 (S.D.N.Y. 2008) ....................................... 30

*In re Hertz Glob. Hldgs., Inc. Sec. Litig.*, 2015 WL 4469143 (D.N.J. July 22, 2015) ................ 47

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010)....................................... 23

*In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ........................ passim

*In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551 (D.N.J. 2001) ............................................ 43

*In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712 (S.D.N.Y. 2017)............................ passim

*In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801 (D.N.J. Aug. 28, 2017) ........... 15, 41

*In re RAIT Fin. Trust Sec. Litig*, 2008 WL 5378164 (E.D. Pa. Dec. 22, 2008)............................ 37

*In re Ravisent Techs., Inc.*, 2004 WL 1563024 (E.D. Pa. July 13, 2004)................................... 42

*In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493 (W.D. Pa. 2002) ............................................ 42

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001) ................................................ 37, 42

*In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365 (S.D.N.Y. 2007)............................ 26

*In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635 (E.D. Pa. 2015) ............................ 32

*In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458 (E.D. Pa. 2014)................................... 32

*Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009) ................................... passim

*Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323 (3d Cir. 2018)........................................ 23

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*,
2011 WL 2444675 (D. Del. June 14, 2011)............................................................... 37

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) ................................................ passim

*Mill Bridge V, Inc. v. Benton*, 2009 WL 4639641 (E.D. Pa. Dec. 3, 2009)................................ 12

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
153 F. Supp. 3d 628 (S.D.N.Y. 2015) ...................................................................... 26

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co.*,
998 F.2d 1224 (3d Cir. 1993) ................................................................................... 28

*Phillips v. Cty. of Allegheny*, 515 F.3d 224 (3d Cir. 2008)........................................................ 12

*Resco Prods. Inc. v. Bosai Minerals Grp. Co.*, 158 F. Supp. 3d 406 (W.D. Pa. 2016) ............... 27

*Roofer's Pension Fund v. Papa*, 2018 WL 3601229 (D.N.J. July 27, 2018) ...................... passim

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)........................................................................ 42

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996) .................................................................................................. 19

*Shapiro v. UJB Fin. Corp.*, 964 F.2d 272 (3d Cir. 1992) ........................................................... 21

*Solomon-Shrawder v. CardioNet, Inc.*, 2010 WL 3168366 (E.D. Pa. Aug. 10, 2010)................ 38

*Speakes v. Taro Pharm. Indus., Ltd.*,
    2018 WL 4572987 (S.D.N.Y. Sept. 24, 2018)................................................................. passim

*Steamfitters Local 449 Pension Fund v. Alter*,
    2011 WL 4528385 (E.D. Pa. Sept. 30, 2011) ...................................................................... 48

*Strougo v. Barclays PLC*, 105 F. Supp. 3d 330 (S.D.N.Y. 2015)................................................ 29

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ............................................ 33

*Utesch v. Lannett Co.*, 316 F. Supp. 3d 895 (E.D. Pa. 2018) ................................................ 38, 39

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
    2015 WL 3755218 (E.D. Pa. June 16, 2015)................................................................... 44, 46

*Williams v. Globus Med., Inc.*, 869 F.3d 235 (3d Cir. 2017)....................................................... 15

## **STATUTES**

15 U.S.C. § 78u-4 .................................................................................................................. 14, 33

## **RULES**

Fed. R. Civ. P. 15(a) ................................................................................................................... 48

Fed. R. Civ. P. 9(b) ..................................................................................................................... 14

# PRELIMINARY STATEMENT[1]

At its essence, this securities fraud case arises from the stark difference between what Defendants fraudulently said was driving Endo's financial performance versus the truth. Defendants told shareholders that Endo generated hundreds of millions of dollars in generic drug profits from durable, reliable sources and the acquisitions of smaller drug companies. But the truth was that Endo was earning record profits from massive and unsustainable—if not illegal— price hikes on over a dozen generic drugs. Defendants could not, and did not, tell shareholders the truth because the generic drug industry, by legislative design, is supposed to be intensely competitive and any increase in price should have been immediately undercut by a competitor. For this reason, no generic company "in its right mind" would make large unilateral price increases; by the same token, no investor in its right mind would buy stock in a generic drug manufacturer dependent on inflated prices.[2]  But Defendants pulled it off for a time, ***tripling*** Endo's share price from the $30s to an all-time high of over $90 per share. By the end of the Class Period, as the scheme unraveled, Endo's share price plummeted to just over $12 per share.

---

[1] All capitalized terms not otherwise defined herein have the same meaning ascribed to them in the Amended Class Action Complaint (the "Complaint") and the Glossary attached thereto and also appended to this brief. ECF 62. "¶__" are references to the paragraphs of the Complaint. Citations to "MTD __" are to Defendants' Memorandum of Law In Support of Defendants' Motion to Dismiss the Amended Complaint. ECF 63-1. Unless otherwise noted, all emphasis is added and all internal quotations and citations are omitted.

[2] *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 721 n.10 (S.D.N.Y. 2017) ("*Propranolol*") (upholding Sherman Act violations); *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *17 (S.D.N.Y. Mar. 28, 2018) ("*Mylan*") ("[I]n a market free of collusion, if one generic drug marketer raises its prices significantly above those of its competitors, that marketer will lose market share."); *see Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *11 (D.N.J. July 27, 2018) ("*Perrigo*") (same).

Defendants' misstatements are actionable under the securities fraud laws for two interrelated, yet independently sufficient, reasons:

First, as a factual matter, Defendants' statements were empirically false. They fraudulently claimed that the Company achieved its success because it was able to outmaneuver others in the face of "***intense competition***." ¶¶50-51, 186(a). In reality, however, Endo generated $620 million of additional profits exclusively from 13 Inflated Drugs by not competing at all (the "Inflated Profits")—indeed, Endo raised each drug's price in lock-step with other manufacturers, relying on a lack of price competition. Moreover, Defendants falsely attributed Endo's income solely to sustainable sources. ¶186(b). Defendants concealed, however, that the ephemeral price hikes were driving Endo's profits. ¶1. Finally, Defendants falsely claimed that Endo was "not relying on price increases," ¶49, and had "***not been dependent on pricing***," in generating its profits, ¶66, when in fact it was completely dependent on price increases as they drove one-third of Endo's profits. Critically, Defendants do ***not*** address this first basis for falsity because they cannot.

Second, and separately, Defendants' statements are actionable because they concealed their participation in an industry-wide conspiracy to fix prices and allocate markets. *See* ¶¶152-85. Three recent decisions, *Perrigo*, *Mylan*, and *Taro*, have upheld substantively identical allegations of securities fraud arising from the same anticompetitive conduct.[3] In addition, Judge

---

[3] *Perrigo*, 2018 WL 3601229, at *11; *Mylan*, 2018 WL 1595985, at *16. Following the filing of Defendants' motion, *Speakes v. Taro Pharmaceutical Indust., Ltd.*, 2018 WL 4572987, at *5-6 (S.D.N.Y. Sept. 24, 2018) ("*Taro*") sustained securities fraud allegations arising from the manipulation of the generic drug markets.

Rufe recently issued a comprehensive opinion applying Third Circuit precedent to uphold indistinguishable antitrust allegations **against** Endo.[4]

Not only were their statements false, Defendants made them with fraudulent intent. Courts in the Third Circuit hold that scienter is sufficiently pled based on circumstantial evidence, where, as here: (i) senior officers "indicat[e] their personal knowledge … by repeatedly speaking to investors on the topic"; (ii) the size of the alleged misconduct and financial impact on the company is significant; and (iii) there are "parallel criminal proceedings." *Perrigo*, 2018 WL 3601229, at *21; *see also Mylan*, 2018 WL 1595985, at *12; ¶¶221-52.

The Complaint pleads precisely these kinds of allegations,[5] and goes even further, detailing Defendants' personal involvement in, and responsibility for, Endo's price increases:

- CEO De Silva **personally identified, reviewed, and approved** each and every one of these price increases.  ¶¶9, 35-38, 89-90, 93, 222.

- CEO De Silva along with CFO Upadhyay **held monthly meetings** to monitor and discuss the financial impact of the price increases, ¶40, and **specifically requested and received** financial reports that **tracked** all price increases above 25%, and the resulting revenues.  ¶¶9, 40-43, 90, 224-25.

- Likewise, when now-CEO Campanelli joined Endo as Head of Generics, he too **received** the monthly pricing reports, and **attended** the monthly meetings.  ¶¶9, 40, 42-43, 90, 224-25.  Campanelli also required that he **personally approve** all price changes.  ¶¶64, 93, 223.

---

[4] *In re Generic Pharm. Pricing Antitrust Litig.* sustained allegations of Sherman Act violations against Endo through its generics subsidiary now known as Par Pharmaceuticals.  2018 WL 5003450, at *5, *31, n.35 (E.D. Pa. Oct. 16, 2018) ("*Generics MDL*"); *see also Propranolol*, 249 F. Supp. 3d at 724.

[5] *See* Speaking repeatedly: ¶¶191- 92, 194, 196, 198-99, 201-02, 212-13, 216, 219, 230-33; The size of the alleged misconduct: ¶¶2, 10, 84, 234-36; Parallel criminal proceedings: ¶¶176-85.

Thus, each and every time Defendants described the sources of Endo's success and denied that price increases played any role, they knew the truth that the extraordinary price increases were actually generating the additional profits.  ¶¶186(b), 221-52.

Hidden from shareholders' view, Defendants' scheme began to unravel in December 2015 once law enforcement served Endo with a subpoena probing the Company's generic drug pricing.  Defendants' ability to continue the scheme came to a screeching halt, as did their profit stream from the price hikes.  ¶¶67-68.  Endo's dismal earnings, absent the Inflated Profits, shocked investors.  By the fall of 2016, CEO De Silva and CFO Upadhyay were fired.  ¶80.  Then, on November 3, 2016, *Bloomberg* reported for the first time that Endo was a target of law enforcement for manipulation of generic drug prices and was exposed to potential criminal and civil charges.  ¶¶14, 81, 260-61.  That day, Endo's share price plummeted 19.5% to close at $14.63 on heavy trading volume.  ¶¶82, 262.

On February 27, 2017, without the once-steady flow of Inflated Profits, the Company disclosed that it was required to take an accounting charge that wiped out ***$2.85 billion*** of earnings because the generics segment was "permanently impaired," an implicit admission that the Inflated Profits were never coming back.  ¶¶15, 84, 264.  The consequences for investors were devastating, and shareholders, like Lead Plaintiff Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago, suffered damages.  All told, Endo's shares fell from a Class Period-high of over $90 to just $12.82.  ¶¶11, 265.

Defendants' motion does not—and cannot—explain how these powerful facts are deficient.  Nor does their motion address—much less distinguish—the *Perrigo*, *Mylan*, and *Taro* decisions sustaining substantively identical securities fraud allegations.  The Complaint amply

sets forth a violation of Section 10(b) of the Exchange Act, and consequently, a proper control person claim under Section 20(a).  Defendants' motion should be denied in its entirety.

<u>**SUMMARY OF THE COMPLAINT'S FACTUAL ALLEGATIONS**</u>

**Industry Dynamics And Endo's Pre-Class Period Struggles**: Endo, one of the world's top ten generic drug manufacturers, ¶1, was facing a grim future leading into 2013.  ¶¶30-31. Importantly, Congress specifically legislated that generic drug manufacturers produce commoditized versions of branded drugs, differentiated only by price.  ¶¶1, 31, 95, 169.  As a result, generic drug prices steadily decline to a stable level near the manufacturers' costs of production.  ¶¶95, 169.  Thus, when the generic drug markets function competitively, a manufacturer who takes a unilateral price increase*,* particularly a significant one, will lose market share to competitors selling at a lower price.  ¶¶1, 164.  Consequently, before the Class Period (defined as March 2, 2015 to February 27, 2017), Endo's generics division, Qualitest, was experiencing stagnating sales due to normal competitive dynamics, as manufacturers underbid each other to gain market share.  ¶31.

**Defendants Announce A Turnaround Acquisition Plan**: Tasked with turning the Company around as its new CEO and President, De Silva announced in early 2013 that, in order to increase the Company's revenues, he planned to purchase smaller manufacturers and absorb their drug portfolios and revenues.  ¶¶33, 239.  Additionally, De Silva set his sights on a "transformative" acquisition (*i.e.*, one that would dramatically increase the Company's market share).  ¶¶5, 32, 237.  But Endo did not have the cash for any such deals, and particularly not the type of mega-deal that was required to achieve a transformation.  ¶¶33, 238.  To solve this problem, De Silva planned to use Endo's securities as "currency"—that is, he planned to elevate Endo's share price to raise the necessary capital through public and private offerings.  ¶¶33, 238.

By January 2015, Endo had acquired five smaller companies that incrementally added revenues; Endo's securities funded nearly all of the $7.1 billion price tag.  ¶¶33, 239.

**Defendants Secretly Launch Price Hikes To Inflate Profits And Share Price**: What Defendants concealed, however, was that De Silva had embarked on a new, secret strategy to systematically implement extraordinarily large price increases, always in tandem with Endo's purported competitors.  ¶¶6, 34-38, 50-55, 59-60, 69-79, 89-94, 101-45, 222-23.  Indeed, just months into De Silva's tenure, in the spring of 2013, Endo began making these price increases. ¶¶37, 98.  All told, Endo benefitted from at least 13 secret price hikes that Lead Counsel has been able to uncover without discovery, generating hundreds of millions in pure profits because there was no additional associated expense.  ¶¶10, 85, 97.

The impact of the Inflated Drugs was nearly immediate on Endo's profits and its share price.  ¶¶10-11, 85.  On the first day of the Class Period, March 2, 2015, Defendants announced Endo's 2014 results, reporting a striking $270 million, or ***140% year-over-year increase*** in its generic adjusted income from 2013.  ¶50.  Critically, Defendants concealed that Inflated Profits had already generated $141 million or over ***half*** of this improvement and ***one-third*** of the ***total*** annual generics adjusted income.  ¶51.  By early 2015, the stock price had tripled from near $30 per share in 2013, ¶33, and was trading well above $90.  ¶¶11, 55.  In total, by the end of the Class Period, Endo's price increases generated over $620 million in Inflated Profits, ¶2—*i.e.*, the profits that Lead Counsel's econometric expert calculated that are attributable alone to the price increases, not to general market trends or inflation.  ¶¶146-51.  These Inflated Profits accounted for nearly one-third of Endo's entire generics profits.  ¶¶10, 234-35.  And, as explained below, without these Inflated Profits, the Company would never have been able to execute its acquisition strategies.

In order to generate shareholder interest and investment in Endo, Defendants had to conceal that they were implementing these risky, noncompetitive price increases.[6]  ¶¶1, 7, 45, 49, 96.  From a shareholder perspective, given the commoditized nature of U.S. generic drugs, price increases were inherently unsustainable and short-lived because at any time a competitor could swoop in with a lower price and seize market share.  ¶¶1, 96, 164.  Furthermore, by the start of the Class Period, public concern was brewing over rising prescription drug prices, with state, federal, and congressional inquiries all launched during 2014.  ¶¶7, 47-49.

To dispel any notion that Endo was engaged in price increases, Defendants: (i) categorically denied reliance on price, ¶¶49, 66, 192, 202; (ii) repeatedly attributed Endo's generic segment's positive financial results to durable sources such as new launches, "favorable [product] mix," "increases in demand," and other expected factors in a competitive environment, *see* SEC filings, ¶¶191, 194, 198, 201, 204, 211, 215, 218; conference calls, ¶¶194, 196, 198, 201; and (iii) repeatedly and falsely claimed that Endo faced "*intense competition from other generic drug manufacturers*," and that, despite this typical industry-wide competition, Endo was recording record profits, ¶¶50, 186(a).

**Defendants Personally Implemented Each Price Increase And Tracked Inflated Profits**: As CEO, De Silva personally took control of Endo's generics division, Qualitest, and had its two most senior officials, Vice Presidents Propst and Reiney, report to him.  ¶¶35, 89(a), 90(a), 222.  De Silva directed Propst and Reiney to regularly review Qualitest's drugs and provide him with lists identifying the generic drugs that presented opportunities for price increases, along with analysis for why those price hikes were feasible.  ¶¶36, 93(a), 222.  Then,

---

[6] Neither Endo nor its peers disclosed to investors any information regarding their drug prices, changes in prices, or revenues per drug.  Investors therefore had no way of knowing if Endo was profiting from systemic price hikes unless Defendants explicitly told them.  ¶146.

De Silva, together with Propst and Reiney, decided which generic drug prices to increase.  ¶¶41, 93(a), 222.  But all price increases required De Silva's approval; Propst and Reiney did not have the authority to order price increases alone.  ¶¶89, 90(a), 93, 222.  To implement the increases, Propst and Reiney directed Pricing Analysts to enter the increases into Qualitest's systems.  ¶¶41, 94(a).  Once elevated, the prices never dropped back down to their original levels.  ¶89(b).

De Silva, CFO Upadhyay, and later Campanelli, personally tracked all price changes and the resulting revenues.  ¶¶9, 36, 40-44, 90-91, 224-29.  Specifically, every month and for each quarter from 2014 through at least 2016, the finance team generated internal financial reports using the monthly and quarterly sales data on a price-per-pill level from Endo's financial system.  ¶¶42, 90(b).  Qualitest CFO Cupero, and later his replacement Raimer, consolidated those reports into Excel files, which they sent to De Silva, Upadhyay, Propst, Reiney, Jeremy Tatum (Director of Market Insights), and Warren Pefley.  ¶¶9, 42-43, 90, 224.  The Excel files were critically important because they: (i) reflected average manufacturer prices, sales, as well as revenue information for each generic drug, generated from data on a price-per-pill level of granularity, ¶¶9, 42, 90, 224, 229; (ii) tracked historic pricing and reflected the price increases that Endo implemented on a drug-by-drug basis, and the profits generated since Endo started selling the drug, ¶¶9, 42-43, 90(c), 224-28; and (iii)  reflected the same information for the drugs that Endo acquired through company acquisitions, ¶¶42, 90(c), 224-25, 228.

De Silva and Upadhyay specifically requested that the Excel file contain a stand-alone spreadsheet that identified all price changes greater than 25%.  ¶¶9, 43, 90(d), 225-28.  This spreadsheet was tabbed in red highlight for their ease of reference and included a column that required "comments" explaining the reasons for each of these price changes.  *Id*.  At least

monthly, De Silva, Upadhyay, Propst, Reiney, and Campanelli discussed these Excel spreadsheets at meetings, attended in person or by telephone.  ¶¶9, 40, 42-43, 90(e), 225.

De Silva, along with Cupero, also tracked the anticompetitive price increases and their financial impact by way of monthly Profit & Loss ("P&L") reports, which reflected revenues by product line.  ¶¶44, 91(b).  After Qualitest closed its monthly books, De Silva held a pre-scheduled conference call, ordinarily lasting from 30 minutes to an hour, specifically to discuss Qualitest's P&L reports and ask questions about the revenues from specific products.  ¶¶44, 91. During the calls, De Silva also made reference to detailed and granular revenue and other data from the ERP system used to support the P&L reports, confirming that he had access to individual drug-level pricing and revenue data in the ERP systems.  ¶¶44, 91(b), 229.

**Defendants "Lock Up" Supply To Increase Prices**: Price increases on the Inflated Drugs were not the only method that Defendants used to manipulate the markets for generic drugs.  ¶¶89(c), 92, 242, 253-56.  After De Silva took control, Qualitest employees were prohibited from selling certain products for several weeks, despite having sufficient inventory. ¶¶89(c), 92, 242, 254-55.  This "lock-up" of inventory created an artificial shortage of the drug, thereafter allowing Endo to dramatically increase the product's price to customers in need.  *Id*. Through a formalized, top-down process, Propst, Reiney, and Cupero informed Minnihan (Manager of Pricing and Analysis) of major price increases of as much as 300% for the "lock-up" or shelved drugs.  ¶¶92, 255.  With their approval, only Minnihan was authorized to make changes to the master pricing spreadsheet.  ¶92(c).  Minnihan then instructed the pricing team to send "blast" notifications to customers to announce the re-release of these drugs at the higher prices.  ¶¶92, 255.  The pricing team conducted meetings three times a week to identify the drugs, pricing, and timing for upcoming blasts.  *Id*.

**Defendants' Opportunities To Collude Over Price Increases**: Together with their personal role and knowledge of the price increases, Propst and Reiney personally attended several industry conferences where they had the opportunity to collude with other manufacturers, including in August 2013 (coinciding with 100% price increase of Prednisone); June and August 2014 (coinciding with 150% increases in Amitriptyline and Baclofen); and June 2015 (coinciding with 60% increase in Butalbital).  App. A; ¶¶102, 109, 113, 116.  Campanelli attended such conferences in April 2013 and June 2015.  App. A.  Other senior-level Endo officials, namely Tatum and Minnihan, also attended the same conferences with Propst and Reiney.  App. A.

**With Its Share Price Above $90, The "Transformational" Deal Is Announced**: By the spring of 2015, the Inflated Profits had propelled Endo's share price from the $30s to well above $90 per share.  ¶¶16, 33, 55.  In May 2015, Defendants released Endo's seemingly stellar financial results for Q1 2015, while concealing that the Inflated Profits contributed $49 million, or 27%, to Endo's generics division's profits.  ¶54.  With Endo's inflated shares in hand to use as "currency," on May 18, Defendants announced that Endo had entered into an agreement to acquire Par.  ¶¶11, 56.  The deal would catapult Endo into the top five generic manufacturers in the world and increase its enterprise value by 40%.  ¶58.  The price tag: ***$8.05 billion***, or 30 years of Endo's average profits.  ¶¶56-57.

With only $375 million on hand, Defendants needed to maintain the inflated share price to maximize their "currency" and close the deal.  ¶¶11, 57.  To accomplish this, they implemented additional price hikes, which added another $97 million in Inflated Profits.  ¶¶11, 59, 118, 121, 124.  The plan worked: Endo's stock price remained inflated, allowing Endo to raise $3.6 billion from investors using its securities together with additional debt.  ¶¶57, 60-61.

The deal closed on September 28, 2015.  ¶61.  Unaware of the price hikes, Wall Street analysts remained confident about Endo's present and future.  *See, e.g.*, ¶61 (J.P. Morgan: "We see Endo's generics business driving sustained double-digit top-line growth.").

**Law Enforcement Subpoena Halts Endo's Price Hikes**: Unbeknownst to the public, in December 2015, the Connecticut AG served Endo with a subpoena (the "CT AG Subpoena") seeking information concerning the Company's generic drug pricing.  ¶67.  Now under direct government scrutiny, Endo could not implement any new price increases or maintain its prior increases.  ¶67.  Defendants failed to disclose the CT AG Subpoena for five months.  ¶¶68, 74.

Instead, in January 2016, Defendants attempted to misdirect and steer the public away from this critical news, misleadingly stating that law enforcement had recently issued subpoenas to "***a pharmaceutical company***" seeking information about its drug pricing practices and that Endo "***may***" face pricing pressure "due to … increased public and governmental scrutiny of the cost of drugs."  ¶¶70, 72.  Not only had Endo actually received the CT AG Subpoena, but it also had already experienced a sudden acceleration of pricing pressure, caused by Defendants' inability to sustain the price hike scheme.  ¶209.  As a result, Endo's profits plummeted, with the Company reporting disappointing results for Q1 and Q2 2016.  ¶¶68, 74, 76, 85.  Nonetheless, Defendants continued to attribute the declines to normal market dynamics and not the demise of their hyper-inflated pricing.  ¶¶211, 215-16.

**Defendants' Fraud Unravels**: With the collapse of their pricing strategy, Defendants' fraud began to unravel.  In September and October 2016, Endo fired De Silva and Upadhyay.  ¶80.  Then, on November 3, 2016, *Bloomberg* published an article in which shareholders first learned that Endo was the subject of an investigation into criminal anticompetitive pricing.  *Bloomberg* specifically identified Endo as one of the companies that the DOJ and Connecticut

AG were targeting.  ¶¶14, 81, 260-61.  That day, Endo's share price plummeted 19.5% to close at $14.63 on very heavy trading volume.  ¶¶82, 262.

On March 1, 2017, in connection with the release of the Company's FY 2016 financial results, Endo disclosed that it was required to take a massive ***$2.85 billion write-down*** against earnings because its generics business had suffered a "permanent impairment."  ¶¶15, 84, 264. Defendants, thus, effectively admitted that the Inflated Profits were never coming back and that Endo's generics business had been wholly overvalued by at least this amount during the Class Period.  ¶¶84-86.  By the end of the Class Period, and with the scope and impact of Defendants' fraud fully revealed, the price of Endo's stock fell another 3.5% to close at $12.82, again on heavy trading volume.  The share price was now a far cry from its Class Period high of over $90 per share at the height of Defendants' fraud.  ¶¶15, 87, 265.

## ARGUMENT

In deciding a motion to dismiss under Rule 12(b)(6), courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).  The Court's review is not limited; it must consider the Complaint as a whole and ***all*** of the factual allegations. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011).

The PSLRA's heightened pleading standard is "relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997); *see Mill Bridge V, Inc. v. Benton*, 2009 WL 4639641, at *6 (E.D. Pa. Dec. 3, 2009).  At this stage, the Court's role is not to determine whether Lead Plaintiff "will ultimately prevail" but whether it is "entitled to offer evidence to support the claims." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 583 (2007).

12

I.      **THE COMPLAINT ALLEGES VIOLATIONS OF**
        **SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5**

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: (1) a

material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of

a security; (4) reliance; (5) economic loss; and (6) loss causation.  *Institutional Inv'rs Grp. v.*

*Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009).  Of these six elements, Defendants challenge only

the first and second elements of Lead Plaintiff's claim.

As an initial matter, Defendants' motion rests entirely on the premise that the Complaint

is *exclusively* "predicated on the notion that Endo should have disclosed that its pricing was

'anticompetitive' because it was based on an 'illegal agreement to fix prices, rig bids, and

allocate markets for generic drugs.'"  MTD at 1, 6.  This is simply wrong.  Instead, the

Complaint first alleges, and Defendants do not challenge, that Defendants' misstatements were

empirically false; specifically, Defendants fraudulently misled shareholders by saying that:

> (i)      Endo was succeeding despite "intense competition" on price, when in fact
>          Defendants were deliberately *not* competing with its named competitors on
>          the Inflated Drugs, and sometimes actually gave up market share to these
>          purported competitors so that no one would compete on price, ¶186(a);
>
> (ii)     Endo's profits and performance were the result of durable, sustainable
>          initiatives like increased sales volume, when in fact the highly risky and
>          ephemeral price increases were a main driver, ¶186(b); and
>
> (iii)    Endo's success was not the result of price increases, when in fact at least
>          one-third of Endo's generics profits were secretly the result of orchestrated
>          price hikes.  ¶186(c).

As alleged, Defendants' statements are actionable independent of whether the price

increases and lack of competition were the result of a conspiracy.  Defendants do not contest

these grounds for falsity, and the Complaint survives on this basis alone.

As for Defendants' anticompetitive behavior, that is an additional, independently

sufficient basis for liability because Defendants were part of an industry-wide conspiracy to fix

prices and allocate markets.  The Complaint alleges both parallel price increases, which are undisputed, and the same circumstantial evidence of collusion that *Mylan*, *Taro*, *Perrigo*, the *Generics MDL*, and *Propranolol* accepted for pleading a plausible conspiracy.  Measured against the Third Circuit's long-standing precedent and these recent district court decisions, the Complaint's collusion allegations well exceed Lead Plaintiff's burden and serve as an independent basis for this securities fraud claim.

Finally, Defendants made these misstatements with scienter, having personally decided to implement each and every price increase, asked for and received reports tracking each price change and its financial impact, and routinely discussed these matters in person and by phone.

### A.   The Complaint Alleges Actionable Misstatements And Omissions

Under the PSLRA, a plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  Both the PSLRA and Rule 9(b) "require facts to be pleaded with particularity" which "requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story."  *Avaya*, 564 F.3d at 253.

A statement is actionable if (i) contemporaneous empirical facts contradict the statement, *id.* at 263-64 (statements that pricing was "fairly steady" were actionable when sales actually relied on "deep and unusual discounting"), or (ii) it conceals "material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  *Matrixx*, 563 U.S. at 47 (defendants concealed a "significant risk to its leading revenue-generating product.").

Thus, "once a company has ***chosen to speak*** on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to

make the disclosure misleading." *In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at

*14 (D.N.J. Aug. 28, 2017) (quoting *Williams v. Globus Med., Inc*., 869 F.3d 235, 241 (3d Cir.

2017)).  Simply put, the "law does not permit corporate executives to mislead investors through

half-truths." *Perrigo*, 2018 WL 3601229, at *13.  The determination of "whether disclosure was

required is best left to the trier of fact, since whether a prior disclosure is inaccurate, incomplete,

or misleading in light of all of the evidence is a mixed question of law and fact." *Id.* at *12.

### 1.   Defendants' Misstatements Are False And Misleading As A Matter Of Fact

Each category of Defendants' fraudulent statements is false and misleading because the

well-pled facts explicitly contradict Defendants' statements.  *See Matrixx*, 563 U.S. at 47.

### a.   Defendants' Misleading Statements Explaining Competition Are Actionable

On the first day of the Class Period, March 2, 2015, Defendants signed and filed with the

SEC Endo's Annual Report for 2014 on Form 10-K, stating that:

- "In the generic pharmaceutical market, we face *intense competition* from other generic drug manufacturers," and identifying "*price*" as a major competitive factor. ¶188.

The Company's 2015 Form 10-K repeated this statement, ¶205, and added that:

- "We operate in a *highly competitive* industry." ¶208. The "pharmaceutical industry is *intensely competitive*, and we face competition in our branded and generic pharmaceutical business…. [on] product quality and price." *Id.*

The annual reports also identified Endo's purported competitors, namely:

- Actavis, Teva, Mylan Technologies Inc., and Sandoz, Inc. for 2014 and Abbott, Allergan, Purdue, Jazz, Shire, Horizon, Mallinckrodt, Teva, Mylan, and Impax for 2015.  ¶¶188, 205.

In these same statements, Defendants also claimed Endo's ability to succeed in the face of

intense price competition depended on its:

- "ability to select, develop and launch new generic products," to "maintain efficient, high quality manufacturing relationships," and "to compete in the generic product market." ¶¶190, 206-07.

Independent of whether Defendants colluded with other manufacturers, it is undisputed that they engaged in conscious parallel conduct and did ***not*** compete. ¶¶95-151, 155 (table). Following a long history of low and stable pricing, Defendants raised prices in lock-step with and at or near the time of their purported competitors. ¶95; Graphs at ¶¶99, 102, 105, 109, 113, 116, 120, 123, 127, 131, 136, 140, 143. As the graphs illustrate, once the prices were increased, there was no competition on these drugs, often for years. Moreover, Defendants allocated market share for the Inflated Drugs, including ceding Endo's own market share to existing and new entrants to ensure that no one would compete on price. ¶¶106, 110, 117, 120, 128. Likewise, Endo benefited from other manufacturers ceding market share after Endo raised its prices or matched competitors' prices. ¶¶132, 143. Thus, Endo's market share for many of these drugs became more stable following the price increases and, once increased, the prices did not fall. ¶¶99, 102, 113, 123, 136, 140, 143. In addition, Endo did all of this together with its purported competitors, including Teva, Mylan, Allergan, Sandoz, Impax, and Actavis. ¶¶102, 105, 109, 113, 123, 127, 131, 136, 140, 143.

Defendants' statements concerning the market for generic drugs are substantively identical to those held actionable in *Perrigo*, *Mylan*, and *Taro*. In *Perrigo*, the statements that the generic market was "highly competitive" were actionable in light of price increases on seven of Perrigo's generic drugs, increases made in tandem with competitors and which lasted for months or years. *See Perrigo*, 2018 WL 3601229, at *12. Likewise, in *Mylan*, defendants described the generics market as "very competitive" and "highly sensitive to price," where Mylan was alleged to have raised and maintained the prices of five of its generic drugs in tandem with competitors "over the course of several months." *Mylan*, 2018 WL 1595985, at *7, *16.

16

Defendants contend that their statements on competition are false only if the Complaint demonstrates that they participated in an illegal conspiracy. MTD at 6. This is not the law. It is axiomatic that the facts or activity concealed by false statements "need not be illegal" for those statements "to be materially misleading" and actionable under the Exchange Act. *Mylan*, 2018 WL 1595985, at *12; *see Matrixx*, 563 U.S. at 47 (holding as actionable a company's characterization of reports that a drug caused loss of smell as "unfounded and misleading" and its assertion that the drug was "safe," when there was evidence of a link between the drug and the loss of smell, and defendants had not conducted studies to disprove that link); *Avaya*, 564 F.3d at 260, 267 (holding statements that "although there was pressure in the market, there were no significant changes to the pricing environment" were false in light of "unusual price discounting" to key customers).

> **b.** **Defendants' Misleading Statements Explaining**
> **The Sources Of Endo's Income Are Actionable**

In each filing with the SEC and on frequent calls with shareholders and analysts, Defendants provided reasons for Endo's remarkable year-over-year income growth, solely attributing it to durable and sound business reasons. However, "statements disclosing some sources of past income create[] a duty to tell the ***whole truth*** about past sources of income." *Mylan*, 2018 WL 1595985, at *6.

Defendants' response to this well-settled duty is to mischaracterize Lead Plaintiff's allegations as merely a "recitation" of Endo's historical financial figures. MTD at 8. To be clear, Defendants' statements are actionable because they placed the sources of Endo's generics profits "at issue," while fraudulently attributing all of those profits to sources that were "durable and due to a legitimate competitive advantage." *Taro*, 2018 WL 4572987, at *7. These

17

statements concealed that the Inflated Profits were a material and secret source of Endo's revenues that were "subject to abrupt termination." *Id.*[7]

Indeed, in each quarterly SEC filing, Defendants attributed Endo's generics business's success to specific products and transactions. For example, the Q3 2015 Form 10-Q reported that the generics segment's Adjusted Income had increased 28%, or $38 million, year-over-year, to $178 million, and attributed that increase as:

> primarily due to the DAVA acquisition, the May 2014 launch of … Lidoderm® and overall increases in demand. ¶201.

This statement was false and misleading because, at a minimum, Defendants concealed that price increases had generated $71 million, *or 40%*, of that total (in other words, without the price increases, Adjusted Income would have been ***down*** for the quarter). ¶¶85, 201; ¶¶191, 194, 198, 201, 204, 211, 215, 218 (each quarterly and yearly SEC filing attribution of income statement).

Likewise, on conference calls with Wall Street analysts, Defendants added that Endo's generic division's profits were due to "favorable [product] mix," "new product launches," and other sources. ¶¶194, 196, 198, 201. During the May 18, 2015 conference call announcing Endo's acquisition of Par, CFO Upadhyay fraudulently explained that Endo's growth:

> resulted from a combination of volume, new products, prudent pricing strategies and accretive acquisitions … [and Endo] realized meaningful margin gains since 2011 as a result of greater manufacturing efficiencies, favorable mix and through the optimization of pricing across a more specialized product portfolios.

---

[7] Defendants do not take issue with the Complaint's allegations of Inflated Profits calculated through econometric analysis. Nor should they as *Perrigo*, *Mylan*, and *Taro* all credited nearly identical analyses in sustaining securities fraud allegations. *See Perrigo*, 2018 WL 3601299, at *3 (crediting allegations based on "[a]n economic expert … [who] determined that there was strong indicia of collusion, including dramatic price hikes contemporaneous with competitors following industry conferences."); *Mylan*, 2018 WL 1595985, at *16 (same); *Taro*, 2018 WL 4572987, at *2 (same); *see also Propranolol*, 249 F. Supp. 3d at 716 (crediting price increase data); *Generics MDL*, 2018 WL 5003450, at *6-7 (same).

In short, Upadhyay conveyed that Endo's profit stream was steady, durable, and the outgrowth of good management.  But this was false.  Rather than relying on "prudent pricing strategies," Defendants were engaged in, and Endo was dependent on, the highly risky strategy of systematic price increases.  While Upadhyay referenced pricing in the "specialized product portfolio," none of the Inflated Drugs was a "specialized" product subject to limited manufacturing and higher profits.  ¶¶95, 97.  Rather, each of the Inflated Drugs was a long-established generic drug, manufactured by numerous companies, with a long history of low, steady prices without shortages.  ¶¶95, 97.  Defendants made no mention of this reality; nor did Upadhyay explain that, by the time of his May 2015 false statement, Endo had earned over $200 million in Inflated Profits.  ¶¶10, 85.[8]

Defendants made additional statements that falsely explained the source of the collapse of Endo's generics business.  The truth was that when Defendants received the CT AG Subpoena in December 2015, they could no longer sustain the inflated prices, let alone make new increases.  ¶¶67-68.  However, in the first SEC filing after Endo received the subpoena, Defendants misleadingly stated that Endo "*may*" face "pricing pressure … due to … increased public and governmental scrutiny" including from a governmental "subpoena" into "drug price increases."  ¶¶69-72.  Courts hold that statements like these that supposedly warn investors of events that "already occurred" constitute "deceit."  *Mylan*, 2018 WL 1595985, at *10.

---

[8] Defendants assert that Endo was under no duty to disclose its corporate pricing strategy, citing *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 810 (2d Cir. 1996) and *Hammerstone NV v. Hoffman*, 2010 WL 882887, at *5 (S.D.N.Y. Mar. 10, 2010).  MTD at 6 n.4.  This argument is irrelevant; Defendants affirmative misstatements concealed that their price increases were the substantial *sources* of profit.  Further, Defendants' cases are wholly inapposite.  In *San Leandro*, at issue was a *contemplated* strategy that management had not even put into place, let alone one that was impacting financial results in any way.  75 F.3d at 810.  In *Hammerstone*, plaintiffs failed to plead a single false statement "even tangentially related" to the allegedly-concealed corporate plan.  2010 WL 882887, at *5.

19

Later, in reporting disappointing earnings as the Inflated Profits diminished, Defendants misleadingly attributed the decline to pricing pressure from normally functioning market dynamics.  These statements were false because they placed the sources of Endo's declining revenue "at issue," but concealed the truth that Defendants could no longer implement new price increases or sustain already inflated prices, causing the Inflated Profits to dry up.  *See* ¶¶68, 211-20.  Moreover, Defendants' acknowledgment of pricing pressure was misleading in the absence of a disclosure that declining revenues were still being "mitigated by" the Inflated Profits. *Mylan,* 2018 WL 1595985, at *6; *see Perrigo*, 2018 WL 3601229, at *12 ("statements regarding … pricing pressures are likewise actionable.").

### c.   Defendants' Misleading Statements Explaining Price Increases Are Actionable

Defendants made numerous statements about the nature and importance of Endo's price increases that were false and misleading.  CEO De Silva categorically denied that Endo was dependent on price increases.  Specifically, he stated Endo had:

- "***not*** been dependent on pricing," ¶66, and that it was "***not*** relying on price increases" for growth, instead it was looking to "volume and [product] mix as we launch our new [drug applications] and ***not by net price***."  ¶49.

In reality, however, by the start of the Class Period, Endo had earned $140 million in FY 2014, or 30% of reported generics income, exclusively due to Inflated Profits generated by seven extraordinary price increases.  ¶¶10, 98-114, 126-33.  In 2015, Endo earned an additional $235 million in Inflated Profits, accounting for 32% of the Company's overall generics profits. *Id.*  All told, the Inflated Drugs yielded $620 million by the end of the Class Period.  ¶2.

In an attempt to portray Endo as operating in a normally functioning generics market, De Silva told analysts and shareholders that the market was functioning normally, and that Endo could not plan for price increases, as they were driven by supply-demand dynamics.  He said:

- "while we ***cannot plan for them***, we will maintain our opportunistic approach to supply and demand imbalances that lead to volume and price opportunities." ¶192; *see also* ¶¶199, 202.

Nothing could have been further from the truth.  De Silva personally "planned" and orchestrated each of these price increases, determining the amount and timing of each and every price hike.  ¶¶9, 35-38, 89-90, 93, 222.  Once in place, De Silva, Upadhyay, and Campanelli tracked and monitored each increase and the related revenues generated therefrom .  ¶¶9, 40-44, 90-91, 224-28.  Importantly, none of the 13 Inflated Drugs that Lead Counsel identified thus far suffered from shortages or any other type of supply-demand imbalance.  ¶¶10, 97.

In addition, De Silva's statement concealed that they planned and carried out other market disruptions through the "lock-up" of certain drugs to artificially create a shortage and then "blasted" them into the market at highly inflated prices.  ¶¶89(c), 92, 242, 253-56.  In effect, rather than taking advantage of occasional "opportunities" created by normal market dynamics (as they told the investing public), Defendants created their own market opportunities.

Defendants argue that Endo's single reference to "certain pricing increases" in the 2014 10-K, "makes clear that Endo had in fact, disclosed that it was increasing prices."  MTD at 7, n.6.  To the contrary, this statement highlights Defendants' liability; they put "the subject [] in play," giving rise to their duty to disclose the full truth that the Inflated Drugs were generating one-third of Endo's generics profits quarter after quarter.  *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992).  Instead, they denied it.

Indeed, Defendants' denials that Endo depended on price increases make the allegations here far stronger than those in *Taro* and *Perrigo*.  Specifically, in *Taro*, far from denying the existence of price increases, executives told investors that Taro's profits were "***primarily*** due to price adjustments," *i.e.*, price increases.  The court held that the statements were actionable half-

truths that "called into question whether Taro's ability to secure favorable pricing in the future was durable and due to a legitimate competitive advantage." *Taro*, 2018 WL 4572987, at *7.

In *Perrigo*, defendants argued that their explicit statement that pricing was "flat to up slightly," was true and acknowledged that Perrigo was benefitting from price increases. The court held that the statement was false, reasoning that, like here, it fraudulently "masked" the alleged fact that Perrigo's "pricing was inflated by enormous and unsustainable price spikes in drugs and that these products contributed … more than a quarter of all Generic Rx revenues." *Perrigo*, 2018 WL 3601229, at *12. As set out above and in the Complaint, in the face of Defendants' outright denials that Endo had "***not*** been dependent on pricing," ¶66, a singular passing reference to "certain pricing increases" only adds to Defendants' liability. ¶191.

## 2.   Defendants Engaged In Anticompetitive Collusion, Further Rendering Their Misstatements Actionable

In addition to being wholly undermined by the facts, each of the three categories of Defendants' misstatements is also actionable because the misstatements concealed Defendants' secret collusive conduct that violated the antitrust laws. Defendants' motion addresses only this second basis for establishing falsity. In so doing, however, Defendants mischaracterize the Third Circuit's long-standing precedent and fail to address any of the recent securities fraud cases upholding identical allegations of collusive conduct. *See Mylan*, 2018 WL 1595985, at *16; *Perrigo*, 2018 WL 3601229, at *11; *Taro*, 2018 WL 4572987, at *6. Defendants also ignore *Propranolol*, which sustained allegations of a price-fixing conspiracy—also based on allegations nearly identical to those here—and that *Mylan*, *Taro* and *Perrigo* all found highly persuasive. *See* 249 F. Supp. 3d at 724. Finally, Judge Rufe issued an extensive opinion in the *Generics MDL* (also referencing *Propranolol*) denying almost entirely the motions to dismiss antitrust violations, including allegations ***against*** Endo's generics unit Par. 2018 WL 5003450, at *33.

"When a securities fraud action rests on the failure to disclose uncharged illegal conduct, the complaint must state a plausible claim that the underlying conduct occurred." *Perrigo*, 2018 WL 3601229, at *11.  Here, the Complaint includes "enough factual matter (taken as true) to suggest that" Defendants were involved in a price-fixing conspiracy; there is no "probability requirement at the pleading stage." *Twombly*, 550 U.S. at 556.[9]

Contrary to Defendants' suggestion, to properly allege an antitrust violation, plaintiffs are not required to plead direct evidence of an illegal scheme; an "agreement may be shown by either direct or circumstantial evidence." *See Lifewatch Servs. Inc. v. Highmark Inc*., 902 F.3d 323, 333 (3d Cir. 2018); *Taro*, 2018 WL 4572987, at *5 (*citing Mylan*, 2018 WL 1595985, at *16-17).  To sufficiently demonstrate circumstantial evidence of an agreement, a plaintiff must allege parallel conduct—such as price increases made in parallel with competitors—along with "a plus factor." *Lifewatch*, 902 F.3d at 333.  The circumstantial "plus factors" may include: "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy," such as "proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown." *In re Ins. Brokerage Antitrust Litig*., 618 F.3d 300, 322 (3d Cir. 2010). The "plus factors … serve as proxies for direct evidence of an agreement," and "show that the allegedly wrongful conduct of the [defendants] was conscious and not the result of independent

---

[9] In other words, securities fraud plaintiffs need only allege facts sufficient to support a plausible inference of a conspiracy, *i.e.*, "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556.  *Mylan*, *Taro* and *Perrigo* each applied this standard and held plausible price fixing, "even when viewed through the PSLRA's heightened standard." *Perrigo*, 2018 WL 3601229, at *11; *Mylan*, 2018 WL 1595985, at *16; *Taro*, 2018 WL 4572987, at *6.

business decisions of the competitors." *Generics MDL*, 2018 WL 5003450, at *21.[10]

As a threshold matter, Defendants ***do not dispute*** that the price increases on the 13 Inflated Drugs, deliberately undertaken at or near the time that Endo's competitors made identical increases, constitute parallel conduct.  ¶¶95-151.  Thus, analysis of the Complaint's allegations turns to the "plus factors."[11]

Endo's Motive to Conspire:  The Complaint alleges "facts specific to the market[s] at issue, [that] suggest[] that the defendants had an incentive to manipulate prices." *Propranolol*, 249 F. Supp. 3d at 719.  In particular, as is expected in the generic drug markets, for each Inflated Drug, price competition had driven prices down to a point "near the marginal costs of production."  ¶169; *see also Perrigo*, 2018 WL 3601229, at *3.  This reduced each competitor's profits in each Inflated Drug's market, "thereby giving them a common motive to conspire." *Propranolol*, 249 F. Supp. 3d at 720; *compare* ¶169.  As economics and common sense dictate, "[d]eclining prices or profits in a market make price competition more than usually risky and collusion more than usually attractive." *Generics MDL*, 2018 WL 5003450, at *27.

Here, the Complaint alleges the necessary facts "describing the downward pricing pressure in competitive generic drug markets [¶¶1, 164, 169-70], describing the market

---

[10] Defendants argue incorrectly that courts in the Third Circuit "have been cautious in accepting inferences … from circumstantial evidence" in oligopolistic markets.  MTD at 10.  Each of the cases that Defendants cite was decided at summary judgment.  As Judge Rufe noted, "[w]hether plaintiffs can ultimately survive a motion for summary judgement after discovery is of no consequence" on a motion to dismiss.  *Generics* MDL, 2018 WL 5003450, at *17.

[11] Defendants' only response to these allegations is to isolate each "plus factor" and argue that each standing alone is insufficient.  Even assuming that "these factual allegations in isolation may lead one to the conclusion drawn by the defendants, *i.e.*, that there is a legitimate business justification for each of the acts, a view of the complaint as a whole, which this Court must take, and accepting all of the factual allegations as true, does support a plausible inference of a conspiracy or agreement made illegal under § 1 of the Sherman Act." *Generics MDL*, 2018 WL 5003450, at *31.

concentration for each impacted drug [¶¶98, 101, 104, 108, 112, 115, 119, 122, 126, 130, 135, 139, 142], establishing that there were high barriers of entry due to FDA requirements [¶¶155, 158-59], … [and] demonstrating that demand was both theoretically inelastic and actually inelastic in that changes in price would not affect the quantity demanded [¶¶161-62]." *Perrigo*, 2018 WL 3601229, at *11; *compare Mylan*, 2018 WL 1595985, at *16 (also assessing "high degree of interchangeability") *with* ¶¶154-62, 169-70.[12]

   Endo Acted Against Apparent Self-Interest:  As the Complaint explains, federal law requires that generic drugs be completely substitutable and, thus, generic manufacturers compete only on price.  ¶96; *see also Mylan*, 2018 WL 1595985, at *17 (same).  Consequently, as alleged at ¶164, "in a market free of collusion, if one generic drug marketer raises its prices significantly above those of its competitors, that marketer will lose market share."  *Mylan* 2018 WL 1595985, at *17; *see also Perrigo*, 2018 WL 3601229, at *11 (when faced with a competitor's price increase, a "rational competitor … should have kept its price stable and vastly increased its market share") (quoting *Propranolol*, 249 F. Supp. 3d at 719).

   Given the unique characteristics of generic drug markets, absent collusion, "no company in its right mind" would unilaterally make the drastic price increases on 13 drugs that Endo made abruptly and without any market-based explanation.  *Propranolol*, 249 F. Supp. 3d at 721 n.10;

---

[12] The cases on which Defendants rely to argue that Lead Plaintiff's allegations are insufficient to establish motive are inapposite.  MTD at 12.  First, *In re Chocolate Confectionary Antitrust Litigation* and *In re Baby Food Antitrust Litigation* addressed antitrust claims at summary judgment.  Second, *Chocolate Confectionary* held that "market concentration and high barriers to entry" established motive there.  801 F.3d 383, 398 (3d Cir. 2015).  Third, in *Baby Food*, the relevant market for baby food, unlike the generics market, is not legislatively regulated to drive down prices towards the costs of production, and plaintiffs' expert did not address any of the factors that render a market ripe for collusion.  166 F.3d 112, 134-35 (3d Cir. 1999).  Fourth, in *Burtch v. Milberg Factors, Inc.*, plaintiffs did not allege that defendants "had a motive to enter into a conspiracy."  662 F.3d 212, 229 (3d Cir. 2011).

¶¶163-68; *see also Generics MDL*, 2018 WL 5003450, at *27.  Strikingly, Defendants' decision

to cede market share to existing and new entrants, rather than compete on price for many of the

Inflated Drugs, was strikingly contrary to self-interest absent collusion.[13]  ¶¶106, 110, 117, 120,

128.  Certainly, Endo's decision to implement "dramatic price increases would have left it

vulnerable to market share loss to competitors in the absence of collusion."  *Perrigo*, 2018 WL

3601229, at *11.[14]

Opportunities To Collude:  Defendants' participation "in trade association meetings

taking place over a number of years [including a] list [of] the dates of such conferences, the

names of the attendees from each defendant, and their respective job titles," suffice to plead an

inference of a traditional conspiracy, along with allegations that "attendees were responsible for

setting drug prices and that the stated purposes of the various conferences were to provide peer-

to-peer connections, strategic business discussions, and one-on-one strategic meetings."

*Propranolol*, 249 F. Supp. 3d at 722.  The Complaint alleges precisely those facts.

- Qualitest VPs Propst and Reiney, who—together with CEO De Silva—identified, reviewed, approved, and tracked each of the 13 Inflated Drugs, personally attended several industry conferences, including in August 2013 (coinciding with 100% price increase of Prednisone); June and August 2014 (coinciding with 150%

---

[13] *Taro*, 2018 WL 4572987, at *5 (following *Mylan*'s reasoning on similar allegations); *Propranolol*, 249 F. Supp. 3d at 721 (increases in Propranolol price were against self-interest, even where competitors' increases "did not always align on a monthly basis").

[14] Defendants argue wrongly that the Complaint's allegations are insufficient to demonstrate that they acted against their self-interest, again relying on inapposite cases.  MTD at 14.  First, *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628 (S.D.N.Y. 2015), and *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365 (S.D.N.Y. 2007), were securities cases that did not involve antitrust allegations.  Moreover, in *Chocolate Confectionary*, which was resolved at summary judgment, because retailers set consumer prices in the market for chocolate, which is completely different than the highly regulated and commoditized generic drug market, there was insufficient evidence that manufacturers were acting anti-competitively. 801 F.3d at 400, n.11.

increases in Amitriptyline and Baclofen), and June 2015 (coinciding with 60% increase in Butalbital).  App. A; ¶¶90-91, 102, 109, 113, 116.

- Campanelli, who had authority over any price change at both Par and Endo, also attended conferences in April 2013 and June 2015.  ¶¶64, 93, 223; App. A.

- Tatum (Director of Market Insights)—who received the monthly reports reflecting the Inflated Profits and the "red tab" Excel spreadsheet and met with De Silva, Upadhyay, Propst, and Reiney, among others, to discuss in detail the drug pricing information—also attended the interfirm conferences in August 2013 and August 2014 that coincided with price hikes.  ¶90; App. A.

- Minnihan—who was also central to Endo's "lock up" and "blast" price manipulation strategy—attended the same conferences as Tatum, along with Propst and Reiney.  ¶92; App. A.

These conferences provided Campanelli and other Endo executives involved in generic drug pricing with the means "to interact with their counterparts at other manufacturers during the relevant period" with many such meetings occurring "in close proximity to the price increases that Endo and/or another manufacturer[] implemented." ¶172.[15]  The State AGs have specifically alleged that such interfirm conferences were in fact used by generic drug manufactures to facilitate agreements to fix prices and allocate markets.  ¶173.  The allegations of motive and actions against self-interest, the close timing of the price hikes, the conferences attended by Endo employees responsible for pricing, and the corroborating State AGs' allegations, all lend "greater significance to Defendants' participation in the trade meetings as

---

[15] In view of these allegations, the Complaint more than sufficiently alleges the temporal relation between Endo's price increases and interfirm events.  Defendants' argument to the contrary is factually incorrect.  MTD at 13 n.5.  Moreover, Defendants' cited authority is also inapposite. *See Resco Prods. Inc. v. Bosai Minerals Grp. Co.*, 158 F. Supp. 3d 406, 424, 426 (W.D. Pa. 2016) (at summary judgment, interfirm communications between individuals lacking authority over pricing did not suffice).

evidence of conspiracy." *Perrigo*, 2018 WL 3601229, at *11; *see also Taro*, 2018 WL 4572987, at *5; *Propranolol*, 249 F. Supp. 3d at 722 (crediting State AGs allegations).[16]

Law Enforcement Investigations: The DOJ's investigation of Endo and the State AGs' lawsuit against Endo "raise[] an inference of conspiracy." *Propranolol*, 249 F. Supp. 3d at 723. The DOJ is investigating Endo for fixing the prices of four Inflated Drugs: Amitriptyline, Baclofen, Propranolol, and Digoxin. ¶¶182, 184. The State AGs allege that for years Endo and its competitors were involved in an "overarching conspiracy," whereby each manufacturer agreed to "play nice in the sandbox" so that each could enjoy its "fair share" of the generic drug markets, allowing them to suppress competition by fixing price and allocating markets. ¶¶177-78. The CT AG Subpoena subpoenaed Endo for information concerning this conspiracy in four of the Inflated Drugs: Amitriptyline, Doxazosin, Methotrexate, and Oxybutynin. ¶179. Thus, a total of 7 of the 13 Inflated Drugs are under investigation.

Importantly, the government investigations and criminal and civil charges corroborate many of the detailed facts independently alleged in the Complaint. ¶¶176-85. Defendants argue that the Court cannot consider allegations that were taken from the State AGs' complaint. MTD at 7. Not so. It "is perfectly permissible to take as true the fact that a government investigation has been instituted, and that therefore at least several individuals within the governmental chain of command thought certain facts warranted further inquiry into a potential criminal conspiracy."

---

[16] Defendants argue that Lead Plaintiff's allegations of traditional conspiracy are lacking, but the cases they cite lend no support to their argument. MTD at 13. In *Burtch*, 662 F.3d at 228, the court held that allegations of interfirm communications were irrelevant as the defendants were "exchanging information regarding the creditworthiness of customers" which "does not violate the Sherman Act." In *Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co.*, 998 F.2d 1224, 1235 (3d Cir. 1993), at summary judgment, the court found evidence of interfirm communications established an inference of conspiracy. In *Baby Foods*, plaintiffs' evidence of interfirm communications failed because the individual involved had no authority to set prices, and only discussed irrelevant information. 166 F.3d at 125-26.

*Generics MDL*, 2018 WL 5003450, at *29.[17]  Further, as to the State AGs' allegations

specifically, "reference to a recent civil complaint brought by the attorneys general of forty states

… lend[s] greater significance to … evidence of conspiracy."  *Perrigo*, 2018 WL 3601229, at

*11 (referring to trade show participation); *Propranolol*, 249 F. Supp. 3d at 722 (same).

Likewise, here, the DOJ's ongoing investigation has already resulted in guilty pleas, and the

State AGs' complaint is based on years of investigation and alleges detailed facts based on

documentary evidence and information from cooperating witnesses.  ¶¶177, 184.  Thus, the

Court may properly consider these substantive allegations taken from the State AGs' complaint,

just as the *Taro*, *Mylan*, *Perrigo*, and *Propranolol* courts already have.

\*                    \*                    \*

In view of the sufficiently pled price-fixing allegations, Defendants' statements here—

that Endo faced "intense competition" in the generic pharmaceuticals market, and that "price"

was one of Endo's "competitive factors"—were false and misleading because Endo engaged in

illegal collusive activity.  ¶¶188, 205, 208.  The courts in *Taro*, *Mylan*, and *Perrigo* each held

that substantively identical statements were actionable for this very reason.  *Taro*, 2018 WL

4572987, at *6 (holding statements describing the generic drug market as "intensely

competitive" were "misleading in the absence of a disclosure of [Taro's] anticompetitive

conduct."); *see also Mylan* at 2018 WL 1595985, at *7 (same); *Perrigo*, 2018 WL 3601229, at

_____

[17] Judge Rufe considered the criminal proceedings brought by the DOJ, but did not rely on the State AGs' allegations in denying the motions to dismiss because they were not properly before the Court.  The State AG's "pleading [] was filed **after** the Group 1 complaints and after Group 1 Defendants filed their motions to dismiss," and was thus not pled.  *Generics MDL*, 2018 WL 5003450, at *17 (emphasis in original).  Here, however, the Complaint has properly pled the corroborative facts that the State AGs have uncovered.  ¶¶177-80; *see also Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 343 (S.D.N.Y. 2015) (permitting plaintiffs to borrow allegations from a State AG's complaint as "[t]he facts are derived from a credible complaint based on facts obtained after an investigation.").

*12 (same); *supra* I.A.1.a.

Similarly, Defendants' statements purportedly explaining that Endo took price increases only as a result of normal, competitive market "supply and demand imbalances," ¶¶192, 199, 202, are false and misleading for failing to disclose that Endo's price increases were the result of price-fixing agreements. *See Perrigo*, 2018 WL 3601229, at *12 (descriptions of Perrigo's pricing strategy as "flat to up slightly" were false and misleading because collusive price increases "masked serious price deterioration in products subject to normal competitive forces.").

Finally, Defendants' numerous statements attributing the source of Endo's income and profits as "primarily due" to benign sources such as new launches and increases in demand, ¶¶194, 201, are misleading because they failed to "disclose that … income and revenue were inflated as a result of [] anticompetitive activity." *Mylan*, 2018 WL 1595985, at *6; *Taro*, 2018 WL 4572987, at *7. Defendants cannot cite any contrary authority.[18]

### 3. Defendants' Remaining Arguments Fail

Defendants make three remaining arguments on falsity: (i) they have no duty to accuse themselves of wrongdoing; (ii) certain false statements are inactionable puffery; and (iii) certain statements are forward looking and protected by the PSLRA's safe harbor. These arguments fail.

Defendants mischaracterize the Complaint's falsity allegations as somehow hinging on an

---

[18] Defendants cite *In re Axis Capital Holdings Ltd. Securities Litigation*, but there, the court held that statements regarding a company's "competitive strengths" were not false because the plaintiffs did not allege that the defendants took part in any sort of anticompetitive behavior. 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) (noting that plaintiff did not "allege that AXIS participated in any bid-rigging conspiracy or … any form of customer or market allocation"); s*ee also Hogan v. Pilgrim's Pride Corp*., 2018 WL 1316979, at *8 (D. Colo. Mar. 14, 2018) (plaintiffs failed to plead underlying misconduct, because unilateral business decisions are "not parallel conduct"); *In re FBR Inc. Sec. Litig*., 544 F. Supp. 2d 346, 357-58 (S.D.N.Y. 2008) (complaint contained "no allegation" that underlying misconduct "was the source of the financial success referred to in defendants' statements").

independent "duty to accuse [oneself] of wrongdoing."  MTD at 6.  This is not so.  Instead, the

Complaint alleges that Defendants misled investors through affirmative misstatements that

placed Endo's pricing practices and the sources of its profits at issue, while at the same time

concealing Endo's price hikes and Inflated Profits.  As such, the Complaint's allegations are

completely different from the two cases on which Defendants rely.  Specifically, in *Galati*, the

Third Circuit affirmed dismissal because there was no nexus between the subject matter of the

alleged false statement (the bare accurate fact that a bank held deposits of $9 billion to

$19 billion) and the undisclosed wrongdoing (a local kick-back scheme by three branch

employees involving $50 million).  *See Galati v. Commerce Bancorp, Inc*., 220 F. App'x 97,

101-02 (3d Cir. 2007).  Similarly, in *Citigroup*, the court dismissed the complaint because the

plaintiffs had failed to identify any statement that was rendered misleading by defendants' failure

to disclose the "illegitimate sources" of revenue.  *See In re Citigroup, Inc. Sec. Litig*., 330 F.

Supp. 2d 367, 377 (S.D.N.Y. 2004).[19]

  Defendants also wrongly maintain that some of their false statements are inactionable

puffery.  MTD at 15-16.  "'Puffing' statements—that is, vague expressions of corporate

optimism and expectations about a company's prospects—are not actionable because reasonable

investors do not rely on such statements in making investment decisions."  *In re Aetna Inc. Sec.

Litig.*, 34 F. Supp. 2d 935, 945 (E.D. Pa. 1999) (Padova, J.).  "[O]nly if the alleged

misrepresentations or omissions are so obviously unimportant to an investor that reasonable

minds ***cannot*** differ on the question of materiality is it appropriate … to rule that the allegations

are inactionable as a matter of law."  *Perrigo*, 2018 WL 3601229, at *8.

---

[19] Defendants' further argument that recitations of past earnings "so long as they are accurate, do not create liability under Section 10(b)," MTD at 8, is irrelevant. The Complaint does not allege that the historical financial figures are *per se* false.

31

In an effort to create puffery where none exists, Defendants improperly "pluck" clauses from larger alleged false statements to take them out of context.  *See In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 2013 WL 11319408, at *23 (S.D.N.Y. 2013).  When read in full, each statement is obviously material.[20]  The statements concerning "intense competition" and the like are material as they concern the Company's revenues and profits generated from its core business.  *See Perrigo*, 2018 WL 3601229, at *12 ("statements regarding competitiveness in the generic market and pricing pressures" were not puffery); *In re Aetna*, 34 F. Supp. 2d at 945 (statement that integration was "successful" "cannot be characterized as one[] that would be so obviously unimportant to an investor that reasonable minds could not differ").

Finally, Defendants' bespeaks caution/safe harbor argument is similarly unavailing.  The PSLRA's safe harbor protects only purely forward looking statements.  *See Avaya*, 564 F.3d at 255 ("[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.").  Accordingly, "omissions of existing facts or circumstances are not forward-looking, and thus do not qualify for safe harbor protection."  *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 471 (E.D. Pa. 2014).  Here, each of the two statements Defendants challenge are "mixed present/future statement[s]," as they refer to then-present facts that are false and misleading.  *See Avaya*, 564 F.3d at 255; ¶¶192, 212.  The statement that Endo "will ***maintain*** [an] opportunistic approach to supply and demand imbalances" necessarily implies that Endo had already implemented that approach.  ¶192.  The statement that "CDC guidelines will ***continue*** to put pressure on a[n] already soft pain market" referred to the guidelines' then-current negative impact that Campanelli listed among five current

---

[20] *See* Sections I.A (statements explaining the market, including ¶¶188, 205, 208); I.B. (statements explaining income, including ¶¶191, 194, 196, 201, 212); I.C. (statements explaining price increases, including ¶¶192, 199).

reasons Endo's generic segment was facing pricing pressure.  ¶212.  The safe harbor protects

neither of these statements of historical fact.  *See In re Aetna*, 34 F. Supp. 2d at 946 ("bespeaks

caution doctrine does not apply to presently known facts" where defendants stated they were "on

track to meet all objectives"); *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 649-

50 (E.D. Pa. 2015).

### B.    The Complaint Alleges A Strong Inference Of Scienter

"Under the PSLRA, a plaintiff must 'state with particularity facts giving rise to a strong

inference that the defendant acted with the required state of mind.'"  *Matrixx*, 563 U.S. at 48

(quoting 15 U.S.C.A. § 78u–4(b)(2)(A)).  A complaint demonstrates scienter by alleging facts

that give rise to a strong inference of either reckless or conscious misbehavior.  *Avaya*, 564 F.3d

at 267.  Allegations of scienter "need not be irrefutable, *i.e.*, of the 'smoking gun' genre."

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  Nor does the inference

of scienter turn on the "presence or absence of certain types of allegations."  *Avaya*, 564 F.3d at

269.  Instead, the inquiry is a holistic evaluation of whether, "accepting the whole factual picture

painted by the [c]omplaint, it is at least as likely as not that defendants acted with scienter."

*Avaya*, 564 F.3d at 269.  When comparing competing inferences, a "tie on scienter goes to the

plaintiff."  *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359,

372 (S.D.N.Y. 2012).

*Mylan*, *Taro*, and *Perrigo* are particularly persuasive in this regard.  Consistent with well-

established Third Circuit precedent, the *Mylan* and *Taro* courts found that scienter is

demonstrated where defendants (i) actively participated in the fraud or (ii) had access to

information about the fraud that contradicted their public statements.  *See Mylan*, 2018 WL

1595985, at *17; *Taro*, 2018 WL 4572987, at *9; *compare* ¶¶9, 34-44, 89-94, 222-29.[21]

Knowledge or reckless disregard of falsity is also adequately pled based on circumstantial

allegations, for example that: (i) Defendants repeatedly spoke to investors about generic drug

pricing; (ii) the financial impact of the price-fixing scheme was significant; and (iii) there was a

parallel criminal investigation concerning the Company's price-fixing activities.  *See Perrigo*,

2018 WL 3601229, at *22; *compare* ¶¶191, 194, 198, 201, 212-13, 216, 219, 232 (Individual

Defendants repeatedly spoke about pricing, its financial impact, and pricing pressure); ¶¶10, 84,

235 (massive size of Defendants' fraud); and ¶¶47, 176-85 (law enforcement investigations of

Endo).  As detailed below, the Complaint makes far more powerful and particularized allegations

of scienter than any of the allegations in *Mylan*, *Taro*, and *Perrigo*.

### 1. Defendants' Active Participation In Endo's Drug Pricing Supports A Strong Inference Of Scienter

The Complaint alleges that each Individual Defendant made false statements with

contemporaneous knowledge of, or access to, facts that contradicted their statements, thereby

pleading a strong inference of scienter.  *See Matrixx*, 563 U.S. at 49-50 (defendants' access to

reports concerning undisclosed adverse results of drug test established strong inference of

scienter); *Perrigo*, 2018 WL 3601229, at *18 (scienter alleged where "defendants knew or, more

importantly, should have known that they were misrepresenting material facts related to the

corporation.").  The Complaint is replete with allegations based upon Confidential Witnesses

("CWs"), who each have personal knowledge of the facts attributed to them and whose

statements corroborate each other.  ¶¶89-94; *infra* I.B.6.  These allegations, which specify

---

[21] As this Court has recognized, the PSLRA codified "the Second Circuit's standards for
pleading scienter." *Aetna*, 34 F. Supp. 2d at 951.  Thus, the decisions of the *Taro* and *Mylan*
courts applying the Second Circuit standards are particularly persuasive here.

documents, monthly meetings, and conference calls, further support a strong inference that each

Individual Defendant acted with scienter:

- De Silva, upon taking personal control over Endo's generics business in 2013, analyzed and determined whether and when to make price increases at Endo; all price increases required De Silva's approval.  ¶¶9, 35-38, 89-90, 93, 222.

- De Silva, Upadhyay, and Campanelli requested and received each month an Excel spreadsheet that identified all price increases or decreases greater than 25% for the current month, with these increases tabbed red for ease of reference.  ¶¶9, 40, 42-43, 90, 224-25.  That Excel spreadsheet also included a column that required "comments" explaining the reasons for each price increase of 25% or more.  ¶¶9, 43, 90, 225.

- This Excel spreadsheet further reflected pricing, sales, revenue, and profit data on a drug-by-drug basis down to the per-pill price.  ¶¶9, 42-43, 90, 224-28.  Thus, the spreadsheet tracked the profits from price increases over time.  ¶¶42, 44, 90, 225-28.

- After receiving the Excel spreadsheets, De Silva, Campanelli, and Upadhyay discussed their contents in prescheduled meetings with management, including Propst, Reiney, and finance personnel, such as Qualitest's CFOs, Cupero and Raimer.  ¶¶9, 40, 42-43, 90, 225.

- De Silva and Campanelli (after joining Endo) also received monthly P&L statements reflecting the Inflated Profits.  ¶¶44, 91.  De Silva and Campanelli participated in calls with Endo's finance department to discuss the P&Ls during which they referenced detailed drug-by-drug pricing information.  ¶¶44, 91.

- Campanelli, while he was at Par and during his tenure at Endo, approved all price changes, whether they were increases or decreases.  ¶¶64, 93, 223.

First, the fact that Defendants "actively participated in [] pricing decisions" supports a

plausible inference that they knew of the price increases.  *Mylan*, 2018 WL 1595985, at *17.

Indeed, De Silva made the price increases himself.  Further, Defendants' knowledge of the

existence and extent of those price increases contradicted their statements that denied or

minimized that Endo made or profited from price hikes.  *See id.*  Defendants' knowledge further

supports a strong inference that they "consciously participated in price-fixing *or were at least*

*reckless* in ignoring information indicating that price-fixing was occurring" because, absent

collusion, it was against Endo's interests to make large unilateral price increases.  *See Mylan*, 2018 WL 1595985, at *17; *Taro*, 2018 WL 4572987, at *9.[22]

For example, on March 2, 2015, De Silva claimed that Endo "cannot plan" for price increases and took them only when there were "supply and demand imbalances."  ¶192; *see also* ¶¶199, 232.  In contrast, by that time, De Silva had personally analyzed, planned, and approved at least five anticompetitive price increases that had no relation to supply and demand issues. ¶¶9-10, 35-38, 89-90, 93, 97-114, 222, 224-27.  Likewise, on May 18, 2015, Upadhyay represented to investors that Endo's pricing strategy was "prudent" ¶196, a statement that De Silva also emphasized.  ¶199.  In contrast, at least monthly, Upadhyay, like De Silva, personally requested Excel spreadsheets which informed him of the massive and unsustainable, if not illegal, price increases (*e.g.*, Phenobarbital Oral Elixir increased by approximately 450%, Prednisone by over 100%, and Oxybutynin by approximately 200%).  ¶¶98, 101, 104. Moreover, under De Silva's purview, Endo engaged in various anticompetitive practices, such as product "lock-up" for periods of time in order to intentionally and artificially create shortages and drive up prices.  ¶¶89, 242, 254-55.

Second, the Complaint also raises a strong inference of scienter because Defendants had access to reports that "paint[ed] a different picture" from their public statements denying that

---

[22] Defendants ask the Court to apply the wrong standard for determining the adequacy of scienter allegations, incorrectly maintaining that a complaint must allege "facts establishing an intent to engage in securities fraud—*not* merely an intent to participate in the underlying business activity."  MTD at 17.  On the contrary, the Third Circuit standard for scienter is clear in requiring allegations "giving rise to a strong inference of *either* reckless or conscious behavior." *Avaya*, 564 F.3d at 267.  Defendants cite *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x 672 (3d Cir. 2011), which does not suggest otherwise.  There, the Third Circuit did not even address the applicable standard for scienter generally, but rather rejected plaintiffs' argument that the scienter of lower-level managers could be imputed to executives. *See id.* at 673, 676.

Endo made profits from price increases.  *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (strong inference of scienter where defendants tracked book returns on a monthly and weekly basis, monitored internal data, and received a monthly analysis of sales figures, such that access to these reports demonstrated "what defendants knew on a daily, weekly and monthly basis"); *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, 2011 WL 2444675, at *12 (D. Del. June 14, 2011) (scienter sufficiently pled in part because "Defendants had access to sales data and internal reports, and had meetings and calls with company insiders about the performance of the business").  Defendants' access to the Excel spreadsheets described above demonstrates that they "either consciously participated in price-fixing, or were at least reckless in ignoring information indicating that price-fixing was occurring."  *Mylan*, 2018 WL 1595985, at *17; *see In re RAIT Fin. Trust Sec. Litig*, 2008 WL 5378164, at *12-13 (E.D. Pa. Dec. 22, 2008) (scienter adequately alleged where defendants took part in regularly scheduled meetings and had access to inside information concerning matters central to the fraud).

Here, De Silva regularly asked for, received, and reviewed lists of pricing opportunities from Propst and Reiney based on extensive pricing analysis upon which he approved price increases.  ¶¶34-38, 222-23.  Similarly, De Silva, Upadhyay, and Campanelli regularly received specific internal financial reports created from Endo's ERP system, such as the Excel spreadsheets and P&Ls, that reflected price increases and other material metrics related to the financial impact of those price increases.  ¶¶40-44, 224-28.

Viewed holistically, these allegations far exceed the allegations in *Mylan* and *Taro*, and certainly *Perrigo*, which did not allege any evidence of scienter based on CWs or documents.  In *Mylan*, the court upheld allegations based on a single former employee who explained that "pricing decisions at Mylan occurred frequently and involved all of Mylan's top executives" and

that "the CEO and CFO ... reviewed any price adjustments and had the last word on pricing

decisions for Mylan's drugs" and when it came to price, "[e]verything went up through the top."

*Mylan*, 2018 WL 1595985, at *17.  In *Taro*, the court upheld scienter on the basis that one CW

discussed pricing-related issues with the CFO, while another CW attended regular pricing

meetings with senior-level executives who instructed the CW to change drug prices.  *See Taro*,

2018 WL 4572987 at *2, *9.  As detailed above, the Complaint alleges much more.

Defendants' suggestion that their conduct amounts to mere active management fails

factually and legally.  MTD 18-19.  To be sure, the Complaint alleges that the Defendants

"actively managed" the details of Endo's price increases to generate hundreds of millions in

profits.  However, Lead Plaintiff's securities fraud claims arise from Defendants' affirmative

false statements concealing the very price increases and Inflated Profits that Defendants were

actively—but secretively—managing.  *See Aetna*, 34 F. Supp. 2d at 950 ("Plaintiffs allege that

Defendants made material misrepresentations and failed to disclose material facts….  Therefore,

the Court rejects Defendants' arguments that Plaintiffs' allegations are merely examples of

mismanagement.").[23]

Defendants' reliance on *Utesch v. Lannett Co.*, 316 F. Supp. 3d 895 (E.D. Pa. 2018)

("*Lannett*") is also unavailing.  MTD at 18.  In *Lannett*, the entirety of plaintiffs' scienter

allegations arose from anecdotal comments from a single CW whose statements, the court

concluded, "sound[ed] in exaggeration and stretch[ed] the bounds of credulity."  *Lannett*, 316 F.

Supp. 3d at 904.  The court further gave the allegations "little weight" because the complaint did

---

[23] Defendants' cited authorities are inapposite.  In *Solomon-Shrawder v. CardioNet, Inc.*, the
plaintiffs literally pled "no facts" that were contrary to an alleged false statement.  2010 WL
3168366, at *10-12 (E.D. Pa. Aug. 10, 2010).  Likewise, in *Axis*, the plaintiff did not allege that
the company "participated in any bid-rigging conspiracy or … any form of customer or market
allocation."  456 F. Supp. 2d at 585.

"not explain the source of [the CW's] knowledge." *Id.* at 904-05.  The *Lannett* court also found

that the CW's allegations, even if credited, lacked substance because, while the CW claimed that

the CEO's approval was required "to do anything," the CW alleged merely that the CEO "***could***

set drug prices." *Id.*[24]  Thus, although the court sustained the allegations that Lannett

participated in price-fixing, it held that the scienter allegations were insufficient to establish that

the executives were aware of the conspiracy at issue. *Id.*

In contrast, here, like in *Mylan*, the Complaint specifically alleges that De Silva ***did*** set

drug prices.  ¶¶9, 35-38, 89-90, 93, 222.  Indeed, the Complaint alleges which drugs were hiked,

when those price increases were implemented, by how much, and the Inflated Profits generated

therefrom.  ¶¶95-151.  Additionally and unlike plaintiffs in *Lannett*, the Complaint alleges which

Endo executives were involved in pricing decisions, how pricing decisions were made, the

factors that went into those decisions, the corporate practices that were implemented once a

pricing decision was made, the documents Defendants generated and reviewed in connection

with their pricing decisions, and the meetings and conference calls during which pricing

decisions and their financial impact were discussed.  ¶¶34-36, 40-44, 89-94, 222-29.  These

allegations leave no doubt that Defendants knew of, or at least recklessly disregarded, the price

hikes at issue and the profits they generated.[25]

---

[24] *Taro* also distinguished *Lannett* on the ground that it did not address *Mylan* and its reasoning that an executive's knowledge of price increases supports a strong inference of scienter of collusion because unilateral price increases are against a company's interests absent collusion. *See Taro*, 2018 WL 4572987, at *9.

[25] The recent decision in *Fleming v. Impax Laboratories Inc.*, 2018 WL 4616291 (N.D. Cal. Sept. 7, 2018) is also inapposite.  There, the court sustained the price-fixing allegations against the defendants, but dismissed on scienter grounds because the complaint failed to "explain how the individual executives had personal access to, or control over … pricing." *Id.* at *3-4.  Here, in contrast, the allegations specify the Defendants' personal control over and knowledge of the price increases, as well as how they impacted Endo's revenues.

**2.**     **Defendants Repeatedly Spoke About The Subject**
**Matter Of The Fraud Because It Was Critically**
**Important To Endo And Shareholders**

Among "the most powerful evidence of scienter" is often the "content and context" of [defendants'] statements themselves." *Avaya*, 564 F.3d at 269.  Thus, a strong inference of scienter is further supported where, as here, the subject matter of the fraud was particularly important to Endo, and Defendants repeatedly spoke about it with investors.  *See id.* at 271 (holding that it "strains reason to suggest" that CFO did not know about pricing pressure on key product where he repeatedly denied such pricing pressure).

Throughout the Class Period, the sale of generic drugs was critically important to the Company, its investors, and analysts, and constituted Endo's core business and primary source of revenue.  ¶¶61, 73, 78, 263, 266.  Specifically, in 2014, 2015, and 2016 the Company's U.S. generic revenues accounted for 48%, 51%, and 64% of the Company's total revenue, respectively.[26]  The actual and "perceived importance" of U.S. generics profits—the source of the fraud here—supports scienter because it indicated that the Individual Defendants were "paying close attention to these numbers."  *Avaya*, 564 F.3d at 271; *see Aetna*, 34 F. Supp. 2d at 953 (the fact that  the subject of a misstatement "affected a key aspect" of the company provided "strong circumstantial evidence" that defendants spoke with scienter).

As detailed above, Defendants repeatedly discussed with investors and analysts Endo's pricing practices and the financial results derived from the Company's generic drugs.  *See*

---

[26] Endo 2016 Form 10-K (March 1, 2017), at 66, *available at* https://www.sec.gov/Archives/edgar/data/1593034/000159303417000009/endp-12312016x10k.htm#sE6F9D2AA37B15B8987B6341FFBE54C8F; Endo 2015 Form 10-K (Feb. 29, 2016), at 65, *available at* https://www.sec.gov/Archives/edgar/data/1593034/000159303416000051/endp-12312015x10k.htm.

De Silva, ¶¶191-92, 194, 198-99, 201-02, 213, 232; Upadhyay ¶196; Campanelli, ¶¶212, 216, 219.  Thus, Defendants' repeated and specific false statements about these critical topics strengthens the inference that they knew or recklessly ignored the truth.  *See PTC,* 2017 WL 3705801, at *16 (holding "most persuasive" that "[d]uring conference calls, publics remarks, and in quarterly reports," defendants "explicitly and repeatedly" discussed subject matter of the fraud with investors); *Lockheed*, 875 F. Supp. 2d at 372 (holding that "specificity" of false statements is "strong circumstantial evidence" that defendants received "specific" truthful information on the topic).

Moreover, Defendants made many of these statements in direct response to analysts' questions, further strengthening the inference of scienter.  ¶¶48-49, 199, 202, 256; *see Avaya*, 564 F.3d at 270 ("confident, unhedged" false and misleading answers in the face of "repeated questions about pricing by analysts" strongly supported scienter); *Perrigo*, 2018 WL 3601229, at *21 (executives' repeated responses "to pointed analyst questions regarding pricing" supported strong inference of scienter).

### 3.    The Magnitude Of The Fraud Supports A Strong Inference Of Scienter

The "magnitude" of the fraudulent scheme "strengthens the inference of scienter." *Avaya,* 564 F.3d at 271.  Defendants' fraud here was massive.  Endo reaped as much as ***$620 million*** in Inflated Profits by the end of 2016.  ¶2.  The Inflated Profits were at least 30% of Endo's total generics income in 2014 and 32% in 2015.  ¶10.  These Inflated Profits funded the "transformational acquisition" for the Company.  Conversely, once Endo was no longer able to implement price increases and experienced pricing pressure on its generic drugs, the diminution of Inflated Profits led to Endo's ***$2.85 billion generics write-down***.  ¶84; s*ee Perrigo*, 2018 WL

3601229, at *21 (holding that "the size of the scheme" that generated "hundreds of millions of dollars of collusive revenue in operating results" supported scienter).[27]

### 4.   Defendants Were Motivated To Commit The Fraud

The Third Circuit's holistic analysis of scienter allegations may include an assessment of Defendants' motive to commit the fraud; there is no dispute they had the opportunity.  *See Avaya*, 564 F. 3d at 276-79.  Defendants' explicit motivation was to inflate Endo's stock so it could be used "as currency" in order to consummate a "transformational" acquisition, *i.e.*, the $8 billion acquisition of Par.  ¶¶5, 32, 237-41.  De Silva thus approved each price increase in the lead-up to the offer to acquire Par in May 2015, as well the two additional price hikes in June 2015 that were required to keep the profits juiced in order to close the deal.  ¶¶9, 35-38, 59-61, 89-90, 93, 98-114, 222.

Courts in the Third Circuit hold that "stock-based acquisitions at the time of the alleged misrepresentations support a strong inference of scienter."  *In re Ravisent Techs., Inc.*, 2004 WL 1563024, at *10 (E.D. Pa. July 13, 2004) (finding allegations that defendants were motivated to inflate stock price to acquire another company "compelling" evidence of scienter); *see also Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000) (motive to inflate "stock price in the acquisition context" supports strong inference of scienter).[28]

_____

[27] Courts regularly hold that frauds of much smaller magnitude support a strong inference of scienter.  *See Scholastic* 252 F.3d at 77 (holding that a total of $24 million in charges "undermines, at the pleading stage, the argument that the defendants were unaware" of true facts contradicting their statements); *In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 507 (W.D. Pa. 2002) (fraud of $9 million over three years was probative of scienter); *Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 553 (S.D.N.Y. 2017) (write-down of $43.2 million supported strong inference of scienter).

[28] Defendants' cases purportedly supporting the proposition that acquisition-motive is a "generalized motive common to all companies" are factually inapposite here. *See GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004) (pleading no facts of how or when defendants implemented their underlying fraudulent misconduct that connected it to public

Defendants incorrectly claim that the absence of insider sales negates an inference of motive.  MTD at 20-21.  This is plainly not the law.  *See Avaya*, 564 F.3d at 269, 272 (scienter is not limited to "categorical rules about the sufficiency of different types of allegations" or "the presence or absence of certain types of allegations but [on] … accepting the whole factual picture painted by the Complaint.").

Defendants also maintain that it would be "curious" for De Silva and Upadhyay to inflate Endo's stock to purchase Par, whose value was also inflated by price increases, while "knowing that these inflated valuations would be short-lived."  MTD at 21.  The stronger inference is that Defendants thought their scheme would successfully continue.  Regardless, curiosity is no basis for dismissal.  Defendants do nothing more than raise a potential factual issue; whether Defendants' misconduct was prudent or well-executed is wholly irrelevant at this stage.  Indeed, the "securities laws forbid foolish frauds along with clever ones."  *Asher v. Baxter Int'l, Inc.*, 377 F.3d 727, 728 (7th Cir. 2004).

### 5. Executive Resignations And Governmental Investigations Strengthen The Inference Of Scienter

The abrupt resignations of De Silva and Upadhyay were connected to the fraud.  On September 22, 2016, without warning and without a replacement in line, CEO De Silva was terminated. ¶80.  CFO Upadhyay was ousted just weeks later.  ¶80.  Days after Endo announced these resignations, investors learned from the *Bloomberg* article that Defendants were embroiled in investigations of anticompetitive, if not illegal, practices.  ¶81.  Such resignations of key executives, including those responsible for the misstatements, "bolsters the evidence of

_____

offering); *In re Amarin Corp. PLC*, 2015 WL 3954190, at *11 (D.N.J. June 29, 2015) (motive not tied to furtherance of specific scheme or business strategy); *In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 584 (D.N.J. 2001) (plaintiffs alleged generalized motive of "secur[ing] market share").

conscious or reckless behavior." *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 WL 3755218, at *17 (E.D. Pa. June 16, 2015).

Governmental investigations of Endo in connection with its generic drug pricing further support the inference of scienter.  ¶180 (State AGs are investigating Endo in what "could be the largest cartel case" in U.S. history); ¶184 (DOJ issued subpoena to Par and intervened in civil antitrust involving the Inflated Drugs).  *Perrigo* and *Mylan* both held that such allegations strengthen the scienter inference.  *See Perrigo*, 2018 WL 3601229, at *21 ("mere fact" of being investigated supports scienter); *Mylan*, 2018 WL 1595985, at *13 ("Mylan's receipt of a DOJ subpoena … may be considered by the Court as part of its analysis.").

### 6.    Allegations Based On Confidential Witnesses Support A Strong Inference Of Scienter

Defendants incorrectly maintain that the Complaint does not establish a basis for the CWs' allegations.  MTD at 19-20.  Under *Avaya*, what is required is that a complaint "adequately describe[] the duration of each CW's employment, the time period during which the CWs acquired the relevant information, and how each CW had access to such information."  564 F.3d at 263.  The Complaint alleges this and more.  ¶89 (CW-1); ¶90 (CW-2); ¶91 (CW-3); ¶92 (CW-4); ¶93 (CW-5); ¶94 (CW-6).

As an initial matter, Defendants speciously take issue with the fact that the CWs all worked for Qualitest, the U.S. generics subsidiary of Endo.  MTD at 19.  Of course, as alleged, the CWs' positions at Qualitest provided them with personal knowledge of how Defendants made price increases on Endo's generics drugs and how the resultant profits were tracked.  ¶88.

Indeed, here, the CWs' allegations are not based only on their titles or tenures but on their personal experience working on the specific subject matter attributed to them, specifically:

- Accountant, who was at Qualitest from October 2014 to August 2015, CW-3, *personally participated* in the pre-scheduled monthly calls with top Endo

leadership to discuss Endo's P&L reports, during which CW-3 **heard** De Silva demonstrate his granular knowledge of generic pricing and revenues.  ¶91.

- Manager of Government Contracts, who was at Qualitest from February 2012 to September 2016, CW-2, "analyzed government purchasing of generic drugs and functioned as part of Qualitest's finance department." As part of this position, CW-2 personally "***saw and reviewed***" the Excel spreadsheets containing pricing data and profits.  ¶90.

- Head of Sales and Customer Operations, who worked at Qualitest from October 2010 to January 2016, CW-5, "***was responsible for customer contracts and pricing***," and thus had direct knowledge about the Individual Defendants' role in making price increases and how those decisions were made.  ¶93.

- Senior Pricing Analyst, who worked at Qualitest from June 2011 to April 2014, CW-6, "***was responsible*** for profit and loss analyses in response to customer bid requests" regarding generic drugs.  CW-6 therefore knew that Endo pricing analysts accessed confidential competitor data, and that Propst and Reiney entered price increases into Qualitest's data bases.  ¶94.

- Inside Sales Representative at Endo from July 2012 to October 2015, CW-1, had ***first-hand knowledge*** of when and how often Defendants raised prices on the drugs that CW-1 sold.  Sales managers told CW-1 personally when Endo locked up its inventory on a generic drug in order to drive up prices.  ¶89.

- National Account Pricing Team Trainee in Endo's Pricing Department who worked at Qualitest from June to August 2015, CW-4, ***personally sent customers the "blasts"*** informing them of price increases after Probst, Reiney, and Cupero informed Minnihan to lock up a drug's inventory in order to drive up prices.  ¶92.

The corroborating nature of these allegations also bolsters the CWs' reliability.  *See Avaya,* 564 F.3d at 261, 263 (noting that the "corroborative nature" of CW allegations supported scienter); *Aviva Partners LLC v. Exide Techs.*, 2007 WL 789083, at *14 (D.N.J. Mar. 13, 2007) (plaintiffs adequately alleged scienter where they relied "primarily on confidential sources from various . . . divisions, who corroborate one another's assertions"); *see* ¶¶90(e), 91 (CW-2 and CW-3 both corroborated that the Individual Defendants received documents and discussed drug-by-drug revenues with Qualitest management on a regular basis); ¶¶89(a), 93(a) (CW-5 and CW-

1 both corroborate that De Silva decided price increases); ¶¶89(c), 92(a)-(b) (CW-1 and CW-4 both corroborate that Endo "locked-up" products to restrict supply and inflated prices).[29]

Defendants' further argument that "none of the CWs is alleged to have ever communicated with—or even met—any of the individual defendants" is patently wrong.  MTD at 20 (emphasis in original removed).  As explained above, CW-3 participated in teleconferences during which De Silva discussed generic drug pricing and profits.  ¶91.  CW-2 and CW-3 personally knew the content of the spreadsheets and reports that the Individual Defendants possessed.  ¶¶90-91.  And CW-5, who was the Head of Sales and Customer Operations, was responsible for pricing and interacted with Probst, Reiney, and the Individual Defendants.  ¶93. In any event, even if true, a CW's "lack [of] direct contact with the Individual Defendants does not undermine their evidence," so long as the CW opines about "facts as to which they had" personal knowledge concerning "relevant information made available to senior executives" that was contrary to their statements.  *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *9 (S.D.N.Y. May 24, 2018);  *see Perrigo*, 2018 WL 3601229, at *23 (crediting CW allegations where former employees "spoke to issues within their sphere of knowledge," despite no direct communication between CWs and defendants); *DFC Glob. Corp.*, 2015 WL 3755218, at *16 (CWs' "positions afforded them firsthand knowledge of the underlying facts").  The CWs alleged here do precisely that.[30]

---

[29] In *Freed v. Universal Health Servs., Inc.*, 2005 WL 1030195, at *7-8 (E.D. Pa. May 3, 2005), this Court held that the plaintiffs' CW allegations failed.  Unlike here, though, the *Freed* plaintiffs failed to allege all of the following: any of the CWs' tenure or dates for when they acquired the alleged information; the CWs' title, role, or responsibility; or how these employees from regional locations had access to information about the company's nationwide operations.

[30] The Complaint's detailed allegations are incomparable to those in the cases Defendants cite. *See Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 148, 155 (3d Cir. 2004) (CWs worked in irrelevant business segments, or not at the company at all, or at disparate branch offices with no specific access to information relevant to alleged nationwide fraud); *In re Hertz*

7.    **Defendants' Proposed Competing
Inference Fails**

Defendants' proposed alternative to scienter argues that they simply "adjusted prices …

based on market forces and myriad other considerations."  MTD at 22.  Far from being more

compelling than the inference of scienter, as required under *Tellabs*, 551 U.S. at 324, their

admission to deliberately adjusting prices undermines their position.

As to the first basis of falsity, Defendants' claim to "adjusting prices" concedes the

knowledge of facts contrary to their public statements necessary to establish a strong of scienter.

Defendants knew of and directed extraordinary price increases, received reports specifying the

Inflated Profits, yet knowingly or recklessly concealed this material information from

shareholders.

Moreover, as to the second basis of falsity (*i.e.*, collusion) *Mylan*, *Taro*, and *Perrigo* each

hold that a generic drug manufacturer's executive with knowledge of price increases supports a

strong inference that they knew, or recklessly ignored, that those price increases were against

their company's self-interest, absent collusion.  *See Mylan*, 2018 WL 1595985, at *17; *Taro*,

2018 WL 4572987, at *9; *Perrigo*, 2018 WL 3601229, at *21-22.  Defendants have no answer to

this authority.

II.    **THE COMPLAINT ALLEGES CONTROL PERSON LIABILITY**

Defendants make no arguments with regard to the Complaint's Section 20(a) control

person claims other than that the underlying 10(b) claims should be dismissed.  MTD at 22.  As

set forth above, because the Complaint sufficiently alleges violations of Section 10(b) and that

---

*Glob. Hldgs., Inc. Sec. Litig.*, 2015 WL 4469143, at *19-20 (D.N.J. July 22, 2015) (CWs worked
in disparate, remote branch locations, did not work with or report to anyone closely associated
with defendants, never engaged with defendants or participated in corporate activities with
defendants, and never saw or generated specific documents to which defendants had access).

the Individual Defendants had the ability to exert control over Endo, ¶285, Lead Plaintiff's claims under Section 20(a) should be sustained.  *See Steamfitters Local 449 Pension Fund v. Alter*, 2011 WL 4528385, at *11 (E.D. Pa. Sept. 30, 2011).

## CONCLUSION

For all the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.  Nevertheless, if the Court dismisses any of the claims asserted, Lead Plaintiff requests the opportunity to replead. *See* Fed. R. Civ. P. 15(a).

**DATED: OCTOBER 26, 2018**

Respectfully submitted,

**ELLIOTT GREENLEAF, P.C.**

**BLEICHMAR FONTI & AULD LLP**

 /s/ *Timothy T. Myers*           
John M. Elliott
Thomas J. Elliott
James C. Crumlish, III
Timothy T. Myers
925 Harvest Drive, Suite 300
Blue Bell, PA 19422
Telephone: (215) 977-1000
Facsimile: (215) 977-1099
jme@elliottgreenleaf.com
tje@elliottgreenleaf.com
jccrumlish@elliottgreenleaf.com
ttm@elliottgreenleaf.com

 /s/ *Joseph A. Fonti*             
Joseph A. Fonti (Admitted *Pro Hac Vice*)
Javier Bleichmar (Admitted *Pro Hac Vice*)
Wilson M. Meeks III (Admitted *Pro Hac Vice*)
7 Times Square, 27th Floor
New York, NY 10036
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jfonti@bfalaw.com
jbleichmar@bfalaw.com
wmeeks@bfalaw.com

*Co-Counsel for the Park Employees' and
Retirement Board Employees' Annuity and
Benefit Fund of Chicago*

*Co-Counsel for the Park Employees' and
Retirement Board Employees' Annuity and
Benefit Fund of Chicago and
Lead Counsel For The Class*

**KEHOE LAW FIRM, P.C.**
John A Kehoe (*Pro Hac Vice* To Be Submitted)
Two Penn Center Plaza
1500 JFK Boulevard, Suite 1020
Philadelphia, PA 19012
Telephone: (215) 792-6676
jkehoe@kehoelawfirm.com

*Additional Counsel for the Park Employees'
and Retirement Board Employees' Annuity and
Benefit Fund of Chicago*

## GLOSSARY OF TERMS

| Term | Definition |
|---|---|
| Actavis | Actavis Generics, a company that produces generic pharmaceuticals and was acquired by Teva from Allergan plc in August 2016 |
| Adjusted Income | Adjusted income from continuing operations before income tax, as used in Endo's Annual Reports on Forms 10-K, Quarterly Reports on Forms 10-Q, and Current Reports on Forms 8-K, all of which Endo filed with the SEC during the Class Period |
| AG | Attorney General |
| Anda | Anda, Inc., a U.S. distributor of generic pharmaceuticals that Teva acquired from Allergan plc on October 3, 2016 |
| Apotex | Apotex Inc., a company that produces generic pharmaceuticals |
| Auxilium | Auxilium Pharmaceuticals, Inc., a specialty pharmaceuticals company acquired by Endo on January 29, 2015 |
| Boca | Boca Pharmacal, a generic pharmaceuticals company acquired by Endo on February 3, 2014 |
| Campanelli | Paul V. Campanelli, Endo's CEO and President since September 2016, the President of Par – then Endo's generic pharmaceuticals business segment – from September 2015 until September 2016, and Par's CEO prior to Endo's acquisition of Par, from September 2012 until September 2015 |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| Class | All persons and entities who purchased or otherwise acquired the ordinary shares of Endo during the Class Period and were damaged thereby |
| Class Period | March 2, 2015 to February 27, 2017, inclusive |
| CW | Former Employees of Endo who are confidential witnesses are referenced herein and identified as "CW-" |
| DAVA | DAVA Pharmaceuticals, Inc., a generic pharmaceuticals company acquired by Endo on August 6, 2014 |

| Term | Definition |
|------|------------|
| Defendants | Endo International plc, Rajiv Kanishka Liyanaarchchie De Silva, Suketu P. Upadhyay, and Paul V. Campanelli |
| De Silva | Defendant Rajiv Kanishka Liyanaarchchie De Silva, Endo's CEO and President from March 2013 to September 2016 |
| DOJ | U.S. Department of Justice |
| ECI | ECI Pharmaceuticals, LLC, a company that produces generic pharmaceuticals |
| Endo or the Company | Endo International PLC, headquartered in Dublin, Ireland with U.S. headquarters at 1400 Atwater Drive, Malvern, Pennsylvania |
| ERP | Enterprise Resource Planning, the integrated management software system for core business processes |
| FDA | U.S. Food and Drug Administration |
| Glazer | Jeffrey Glazer, former CEO of Heritage Pharmaceuticals Inc. |
| GphA | Generic Pharmaceutical Association (now the Association for Accessible Medicines or AAM), a trade association representing manufacturers and distributors of generic prescription drugs that hosted trade shows, conferences, and other industry events attended by Endo and other generic manufacturers during the Class Period |
| HDMA | Healthcare Distribution Management Association (now the Healthcare Distribution Alliance), a trade association representing primary pharmaceutical distributors that hosted trade shows, conferences, and other industry events attended by Endo and other generic manufacturers during the Class Period |
| Heritage | Heritage Pharmaceuticals Inc., a company that produces generic pharmaceuticals |
| Impax | Impax Laboratories LLC, a company that produces generic pharmaceuticals |
| Individual Defendants | Defendants De Silva, Upadhyay, and Campanelli |
| Inflated Drugs | The 13 generic drugs from which Endo profited as a result of Defendants' anticompetitive price |

| Term | Definition |
|---|---|
| Inflated Profits | The amount of Endo profits generated solely as a result of anticompetitive price increases as calculated through Lead Counsel's and Lead Counsel's expert's econometric and empirical analysis |
| JD Edwards | An ERP software system produced by Oracle Corporation |
| Lannett | Lannett Company, Inc., company that produces generic pharmaceuticals |
| Lead Plaintiff or Chicago Park Employees | Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago |
| Malek | Jason Malek, former President of Heritage Pharmaceuticals Inc. |
| MAPICS | Manufacturing, Accounting and Production Information Control Systems, an ERP software system developed by IBM |
| Mylan | Mylan N.V., a company that produces generic pharmaceuticals |
| NACDS | National Association of Chain Drug Stores, a trade association representing the chain community pharmacy industry that hosted trade shows, conferences, and other industry events attended by Endo and other generic manufacturers during the Class Period |
| NASDAQ | NASDAQ Global Select Market |
| NDC Code | National Drug Code, a unique three-segment product identifier for drugs required by the Food, Drug, and Cosmetic Act (21 U.S.C. § 360) |
| Northstar | NothstarRx LLC, a company that produces generic pharmaceuticals |
| Pack | PACK Pharmaceuticals, a company that produces generic pharmaceuticals |
| Par | Par Pharmaceutical Holdings, Inc., a generic pharmaceuticals company acquired by Endo on September 28, 2015 |
| Par Acquisition | Endo's $8.05 billion acquisition of Par Pharmaceutical Holdings Inc., which was completed on September 28, 2015 |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| Qualitest | Qualitest Pharmaceuticals, a generic pharmaceuticals company acquired by Endo on December 1, 2010 that thereafter became Endo's generic pharmaceutical business segment |

| Term | Definition |
|---|---|
| SEC | Securities and Exchange Commission |
| Sandoz | Sandoz International GmbH, a company that produces generic pharmaceuticals |
| SAP | An ERP software system produced by SAP SE |
| SOX | The Sarbanes-Oxley Act of 2002 |
| State AGs | The Attorneys General of 47 States who have filed suit against a number of generic pharmaceuticals companies and their executives, including Endo by virtue of naming its generics segment, Par, alleging antitrust violations arising from agreements among generic pharmaceutical manufacturers to fix the prices of, and allocate the markets for, certain generic pharmaceuticals |
| Teva | Teva Pharmaceutical Industries Ltd., a company that produces generic pharmaceuticals |
| Upadhyay | Suketu P. Upadhyay, Endo's CFO and Executive Vice President from September 2013 to November 2016 |
| Upsher-Smith | Upsher-Smith Laboratories, LLC, a company that produces generic pharmaceuticals |
| VP | Vice President |
| WAC | Wholesale Acquisition Cost, the list price of a generic manufacturer's drug for sale to a wholesaler or a direct purchaser without discounts |
| West-Ward | West-Ward Pharmaceuticals Corp., a company that produces generic pharmaceuticals |
| **Financial Periods, Reports, and Earnings Calls (chronologically)** | |
| Q1 2014 | First quarter 2014 |
| Q2 2014 | Second quarter 2014 |
| Q3 2014 | Third quarter 2014 |
| Q4 2014 | Fourth quarter 2014 |

| Term | Definition |
|---|---|
| 2014 10-K | Endo's Annual Report on Form 10-K reporting Endo's full-year 2014 results that Endo filed with the SEC on March 2, 2015 |
| Q1 2015 | First quarter 2015 |
| Q1 2015 Earnings Call | The investor earnings call held by Defendants on May 11, 2015 to discuss Endo's first quarter 2015 results |
| Q1 2015 10-Q | Endo's Quarterly Report on Form 10-Q reporting Endo's first quarter 2015 results that Endo filed with the SEC on May 11, 2015 |
| Q2 2015 | Second quarter 2015 |
| Q2 2015 Earnings Call | The investor earnings call held by Defendants on August 10, 2015 to discuss Endo's second quarter 2015 results |
| Q2 2015 10-Q | Endo's Quarterly Report on Form 10-Q reporting Endo's second quarter 2015 results that Endo filed with the SEC on August 10, 2015 |
| Q3 2015 | Third quarter 2015 |
| Q3 2015 Earnings Call | The investor earnings call held by Defendants on November 5, 2015 to discuss Endo's third quarter 2015 results |
| Q3 2015 10-Q | Endo's Quarterly Report on Form 10-Q reporting Endo's third quarter 2015 results that Endo filed with the SEC on November 9, 2015 |
| Q4 2015 | Fourth quarter 2015 |
| Q4/FY 2015 Earnings Call | The investor earnings call held by Defendants on February 29, 2016 to discuss Endo's fourth quarter 2015 and full-year 2015 results |
| Q4/FY 2015 Press Release | The press release filed by Endo with the SEC on February 29, 2016 as an attachment to a Form 8-K announcing Endo's fourth quarter 2015 and full-year 2015 results |
| 2015 10-K | Endo's Annual Report Form 10-K reporting Endo's full-year 2015 results that Endo filed with the SEC on February 29, 2016 |
| Q1 2016 | First quarter 2016 |
| Q1 2016 Earnings Call | The investor earnings call held by Defendants on May 5, 2016 to discuss Endo's first quarter 2016 results |

| Term | Definition |
|---|---|
| Q1 2016 10-Q | Endo's Quarterly Report on Form 10-Q reporting Endo's first quarter 2016 results that Endo filed with the SEC on May 6, 2016 |
| Q2 2016 | Second quarter 2016 |
| Q2 2016 Earnings Call | The investor earnings call held by Defendants on August 8, 2016 to discuss Endo's second quarter 2016 results |
| Q2 2016 10-Q | Endo's Quarterly Report on Form 10-Q reporting Endo's second quarter 2016 results that Endo filed with the SEC on August 9, 2016 |
| Q3 2016 | Third quarter 2016 |
| Q3 2016 Earnings Call | The investor earnings call held by Defendants on November 8, 2016 to discuss Endo's third quarter 2016 results |
| Q3 2016 10-Q | Endo's Quarterly Report on Form 10-Q reporting Endo's third quarter 2016 results that Endo filed with the SEC on November 8, 2016 |
| Q4 2016 | Fourth quarter 2016 |

## **CERTIFICATE OF SERVICE**

I hereby certify that on this day I caused a true and correct copy of the foregoing to be filed using the Court's Electronic Filing System ("ECF System"). The document is available for viewing and downloading via the ECF System, and will be served by operation of the ECF System upon all counsels of record.


Dated: October 26, 2018                                **BLEICHMAR FONTI & AULD LLP**

                                                          /s/ *Joseph A. Fonti*
                                                      _____

                                                       Joseph A. Fonti