**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ALEXANDRE PELLETIER**, Individually and On Behalf of All Others Similarly Situated, <br><br> **v.** <br><br> **ENDO INTERNATIONAL PLC, RAJIV KANISHKA LIYANAARCHCHIE DE SILVA, SUKETU P. UPADHYAY, AND PAUL V. CAMPANELLI** | **CIVIL ACTION** <br><br> **NO. 17-cv-5114** |

**Baylson, J.**                                                    **February 14, 2020**

## MEMORANDUM

### I.     Introduction

In this suit, Lead Plaintiff Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago alleges that Endo International PLC committed securities fraud by engaging in inherently risky and unstable pricing practices, including an illegal price-fixing scheme, and failing to disclose those practices, and other key information, to investors. Defendants have moved to dismiss, arguing that Lead Plaintiff has not sufficiently alleged any price-fixing conspiracy, that they made were no actionable misrepresentations or omissions whether or not there was an anticompetitive conspiracy, and that they had no scienter. For the reasons that follow, Defendants' Motion to Dismiss will be GRANTED with prejudice insofar as Lead Plaintiff's claims rest on an alleged price-fixing conspiracy, and DENIED otherwise.

1

### a. Factual Allegations

In reviewing a motion to dismiss, the Court "accept[s] all factual allegations as true, [and] construe[s] the complaint in the light most favorable to the plaintiff." Warren Gen. Hosp. v. Amgen, Inc., 643 F.3d 77, 84 (3d Cir. 2011) (quoting Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  As alleged in the amended complaint, the factual background is as follows.

#### i. Pre-2013 Background

Endo is a major pharmaceuticals manufacturer.  Am. Compl. ¶ 1.  It manufactures both branded and generic drugs.  Id. ¶¶ 30–31.  In December 2010, Endo acquired Qualitest Pharmaceuticals ("Qualitest"), which afterwards operated as Endo's generics manufacturing division.  Id. ¶ 23.

Leading up to 2013, Endo's business was troubled.  Id. ¶ 30.  Several of its key branded drugs were approaching the end of their patents, and its medical devices business faced significant exposure to products liability lawsuits.  Id.  At the same time, its generics business was stagnating due to price competition.  Id. ¶ 31.  Per federal law, generic drugs must be effectively identical to each other, and are therefore vulnerable to aggressive price competition.  Id. ¶¶ 31, 95.  This generally leads to low and stable prices.  Id. ¶ 95.

#### ii. Endo on the Rise

##### 1. New CEO and Strategy

In early 2013, Defendant Rajiv Kanishka Liyanaarchchie De Silva joined Endo as President and CEO with a mandate "to turn the Company around."  Id. ¶ 32.  Around the time he joined,

Endo's stock price was "languishing" at $30 per share.  Id. ¶ 32.  Later in 2013, Suketu P. Upadhyay joined as CFO.  Id. ¶ 25.

To fulfill his mandate, De Silva sought "acquisition opportunities" to grow Endo's size and revenues.  Id.  De Silva particularly sought to acquire companies in the generics business, and particularly sought "larger, more transformative deals."  Id.  However, since Endo had limited cash with which to accomplish such transactions, it needed to use stock to make acquisitions.  Id.  To make Endo more attractive to investors and thereby raise its stock price, De Silva first sought to make smaller acquisitions to provide Endo with additional revenue streams.  Id.  Between his joining the company and January 2015, De Silva had made five acquisitions.  Id.  Those acquisitions cost a total of $7.1 billion, nearly all of which was paid for in stock or cash raised by the sale of stock.  Id.  Endo's revenues increased accordingly.  Id.

### 2. *Price Hikes*

However, Endo's revenue growth was not solely the result of its acquisition strategy.  Endo also quietly hiked the prices of numerous generic drugs.  Id. ¶ 34.  This created substantial, but unsustainable, revenue growth.  Id. ¶ 96.  As Lead Plaintiff puts it, Endo "was reliant on its ability to sustain price increases on products that, by design, are interchangeable, and the only means of competition is on price. Thus, Defendants' price increases could be easily undercut and without warning."  Id.

To implement these non-price-competitive price hikes, De Silva reorganized Qualitest early on in his tenure as CEO.  Id. ¶ 3.  He had Qualitest's two most senior executives, Michael Reiney and Trey Propst, begin reporting directly to him.  Id.  He demanded and received lists of generic drugs whose prices could be hiked and analyses of the feasibility of those hikes.  Id. ¶ 36.

De Silva, Reiney, and Propst would discuss prospective price hikes and agree on which to implement. Id. In the meantime, De Silva received monthly updates including Microsoft Excel spreadsheets that identified any large price increases and profit and loss statements that broke out revenues by product. Id. ¶¶ 36, 42–44. Upadhyay also received the Microsoft Excel spreadsheets. Id. ¶ 43. The Microsoft Excel spreadsheets' recipients met monthly to discuss the spreadsheets' contents and "track profits." Id. ¶¶ 9, 43. De Silva also held monthly conference calls with Endo finance personnel, although possibly not Upadhyay, to discuss the profit and loss statements. Id. ¶ 44.

This resulted in numerous price hikes for drugs whose prices had previously been stable.[1] For example, Endo hiked the price of Prednisone over 100% in August of 2013, id. ¶¶ 101, and Oxybutynin around 200% in or about the third quarter of 2013, id. ¶¶ 104. Other drugs whose prices Endo dramatically increased include Baclofen, Amitriptyline, Propanolol, and Methotrexate. Id. ¶¶ 108, 112, 122, 126. In total, Endo made non-price-competitive price hikes for thirteen drugs. Id. ¶ 71. Other generic drug manufacturers made similar price increases around the same time, sometimes before and sometimes after Endo's price hikes. Id. ¶¶ 98–99, 101–02, 104–06, 108–10, 112–13, 115–17, 119–20, 122–23, 125–28, 130–32, 135–37, 139–40, 142–43. Together, the price increases resulted in Endo earning hundreds of millions of dollars in additional profits ("inflated profits"). Id. ¶¶ 100, 103, 107, 111, 114, 118, 121, 124, 129, 133, 138, 141, 144. Endo accomplished some of these price hikes, at De Silva's request, by "locking up" drugs to create artificial supply shortages. Id. ¶¶ 89(c), 92(a), 242. None of these price hikes were the

---

[1] Much of the data underlying Lead Plaintiff's allegations is nonpublic. They describe their research and econometric methods in paragraphs 146–151 of their complaint.

result of ordinary supply and demand.  Id. ¶ 37.  Lead Plaintiff claims that these price hikes demonstrate that Endo was knowingly not competing on price in the markets for certain generic drugs.  Id. ¶¶ 51, 145.  They also claim that evidence suggests that established manufacturers of certain drugs ceded market share in order to bribe new market entrants to not compete on price. Id. ¶¶ 110, 113, 123, 143.  Endo's public messages nonetheless continued to describe the generics drug market as price-competitive and inaccurately attributed revenue growth to acquisitions and the launches of entirely new drugs.  Id. ¶¶ 50–55, 60, 66.

### 3. The Par Acquisition

In part because of the inflated profits, Endo saw its stock price increase.  Id. ¶ 239.  By April of 2015, its stock price exceeded $90 per share, id. ¶ 55, a roughly threefold increase from its pre-De Silva price.  Shortly thereafter, in May, Endo announced that it had agreed to acquire Par Pharmaceutical Holdings, Inc., a privately-held pharmaceutical company specializing in generic drugs.  Id. ¶ 56.  Endo paid for the deal in significant part using its newly valuable stock. Id. ¶ 57.  (Some was paid directly to Par's shareholders, and some was used to raise cash in a share offering.  Id.)  Endo made three more price hikes leading up to the deal closing in order to keep earning inflated profits and maintain its stock price, and the deal closed on September 28, 2015. Id. ¶¶ 59–61.

As part of the deal, Par's CEO, Defendant Paul V. Campanelli, joined Endo as the head of Endo's generics business.  Id. ¶ 58.  Campanelli joined the monthly meetings discussing the Excel spreadsheets on drug pricing and the monthly meetings discussing Endo's profit and loss statements.  Id. ¶¶ 43–44.  After he joined Endo, Campanelli had the sole power to approve all of

Endo's generic drug pricing changes, whether those changes were increases or decreases.  Id. ¶ 64.

He had held the same power at Par.[2]  Id.

### 4.  The Alleged Price-Fixing Conspiracy

Lead Plaintiff alleges not only that Endo raised generic drug prices markedly, but that those price hikes were part of an industry-wide price-fixing conspiracy.  They attempt to support that allegation using the following facts and arguments.

First, certain market features made the market ripe for price fixing.  The market for each drug is an oligopoly controlled by a few manufacturers.  Id. ¶ 155.  Most leading manufacturers also produce several different generic drugs.  Id.  There are also high regulatory barriers to market entry.  Id. ¶¶ 158–159.  And, although generic drugs produced by different manufacturers are substitutable for one another, they are not substitutable for different drugs, and they are important and potentially critical to patients' health, meaning that demand is inelastic.  Id. ¶¶ 160–61.  This combination of market concentration, barriers to entry, and inelastic demand would tend to increase the stability and per-producer profitability of price-fixing arrangements.  Id. ¶¶ 156–58, 160–61.

Second, large, sudden, price increases were against Endo's self-interest.  Id. ¶ 163.  Had other manufacturers not raised prices in lockstep, or had other manufacturers not maintained those price increases, Endo would have lost market share.  Id. ¶ 163.  The fact that multiple manufacturers settled simultaneously on substantially higher prices, with no manufacturers appearing to fight for market share, suggests collusion.  Id. ¶¶ 166–67.

---

[2] Before the acquisition, Par had, like Endo, made several substantial generic drug price hikes not justified by ordinary supply and demand factors.  Id. ¶¶ 62–63.

Third, Endo and its peers had a motive to collude.  Id. ¶ 169.  Because of price competition, drug prices had stabilized near the marginal costs of production.  Id.  And, because demand is inelastic, there was no way to increase profits by increasing volume.  Id.  In other words, coordinated price increases were the best means of generating additional profits.  Id. ¶ 171.

Fourth, Endo and its peers had the opportunity to collude in person through trade shows and conferences.  Id. ¶ 172.  Many of those events were proximate in time to the price hikes.  Id.  The State Attorneys General have made similar allegations in their own civil antitrust action.  Id. ¶¶ 173–74.  For example, they alleged the existence of communications between employees of major manufacturers of Doxycycline Monohydrate.  Id.  Those manufacturers eventually hiked the price of Doxycycline Monohydrate.  Id. ¶ 174.

Fifth, Lead Plaintiff refers the Court to enforcement actions currently taking place.  Id. ¶¶ 176–85.  State Attorneys General have filed a civil antitrust complaint focused on another generics manufacturer, Heritage Pharmaceuticals.  Id. ¶ 177.  That complaint also sweeps in Par.  Id. ¶¶ 177–80.  They have stated that they are investigating other drug markets and may file additional complaints.  Id. ¶ 180.  In parallel, DOJ subpoenaed Par (pre-acquisition) in connection with Digoxin, a drug at issue in this case, as part of a criminal investigation into price fixing in the generics market.  Id. ¶ 181–82.  That investigation includes some of the drugs at issue in this case.  Id. ¶¶ 181, 184.  It has led to guilty pleas by Heritage executives.  Id. ¶ 183.

### iii.  Endo Declines

#### 1.  State and Federal Investigations Begin

Public concern over drug pricing had been growing since 2014.  Id. ¶¶ 45–47.  In the summer of 2014, the Connecticut Attorney General subpoenaed drug companies, not including

Endo, concerning pricing for Digoxin, a generic heart drug. Id. ¶ 47. Later that year, the Department of Justice opened a grand jury investigation in this District and subpoenaed several generic drug manufacturers. Id. ¶ 47. Those subpoenas did not include Endo, but did include Par, which Endo would soon acquire. Id. DOJ subpoenaed Par again in December 2014. Id. In parallel, Congressional oversight committees sent letters to manufacturers including Endo inquiring about the reasons for certain branded drug price increases. Id. Endo never replied. Id. Investigations continued apace. In December of 2015, the Connecticut Attorney General subpoenaed Endo. Id. ¶ 67.

Endo did not disclose the subpoena for five months. Id. ¶ 68. However, it did announce in the meantime that it faced possible pricing pressure due to "social or political pressure" and "public and governmental scrutiny of the cost of drugs." Id. ¶ 70. The public scrutiny and investigations meant that Endo could not make new price hikes, and made it increasingly difficult to maintain the thirteen price hikes it had already made. Id. ¶ 71. In May of 2016, it announced disappointing financial results for its generics business, and one day later, disclosed the Connecticut Attorney General's subpoena. Id. ¶ 74. Nonetheless, Campanelli and De Silva publicly maintained that the disappointing results were due to normal market factors such as price competition. Id. ¶ 75. This trend—disappointing generics performance blamed on ordinary market circumstances—continued into the second quarter of 2016. Id. ¶¶ 76–77.

### 2. *De Silva and Upadhyay Depart; Campanelli Takes Over*

On September 22, 2016, Endo announced that De Silva would be stepping down as CEO, effective immediately. Id. ¶ 80. Campanelli replaced him. Id. One month later, Endo announced that Upadhyay would be departing, effective November 22, 2016. Id. On November 3, *Bloomberg*

published an article describing DOJ's investigation into drug pricing and the Connecticut Attorney General's plans to lead a group of states in a civil antitrust enforcement action against drug companies. Id. ¶ 81. Endo's stock price dropped about 20%. Id. ¶ 81. A few days later, Endo reported that its generics revenues had dropped 20% since the previous quarter. Id. ¶ 83. Endo attributed the drop in generics revenues to normal market dynamics. Id. Endo's revenues from the price hikes continued to drop through the end of 2016, and its stock price dropped further following the release of its Q4 2016 Form 8-K in late February 2017. Id. ¶¶ 87, 264–65. At that point, "investors, news media and analysts . . . effectively gave up on Endo for the foreseeable future." Id. ¶ 266.

iv.   Specific Misstatements

Lead Plaintiff alleges that the 2014 10-K, the Q1 2015 10-Q, the Q2 2015 10-Q, the Q3 2015 10-Q, the 2015 10-K, the Q1 2016 10-Q, the Q2 2016 10-Q, and the Q3 2016 10-Q all contain actionable misstatements. Id. ¶¶ 187, 193, 197, 200, 204, 210, 214, 217. More specifically, they allege that these documents misrepresent the competitiveness of the generics market, the source of Endo's income, and the reasons for Endo's pricing decisions. Id. ¶¶ 186, 188–92, 194, 197–99, 201, 204–09, 211, 215, 218.

De Silva signed and certified each of those documents except for the Q3 2016 10-Q. Id. ¶¶ 187, 193, 197, 200, 204, 210, 214. Upadhyay signed and certified each document at issue. Id. ¶¶ 187, 193, 197, 200, 204, 210, 214, 217. Campanelli signed and certified only the Q3 2016 10-Q. Id. ¶ 217.

Lead Plaintiff also alleges that De Silva and Campanelli made many misleading public statements concerning the same issues, see id. ¶¶ 48–49, 191, 192, 194, 198–99, 202, 213 (De

9

Silva); id. ¶¶ 72, 73, 77, 83, 212, 216, 219–20 (Campanelli), and Upadhyay made one misleading public statement about the sources of Endo's revenue on an investor call about the Par acquisition, id. ¶ 196.

Stated generally and generously, Lead Plaintiff's theory of why Defendants' statements were misleading is as follows. Defendants' choices not to compete on price were based on abnormal conditions in the generics market and inherently risky and unstable, and significantly increased Endo's revenues and altered Endo's competitive position. However, Defendants' communications to investors did not disclose these non-price-competitive pricing decisions or how they affected Endo, or the abnormal market conditions.

v.     Other Scienter Allegations

Lead Plaintiff makes a few other noteworthy allegations concerning Defendants' scienter.

1.     *De Silva and Upadhyay's Scienter*

De Silva regularly spoke publicly about the reasons for price increases and how those price increases affected Endo's bottom line. Id. ¶¶ 230–33.

Endo made a deal to acquire a generics manufacturer called DAVA in 2014. Id. ¶ 245. Methotrexate, which was allegedly subject to non-price-competitive price hikes, was such a significant portion of DAVA's business that Endo's due diligence must have revealed that the non-price-competitive price hikes were an important part of DAVA's revenue. Id. ¶¶ 245–46. Similarly, Doxasozin, which also saw non-price-competitive price increases, "was an important drug for which DAVA had just entered the market." Id.

Similarly, Par's price hikes for Isosorbide, Divalproex, Cholestyramine, and Digoxin were so important to Par's bottom line that De Silva and Upadhyay must have been aware of them before

purchasing Par.  Id. ¶¶ 247–49.  Also, DOJ subpoenaed Par to testify on price hikes in 2014, which De Silva and Upadhyay should have discovered during Endo's due diligence.  Id. ¶ 250.

Finally, De Silva and Upadhyay must have known that certain generic drug markets were behaving abnormally after the 2014 Congressional letter seeking an explanation for drug price increases and the 2015 subpoena from the Connecticut AG.  Id. ¶¶ 243–44.

### 2. Campanelli's Scienter

Campanelli spoke in public at length at least twice about the reasons for price increases and how those price increases affected Endo's bottom line.  Id. ¶¶ 233.  When Par was an independent company, its price hikes for Isosorbide, Divalproex, Cholestyramine, and Digoxin were so important to Par's bottom line that must have been aware of them.  Id. ¶¶ 247–49.  And Campanelli must have been placed on notice of any non-price-competitive pricing by DOJ's December 2014 subpoena to Par to testify concerning potential criminally anticompetitive drug pricing.  Id. ¶ 250.

### vi. Loss Causation

Lead Plaintiff alleges that they purchased Endo's stock at artificially inflated prices, causing them to suffer losses when Endo's stock crashed in late 2016 and in early 2017.  Id. ¶ 257.

### b. Procedural History

The original class-action complaint (ECF No. 1), filed November 14, 2017, was assigned to Judge Padova.  On January 17, 2018, the case was transferred to Judge Savage as a related case to SEB Investment Management AB v. Endo International, PLC, Civil Action No.: 17-cv-3711.  ECF No. 12.  On June 19 of that year, Judge Savage appointed the Park Employees' Annuity and

Benefit Fund of Chicago as lead plaintiff and approved the Fund's selection of lead counsel. ECF Nos. 57–59.

On August 6, the Fund filed an amended class action complaint. ECF No. 62. On September 14, Defendants filed this Motion to Dismiss. ECF No. 63. One week later, the case was reassigned back to Judge Padova.[3] ECF No. 64. On October 26, the Fund filed its opposition to Defendants' Motion to Dismiss. ECF No. 66. On November 13, Defendants filed a reply brief in support of their motion. ECF No. 69.

On June 19, 2019, Judge Padova recused himself and the case was reassigned to the undersigned. ECF No. 75. Oral argument took place on September 18, 2019. ECF No. 83. The parties provided supplemental memoranda on October 2, 2019. ECF Nos. 88, 89. The parties have also supplemented their thorough briefing with several relevant court decisions that postdate their briefing. ECF Nos. 70–72, 86, 89, 91–92.

## II.　Legal Standard

A securities fraud complaint must do much more than a typical complaint. In addition to the traditional Rule 12(b)(6) standard, a securities fraud complaint must satisfy Rule 9(b)'s particularity requirement. Moreover, a securities fraud complaint must comply with the heightened pleading requirements of the PSLRA, which "imposes another layer of factual particularity to allegations of securities fraud." In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 217 (3d Cir. 2002).

---

[3] A few days later, Chief Judge Sanchez filed an order vacating both the January 2018 and September 2018 transfers. ECF No. 65. The result was that the case stayed with Judge Padova.

### a. Pleading Standard Under Rule 12(b)(6)

In considering a motion to dismiss under Rule 12(b)(6), the Court "accept[s] all factual allegations as true [and] construe[s] the complaint in the light most favorable to the plaintiff." Warren Gen. Hosp., 643 F.3d at 84 (internal quotation marks and citations omitted). The Supreme Court has instructed that, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

The Court in Iqbal explained that, although a court must accept as true all of the factual allegations contained in a complaint, that requirement does not apply to legal conclusions; therefore, pleadings must include factual allegations to support the legal claims asserted. 556 U.S. at 678, 684. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. Accordingly, to survive a motion to dismiss, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

### b. Pleading Standard Under Rule 9(b) and the PSLRA

All allegations of fraud must meet Rule 9(b)'s "particularity" requirement. "Rule 9(b)'s heightened pleading standard gives defendants notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997).

Rule 9(b) may be satisfied by describing "the circumstances of the alleged fraud with precise allegations of date, time, or place, *or* by using some means of injecting precision and some

measure of substantiation into [the] allegations of fraud." Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 172 n. 10 (3d Cir. 2002) (internal quotation marks and citation omitted). Stated another way, the plaintiff must plead the who, what, when, where, and how of the fraud. Institutional Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 253 (3d Cir. 2009); see Bonavitacola Elec. Constr. v. Boro Developers, Inc., No. CIV.A 01-5508, 2003 WL 329145, at *6 (E.D. Pa. Feb. 12, 2003) (Baylson, J.). Rule 9(b)'s particularity requirement is "rigorously applied in securities fraud cases." Burlington Coat Factory, 114 F.3d at 1417. "[B]oilerplate and conclusory allegations will not suffice." Id. at 1418.

However, "courts should be sensitive to the fact that application of [Rule 9(b)] prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud. Accordingly, the normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control." Id. (internal quotation marks and citations omitted).

The PSLRA[4] imposes two distinct, heightened pleading requirements for actions brought under Section 10(b) and Rule 10b-5. First, the PSLRA requires that "the complaint . . . specify each statement alleged to have been misleading, the reason or reasons why the statement is

---

[4] The PSLRA was enacted "to curb perceived abuses of the § 10(b) private action—'nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers.'" Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 320 (2007) (quoting Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 81 (2006)). The "substantive and procedural controls" imposed by the PSLRA include procedures for the appointment of lead plaintiffs and lead counsel; limitations on damages and attorney's fees; a safe harbor for forward-looking statements; sanctions for frivolous litigation; authorization for a stay of discovery pending decision on a motion to dismiss; and additional pleading requirements. Tellabs, 551 U.S. at 320.

14

misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint [must] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Second, the PSLRA requires that "the complaint . . . state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). In a nutshell, the PSLRA requires that "securities fraud complaints 'specify' each misleading statement; . . . set forth the facts 'on which a belief' that a statement is misleading was 'formed'; and . . 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." <u>Dura Pharm., Inc. v. Broudo</u>, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u-4(b)(1)-(2)).

The PSLRA's pleading standard for private securities actions essentially replaced Rule 9(b)'s heightened pleading standard for claims of fraud. The particularity requirement in Rule 9(b) "is comparable to and effectively subsumed by the requirements of . . . the PSLRA." <u>Avaya</u>, 564 F.3d at 253 (internal quotations and citations omitted). Therefore, securities fraud plaintiffs must "plead the who, what, when, where and how" of the alleged fraud. <u>Id.</u> However, for allegations that are made on information and belief, "the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b); <u>see also</u> <u>Avaya</u>, 564 F.3d at 253 ("[W]hen allegations are made on information and belief, the complaint must not only state the allegations with factual particularity, but must also describe the sources of information with particularity, providing the who, what, when, where and how of the sources, as well as the who, what, when, where and how of the information those sources convey.").

### III.   <u>Discussion</u>

#### a.  **Legal Framework: Section 10(b), Rule 10b-5, and Section 20(a)**

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ." 15 U.S.C. § 78j(b). Rule 10b-5, which was created under Section 10(b), makes it unlawful "[t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). Stating a claim under Section 10(b) and Rule 10b-5 requires the plaintiff to establish six elements:

(1) A material misrepresentation or omission by the defendant;
(2) Scienter;
(3) A connection between the misrepresentation or omission and the purchase or sale of a security;
(4) Reliance upon the misrepresentation or omission;
(5) Economic loss; and
(6) Loss causation.

<u>Matrixx Initiatives, Inc. v. Siracusano</u>, 563 U.S. 27, 37–38 (2011).

Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable [for a Section 10(b) violation] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act . . . constituting the violation . . . ." 15 U.S.C. § 78t(b). Therefore, liability under Section 20(a) runs with liability under Section 10(b). <u>Avaya</u>, 564 F.3d at 280. If there is no liability under Section 10(b), there is no control person liability under Section 20(a). <u>Id.</u>

**b. Claims Premised on Price-Fixing Allegations**

With regard to Lead Plaintiff's allegations that the individual Defendants concealed the fact that Endo was engaged in a price fixing agreement with competitors, and failed to disclose this to the prejudice of shareholders, this Court finds these allegations not sufficient to proceed. The requirements to prove a price fixing conspiracy have been fully set forth in several opinions of this Court in <u>In re Domestic Drywall Antitrust Litigation</u>, MDL 13-2437, in which the plaintiffs, purchasers of drywall, alleged that defendants, manufacturers of drywall, engaged in an agreement to fix prices. In an extensive Memorandum, 163 F. Supp. 3d 175 (E.D. Pa. 2016), summary judgment was granted to one defendant, but denied as to all other defendants. In a subsequent opinion, this Court more recently granted a motion by one defendant, United States Gypsum Corporation, for summary judgment, on the same issue. MDL No. 13-2437, 2019 WL 3254090 (E.D. Pa. July 19, 2019) (Baylson, J.).

These two opinions rely on applicable U.S. Supreme Court and Third Circuit law as to what constitutes sufficient evidence of price fixing allegations, to survive summary judgment. They apply in this case, where the Defendants have moved to dismiss the Amended Complaint on the grounds that Lead Plaintiff's allegations concerning the Defendants' participation in a price fixing agreement are insufficient.

Although the standard for evaluating evidence for summary judgment under Rule 56 is different than allegations in an Amended Complaint, both turn on the same underlying issue— what facts (proven or merely alleged) plausibly demonstrate the existence of price-fixing conspiracy. Indeed, given the requirements that Rule 9(b) and the PLSRA impose on complaints,

Lead Plaintiff's price-fixing allegations, to be plausible, must be set forth in some detail and with specificity, which makes the summary judgment and motion-to-dismiss standards very close.

As noted above, the allegations in the Amended Complaint assert that Defendant Endo was aware of the prices charged by its competitors, and priced its drugs exactly similar as other competitors, and thus a jury can make an inference from these facts that Endo was participating in a price fixing conspiracy, which it failed to disclose.

This Court cannot agree with Lead Plaintiff's arguments.

Lead Plaintiff basically alleges that Endo was engaged in what is commonly referred to as "parallel pricing." The Third Circuit has consistently held that in order to sustain a claim of price-fixing based on parallel pricing, Lead Plaintiff must present facts that:

1. Defendants' behavior was parallel;

2. Defendants were conscious of each other's conduct and awareness was an element in their decision-making processes; and

3. Plus factors showing an actual agreement: (1) motive, (2) actions contrary to Defendants' interests, and (3) traditional conspiracy evidence.

See In Re Domestic Drywall Antitrust Litigation, 163 F. Supp. 3d at 190 (citing In re Flat Glass Antitrust Litig., 385 F.3d 350, 360 n.11 (3d Cir. 2004)).

"Once the plaintiffs have presented evidence of the defendants' consciously parallel pricing and supplemented this evidence with plus factors, a rebuttable presumption of conspiracy arises." In re Baby Food Antitrust Litig., 166 F.3d 112, 122 (3d Cir. 1999).

Concerning Endo's alleged concealment of its participation in a price fixing allegation, Lead Plaintiff has merely alleged parallel pricing. Lead Plaintiff has adequately alleged that Endo and the other competitors were conscious of each other's prices and factored that into their own

pricing decisions. But there are no allegations to establish the "plus factors" as required. Thus Lead Plaintiff's allegations are insufficient to proceed on their "agreement to fix prices" theory. Where the allegations are insufficient to meet appropriate legal standards, then the PSLRA requires the Court to conclude the allegations cannot form the basis of a securities fraud lawsuit.

Although all three plus factors are "weighed together, in the case of oligopolies the first two factors are deemphasized because they 'largely restate the phenomenon of interdependence.'" Valspar Corp. v. E.I. Du Pont De Nemours & Co., 873 F.3d 185, 193 (3d Cir. 2017) (quoting Flat Glass, 385 F.3d at 360). Thus, traditional conspiracy evidence is the most critical plus factor in cases of oligopolies. Notably, Lead Plaintiff has alleged that generic drug markets are oligopolies. "After evaluating the evidence through our plus factor analysis, we then assess whether, '[c]onsidering the evidence as a whole,' it is 'more likely than not [that the defendants] conspired to fix prices.'" Id. at 194 (quoting In re Chocolate Confectionary Antitrust Litig., 801 F.3d 383, 412 (3d Cir. 2015)).

There are insufficient allegations to warrant this case moving forward on this theory.

  i.  Traditional Conspiracy Evidence

Traditional conspiracy evidence is "proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown." Id. at 193 (quoting Flat Glass, 385 F.3d at 361). In Valspar, the Court of Appeals indicated that at least one method of evaluating traditional conspiracy evidence is by "first considering individual groups of evidence to see whether any raise an inference of conspiracy, before evaluating all of the proof in context." Id. at 198.

Lead Plaintiff's Amended Complaint makes no allegations about any traditional conspiracy evidence. Defendants are correct that without such an allegation, Lead Plaintiff cannot proceed on its price-fixing theory of securities fraud.

Another reason to grant the Motion to Dismiss as to the price fixing theory concerns the absence of sufficient facts to warrant what would amount to an "antitrust trial within a securities trial"—there is no Third Circuit precedent that Lead Plaintiff has cited or the Court can find that would warrant such a failure to disclose a price fixing conspiracy to become an integral of a securities fraud case.

      ii.    <u>Disclosure Obligations</u>

Moreover, joining a price-fixing conspiracy is a criminal offense, and it is simply not conceivable that the Defendants would admit such conduct, or that they would be required to violate their right against self-incrimination to avoid liability under the Securities laws. "[C]ompanies do not have a duty 'to disclose uncharged, unadjudicated wrongdoing.'" <u>City of Pontiac Policemen's and Firemen's Retirement Sys. v. UBS AG</u>, 752 F.3d 173, 184 (2d Cir. 2014) (quoting <u>Ciresi v. Citicorp</u>, 782 F. Supp. 819, 823 (S.D.N.Y. 1991), <u>aff'd without opinion</u>, 956 F.2d 1161 (2d Cir. 1992)); <u>see also</u> <u>In re Galena Biopharma, Inc. Sec. Litig.</u>, Civil Action No. 17-929, 2019 WL 5957859, at *10 (D.N.J. Nov. 12, 2019) (Vasquez, J.). Furthermore, it is not plausible to expect Defendants to admit this in any kind of public filing. Plaintiffs do not articulate any legal theory, or cite any Supreme Court or precedential Third Circuit case that would warrant a failure to disclose participation in a price fixing conspiracy as part of a securities fraud.

These factors are a fatal gap in Lead Plaintiff's theory that Defendants are liable for securities fraud for failing to publicly admit that they were engaged in price-fixing. In other words,

Lead Plaintiff has not alleged anything to allow an inference that Defendants were engaged in price fixing with competitors, and thus Defendants did not have any facts to disclose on this topic. Defendants have disclosed they followed a practice of what is called "parallel pricing," but parallel pricing ipso facto does not violate the antitrust laws. Plaintiffs have failed to allege any sufficient facts, and have failed to cite any appellate authority to allow this claim to go forward. Since additional factual pleadings could not cure this deficiency, allowing an amendment would be futile.

A similar claim has been in front of Judge Beetlestone, who dismissed a complaint which attempted to make similar allegations in a price fixing conspiracy on the grounds that the plaintiff had not sufficiently alleged the defendants possessed scienter. See Utesch v. Lannett Co., 316 F. Supp. 3d 895, 902, 907 (E.D. Pa. 2018) (Beetlestone, J.) ("Utesch I"). Although Judge Beetlestone did not reach the question of whether an antitrust conspiracy existed, she concluded that the allegations did not connect the individual defendants to the alleged antitrust conspiracy. Id. at 903–04. In a subsequent amended complaint, the Utesch plaintiff alleged that there was price fixing in the industry, of which defendants had knowledge even if they did not participate, and their failure to disclose that could be a fact supporting a claim for securities fraud. See Utesch v. Lannett Co., 385 F. Supp. 3d 408, 419–20 (E.D. Pa. 2019) (Beetlestone, J.) ("Utesch II"). Judge Beetlestone allowed the plaintiff to proceed on that theory. Id. at 412–13. Thus, in this case, Plaintiffs may pursue Defendants' knowledge of price fixing in the generic industry, among Endo's competitors, as part of its overall securities fraud claim, but not as part of a separate claim premised on a failure to disclose its own alleged price-fixing.

The Court will therefore GRANT Defendants' Motion to Dismiss with prejudice as to the alleged price-fixing conspiracy.

### c. Remaining Claims

#### i. Misrepresentations or Omissions

Section "10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.[']" Matrixx Initiatives, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b-5). "Silence, absent a duty to disclose, is not misleading under Rule 10b–5." Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988). However, "[o]nce a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading." Williams v. Globus Med. Inc., 869 F.3d 235, 241 (3d Cir. 2017) (citing Kline v. First W. Gov't Sec., Inc., 24 F.3d 480, 490–91 (3d Cir. 1994)).

Having concluded that Lead Plaintiff has not adequately alleged that defendants participated in a price-fixing conspiracy, the Court turns to Lead Plaintiff's theory that Defendants' statements[5] about market conditions, sources of revenue, and pricing decisions were misleading even in the absence of a price-fixing conspiracy. Having reviewed the statements, the Court concludes that Lead Plaintiff has sufficiently alleged that Defendants' statements were misleading. Those statements purported to inform investors about the competitive environment, the sources of their generics revenue, or the basis of their pricing decisions, but obscured or omitted material information about the same topics. If these allegations prove true, the statements were misleading.

---

[5] Those statements appear in Paragraphs 186–220 of the Amended Complaint, and are summarized in Section II(a)(iv) of this opinion.

The Court acknowledges that, as Defendants argue, certain of Lead Plaintiff's lines of argument may be in tension with one another. But at the pleadings stage, "a party may set out 2 or more statements of a claim or defense alternatively or hypothetically," and "state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(2)-(3); see also Ohama v. Markowitz, Civil Action No. 19-2150, 2020 WL 365058, at *5 n.6 (E.D. Pa. Jan. 21, 2020) (Baylson, J.) (citing Fed. R. Civ. P. 8(d)(2)-(3)). Indeed, Defendants may find themselves asserting inconsistent affirmative defenses when they answer the Amended Complaint.

The Court also acknowledges that, on the face of the Amended Complaint, not all of the allegedly actionable statements appear equally misleading. Nonetheless, considering the overall allegations in the light most favorable to Lead Plaintiff, the Court concludes that Lead Plaintiff has sufficiently alleged that the statements at issue were misleading and are therefore actionable.[6]

   ii.   Scienter

The PSLRA requires that a securities fraud complaint plead facts that lead to a "strong inference" of scienter, 15 U.S.C. § 78u-4(b)(2)(A); that is, an intent "to deceive, manipulate, or defraud." Tellabs, 551 U.S. at 313. Scienter may include "either reckless or conscious behavior." Avaya, 564 F.3d at 276 (quoting In Re Advanta Corp. Sec. Litig., 180 F.3d 525, 534–35 (3d Cir. 1999)). "A reckless statement is one involving not merely simple, or even inexcusable negligence,

---

[6] Defendants have also argued that two of the statements at issue are shielded by the PSLRA's "safe harbor" for forward-looking statements. See ECF No. 63-1 ("Defs.' MtD Mem.") at 16–17. However, a "mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." Id. at 255 (citing Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702 (7th Cir. 2008)). Each of the challenged statements refers in part to present facts, and is in that part sufficiently alleged to be misleading. Defendants' safe harbor argument therefore fails. Defendants' "puffery" argument, see Defs.' MtD Mem. at 15–16 fares no better, as it relies on selective quotation.

but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Id. at 276 n.42 (quoting Advanta, 180 F.3d at 535).

In Tellabs, the Supreme Court prescribed three rules for assessing scienter on a motion to dismiss. "*First*, faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." Tellabs, 551 U.S. at 322. "*Second*, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Id. This includes documents that are "integral to or explicitly replied upon" in the complaint. Burlington Coat Factory, 114 F.3d at 1426 (quoting Shaw v. Dig. Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996)) (emphasis omitted). "*Third*, in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Id. at 323.

The pertinent inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 322–23. In assessing scienter, courts must "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Id. at 323–24. To survive dismissal, the inference of scienter "must be cogent and compelling, thus strong in light of other explanations." Id. at 324.

To prove a corporate defendant's scienter, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008).

Lead Plaintiff's allegations that De Silva and Campanelli exercised direct and exclusive control of prices, alongside De Silva, Campanelli, and Upadhyay's intimate knowledge of those prices and their significant effect on Endo's overall finances, require the Court to infer that Lead Plaintiff can prove scienter.[7]  Those allegations "mark [the] important distinction between this

---

[7] Paragraphs 221–251 of the Amended Complaint collect and summarize Lead Plaintiff's scienter allegations.  Based on the Amended Complaint, the Court draws the following key inferences for the purposes of the Motion to Dismiss.

De Silva and Campanelli directly controlled generic drug pricing, and De Silva, Upadhyay, and Campanelli kept closely informed about generic drug pricing decisions' effects on Endo's bottom line.  De Silva and Campanelli's pricing decisions substantially increased Endo's profits, and similar pricing decisions at companies Endo acquired, including Par, had such significant effects on those companies' bottom lines that De Silva and Upadhyay should have become aware of those effects while negotiating the acquisitions.

The allegations concerning Par's pre-acquisition pricing practices' effects on its bottom line allow the inference that Campanelli should have been aware, after he joined Endo, of how Endo would be affected if it followed similar pricing practices.

Moreover, De Silva, at least, had some motive to obscure how significant these allegedly risky pricing decisions were to Endo's profitability.  From the Amended Complaint, the Court may infer that De Silva wanted to be perceived as fulfilling his mandate to "turn the company around" by making important acquisitions, even if those acquisitions' true effects on Endo's bottom line proved dubious in the long term.  This motive is relevant to the Court's holistic review of the scienter allegations even though it does not involve the kind of "concrete and personal benefit" that may be particularly persuasive under Avaya, 54 F.3d at 278 (quoting Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001)); see also id. at 278–79 (concluding corporate officer defendants' general "incentive to improve the lot of their companies . . . fail[ed] to contribute *meaningfully*" to the scienter analysis) (emphasis added)).

Lead Plaintiff's allegations concerning "lock-ups" of generic drugs to boost price and Endo's failure to swiftly disclose the 2015 subpoena from the Connecticut Attorney General, or at least its impact on competition in the generics market, could also support inferences of scienter, at least as to some of the statements at issue.

case and those in which defendants win dismissal on a showing that defendants were most likely simply ignorant of the facts that made their statements false." Avaya, 564 F.3d at 270; cf. Utesch I, 316 F. Supp. 3d at 905 (concluding that, where generic drugs "purportedly generate[d] a substantial amount of revenue for pharmaceutical company, court could impute knowledge about generic drug pricing to company's high-level officers under the Third Circuit's "core operations doctrine").

The Court views Lead Plaintiff's allegations collectively, as it must, Tellabs, 551 U.S. at 326. So viewed, Lead Plaintiff's allegations allow the Court to draw the strong inference that Defendants' statements, which omitted or obscured these non-price-competitive pricing decisions' existence or  significant effect on Endo, represented an "extreme departure from the standards of ordinary care" and "present[ed] a danger of misleading buyers or sellers that [wa]s either known to the defendant[s] or [wa]s so obvious that the actor[s] must have been aware of it." Avaya, 564 F.3d at 267 n.42 (quoting Advanta, 180 F.3d at 535). In other words, Lead Plaintiff has sufficiently alleged that the Individual Defendants possessed scienter.[8]

---

[8] Defendants also attack Lead Plaintiff's scienter allegations on the basis that Lead Plaintiff "rel[ies] on C[onfidential ]W[itnesse]s who have no basis to opine on that topic." Defs.' MtD Mem. at 19. The Court disagrees.

In key part, Lead Plaintiff's confidential witness allegations are as follows. CW-5, who worked for about five years ending in early 2016 as Head of Sales and Customer Operations, reporting directly to Propst and Reiney, claimed that De Silva received regular reports on drugs that were ripe for price increases, and decided what drug prices to raise in collaboration with Propst and Reiney. Am. Compl. ¶ 93. CW-5 also claimed that once Campanelli became the head of Endo's generics segment, Campanelli required that he personally approve each price change at Endo. Id. ¶ 93. CW-5 also claims that Campanelli "carried over" this practice from Par. Id. ¶ 93(b). CW-3, a contract accountant employed for slightly less than a year, claims to have participated in monthly conference calls with De Silva and key Qualitest finance personnel to discuss Qualitest's financial performance. Id. ¶ 91. During those calls, De Silva displayed specific and granular

Having concluded that Lead Plaintiff has sufficiently alleged that the Individual Defendants possessed scienter, the Court concludes that Lead Plaintiff has sufficiently alleged that Endo possessed scienter as well. For a plaintiff to successfully plead that a corporate defendant possessed scienter, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." Teamsters Local 445, 531 F.3d at 195. Especially given Lead Plaintiff's allegations that the CEOs closely controlled generic drug pricing, the CEOs' and CFO's intents can be imputed to Endo. Lead Plaintiff therefore has sufficiently alleged corporate scienter.

---

knowledge of Qualitest's P&L reports, and asked questions about revenues from specific products. Id. ¶ 91(b). CW-2 worked in several roles, including as a Manager of Government Contracts, and provided details about the Excel spreadsheets allegedly provided to Endo leadership. Id. ¶ 90. CW-2 was able to provide those details because he or she saw and reviewed the Excel files. Id. ¶ 90(c). CW-4, a trainee on the national accounts pricing team, also accessed an Excel master spreadsheet describing prices. Id. ¶ 92.

Applying the PSLRA's particularity standard to the scienter element requires the court to "evaluat[e] the 'detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia.'" Avaya, 564 F.3d at 263 (quoting Cal Pub. Emps.' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 147 (3d Cir. 2004)); see also In re Cigna Corp. Sec. Litig., No. Civ. A. 02-8088, 2006 WL 263631, at *2 (E.D. Pa. Jan. 31, 2006) (Baylson, J.) ("[E]ven if personal sources must be identified in a complaint, there is no requirement that they be explicitly named, provided they are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.").

The Court concludes that the key Confidential Witness allegations are specific, mutually consistent, and plausibly within the scope of knowledge each Confidential Witness would have acquired during his or her employment with Endo. Although some allegations, such as the allegation that "De Silva had 'his hand in everything Qualitest did,'" Am. Compl. ¶ 90(a), may be too broad to be plausible, those do not undermine the other, more specific allegations.

The Court will therefore DENY Defendants' Motion to Dismiss as to the Section 10(b) claims not premised on the alleged price-fixing conspiracy.

### d. Disposition of Section 20(a) Claims

To state a claim under Section 20(a), a plaintiff must allege a predicate Section 10(b) violation. <u>See, e.g.</u>, <u>City of Edinburgh Council v. Pfizer, Inc.</u>, 754 F.3d 159, 177 (3d Cir. 2014) ("Because the [plaintiffs] have failed to adequately plead a predicate section 10(b) violation, their section 20(a) claim must be dismissed). The Court will therefore GRANT the Motion to Dismiss as to the Section 20(a) claims, with prejudice, to the extent that they are premised on the insufficiently alleged price-fixing conspiracy, and DENY the Motion otherwise.

## IV. <u>Conclusion</u>

For the foregoing reasons, Defendants' Motion to Dismiss will be GRANTED with prejudice as to the alleged price-fixing conspiracy, and DENIED otherwise. An appropriate order follows.

# 2012-2014

**Endo International PLC**
*CEO and President*: De Silva (hired March 2013)
*CFO and EVP*: Upadhyay (hired September 2013)

**Qualitest Pharmaceuticals**
Operating as Endo's generics manufacturing division since December 2010. Allegedly under De Silva's complete control.
*Vice Presidents:* Propst and Reiney

**Par Pharmaceutical Holdings, Inc.**
At this point, Par is completely independent of Endo.
*CEO*: Campanelli (hired September 2012)

# 2015

**Endo International PLC**
*CEO and President*: De Silva (hired March 2013)
*CFO and EVP*: Upadhyay (hired September 2013)

**Acquired September 2015**

~~Qualitest Pharmaceuticals~~
It is not alleged what happened to Qualitest or its management after Par was acquired in September 2015.

Par ~~Pharmaceutical Holdings, Inc.~~
Operating as Endo's generics manufacturing division following its acquisition by Endo.
*President*: Campanelli (title changed from CEO to President upon Endo's acquisition of Par)

29

# **2016**

**Endo International PLC**
*CEO*: Campanelli (promoted September 2016)
~~*CEO and President*: De Silva~~ (terminated September 2016)
~~*CFO and EVP*: Upadhyay~~ (terminated November 2016)

**Par**
Operating as Endo's generics manufacturing division
following Endo's acquisition of Par.
It is not alleged who ran Par following Campanelli's
promotion to CEO of Endo.

O:\CIVIL 17\17-5114 Pelletier v Endo Intl\17cv5114 MtD Memo.docx