## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALEXANDRE PELLETIER, Individually and On Behalf of All Others Similarly Situated, | Hon. Michael M. Baylson |
| Plaintiff, | No. 2:17-cv-05114-MB |
| - v. - | **CLASS ACTION** |
| ENDO INTERNATIONAL PLC, RAJIV KANISHKA LIYANAARCHCHIE DE SILVA, SUKETU P. UPADHYAY, AND PAUL V. CAMPANELLI | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

## LEAD PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVE AND CLASS COUNSEL

John M. Elliott
**ELLIOTT GREENLEAF, P.C.**
925 Harvest Drive, Suite 300
Blue Bell, PA 19422
Telephone: (215) 977-1000
Facsimile: (215) 977-1099

*Co-Counsel for the Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago*

Joseph A. Fonti (admitted *pro hac vice*)
**BLEICHMAR FONTI & AULD LLP**
7 Times Square, 27th Floor
New York, NY 10036
Telephone: (212) 789-1340
Facsimile: (212) 205-3960

*Co-Counsel for the Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago and Lead Counsel For The Class*

John A. Kehoe
**KEHOE LAW FIRM, P.C.**
Two Penn Center Plaza
1500 JFK Boulevard, Suite 1020
Philadelphia, PA 19012
Telephone: (215) 792-6676

*Additional Counsel for the Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT .................................................................................................. 1

STATEMENT OF FACTS ....................................................................................................... 3

ARGUMENT .......................................................................................................................... 4

   A.  Class Certification Standards ................................................................................ 4

   B.  This Action Meets the Requirements of Rule 23(a) ........................................... 5

      1.  Numerosity Is Established ............................................................................ 5

      2.  There Are Questions of Law and Fact Common to the Class ....................... 6

      3.  Lead Plaintiff's Claims Are Typical of the Class ......................................... 8

      4.  Lead Plaintiff, Class Counsel, and Class Liaison Counsel Will
         Fairly and Adequately Protect the Interests of the Class .............................. 9

   C.  The Requirements of Rule 23(b) Are Satisfied .................................................. 12

      1.  Common Questions of Law and Fact Predominate ..................................... 12

      2.  A Class Action Is Superior ......................................................................... 23

CONCLUSION ..................................................................................................................... 24

## **TABLE OF AUTHORITIES**

**Cases**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ............................................................ 9, 12

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455 (2013) .............................. 5, 12, 13

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) .................................................................. 2, 13, 14, 15

*Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ................................................. 15, 16, 17, 18

*Carpenters Pension Trust Fund of St. Louis v. Barclays*,
 310 F.R.D. 69 (S.D.N.Y. 2015) ...................................................................................... 20

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*,
 2015 WL 5097883 (D.N.J. Aug. 31, 2015) ..................................................................... *passim*

*Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170 (3d Cir. 2012) ....................................... 9

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) ..................................................... 13

*Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011) ................................. 5, 12, 13

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) ................................. 14, 15, 19

*Hayes v. MagnaChip Semiconductor Corp.*,
 No. 14-cv-01160-JST, 2016 WL 7406418 (N.D. Cal. Dec. 22, 2016) ..................................... 19

*In re Banc of Cal. Sec. Litig.*, 326 F.R.D. 640 (C.D. Cal. 2018) ................................................... 19

*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001) .............................................................. 11

*In re CIGNA Corp. Sec. Litig.*,
 No. 02–cv-8088, 2006 WL 2433779 (E.D. Pa. Aug. 18, 2006) ...................................... *passim*

*In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586 (C.D. Cal. 2009).............................. 22

*In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196 (E.D. Pa. 2008) .......................................... 16, 17, 21

*In re DVI, Inc. Sec. Litig.*, 639 F.3d 623 (3d Cir. 2011) ................................................ 13, 15, 16

*In re Heckmann Corp. Sec. Litig.*,
 No. 10-cv-378, 2013 WL 2456104 (D. Del. June 6, 2013) ................................................. 5, 19

*In re Merck & Co., Inc. Sec. Litig.*,
 Nos. 05-1151 SRC, 05-2367 SRC, 2013 WL 396117 (D.N.J. Jan. 30, 2013)............ 6, 8, 13, 14

*In re Merck & Co., Vytorin/Zetia Sec. Litig.*,
   2012 WL 4482041 (D.N.J. Sep. 25, 2012) ....................................................... 18, 23

*In re Novo Nordisk Sec. Litig.*,
   No. 3:17-cv-00209, 2020 WL 502176 (D.N.J. Jan. 31, 2020) ........................................... *passim*

*In re Petrobras Sec. Litig.*, 312 F.R.D. 354 (S.D.N.Y. 2016) ..................................................... 20

*In re Petrobras Sec.*, 862 F.3d 250 (2d Cir. 2017) ....................................................... 20

*In re Schering Plough ERISA Litig.*, 589 F.3d 585 (3d Cir. 2009) ................................................. 8

*In re Schering-Plough/ENHANCE Sec. Litig.*,
   No. 2:08-cv-00397 (DMC) (JAD), 2012 WL 4482032 (D.N.J. Sept. 25, 2012) .............. 10, 11

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004) ........................................ 8, 9

*Krangel v. Golden Rule Res., Ltd.*, 194 F.R.D. 501 (E.D. Pa. 2000) ........................................... 23

*Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ................................................... 15, 21, 22

*Marcus v. BMW of N. Am., LLC*, 687 F.3d 583 (3d Cir. 2012) ........................................................ 5

*Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353 (3d Cir. 2015) ............................................. 22

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001) ................. 8

*Pelletier v. Endo Int'l PLC*,
   No. 17-CV-5114, 2020 WL 759410 (E.D. Pa. Feb. 14, 2020) ................................................... 4

*Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38 (S.D.N.Y. 2018) .............................. 16

*Reyes v. Netdeposit, LLC*, 802 F.3d 469 (3d Cir. 2015) ................................................................. 6

*Roofer's Pension Fund v. Papa*, 333 F.R.D. 66 (D.N.J. 2019) ("*Perrigo*") ......................... *passim*

*United States v. Schiff*, 602 F.3d 152 (3d Cir. 2010) ................................................................. 19

*Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39 (S.D.N.Y. 2019) ......................... 22

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
   No. CV 13-6731, 2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) ......................................... *passim*

*Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017) ........................................................ 15, 19

*Williams v. Jani-King of Phila. Inc.*, 837 F.3d 314 (3d Cir. 2016) ............................................ 5

*Wilson v. LSB Indus., Inc.*,
   No. 15CIV7614RAGWG, 2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018) ................. 18, 21, 22

iii

**Statutes**

17 C.F.R. § 229.404 ...................................................................................................... 2

**Other Authorities**

H.R. Conf. Rep. No. 104- 369 (1995) ........................................................................... 13

**Rules**

Fed. R. Civ. P. 23 ................................................................................... *passim*

Pursuant to Federal Rule of Civil Procedure 23, Lead Plaintiff Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago ("Lead Plaintiff" or "Chicago Parks") respectfully requests that the Court:  (1) certify the Class (defined below); (2) appoint Lead Plaintiff as Class Representative; and (3) appoint Bleichmar Fonti & Auld LLP ("BFA") as Class Counsel, with Elliott Greenleaf, P.C. as Class Liaison Counsel.[1]

## PRELIMINARY STATEMENT

"[I]t is well-settled that the class action is a particularly appropriate vehicle for adjudication of federal securities cases."  *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*, 2015 WL 5097883, at *13 (D.N.J. Aug. 31, 2015).  This case is no exception.  Lead Plaintiff asserts securities fraud claims based on Defendants' false and misleading statements that Endo was earning record profits, despite "fac[ing] intense competition," and their attribution of Endo's results to sustainable business practices.  In reality, both Endo and its subsidiary Par (acquired in September 2015) engaged in a scheme to conceal that they were generating hundreds of millions in profits from extraordinary price increases on generic drugs.  This conduct was directly contrary to Defendants' public statements, including that Endo was "not relying on price increases" and had "not been dependent on pricing."  (¶¶49, 66.)

Pursuant to Rule 23(a) and Rule 23(b)(3), Lead Plaintiff now seeks certification of the following Class:

> All persons and entities who purchased or otherwise acquired the ordinary shares of Endo from March 2, 2015 through February 27, 2017, inclusive (the "Class Period") and were damaged thereby.[2]

---

[1] Capitalized terms not defined herein have the meanings stated in the operative Complaint (ECF 62).  All "¶__" references are to the Complaint.  Unless otherwise noted, all emphasis is added and all internal citations and quotation marks are omitted.

[2] Excluded from the Class are (i) Defendants and any affiliates or subsidiaries thereof, (ii) present and former officers and directors of Endo and its subsidiaries or affiliates, and their immediate

Rule 23's requirements are amply satisfied.

*First*, Rule 23(a)'s prerequisites of numerosity, commonality, typicality, and adequacy are satisfied.  As is true in most class actions, numerosity and commonality plainly exist here, as joinder of the many thousands of members of the proposed Class would be wholly impracticable, and this securities fraud action raises numerous common questions of law and fact, including as to Defendants' misrepresentations and omissions, materiality, scienter, and damages.  Typicality and adequacy are also easily satisfied:  Chicago Parks is the quintessential institutional investor lead plaintiff contemplated under the PSLRA.  Proposed Class Counsel and Class Liaison Counsel are highly experienced, have vigorously pursued Class members' claims for over two years, and are fully committed to maximizing Class members' recovery, including by taking this action to trial.

*Second*, Rule 23(b)(3)'s predominance and superiority requirements are readily satisfied. Questions common to all Class members predominate over any questions affecting only individual Class members.  In a securities class action asserting claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), the predominance requirement is synonymous with the element of reliance.  Where securities trade in an efficient market, as here, the fraud-on-the-market doctrine establishes class-wide reliance.  *See Basic Inc. v. Levinson*, 485 U.S. 224 (1988). As explained below, overwhelming evidence, including as summarized in the accompanying expert report of Zachary Nye, Ph.D., of Stanford Consulting Group, Inc. (the "Nye Report"), confirms that Endo ordinary shares traded in an efficient market during the Class Period.  (*See*

---

family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. § 229.404, Instructions (1)(a)(iii) & (1)(b)(ii)); (iii) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (iv) any entity in which any Defendant has or has had a controlling interest; (v) Endo's employee retirement and benefits plan(s); and (vi) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding five categories.

Fonti Declaration Ex. 2.)[3]  Indeed, Defendants have no basis to dispute market efficiency:  millions of Endo ordinary shares were actively traded on the NASDAQ, a paradigmatic efficient market. Proceeding as a class action is also superior to other available methods for fairly and efficiently adjudicating Class members' claims.

## STATEMENT OF FACTS

This action arises from a fraudulent scheme that will be demonstrated with Class-wide, common proof of Defendants' conduct.  As the Complaint alleges, Defendants engaged in a systematic, concealed strategy to raise prices on Endo's generic drugs; these price increases were extraordinary and drove at least roughly one-third of Endo's generics segment's adjusted income. (¶6.)  Moreover, Defendants were well aware that the generic drug industry was rife with price-fixing and allocation of markets and customers, and as Defendants knew, this anticompetitive, yet precarious, environment contributed to the success of their price increase strategy.

Nonetheless, Defendants repeatedly made fraudulent statements about Endo's generic drug pricing, sources of revenues, and market conditions.  To dispel any notion that Endo was engaged in price increases, Defendants: (i) categorically denied reliance on price (¶¶49, 66, 192, 202); (ii) repeatedly attributed Endo's generic segment's positive financial results to durable sources such as new launches, "favorable [product] mix," "increases in demand," and other expected factors in a competitive environment (*see* ¶¶191, 194, 196, 198, 201, 204, 211, 215, 218); and (iii) repeatedly and falsely claimed that Endo faced "intense competition from other generic drug manufacturers," but was nonetheless earning record profits (¶¶50, 186(a)).

---

[3] Declaration of Joseph A. Fonti in Support of Lead Plaintiff's Motion for Class Certification and Appointment of Class Representative and Class Counsel, filed herewith.

Endo's profits from its price-increase scheme peaked in September 2015, when it closed on its "transformative" $8 billion acquisition of Par.  The transaction was fueled by $1.3 billion in Endo's own shares paid to Par's shareholders, as well as $2.3 billion raised by a secondary share offering, and various other financing arrangements.  (¶¶11, 57.)

Hidden from shareholders' view, Defendants' scheme began to unravel in December 2015 when the Connecticut Attorney General served Endo with a subpoena probing the Company's generic drug pricing.  Endo delayed disclosing the subpoena for five months.  ¶13; *see also Pelletier v. Endo Int'l PLC*, No. 17-CV-5114, 2020 WL 759410, at *12 n.7 (E.D. Pa. Feb. 14, 2020).  Defendants' ability to continue the scheme came to a screeching halt, as did their profit stream from the price increases.  (¶¶67-68.)  Unable to use price increases to bolster profits, Endo's financial performance declined precipitously through the first half of 2016, and by the fall of 2016, CEO De Silva and CFO Upadhyay were fired.  (¶80.)  Then, on November 3, 2016, Bloomberg reported for the first time that Endo was a target of law enforcement for manipulation of generic drug prices, calling into question the Company's generic drug pricing practices and the sustainability of profits.  (¶¶14, 81, 260-61.)  That day, Endo's share price plummeted 19.5% to close at $14.63 on heavy trading volume.  (¶¶82, 262.)

Finally, on February 28, 2017, just after the close of the Class Period, the Company announced a massive $3.5 billion impairment charge driven by a $2.85 billion **permanent** decline in the value of Endo's U.S. generic drug business segment.  (¶264.)  All told, Endo's share price fell from a Class Period-high of over $90 to just $12.82.  (¶¶11, 265.)

## ARGUMENT

### A.  <u>Class Certification Standards</u>

An action may be certified as a class action if the four prerequisites of Rule 23(a) (numerosity, commonality, typicality, and adequacy) are met, and the action qualifies under one

of Rule 23(b)'s subdivisions (here, Rule 23(b)(3)).  Class certification is "especially appropriate

in securities fraud cases wherein there are many individual plaintiffs who suffer damages too small

to justify a suit against a large corporate defendant."  *In re Heckmann Corp. Sec. Litig.*, No. 10-

cv-378, 2013 WL 2456104, at \*13-14 (D. Del. June 6, 2013).

Rule 23 must be satisfied by a preponderance of the evidence.  *Williams v. Jani-King of*

*Phila. Inc.*, 837 F.3d 314, 319 (3d Cir. 2016).  As the Supreme Court has cautioned, however,

"Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification

stage.  Merits questions may be considered to the extent—but only to the extent—that they are

relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013); *see also Erica P. John*

*Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812 (2011) ("*Halliburton I*") (securities fraud plaintiff

need not prove loss causation to obtain class certification).

### B.    This Action Meets the Requirements of Rule 23(a)

#### 1.    Numerosity Is Established

Rule 23(a)'s "numerosity" requirement is met if "the class is so numerous that joinder of

all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "There is no minimum number of

members needed for a suit to proceed as a class action."  *Marcus v. BMW of N. Am., LLC*, 687

F.3d 583, 595 (3d Cir. 2012).  However, a showing that the "potential number of plaintiffs exceeds

40" will generally satisfy numerosity.  *Id.*  "[C]ourts have recognized a presumption that the

numerosity requirement is satisfied when a class action involves a nationally traded security."  *In*

*re CIGNA Corp. Sec. Litig.*, No. 02–cv-8088, 2006 WL 2433779, at \*2 (E.D. Pa. Aug. 18, 2006).

Here, numerosity is beyond dispute.  The proposed Class consists of thousands of

members, if not more.  During the Class Period, Endo had between 177.5 million and 226.4 million

ordinary shares outstanding, and Endo ordinary shares had an average weekly volume on the

NASDAQ of over 26 million shares.  (Nye Report ¶25.)  Accordingly, certification of the class is ideal where, as here, the joinder of this vast number of investors would be impractical.  *See, e.g.*, *CIGNA*, 2006 WL 2433779, at *2 (numerosity satisfied where "one hundred and forty million shares . . . were outstanding during the class period, and the stock was actively traded"); *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, No. CV 13-6731, 2016 WL 4138613, at *7 (E.D. Pa. Aug. 4, 2016) (numerosity satisfied where "stock traded on the NASDAQ" and "there were millions of shares of stock outstanding"); *Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 74 (D.N.J. 2019) ("*Perrigo*") (numerosity satisfied where "more than 100 million shares" were outstanding, with "average weekly trading volume of approximately 9.5 million shares").

## 2.    There Are Questions of Law and Fact Common to the Class

The "commonality" requirement under Rule 23(a) is met if "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  This requirement is "not particularly demanding," *Prudential*, 2015 WL 5097883, at *8, and is satisfied where proposed class representatives share "at least one question of fact or law with the grievances of the prospective class." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015); *see also In re Novo Nordisk Sec. Litig.*, No. 3:17-cv-00209, 2020 WL 502176, at *5 (D.N.J. Jan. 31, 2020) ("The threshold for establishing commonality is straightforward: 'The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.'"); *CIGNA*, 2006 WL 2433779, at *3 ("single common issue may satisfy" commonality).

This common contention need only be "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *In re Merck & Co., Inc. Sec. Litig.*, Nos. 05-1151 SRC, 05-2367 SRC, 2013 WL 396117, at *4 (D.N.J. Jan. 30, 2013).  The "commonality requirement is readily satisfied in securities fraud cases." *DFC Glob. Corp.*, 2016

WL 4138613, at *8.  "Courts in this Circuit have recognized that securities fraud cases often present a paradigmatic common question of law or fact of whether a company omitted material information or made misrepresentations that inflated the price of its stock." *Perrigo*, 333 F.R.D. at 74–75.

Here, Defendants have no basis to dispute commonality.  Lead Plaintiff's and proposed Class members' claims arise out of similar misstatements and omissions, raising a host of common questions, such as:

- Whether the federal securities laws were violated by Defendants' conduct as alleged;

- Whether Defendants made any untrue statements of material fact or omitted to state any material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading;

- Whether Endo and the Individual Defendants acted with the requisite level of scienter under Section 10(b) of the Exchange Act;

- Whether the Individual Defendants were controlling persons of the Company under Section 20(a) of the Exchange Act;

- Whether and to what extent the prices of Endo ordinary shares were artificially inflated or maintained during the Class Period due to the alleged false and misleading statements or omissions;

- Whether reliance is presumed under the fraud-on-the-market doctrine; and

- Whether Lead Plaintiff and other members of the Class suffered damages, as well as the appropriate measure thereof.

Courts have repeatedly held that these exact types of common questions satisfy Rule 23(a)(2)'s requirement of common issues.  *Novo Nordisk*, 2020 WL 502176, at *5 (commonality established where "the Amended Complaint alleges a common course of conduct arising from materially false and misleading statements and omissions Defendants made to the investing public"); *CIGNA*, 2006 WL 2433779, at *3 (the "existence, nature and significance of [defendant's] alleged misrepresentations are therefore issues common to all class members").

### 3.     Lead Plaintiff's Claims Are Typical of the Class

Rule 23(a)'s "typicality" requirement is met when "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).

As is true for commonality, typicality "does not require that the putative class members all share identical claims."  *Perrigo*, 333 F.R.D. at 75 (citing *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531-32 (3d Cir. 2004)).  "The standard for demonstrating typicality is undemanding and requires that 'the claims of the named plaintiffs and putative class members involve the same conduct by the defendant.'"  *Perrigo*, 333 F.R.D. at 75 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183-84 (3d Cir. 2001)).

Typicality is unequivocally established here.  Lead Plaintiff and Class members all purchased Endo ordinary shares and assert the same Section 10(b) claims, based on the same misstatements and omissions by Defendants, and the same Section 20(a) claim of "control person" liability.  Moreover, Lead Plaintiff is not subject to any unique defenses, much less any that are "both inapplicable to many members of the class and likely to become a major focus of the litigation." *In re Schering Plough ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009).

Because Lead Plaintiff's "claims arise from the very same alleged Exchange Act violations as those that give rise to the claims of the absent class members," typicality is satisfied.  *Merck*, 2013 WL 396117, at *5; *see also Novo Nordisk*, 2020 WL 502176, at *6 ("[T]ypicality is clearly satisfied because Plaintiffs' claims arise from the same course of conduct that gave rise to the claims of all other Class members and are based on the same legal theory."); *Prudential*, 2015 WL 5097883, at *9 (typicality satisfied where "[t]he factual and legal predicates of [the proposed class representative's] claims are the same as those for the class members"); *CIGNA*, 2006 WL 2433779, at *3 (typicality satisfied where proposed class representatives, like other class members,

"purchased CIGNA common stock at an inflated price caused by allegedly fraudulent public statements of CIGNA executives, and suffered losses as a result").

### 4. Lead Plaintiff, Class Counsel, and Class Liaison Counsel Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a)'s "adequacy" prong requires that the proposed class representatives "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The crux of this inquiry is whether the proposed class representatives are "part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 594-95 (1997). Adequacy requires that: (1) "the named plaintiff's interests must be sufficiently aligned with the interests of the absentees;" and (2) "the plaintiff's counsel must be qualified to represent the class." *Perrigo*, 333 F.R.D. at 76; *see also In re Warfarin*, 391 F.3d at 532. Alleged conflicts only defeat adequacy where they are "fundamental," meaning that "'some class members claim to have been harmed by the same conduct that benefitted other members of the class.'" *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 184 (3d Cir. 2012).

The Court has already determined that Chicago Parks is qualified and appropriate to act as Lead Plaintiff, and that proposed Class Counsel are qualified and appropriate to act as Lead Counsel. (*See* ECF 57.) Lead Plaintiff is unquestionably adequate, having vigorously pursued the proposed Class's claims since the inception of the case, through Defendants' motion to dismiss, and into discovery, propounding numerous document requests and interrogatories, serving a dozen subpoenas, and moving to compel additional discovery from Defendants.[4] Lead Plaintiff continues to be fully committed to actively prosecuting the action in the best interest of the Class.

---

[4] *See* Declaration of Dean Niedospial in Support of the Motion of Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago for Class Certification (the "Niedospial Declaration"), filed herewith.

(Niedospial Declaration ¶6.)  Lead Plaintiff is not subject to any unique defenses, and based on its purchases of Endo ordinary shares during the Class Period, Lead Plaintiff's interests are directly aligned with the interests of other Class members, all of whom were injured by the same materially false statements and omissions.  *See In re Schering-Plough/ENHANCE Sec. Litig.*, No. 2:08-cv-00397 (DMC) (JAD), 2012 WL 4482032, at *6 (D.N.J. Sept. 25, 2012) ("'[W]hen Lead Plaintiffs have a strong interest in establishing liability under federal securities law, and seek similar damages for similar injuries, the adequacy requirement can be met.'"; adequacy satisfied where plaintiffs "purchased Schering securities during the Class Period and have been injured by the allegedly wrongful course of conduct at issue"); *CIGNA*, 2006 WL 2433779, at *4 (same).

Lead Plaintiff has further demonstrated its commitment to monitor and supervise the prosecution of this action on behalf of the Class, which is "all that is required." *DFC Glob. Corp.*, 2016 WL 4138613, at *10; *Novo Nordisk*, 2020 WL 502176, at *7 (adequacy satisfied based on lead plaintiffs' "commitment to litigation, shared interests with members of the purported Class, and hiring of experienced counsel").  Underscoring its vigorous advocacy for the Class's interests, Lead Plaintiff expended necessary resources to challenge Defendants' recent improper settlement of *Public Employees' Retirement System of Mississippi v. Endo Int'l plc, et al.*, No. 2017-2081-MJ (Pa. Ct. Comm. Pl. Chester Cty.) ("*MPERS*"), a class action that asserted claims under Section 11 of the Securities Act of 1933.  While *MPERS* involved entirely different facts and claims than this action, Defendants nonetheless sought to release the claims asserted ***in this action*** on behalf of purchasers of Endo stock between June 5 and June 10, 2015, who are members of both the *MPERS* class and the Class here.  The purported release is improper because the two actions have entirely different factual predicates, the *MPERS* notice failed to disclose the purported release of

10

claims in this action, and Defendants obtained no meaningful consideration for it.  Lead Plaintiff thus objected on behalf of Class members whose rights would be impaired.[5]

Moreover, the PSLRA was intended to "increase the likelihood that institutional investors will serve as lead plaintiffs." *See* H.R. Conf. Rep. No. 104- 369 at 34 (1995) (Conf. Rep.).  Chicago Parks, which manages more than $350 million for over 2,800 beneficiaries (Niedospial Declaration ¶2), is the paradigmatic institutional investor that the PSLRA envisioned as a class representative. *See In re Cendant Corp. Litig.*, 264 F.3d 201, 273 (3d Cir. 2001) (recognizing PSLRA's preference for appointing institutional investors as lead plaintiffs).  In addition to its role as Lead Plaintiff in this action, Chicago Parks is currently a named plaintiff in a class action for breach of fiduciary duties, *In re Viacom Inc. Stockholders Litig.*, C.A. No. 2019-0948-JRS (Del. Ch.).

Finally, Lead Plaintiff has protected the interests of the Class by retaining and overseeing BFA as Lead Counsel.  BFA is highly experienced in litigating securities class actions, has, and will, vigorously prosecute the claims of the proposed Class, and is "qualified, experienced, and generally able to conduct the proposed litigation." *Schering-Plough*, 2012 WL 4482032, at *6; *see also CIGNA*, 2006 WL 2433779, at *4 (class counsel "are well-qualified, experienced, and able to conduct the mechanics of this litigation on behalf of the proposed class"); ECF 57 at 13 (in appointing BFA as Lead Counsel, finding "no question" that BFA satisfies the "adequacy of representation requirement").  Lead Counsel have a proven track record in prosecuting complex securities class actions like this one, establishing their adequacy for appointment as Class Counsel. (*See* Fonti Declaration Ex. 1 (Class Counsel resume).)  Proposed Class Liaison Counsel Elliott

---

[5] The *MPERS* trial court approved the settlement over Lead Plaintiff's objection, and the matter is currently on appeal.  Nos. 369 EDA 2020, 370 EDA 2020 (Pa. Super. Ct.).  Lead Plaintiff maintains that the purported release in *MPERS* is wholly inapplicable to the Class, and to the extent Defendants claim otherwise, will submit further argument to the Court if needed.

Greenleaf, P.C. is also highly experienced with securities and other complex commercial litigation. (*See* Myers Declaration[6] Ex. 1 (Class Liaison Counsel resume).)  Lead Counsel's adequacy also is demonstrated by the substantial work in investigating and prosecuting this action thus far. Accordingly, Lead Plaintiff respectfully submits that proposed Class Counsel satisfy the adequacy requirement of Rule 23(a)(4).

### C.     The Requirements of Rule 23(b) Are Satisfied

Lead Plaintiff seeks class certification pursuant to Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  Both requirements are met.

### 1.     Common Questions of Law and Fact Predominate

The Supreme Court has held that "[p]redominance is a test readily met in certain cases alleging . . . securities fraud." *Amchem Prods., Inc.*, 521 U.S. at 625.  "Considering whether questions of law or fact common to class members predominate begins . . . with the elements of the underlying cause of action." *Halliburton I*, 563 U.S. at 809.  "[T]he predominance inquiry turns on whether the evidence necessary to prove the essential elements of the underlying claims will vary from class member to class member, causing the Court to engage in individual treatment of the issues." *Perrigo*, 333 F.R.D. at 78-79.

A plaintiff seeking class certification does not need to prove that "each elemen[t] of [her] claim [is] susceptible to classwide proof." *Amgen*, 568 U.S. at 469.  Rather, "[w]hen common

---

[6] Declaration of Timothy T. Myers in Support of Lead Plaintiff's Motion for Class Certification and Appointment of Class Representative and Class Counsel, filed herewith.

questions are a significant aspect of a case and they can be resolved in a single action, class certification is appropriate." *Novo Nordisk*, 2020 WL 502176, at \*8.

Common issues plainly predominate here. To prevail under Section 10(b) of the Exchange Act and Rule 10b-5, Lead Plaintiff must prove (1) a material omission or misrepresentation; (2) scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.[7] *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Significantly, the Supreme Court has held that because materiality and loss causation are common merits issues in a securities fraud class action, proof of those elements is not a prerequisite to class certification. *See Amgen*, 568 U.S. at 467 (materiality); *Halliburton I*, 563 U.S. at 812-13 (loss causation). Scienter is another common issue. *See, e.g.*, *Merck*, 2013 WL 396117, at \*12 ("Defendants' state of mind" was common issue).

Thus, whether common questions predominate for Lead Plaintiff's Section 10(b) claim "turns on the element of reliance." *Halliburton I*, 563 U.S. at 809.

Lead Plaintiff will demonstrate Class-wide reliance under the "fraud-on-the-market" presumption of reliance, which dispenses with the requirement that each Class member prove individual reliance upon Defendants' alleged misstatements and/or omissions. The fraud-on-the-market presumption is "based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business," and thus, "[m]isleading statements will . . . defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Basic*, 485 U.S. at 241–42; *see also In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 631 (3d Cir. 2011) ("*DVI II*") (noting that the

---

[7] In addition, Lead Plaintiff's "control person" claim under Section 20(a) of the Exchange Act requires proof that the defendant controlled the primary violator, another common issue subject to Class-wide proof. *See, e.g.*, *Merck*, 2013 WL 396117 at \*5.

Supreme Court "appears to have endorsed the semi-strong form of the efficient capital market hypothesis").

Under *Basic* and *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) ("*Halliburton II*"), Lead Plaintiff may "satisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of a stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Id.* at 283.

As explained below, Endo ordinary shares traded in an efficient market, such that the fraud-on-the-market presumption applies.

> ### a. Lead Plaintiff and the Class Are Entitled to a Presumption of Reliance Because Endo Ordinary Shares Traded in an Efficient Market

To invoke the fraud-on-the-market presumption, Lead Plaintiff need only show that Defendants' false statements were publicly made and that Endo ordinary shares traded in an efficient market during the Class Period. *Halliburton II*, 573 U.S. at 277-78; *Merck*, 2013 WL 396117, at *12.

Lead Plaintiff amply demonstrates these requirements. All of the alleged misstatements were publicly available; indeed, many were made in Endo's SEC filings. Additionally, Endo ordinary shares traded in an efficient market, as explained below. There is also no question that Lead Plaintiff, and other Class members, purchased Endo ordinary shares at market prices after the misstatements were made and before the truth was revealed. (*See, e.g.*, ECF 62 at 118.) As a result, the fraud-on-the-market presumption applies.

Importantly, the Supreme Court has confirmed that the fraud-on-the-market presumption "does not rest on a 'binary' view of market efficiency," but instead is based on the "fairly modest premise that 'market professionals generally consider most publicly announced material

statements about companies, thereby affecting stock market prices.'"  *Halliburton II*, 573 U.S. at 272 (quoting *Basic*, 485 U.S. at 247 n.24).  Lead Plaintiff need only show that the stock traded in a "generally efficient market" at the class certification stage, *Halliburton II*, 573 U.S. at 279.[8]

Although the Third Circuit has not definitively established any test for determining market efficiency, courts in this Circuit regularly consider the exchange listing and the five factors first set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989).  *See, e.g.*, *DFC Glob. Corp.*, 2016 WL 4138613, at *12; *Prudential*, 2015 WL 5097883, at *6.  The five *Cammer* factors are:  (1) the weekly trading volume; (2) the amount of securities analyst coverage, (3) the existence of market makers and arbitrageurs; (4) the eligibility of the company to file a Form S-3 registration statement, and (5) the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the security's prices.  *See DVI II*, 639 F.3d at 633.  Courts in this Circuit also consider the three factors noted in *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001):  (1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders (the "float").  *See, e.g.*, *DVI II*, 639 F.3d at 633; *Prudential*, 2015 WL 5097883, at *6.

The first four *Cammer* factors "examine indirect indicia of market efficiency for a particular security," while the fifth ("*Cammer* 5") looks to direct evidence.  *Waggoner v. Barclays PLC*, 875 F.3d 79, 94 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1702 (2018).  However, no single factor is dispositive.  *See DFC Glob. Corp.*, 2016 WL 4138613, at *12 ("Courts have rejected the idea that the fifth *Cammer* factor is necessary to establish market efficiency.").  In all events, as

---

[8] Importantly, *Halliburton II* also held that "plaintiffs need not directly prove price impact to invoke the *Basic* presumption," 573 U.S. at 279; rather, "it is incumbent upon the defendant to show the absence of price impact."  *Id.* at 284 (Ginsburg, Breyer, and Sotomayor, JJ., concurring).  Defendants will be unable to do so here.

Dr. Nye establishes, ***all*** of these factors demonstrate that Endo ordinary shares traded in an efficient market during the Class Period.  (Nye Report ¶¶16-17, 23-57.)  Lead Plaintiff is thus entitled to invoke the fraud-on-the-market presumption.

### (1)     Endo Ordinary Shares Were Listed and Traded on the NASDAQ, a Presumptively Efficient Market

At all relevant times, Endo ordinary shares were listed and actively traded on the NASDAQ:  specifically, on the Nasdaq Global Select Market, which has the most stringent initial financial and liquidity listing requirements of the NASDAQ's three market tier designations.  (Nye Report ¶¶18-22.)  "[T]he listing of a security on a major exchange such as . . . the NASDAQ weighs in favor of a finding of market efficiency," *DVI II*, 639 F.3d at 634, and supports invoking the presumption of reliance.

### (2)     *Cammer* 1:  Endo Ordinary Shares Traded at a Large Average Weekly Volume

*Cammer* noted that an average weekly turnover "of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one."  711 F. Supp. at 1286; *see also In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 208 (E.D. Pa. 2008) ("*DVI I*") (high weekly trading volume supports a finding of market efficiency because "'many investors are executing trades on the basis of newly available or disseminated corporate information'") (quoting *Cammer*, 711 F. Supp. at 1286).  Endo's ordinary shares easily meet this standard, as their average weekly trading volume during the Class Period was 11.9%—more than five times higher than *Cammer*'s 2% threshold, indicating an efficient market.  (Nye Report ¶¶25-26.)  *See, e.g.*, *DVI I*, 249 F.R.D. at 209 (1.70% average weekly trading volume justified "at a minimum, a substantial presumption that the market for DVI's common stock was efficient"); *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 44 (S.D.N.Y. 2018) (2.5% average weekly trading volume justified "strong presumption of efficiency").

(3)     ***Cammer* 2:  A Significant Number of Analysts Followed and Reported on Endo Ordinary Shares**

Endo ordinary shares were the subject of broad analyst and news coverage during the Class Period.[9]  At least 44 analysts issued over 840 reports regarding Endo during the Class Period. (Nye Report ¶¶29-30.)  This factor strongly supports market efficiency.  *See, e.g.*, *Perrigo*, 333 F.R.D. at 82 (coverage in "over 600 analyst reports" favored efficiency); *DVI I*, 249 F.R.D. at 210 (coverage by three analysts "sufficient to favor a finding of market efficiency").

(4)     ***Cammer* 3:  Existence of Market Makers, Institutional Investors, and Arbitrageurs**

*Cammer* noted that the "existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."  711 F. Supp. at 1286–87.  This factor also strongly supports market efficiency.

As stated above, Endo ordinary shares traded on the NASDAQ, which is widely regarded as one of the most open, developed, and efficient exchanges in the world.  NASDAQ market participants are made up of "market makers, order-entry firms and electronic communications networks (ECNs) that utilize NASDAQ's trading services."  (Nye Report ¶34.)  Market makers help to ensure a liquid market for a particular stock, in which willing buyers can readily find willing sellers, and vice versa.  (*Id.*)  During the Class Period, there were 199 active market makers that

---

[9] As *Cammer* explained, "it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period.  The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.  In this way the market price of the stock would be bid up or down to reflect the financial information contained in the [auditor] reports, as interpreted by the securities analysts."  711 F. Supp. at 1286.

traded Endo stock, many of which handled a sizeable volume of shares.  (*Id.* ¶35.)  *See Perrigo*, 333 F.R.D. at 83-84 ("at least seventeen market makers" favored efficiency).

Additionally, institutional investors (defined as all SEC Form 13-F filers) held significant positions in Endo ordinary shares during the Class Period.  Institutions held over 92% of the Endo ordinary shares outstanding during the Class Period.  (Nye Report ¶40 & Ex. 9.)  This supports a finding of market efficiency because the participation of sophisticated investors facilitates the incorporation of material information into securities prices.  *See, e.g.*, *Wilson v. LSB Indus., Inc.*, No. 15CIV7614RAGWG, 2018 WL 3913115, at *12 (S.D.N.Y. Aug. 13, 2018) (noting "large number of institutional investors").

(5)     *Cammer* 4:  Eligibility to File SEC Form S-3

Endo filed simplified SEC filings on Form S-3 before, during, and after the Class Period. (Nye Report ¶46.)  This factor supports market efficiency because companies are only permitted to make such simplified filings if the SEC believes "that the market operates efficiently for these companies."  *Cammer*, 711 F. Supp. at 1284 (quoting SEC Securities Act Release No. 6331 (Aug. 13, 1981)); *see also Perrigo*, 333 F.R.D. at 83 (Form S-3 filing shortly before class period supported efficiency); *In re Merck & Co., Vytorin/Zetia Sec. Litig.*, 2012 WL 4482041, at *5 (D.N.J. Sep. 25, 2012) (Form S-3 eligibility during class period supported efficiency).

(6)     *Cammer* 5:  The Relationship Between News Events and
         Security Price Changes

*Cammer* noted that "one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between the company disclosures and resulting movements in stock price."  711 F. Supp. at 1291.  Though "[c]ourts have rejected the idea that the fifth *Cammer* factor is necessary to establish market efficiency," *DFC Glob.*

*Corp.*, 2016 WL 4138613, at *12, Lead Plaintiff nonetheless provides far more than necessary support here.[10]

Specifically, to further substantiate market efficiency, Lead Plaintiff provides Dr. Nye's event study as a means to establish the cause and effect relationship between the company disclosures and resulting movements in stock price, more than satisfying *Cammer* 5.  Event studies seek "to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events."  *Halliburton II*, 573 U.S. at 280.  An event study "is a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price."  *United States v. Schiff*, 602 F.3d 152, 173 n.29 (3d Cir. 2010).  "[T]here is no dispute that [an event study] is widely accepted in the academic community and in the courts" to prove the cause-and-effect relationship contemplated by *Cammer*.  *Prudential*, 2015 WL 5097883, at *6.

Dr. Nye conducted an event study using a widely accepted methodology and concluded that the price of Endo ordinary shares reflected the information disclosed to the market, and promptly responded to the disclosure of new, material, unexpected information.[11]  (Nye Report ¶¶49, 51.)  Specifically, Dr. Nye examined dates during the Class Period on which Endo released quarterly or year-end financial results (*id.* ¶50), an objective set of events routinely used for this purpose.  *See, e.g.*, *Perrigo*, 333 F.R.D. at 84 (event study used dates of earnings-related

---

[10] *See also Waggoner*, 875 F.3d at 96-98 ("direct evidence of price impact under *Cammer* 5," such as an event study, "is not always necessary to establish market efficiency and invoke the *Basic* presumption").

[11] Among the decisions recognizing Dr. Nye's opinions as evidence for market efficiency are *Heckmann Corp.*, 2013 WL 2456104, at *13; *Hayes v. MagnaChip Semiconductor Corp.*, No. 14-cv-01160-JST, 2016 WL 7406418, at *7 n.3 (N.D. Cal. Dec. 22, 2016) (noting that "Nye faithfully followed the Cammer factors"); and *In re Banc of Cal. Sec. Litig.*, 326 F.R.D. 640, 648 (C.D. Cal. 2018) (describing Dr. Nye's report as "key evidence").

announcements); *Prudential*, 2015 WL 5097883, at *7 (event study examined dates of "earnings announcements or changes in earnings guidance").

This event study revealed that Endo ordinary shares reacted with statistical significance at the 5% significance level (sometimes called the 95% confidence level) on 62.5% of the eight days during the Class Period in which earnings were announced.[12]  (Nye Report ¶51 & Ex. 12 at 1.)  By comparison, statistically significant price reactions (at the same significance level) occurred on just 7.9% of days without such announcements.  (*Id.* n.85 & Ex. 11.)  "In other words, there were more likely to be big price movements on days when important [Endo] events occurred," demonstrating that the "markets in [these] securities were responsive to new information."  *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 367-68 (S.D.N.Y. 2016), *aff'd in part, vacated in part sub nom. In re Petrobras Sec.*, 862 F.3d 250 (2d Cir. 2017).

In addition, even though Lead Plaintiff is not required to show directionality—that the price of Endo ordinary shares increased with new, material Company-specific positive information and decreased with new, material Company-specific negative information—Dr. Nye's event study confirms that directionality further supports efficiency here.  *See Petrobras*, 862 F.3d at 278-79 ("[There is no] blanket rule requiring district courts to, at the class certification stage, rely on directional event studies and directional event studies alone.").  Specifically, event dates on which predominantly positive new Company-specific news reached the market are associated with statistically significant positive returns, and event dates on which predominantly negative new Company-specific news reached the market are associated with statistically significant negative

---

[12] Courts have also rejected the argument that price reactions on any particular percentage of news days are required.  *See Carpenters Pension Trust Fund of St. Louis v. Barclays*, 310 F.R.D. 69, 82-86 (S.D.N.Y. 2015) (finding market efficiency based on price reaction on 5 of 15 event days, but noting that the court would have found efficiency regardless of *Cammer* 5).

returns.  (Nye Report ¶52.)  On event days that are associated with a statistically insignificant Company-specific return, Endo's disclosures were generally in line with expectations, and/or conveyed a mix of offsetting new positive and negative information, such that the insignificant price reaction is consistent with that expected in an efficient market.  (*Id.*)

(7)     **Additional *Krogman* Factors Further Establish Market Efficiency**

Each of the three *Krogman* factors also strongly supports efficiency.

*First*, "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."  *DVI I*, 249 F.R.D. at 212 (quoting *Krogman*, 202 F.R.D. at 478).  During the Class Period, the market capitalization of Endo ordinary shares was always over $2.6 billion and up to $18.24 billion.  (Nye Report ¶54.)  As of the end of the Class Period, Endo's market capitalization was greater than 85.9% of NASDAQ-listed companies and 51.0% of NYSE-listed companies.  (*Id.* ¶55.)  Numerous courts have found similar or even far lower market capitalization levels to support market efficiency.  *See, e.g.*, *DVI I*, 249 F.R.D. at 212 (market capitalization from "$300 million to $12 million" indicative of efficiency).

*Second*, the narrow bid-ask spreads for Endo ordinary shares also support efficiency.  "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."  *Krogman*, 202 F.R.D. at 478.  During the Class Period, the average daily bid-ask spread on Endo ordinary shares was about 0.04%, smaller than the 0.20% average for randomly sampled stocks listed on the NASDAQ Global Select Market.  (Nye Report ¶41.)  These narrow bid-ask spreads compare favorably to the spreads in other cases finding market efficiency.  *See, e.g.*, *Wilson*, 2018 WL 3913115, at *15 ("relatively narrow" bid-ask spread of 0.07% weighed in

21

favor of efficiency); *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 619 (C.D. Cal. 2009) (bid-ask spread of 0.51%).

*Third*, when evaluating efficiency, "courts also consider the percentage of shares held by the public, rather than insiders," known as the float. *Krogman*, 202 F.R.D. at 478.  A larger float may be an indicator of market efficiency.  (Nye Report ¶57.)  During the Class Period, the float for Endo ordinary shares averaged 99.5% of the ordinary shares outstanding.  (*Id.*)  The large percentage of Endo ordinary shares in the float supports market efficiency.  *See, e.g.*, *Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 54 (S.D.N.Y. 2019) (market float of between 65% and 95%); *Wilson*, 2018 WL 3913115, at *15 (average public float of 82.41% "exceeds amounts other courts have deemed sufficient to suggest a finding of market efficiency").

### b. Individual Damages Calculations Will Not Defeat Predominance

The "law in the Third Circuit" is that "the need to perform individual damages calculations does not foreclose class certification under Rule 23(b)(3)."  *DFC Glob. Corp.*, 2016 WL 4138613, at *14 (citing *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 374 (3d Cir. 2015)).  Thus, Lead Plaintiff is not required to prove at class certification that damages can be calculated Class-wide. *See Prudential*, 2015 WL 5097883, at *13.   Nonetheless, as in most securities class actions, damages here can "be determined by a formula or other means," and the "mere fact that individual members of the class may be entitled to different amounts of money damages does not mean that individual questions predominate."  *CIGNA*, 2006 WL 2433779, at *5.

Dr. Nye's report demonstrates that per-share damages can be determined on a Class-wide basis by (1) using an event study to isolate Company-specific price movement caused by the revelation of true facts related to the alleged fraud from price movement caused by other factors, (2) estimating the price inflation due to the alleged fraud for each day during the Class Period, and

(3) mechanically calculating damages on an individual basis based on each Class member's trading activity. (Nye Report ¶¶59-62.)  That is more than sufficient at this stage.  *See, e.g.*, *Novo Nordisk*, 2020 WL 502176, at *9 (certifying class and noting that the court "need not assess the validity of Plaintiffs' damages model at this stage"); *Perrigo*, 333 F.R.D. at 87 (same).

### 2.    A Class Action Is Superior

Finally, Rule 23's "superiority" requirement is met when a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Rule 23(b)(3) provides four factors to guide the analysis:  (a) the class members' interests in individually controlling the prosecution of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by or against class members; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (d) the likely difficulties in managing a class action.  "[C]lass actions are appropriate in securities cases where a significant number of investors with relatively small losses would likely have decreased motivation to pursue their claims individually."  *Novo Nordisk*, 2020 WL 502176, at *6 (citing *Krangel v. Golden Rule Res., Ltd.*, 194 F.R.D. 501, 506 (E.D. Pa. 2000)).

Each factor demonstrates the superiority of a class action here.  The Class consists of a large number of investors who are "geographically dispersed and whose individual damages may well be small enough to render individual litigation prohibitively expensive."  *Merck/Vytorin*, 2012 WL 4482041, at *8.  Concentrating the litigation in this Court has a number of benefits, including eliminating the risk of inconsistent adjudication.  And federal securities class actions are routinely certified and raise no unusual manageability issues; this case is no different.  *See CIGNA*, 2006 WL 2433779, at *5 (superiority satisfied given "burden of litigating potentially thousands of individual lawsuits" arising "out of the same set of operative facts," "need for efficient use of judicial resources," and fact that "prohibitive expense of maintaining individual actions would

likely prevent many individuals from asserting their claims against the Defendants—a clear departure from the underlying rationale and operation of the federal securities laws").

## CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court: (1) certify this Action as a class action pursuant to Rule 23(a) and (b)(3); (2) appoint Lead Plaintiff as Class Representative pursuant to Rule 23(a) and (b)(3); and (3) pursuant to Rule 23(g), appoint BFA as Class Counsel, with Elliott Greenleaf, P.C. as Class Liaison Counsel.

**DATED: June 26, 2020**                     Respectfully submitted,

**ELLIOTT GREENLEAF, P.C.**                  **BLEICHMAR FONTI & AULD LLP**


 /s/ John M. Elliott                          /s/ Joseph A. Fonti
John M. Elliott                              Joseph A. Fonti (admitted *pro hac vice*)
Thomas J. Elliott                            Javier Bleichmar (admitted *pro hac vice*)
Timothy T. Myers                             Evan A. Kubota (admitted *pro hac vice*)
925 Harvest Drive, Suite 300                 Benjamin F. Burry (admitted *pro hac vice*)
Blue Bell, PA 19422                          Thayne Stoddard (*pro hac vice* pending)
Telephone: (215) 977-1000                    7 Times Square, 27th Floor
Facsimile: (215) 977-1099                    New York, NY 10036
jme@elliottgreenleaf.com                     Telephone: (212) 789-1340
tje@elliottgreenleaf.com                     Facsimile: (212) 205-3960
ttm@elliottgreenleaf.com                     jfonti@bfalaw.com
                                             jbleichmar@bfalaw.com
*Co-Counsel for the Park Employees' and*     ekubota@bfalaw.com
*Retirement Board Employees' Annuity and*    bburry@bfalaw.com
*Benefit Fund of Chicago*                    tstoddard@bfalaw.com

                                             *Co-Counsel for the Park Employees' and*
                                             *Retirement Board Employees' Annuity and*
                                             *Benefit Fund of Chicago and*
                                             *Lead Counsel For The Class*


                                             **KEHOE LAW FIRM, P.C.**
                                             John A. Kehoe (*pro hac vice* to be submitted)
                                             Two Penn Center Plaza
                                             1500 JFK Boulevard, Suite 1020
                                             Philadelphia, PA 19012

Telephone: (215) 792-6676
jkehoe@kehoelawfirm.com

*Additional Counsel for the Park Employees'
and Retirement Board Employees' Annuity and
Benefit Fund of Chicago*

25