UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALEXANDRE PELLETIER, Individually and On Behalf of All Others Similarly Situated,<br><br>         Plaintiff,<br><br>- v. –<br><br>ENDO INTERNATIONAL PLC, RAJIV KANISHKA LIYANAARCHCHIE DE SILVA, SUKETU P. UPADHYAY, AND PAUL V. CAMPANELLI<br><br>         Defendants. | No. 2:17-cv-05114-MMB<br><br><u>CLASS ACTION</u><br><br>PUBLIC REDACTED VERSION |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION FOR LEAVE TO FILE SUR-REPLY REGARDING CLASS CERTIFICATION**

  Unable to rebut Lead Plaintiff's overwhelming showing that all of Rule 23's requirements are met, Defendants seek leave to file a sur-reply that asks the Court to "disregard" three partially corrective disclosure dates (February 29, May 5, and November 8, 2016) "in assessing Lead Plaintiff's motion for class certification."[1] (ECF 163-1 at 10.)

  Having ignored these disclosures in their opposition and lacking any substantive rejoinder to Lead Plaintiff's reply, Defendants now wrongly seek to preclude the Court from considering the indisputable facts, pretending they do not exist. Defendants' proposed sur-reply is improper and should be denied for at least three reasons:

---

[1] Capitalized terms not defined herein have the meanings specified in the Complaint (ECF 62) or the Reply in Further Support of Plaintiff's Motion for Class Certification. Citations omitted and emphasis added unless otherwise noted.

First, these dates are not "new"; rather, they are quarterly earnings disclosures that were alleged *more than two years ago* in the Complaint.  Second, with respect to class certification, these three dates (among others) were explicitly and prominently analyzed by Lead Plaintiff's expert for purposes of market efficiency, which Defendants *do not dispute*.  Third, it is Defendants' own specious argument in opposition to class certification that has cast these disclosures into the spotlight.  These event dates directly defeat Defendants' argument that their misrepresentations had a complete absence of "price impact" (*i.e.*, did not affect the trading price of Endo securities). (ECF 152 at 20-26.)  Moreover, as to damages—a Class-wide merits issue that, under Supreme Court authority, cannot be addressed at class certification—both Lead Plaintiff's and Defendants' experts *agree* that these disclosures must be assessed at the appropriate time during expert discovery.

In addition, Defendants' clumsy effort to mischaracterize Lead Plaintiff's reply as an "amendment" to the Complaint is meritless.  Although Defendants chose to ignore them until now, the February 29, May 5, and November 8, 2016 partially corrective disclosures have always been alleged, and no "amendment" is required.  Nor is there any merit to Defendants' claim that the Class definition is somehow altered by Lead Plaintiff's reply.  The definition is simple and remains unchanged:  those who purchased Endo stock during the Class Period and who were damaged.

Finally, Defendants will not suffer any "prejudice," as they were fully aware of these dates before opposing Lead Plaintiff's class certification motion and will have a full opportunity to litigate the impact of these dates on loss causation and damages as part of the next *five months* of merits discovery.  Defendants' motion should be denied in its entirety.

**ARGUMENT**

I. **THE COURT SHOULD DENY DEFENDANTS' BELATED MOTION AND STRIKE DEFENDANTS' SUR-REPLY**

    A.    <u>The Disclosures Are Not "New," and Defendants' Sur-Reply Is Baseless</u>

To begin, Defendants' sur-reply blatantly violates this Court's Pretrial and Trial Procedures (Section C.2), which provide that sur-replies "should only be requested if the moving party has asserted new arguments or citations in its reply brief." Defendants have long known the 2016 disclosures were at issue, and for this reason alone, their sur-reply should be rejected.[2]

**The Disclosures Were Alleged as Partially Corrective in the Complaint:** The Complaint—filed over two years ago—alleges that the Connecticut Attorney General's subpoena and interrogatories served on Endo in December 2015 marked the "beginning of the end for Defendants' scheme." (¶13.) As the scheme unraveled, Endo experienced a "precipitous decline" in Inflated Profits, a "trend" that "only accelerated into 2016." (¶85.) Endo's quarterly earnings, starting with the February 29, 2016 disclosure, thus began to reveal the "reality [that] because Defendants were no longer able to implement anticompetitive price hikes or sustain profits from the thirteen Inflated Drugs, Endo's financial condition was materially deteriorating." (¶79.)

Specifically, a heading on page 21 explains: "**First Half 2016: Endo's Financial Performance Starts To Suffer, Defendants Conceal History Of Anticompetitive Practices**." The Complaint then alleges that on February 29, 2016, although Defendants began to "warn" investors of various risks, they misrepresented the reasons and causes for those risks (¶¶69-71):

---

[2] If anything, it is Defendants' Motion for Leave that is an "eleventh hour" "new theory of liability" as described in the lead case they cite, *Carr v. Gillis Associated Indus., Inc.*, 227 F. App'x 172, 176 (3d Cir. 2007). *Carr* was a product liability case in which the plaintiff asserted a new theory of failure to warn at summary judgment, after the close of discovery. It has no application to class certification, particularly in this action, where Lead Plaintiff has always asserted a single theory of liability. (ECF 152 at 16-18.)

3

> Notably, *for the first time,* Defendants warned investors that Endo "may" face pricing pressure, but claimed the risk was "due to social or political pressure" and "increased public and governmental scrutiny of the cost of drugs." . . . This supposed risk warning … at best, [was] a *fraudulent half-truth*…. Endo already faced "pricing pressure" because, with the ongoing investigations, they *could no longer make new anticompetitive price hikes, and it was increasingly difficult to maintain the 13 already made*. What Defendants purportedly warned about was already a reality.

As to May 5, 2016, the Complaint similarly describes Defendants' false explanations for Endo's increasingly poor financial results (¶¶74-75):

> On May 5, 2016, Endo *announced disappointing financial results for its generics business* for Q1 2016. Defendants explained that price "erosion [was] significantly deeper than we expected … driven by continued pricing and competitive pressures" on Endo's legacy generic drug portfolio. Defendants, however, continued to mislead investors, providing false explanations for the generics results…. In other words, pricing pressure was not a result of normal market competitive forces, *but rather the result of the unraveling of Defendants' ability to continue the scheme*.

On November 8 Endo's financial free-fall from the unraveling of the scheme continued (¶83):

> [O]n November 8, 2016 and in connection with the Company's Q3 2016 financial results, Endo reported that *revenues from its legacy generics business were down a staggering 20%* compared to Q2 2016.

These are classic allegations that "the materialization of an undisclosed risk caused the alleged loss," *McCabe v. Ernst & Young*, 494 F.3d 418, 429 (3d Cir. 2006), as well as partially corrective disclosures. *See In re Cigna Corp. Sec. Litig.*, 459 F. Supp. 2d 338, 349 n.22 (E.D. Pa. 2006) (recognizing both "corrective events [and] disclosures" and "materialization[s] of the concealed risk"). Nonetheless, Defendants completely ignore these many allegations under the Complaint's heading of "Substantive Allegations," choosing instead to focus only on the "False and Misleading Statements" section of the Complaint, which is solely for pleading purposes of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").[3] Defendants' cherry-

---

[3] Setting aside their disregard of the Complaint's allegations, Defendants cannot dispute that by January 2019 they were on notice that these disclosures give rise to damages. Moreover, in February 2020,

4

picking fails because the Complaint "must [be] consider[ed] in its entirety." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

**The Dates Are Squarely at Issue at Class Certification:** Defendants had ample notice of all three corrective disclosures yet again on June 26, 2020. Defendants' claims that Lead Plaintiff did not mention these events "at all," and that its expert Dr. Nye "did no analysis of those dates," are false. (ECF 163-1 at 4.) Dr. Nye's opening report explicitly analyzed Endo-specific price declines on **all three dates** (ECF 116-5 at page 164 of 403 (reproduced below)) because they were among the dates on which Endo announced earnings during the Class Period:

**Summary of Endo Stock Price Reaction on Event Dates**

| Event Date | Event | Impact Date | Actual Return | Residual Return | Confidence Level |
|---|---|---|---|---|---|
| 3/2/2015 | Fourth-Quarter/Full-Year 2014 Earnings Results | 3/2/2015 | 2.01% | 1.29% | 66.3% |
| 5/11/2015 | First-Quarter 2015 Earnings Results | 5/11/2015 | -0.44% | -0.14% | 8.7% |
| 8/10/2015 | Second-Quarter 2015 Earnings Results | 8/10/2015 | 0.51% | -0.64% | 37.6% |
| 11/5/2015 | Third-Quarter 2015 Earnings Results | 11/5/2015 | -14.53% | -12.91% | 100.0% *** |
| 2/29/2016 | Fourth-Quarter/Full-Year 2015 Earnings Results | 2/29/2016 | -21.02% | -18.49% | 100.0% *** |
| 5/5/2016 | First-Quarter 2016 Earnings Results | 5/6/2016 | -39.19% | -37.37% | 100.0% *** |
| 8/8/2016 | Second-Quarter 2016 Earnings Results | 8/9/2016 | 21.83% | 21.75% | 100.0% *** |
| 11/8/2016 | Third-Quarter 2016 Earnings Results | 11/8/2016 | -7.46% | -7.63% | 98.1% ** |

"***" and "**" indicates statistical significance at the 99% and 95% confidence level, respectively.

Dr. Nye's opening report also extensively reviewed analyst reports for **all three dates**, spanning over **100 pages** of text (*id.* at pages 271-337, 364-400 of 403).

---

Lead Plaintiff served document requests targeting these very dates and "the trading prices of Endo Securities as they related to the announcements and thereafter." (Ex. 1 (RFPs 31 and 33).)

Moreover, at his deposition on July 27, 2020, Dr. Nye testified extensively about all three disclosures, and the related concepts of partial corrective disclosures and leakage.  For example:

- **February 29, 2016:**

    Q. Would you consider as part of that potential analysis the disclosures that happened on *February 29, 2016* as potentially loss-causing elements?

    A: …depending on what plaintiffs can demonstrate and allege and prove, and whether a causal connection can be established [] I would consider [] that date, if it's relevant.  (Ex. 2 at 217:5-14.)

- **May 5, 2016:**

    Q. And is that the same with respect to the *May 5, 2016* disclosure, that you would assess it if it was relevant?

    A:  Yes.  (Ex. 2 at 217:15-19.)

- **November 8, 2016:**

    Q. Would the *November 8th, 2016* disclosure also be an event that you would consider if you were to formulate any opinions on loss causation?

    A: It could be, certainly. It's consistent, I think, with – and that date, in *my event study is quite clear* that the negative information that was associated with the statistically significant negative price decline on that day was due to the generics division performance and the worse-than expectations. And *it's described here in the Complaint in the section that says The Truth Leaks Out.*  So I think it is something to consider.  (Ex. 2 at 198:17-199:5.)

    Q. And you concluded that the stock price movement was statistically significant on that day, *November 8th, 2016*, right?

    A: Right. As shown on page 1 of Exhibit 12 to my report, it was statistically significant at the 98.1 percent confidence level. . . .

    Q. And it's your conclusion that the information released to the market on *November 8th, 2016* caused that stock price movement, correct?

    A: [M]y analysis was of the total mix of information disclosed in the press release on November 8th, 2016 as well as all of the analyst reactions and the media reaction, and

that the ***price reaction was consistent with the value implications of the information*** and how it was received by the market. (Ex. 2 at 87:4-88:5.)[4]

**Partial Corrective Disclosures and Leakage:** Dr. Nye further testified that the relevant truth potentially "leaked" out over partial corrective events, including the three dates at issue. He clearly explained that the truth can leak into the market when, as the "underlying conduct ceases occurring from behind the scenes, the financial performance of the company undoubtedly suffers and you see a sequence of adverse or negative financial developments as those inflated revenues and profits go away upon the resumption of normal market conditions." (Ex. 2 at 195:9-196:24.)

> Q. Do you understand that plaintiffs allege in the Complaint that the November 8th, 2016 earnings announcement was also a false statement?
>
> A: That's my understanding of the Complaint.
>
> Q. And in your understanding as an expert on market efficiency and at times loss causation, ***have you had experience of seeing dates that contain both false and misleading statements and some revelation of the truth?***
>
> A: ***Yes, many times.*** (Ex. 2 at 208:3-15; *see also id.* at 208:20-210:3 (explaining that a "partial corrective event" can occur when a company experiences "poor performance and lower guidance," such that "***the foreseeable consequences***" are "unraveling," but the defendants "attribute[] the decline to reasons other than the alleged misstatements and omissions," and "the price inflation persist[s] for some time until the full and relevant truth reache[s] the market").)[5]

---

[4] *See also* Ex. 2 at 100:13-101:5, 107:17-108:6 (questioning by Defendants' counsel about February 29 and May 5).

[5] *Mass Probiotics, Inc. v. Aseptic Tech., LLC*, No. SA CV 16-1394-DOC (GJSx), 2017 WL 10621233, at *4 (C.D. Cal. Dec. 21, 2017), cited in Defendants' proposed sur-reply (ECF 163-1 at 9 n.2), in no way undermines Defendants' clear notice. In *Mass Probiotics*, the plaintiff supplemented its initial disclosures "less than three months from trial, on the date that discovery closed," to increase its claim from $350,000 to $12 million based on "five entirely new categories of damages." The court rejected the plaintiff's argument that the defendant was on notice because it "asked brief questions" about certain topics during a deposition and "fail[ed] to ask additional questions" to follow up. *Id.* at *5. Here, no new theories have been asserted, Dr. Nye's opening report specifically analyzed the three dates, he testified about them at length well before the close of discovery, and merits discovery will continue for five months.

Indeed, Defendants' class certification expert Dr. Skinner expressly stated in his August 17, 2020 report that "price erosion in Endo's generics base was part of a continued trend that had begun in late 2015, and **price erosion due to pricing and competitive pressures was discussed in Endo's earnings release throughout 2016**," specifically citing the February 29 and May 5 disclosures. (ECF 133-6 ¶39.) He then testified extensively about each of the February 29, May 5, and November 8, 2016 dates, and further admitted ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 3 at 69:16-20; 78:24-90:9; 103:24-108:10.)

Defendants thus have long been fully aware of these dates, could have addressed them in their opposition brief to class certification, and are not entitled to a sur-reply to address long-standing facts or arguments. *See Life Celebration, Inc. v. Xerox Corp.*, 2020 WL 5096945, at *1 n.1 (E.D. Pa. Aug. 28, 2020) (striking sur-reply submitted "late" without "any legitimate reason," and that purported to "correct a consequential factual inaccuracy" raised before reply brief).[6]

### B.    The Corrective Dates Are Properly Considered at Class Certification

Not only have the three corrective dates been in play from inception, but Lead Plaintiff's reply brief properly discussed these dates in connection with class certification.

#### 1.    Defendants' Own "Price Impact" Argument Put These Dates at Issue

Defendants' own argument against class certification put these corrective dates squarely in the spotlight, belying Defendants' claim that Lead Plaintiff made a "tactical about-face."

As the Court will recall, Lead Plaintiff's opening brief demonstrated that Endo securities trade in an efficient market, establishing the fraud-on-the-market presumption of reliance and

---

[6] For the same reason, Defendants' footnoted request to "strike" all or part of Dr. Nye's reply report fails. Again, Dr. Nye testified at length about the dates **three weeks before** Defendants' opposition to class certification. It is highly improper, and reflects sheer desperation, for Defendants to abuse a discretionary sur-reply as a motion in limine by seeking to preclude an expert report in a footnote.

confirming that common issues predominate under Rule 23(b)(3). Defendants' opposition *did not dispute market efficiency*, but instead attempted to rebut the fraud-on-the-market presumption by arguing that Defendants' fraudulent misstatements did not affect the price of Endo securities. That argument requires Defendants to *prove a complete absence* of "price impact" by assessing *all* potential disclosures of new, relevant information, as Defendants' expert Dr. Skinner agreed. (Ex. 3 at 70:18-24.)

However, Defendants did not, and cannot, meet their burden. Instead, they made a strategic decision to ignore the Complaint's allegations, Lead Plaintiff's discovery requests, and the extensive expert reports and testimony to present a misleading, incomplete "price impact" argument focused solely on *one* corrective date, February 28, 2017. On reply, Lead Plaintiff thoroughly defeated Defendants' argument, demonstrating (among other things) that the partially corrective dates of February 29, May 5, and November 8, 2016 confirmed significant price impact. (*See* ECF 152 at 20-26; ECF 152-1 ¶¶19-27, 46 (Nye Reply Report).)

Tellingly, Defendants still do not dispute market efficiency, and offer no substantive response as to the dates themselves; there is no question that they support efficiency and confirm price impact here. Defendants' dissatisfaction with that result does not warrant a sur-reply.

**2.     The Three Corrective Dates Do Not Redefine the Class**

Defendants' *only* argument directed to class certification is that the 2016 corrective dates would somehow redefine the Class to add "new members."

But Defendants are simply wrong, and their suggestion that the class definition has somehow changed makes no sense: Paragraph 270 of the Complaint could not be more clear in defining the Class as including investors who purchased during the Class Period (March 2, 2015 through February 27, 2017) and were "damaged thereby" (¶270). That definition is not confined to specific corrective disclosures and remains fully applicable. Instead, as the Third Circuit has

9

recognized, who is "damaged" is a Class-wide merits issue. *See In re DVI, Inc. Sec. Litig.*, 249 F.R.D. 196, 219 (E.D. Pa. 2008) ("*DVI I*") (limiting the class "to only those who can show damages" but refusing to impose further limitations at class certification because "the existence of loss causation is a factual question"), *aff'd*, 639 F.3d 623 (3d Cir. 2011) ("*DVI II*").

Indeed, Defendants' effort to preclude the Court's consideration of the 2016 disclosures at class certification boils down to a dispute about when is the "earliest date a corrective disclosure occurred"; but the Third Circuit has held this question "***does not implicate predominance*** because it would be made using evidence common to the class." *DVI II*, 639 F.3d at 639-40. In other words, determining the earliest corrective date is a Class-wide issue that is not properly addressed at class certification. Similarly, to the extent Defendants seek to dispute the ***cause*** of Class members' damages, that is another Class-wide issue unrelated to Rule 23. As the Supreme Court has made clear, such merits arguments about loss causation and materiality ***may only be taken up later***—and may not be considered at class certification. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812 (2011) ("*Halliburton I*") (loss causation may not be considered at class certification); *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) (materiality not required at class certification).

### 3. Defendants' Remaining Arguments Fail

Defendants make three additional arguments, which should all be disregarded by the Court because they are (i) unrelated to class certification and (ii) substantively wrong.

#### (a) Partially Corrective Events Are Entirely Appropriate

First, Defendants claim—citing nothing—that the 2016 disclosures cannot be corrective because Lead Plaintiff *also* alleges false and misleading statements on those dates in the section

10

of the Complaint titled "Defendants' Actionable False and Misleading Statements and Omissions," at ¶¶186-220.[7]  (*See* ECF 163-1 at 1-2, 4.)

Defendants' argument rests on the false premise that statements must be *either* actionable or corrective.  However, the Supreme Court, Third Circuit, and courts in this District have long held otherwise, expressly confirming that the truth can "*leak out*" through a series of *partial* corrective disclosures, as alleged here.  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *Semerenko v. Cendant*, 223 F.3d 165, 181-82 (3d Cir. 2000) (disclosure of accounting irregularities itself "misrepresented [defendant's] financial condition" and was both corrective *and* actionable); *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 655–56 (E.D. Pa. 2015) ("the exposure of the alleged fraud need not occur in a single, all-encompassing corrective disclosure; instead, the truth can be revealed through a series of partial corrective disclosures.") (quotation marks omitted); *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *23 (E.D. Pa. Sept. 3, 2010) (same) (citing *Dura*); *DVI I*, 249 F.R.D. at 203 ("Various additional aspects of the fraud were partially disclosed in the months thereafter, on seven different occasions . . . .").  There is nothing new or surprising about this long-established principle.

### (b)   The Complaint's "Loss Causation" Section Is Not Required to Catalog All Corrective Events Before Discovery

Second, Defendants complain—again citing nothing—that the 2016 dates cannot be corrective because they are not repeated in the "Loss Causation" section of the Complaint.

---

[7] Defendants' comment that the Court noted these paragraphs in denying their motion to dismiss misses the mark.  The separate section for the challenged misstatements and omissions conforms with the PSLRA and Rule 9(b) pleading standards, which require plaintiffs to set out *each* false and misleading statement separately in the pleading.  Defendants ignore that many of those same statements are alleged under Rule 8 as partially corrective elsewhere in the Complaint, as explained in detail above.

11

That is simply wrong.  Defendants ignore the settled law that complaints need not catalog all corrective disclosures.  *See In re Tyco Int'l, Ltd.*, 236 F.R.D. 62, 71 (D.N.H. 2006) (that plaintiffs "specifically identified certain corrective disclosures in the complaint ***does not preclude them from later identifying additional disclosures***").  Indeed, while the inclusion of a separate "Loss Causation" section is a pleading convention, it is not a statutory requirement under the PSLRA, the Federal Rules or case law; that section need not contain an exhaustive catalog of every potential corrective date that may be proven after discovery.

Confirming the point, the Supreme Court's seminal decision in *Dura* applied Rule 8 (not Rule 9(b)'s particularity requirement) to loss causation allegations, and requires pleading only "some indication" of the causal connection and loss, 544 U.S. at 347.  Here, the "Loss Causation" section served its purpose by giving Defendants ample notice of Lead Plaintiff's allegations.  It makes clear that "negative events and disclosures" revealed the truth "on a ***piecemeal basis***," "[b]eginning ***no later than*** November 2016," ¶259, as Dr. Nye noted.  (Ex. 2 at 194:19-195:4.)

Defendants' conflation of pleading and proof is particularly inappropriate because Rule 23 required Lead Plaintiff to move for class certification at an "early practicable time," well before the end of merits discovery.  Here, the motion was made ***over one year*** from the July 2021 trial ready date.  Recognizing that class certification is not the proper time to adjudicate fact-intensive merits issues, courts hold that the existence of additional corrective disclosure dates is a ***"factual determination" that "cannot properly" be made at class certification***.  *DVI I*, 249 F.R.D. at 219.

Here, as in any litigation, the facts and arguments will continue to develop as the case proceeds through discovery, the exchange of merits expert reports, summary judgment motions, and preparation for trial.  And while the full range of corrective disclosures ultimately depends on the actual proof, Defendants' documents—produced after Lead Plaintiff moved for class

certification—confirm that, as already alleged, the collapse of Defendants' scheme materially drove Endo's poor financial performance reported on all three 2016 disclosure dates. Lead Plaintiff will continue to develop these facts.

### (c) There Is No Need to Amend the Complaint

Third, Defendants argue that Lead Plaintiff cannot "amend" the Complaint or "add new corrective disclosures" in its reply brief.

To be clear, Lead Plaintiff has not sought to amend the Complaint, and no "amendment" is required. As explained above, the three 2016 dates have *always* been alleged to partially reveal aspects of the fraud, while containing further misstatements and continuing to conceal portions of the relevant truth. Such partial corrective disclosures are entirely consistent with the Supreme Court's recognition in *Dura*, 544 U.S. at 342, that the truth can "leak out" over time. [8]

### C. There Is No "Prejudice" to Defendants

The above demonstrates that Defendants' claim of "prejudice" rings hollow.

As to class certification, Defendants were fully apprised of these disclosures months before their August 17 opposition brief, as explained above. Indeed, their expert Dr. Skinner admittedly



. (Ex. 3 at 12:16-21 ("▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉."); 79:8-14 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉; 81:4-10 (▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉); 88:19-89:10 (▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

---

[8] In any event, even if a plaintiff were to identify wholly new corrective disclosures, the Federal Rules readily allow amendment; Rule 15 recognizes that leave to amend should be "freely give[n]," Fed. R. Civ. P. 15(a)(2), "freely permitt[ed]" at trial, Fed. R. Civ. P. 15(b)(1), and allowed "even after judgment" to "conform [pleadings] to the evidence and to raise an unpleaded issue," Fed. R. Civ. P. 15(b)(2). Here, these disclosures have been pled and are the subject of discovery.

██████████ ); 78:6-10, 108:5-19 (██████████████████████████████████ ).)

That is simply a voluntary strategic choice by Defendants' counsel—the opposite of prejudice.

Nor have Defendants suffered any "prejudice" as to the merits. Their sur-reply itself confirms that they are fully on notice of the 2016 corrective dates. Defendants have ample time to address merits issues related to loss causation and damages over the next five months of fact and expert discovery, and before the trial pool date of July 12, 2021.

## CONCLUSION

For the reasons stated above, Defendants' motion should be denied, their proposed sur-reply should be stricken, and Lead Plaintiff's Motion for Class Certification should be granted.

**DATED: October 16, 2020**  Respectfully submitted,

| | |
|---|---|
| **ELLIOTT GREENLEAF, P.C.** | **BLEICHMAR FONTI & AULD LLP** |
| /s/ John M. Elliott | /s/ Joseph A. Fonti |
| John M. Elliott | Joseph A. Fonti (admitted *pro hac vice*) |
| Thomas J. Elliott | Javier Bleichmar (admitted *pro hac vice*) |
| Timothy T. Myers | Evan A. Kubota (admitted *pro hac vice*) |
| 925 Harvest Drive, Suite 300 | Benjamin F. Burry (admitted *pro hac vice*) |
| Blue Bell, PA 19422 | Thayne Stoddard (*pro hac vice* pending) |
| Telephone: (215) 977-1000 | 7 Times Square, 27th Floor |
| Facsimile: (215) 977-1099 | New York, NY 10036 |
| jme@elliottgreenleaf.com | Telephone: (212) 789-1340 |
| tje@elliottgreenleaf.com | Facsimile: (212) 205-3960 |
| ttm@elliottgreenleaf.com | jfonti@bfalaw.com |
| | jbleichmar@bfalaw.com |
| *Co-Counsel for the Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago* | ekubota@bfalaw.com |
| | bburry@bfalaw.com |
| | tstoddard@bfalaw.com |
| | |
| | *Co-Counsel for the Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago and Lead Counsel For The Class* |
| | |
| | **KEHOE LAW FIRM, P.C.** |
| | John A. Kehoe (*pro hac vice* to be submitted) |

Two Penn Center Plaza
1500 JFK Boulevard, Suite 1020
Philadelphia, PA 19012
Telephone: (215) 792-6676
jkehoe@kehoelawfirm.com

*Additional Counsel for the Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago*