**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALEXANDRE PELLETIER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ENDO INTERNATIONAL PLC, RAJIV KANISHKA LIYANAARCHCHIE DE SILVA, SUKETU P. UPADHYAY, and PAUL V. CAMPANELLI,<br><br>Defendants. | No. 2:17-cv-05114-MMB |

**DEFENDANTS' RESPONSE TO COURT'S LETTER DATED OCTOBER 22, 2020 (QUESTION NOS. 1-7)**

Defendants Endo International plc, Rajiv Kanishka Liyanaarachchie De Silva, Suketu P. Upadhyay, and Paul V. Campanelli submit this response to the first seven questions posed in the Court's letter of October 22, 2020 (Dkt. No. 169). Defendants will submit an answer to the final question in accordance with the Court-ordered schedule.

**Question 1. There are clearly overlapping claims, at least as to the dates, between this case and MissPERS.**

**a. Are there also overlapping substantive claims?**

Yes.

**b. Document your answer by reference to specific exhibits already filed or attach specific exhibits, bound and tabbed, to your response to be filed (with a hard copy sent to Chambers).**

*First*, although the two cases assert different statutory causes of action, they are based on some of the same securities filings. In particular, the plaintiffs in both cases allege material misstatements and omissions in Endo's 2014 annual report on Form 10-K and its first quarter 2015 report on Form 10-Q. (*See* Ex. 1 (*MissPERS* Am. Compl. ("AC")) ¶¶ 52, 66-68 (2014 10-K), 68 (1Q 2015 10-Q); Dkt. No. 62 ("*Pelletier* AC") ¶¶ 187-191 (2014 10-K), 193-194 (1Q 2015 10-Q).)

*Second*, although the different plaintiffs claim that Endo concealed different alleged improper business practices—trade loading in *MissPERS* and unsustainable price increases here (*Compare* Ex. 1 (*MissPERS* AC) ¶ 3, 46-48, 68, *with Pelletier* AC ¶¶ 4, 95-151)—the core allegation in both cases is the same, that Endo was concealing the true source of its generics revenue and income. (*See* Ex. 1 (*MissPERS* AC) ¶ 68; *Pelletier* AC ¶¶ 186.)

*Third*, the class definitions overlap. In particular, class members in *MissPERS* would also be members of the proposed class here as Plaintiff has defined it. Class membership in *MissPERS* turns on whether one purchased stock in Endo's June 2015 secondary stock offering.

(*See* Ex. 1 (*MissPERS* AC) ¶ 1.) Here, Plaintiff proposes a class of those who purchased Endo stock between March 2, 2015 and February 27, 2017, whether in Endo's June 2015 secondary stock offering or not. (*Pelletier* AC at 1.) Thus, as Plaintiff would have it, all *MissPERS* class members would also be members of the class in this case. And because both sets of plaintiffs challenge some of the same disclosures about the same generics revenue and income, Plaintiff is essentially seeking a double recovery for certain proposed class members. To be more specific, what Plaintiff here apparently wants is for *MissPERS* class members who have already agreed to compensation through the settlement in that case for purchasing in the June 2015 offering based on Endo's supposedly mischaracterized generics revenue to recover again here for the same purchases based on alleged mischaracterizations of that same revenue and income.

In addition, although the Amended Complaint in this case alleges only two corrective disclosure events (one on November 3, 2016 and the other on February 28 – March 1, 2017, *see Pelletier* AC ¶¶ 260-266), Chicago Park has recently suggested, without making any effort to obtain leave to amend its complaint, that it intends to characterize additional disclosures as partially corrective. If the Court were to permit Chicago Park, over Defendants' objections (*see* Dkt. No. 172), to change its theory of the case at this late juncture, two of the proposed new "corrective" disclosures (on February 29 and May 5, 2016) would be the same as those alleged in the *MissPERS* case. (*See* Ex. 1 (*MissPERS* AC) ¶¶ 77-83, 88-92.) (*See* Dkt. No. 153 at 23; Ex. 1 (*MissPERS* AC) ¶¶ 77-83, 88-92.) Plaintiff is thus trying to *increase* the overlap between this case and *MissPERS*.

**Question 2. What, if anything, does the settlement in the MissPERS litigation state concerning defendants in this case as to liability for claims in the present litigation? If yes, document your answer.**

In relevant part, the *MissPERS* Settlement Agreement defines "Released Claims" as:

> [A]ny and all manner of actions, suits, claims, . . . that have been or that might have been asserted against any of the Released Defendant Parties . . . in connection with the purchase, other acquisition, sale, other disposition, or holding of Endo's publicly traded common stock acquired in or traceable to Endo's June 5, 2015 Offering, including all claims that were asserted or could have been asserted in this Action. For the avoidance of doubt, this release shall not release claims other than the Released Claims, including to the extent such other claims are asserted in *SEB Investment Management, AB et al. v. Endo International plc*, Civ. No. 2:17-cv-03711-TJS (E.D. Pa.) and any other pending case, as well as claims relating to the enforcement of the Settlement.

(Ex. 2 (Settlement Agreement) ¶ 1(y).) The Settlement Agreement thus broadly releases all claims (asserted or unasserted) that purchasers in Endo's June 2015 stock offering brought or could have brought based on the offering or the shares purchased in the offering.

A court-approved, plain-language notice sent to all known members of the *MissPERS* class notified them of the release and their rights to object or opt out. (Ex. 2, Ex. A-1 at 16-17, 18-20.) It explicitly warned all class members that they would be releasing claims asserted in other litigations if they did not opt out. (*See id.* at 17 ("If you are a member of the Settlement Class, unless you properly exclude yourself, you will give up any rights to sue Defendants and the other Released Defendant parties for any and all Released Claims. If you have a pending lawsuit against any of the Released Defendants Parties, **speak to your lawyer in that case immediately**. You must exclude yourself from this Settlement Class to continue your own lawsuit.") (emphasis in original).)[1] Not a single member of the *MissPERS* class opted out or objected. (*See* Ex. 3 (Mar. 4, 2020 *MissPERS* Op. Pursuant to PA RAP 1925) at 4 ("No objections or requests for exclusion were received from any member of the Settlement Class.").)

[1] Although Chicago Park has asserted that the settlement notice in *MissPERS* was inadequate because it did not make explicit reference to this case, the Court of Common Pleas expressly rejected that position, finding that the notice "clearly and fairly advised members of the Settlement Class of the proposed Settlement, the relief it amply provides, and its consequences." (Ex. 3 (Mar. 4, 2020 *MissPERS* Op. Pursuant to PA RAP 1925) at 23.)

**a. Concisely state your position as to whether this fact bears on class certification in this case, and why or why not.**

The *MissPERS* release bears on class certification in this case in two ways. *First*, assuming the Superior Court rejects Chicago Park's collateral attack on the *MissPERS* settlement, all members of the settlement class in that case, including those that Chicago Park is trying to include in its proposed class in this case, will have fully and finally released any claims arising from purchases in Endo's June 2015 offering.[2] If this Court were to certify a class in this case, it would need to exclude anyone whose claims were released in *MissPERS*.

*Second*, Chicago Park's interference in the *MissPERS* settlement process makes it an inadequate class representative here. It is effectively blocking payment of *MissPERS* settlement proceeds to persons and entities whose interests it claims to represent. Not a single class member in *MissPERS* objected to the scope of the release, or anything else about the settlement. The only entity that "objected" was Chicago Park, which is not even a member of the *MissPERS* class. Chicago Park is thus acting contrary to the interests of some members of the class it seeks to represent here, by interfering with the settlement process and blocking their payment in the *MissPERS* case. That is a textbook conflict, and precludes class certification here. *See Moreno v. Autozone, Inc.*, No. C05-4432 MJJ, 2007 WL 4287517, at *4 (N.D. Cal. Dec. 6, 2007) (finding that class members who objected to a settlement had "an actual conflict of interest" with class members who had "submitted claim forms, and await payment").

**Question 3. Should this Court stay the class certification issue, and/or all proceedings, in this case pending completion of the Pennsylvania court appeal process and any subsequent litigation? State your reasons.**

[2] Because Chicago Park did not purchase in the June 2015 offering, and therefore is not a member of the *MissPERS* class, one of the issues the Superior Court is considering is whether Chicago Park even has standing to object to the settlement (the Court of Common Pleas previously held that it does not). (*See* Ex. 4 (*MissPERS* Appellee Brief) at 22-23, 57-59.)

No. Defendants are confident that the Superior Court will affirm the trial court's ruling, but its ultimate decision is beside the point. Win or lose, Chicago Park has *already* blocked payment of the *MissPERS* settlement proceeds to persons and entities it purports to represent (and has done so against their wishes, as demonstrated by the undisputed fact that *none* of the *MissPERS* class members objected to the settlement).

Chicago Park's adequacy problem cannot be "cured" based on how the Superior Court rules. Even if Chicago Park wins its appeal (highly unlikely given its lack of standing and the trial court's well-reasoned final settlement approval order), the ensuing litigation it presumably would pursue would only be continuing to frustrate the consummation of a settlement to which no class member objected—and its actions would lead only to even *further* delay (and the possibility that the settlement might be reduced or not paid at all). And if Chicago Park loses its appeal, the delay to date does not go away. It is this incurable delay, and Chicago Park's demonstrated actions against the interests of those it purports to represent here, that render it unfit to serve as the representative of a class here. A stay would not change that.

**Question 4. How many persons or entities are members of the MissPERS settlement class?**

Defendants do not have access to this information. The best available information is that the settlement claims administrator in that case, A.B. Data, Ltd., mailed 36,385 "Notice Packets" to potential class members or their nominees. (*See* Ex. 4 (*MissPERS* Appellee Brief) at 19 n.4.) The actual number of shareholders who seek to participate in the settlement will not be known until the *MissPERS* plaintiff moves for distribution of the settlement funds in that case. That cannot happen until after Chicago Park's appeal is resolved.

**a. Is there an exhibit, or can you provide one, which states their names and/or contact information?**

Defendants do not have names and contact information of *MissPERS* class members.

**Question 5. Can you cite specific precedents that either grant or deny class certification under Rule 23 where there is a prior settlement which is at least overlapping in some respect as to dates and/or substantive claims?**

**a. Did any of these cases involve a release of overlapping claims in the second case?**

There appear to be very few precedents on point, perhaps because it is rare for a putative class representative to attempt what Chicago Park attempts here: to certify a class that includes members who have already released their claims in a prior class action settlement.

The most analogous case is *Gooch v. Life Investors Insurance Company of America*, 672 F.3d 402 (6th Cir. 2012). *Gooch* involved two overlapping class actions, both of which asserted that the defendant insurance company's interpretation of "actual charges" in certain of its polices amounted to a breach of contract. *Id.* at 409, 413. The classes overlapped; one included policyholders whose policies had been issued between 2001 and 2007, and the other included policyholders whose policies had been issued between 2004 and 2009. *Id.* at 413. After one case settled, resulting in a "broad release of future suits," *id.*, the Sixth Circuit vacated the grant of class certification in the other case, holding that the release "affects the viability of the class," *id.* at 426, and that "the current class certification is invalid to the extent that it overlaps with the [settled] class." *Id.* at 427. In other words, a class cannot be certified if it includes members who have released their claims as part of another class action settlement. That is the situation here, with the *MissPERS* case.

Other courts have similarly held that class certification is not appropriate where some of the class members have previously released or waived their claims as individuals. *See*, *e.g.*, *Avilez v. Pinkerton Government Services, Inc.*, 596 F. App'x 579 (9th Cir. 2015) (vacating certification of class that included members who had executed a waiver of a right to bring class actions as part of arbitration agreements, although the putative class representative did not); *Hall*

*v. Burger King Corp.*, No. 89-260-CIV-KEHOE, 1992 WL 372354, at *8 (S.D. Fla. Oct. 26, 1992) (denying class certification, in part due to releases by certain class members); *Greeley v. KLM Royal Dutch Airlines*, 85 F.R.D. 697, 701 (S.D.N.Y. 1980) (denying class certification where absent class members had settled their claims with defendant, but putative class representative had not, because "his claim is not typical, and he cannot be relied on to represent the class adequately"). These precedents support denial of class certification here.

**Question 6. Was Park's share purchase on November 3, 2016 before or after the alleged disclosure on that date? Document your answer.**

Chicago Park's purchases on November 3, 2016 were after publication of the alleged disclosure on that date (a *Bloomberg* article published at 2:10 pm ET). (*See* Ex. 5 (*Bloomberg* article, timestamped 2:10:27); AC ¶ 260 (admission by Plaintiff that the *Bloomberg* article was published at 2:10 PM ET).) Chicago Park's purchases on November 3, 2016 were placed through its investment advisor, Lombardia Capital. Evidence recently produced by the non-party broker who executed these purchases shows that they occurred at 2:12 PM, *after* the *Bloomberg* article was published.[3] (Ex. 6 (SWS Execution Data).) This evidence is entirely consistent with the observation in Defendants' class certification opposition brief that, based on the purchase prices, the purchases must have occurred after the article was published. (*See* Dkt. No. 133 (Class Cert. Opp.) at 13-14; Dkt. No. 133-6 (Skinner Report) ¶ 86 n.171.)

---

[3] Defendants were only able to obtain this material after the Court delivered its October 22, 2020 letter demanding to know the timing of the trades. Plaintiff had previously stymied Defendants' ability to obtain these records by interfering with subpoenas to the third party brokers, and filing insupportable motions to quash across the country. Defendants still do not have full productions from the brokers or other non-party subpoena recipients.

**a. If the purchase after occurred after the publication of the Bloomberg article, should the timing of Park's November 3, 2016 purchase of Endo shares preclude Park from serving as lead plaintiff?**

Yes, the timing of Chicago Park's purchases precludes it from serving as class representative. Prior to the publication of the *Bloomberg* article, Chicago Park owned *zero* Endo shares. (*See* Dkt. No. 133 at 13-14.) Its accumulation of shares *afterward* could not have been made in reliance on the so-called fraud because Chicago Park contends that the fraud was revealed by that article. This is so even if Chicago Park itself was not aware of the article before its purchases, which Defendants strongly doubt. Indeed, insofar as Plaintiff here trades through Lombardia, a professional investment firm (no doubt with sophisticated technology and real-time access to news sources such as *Bloomberg*), the notion that it would not have had immediate information regarding the companies in which it trades would lack credibility.[4] And indeed, Chicago Park contends that Endo securities traded in an efficient market in which all material information was rapidly absorbed into the stock price. (*See* Dkt. No. 116-1 at 14-21.) Moreover, regardless of when on November 3, 2016 Chicago Park purchased the Endo shares, the fact that it *continued* to purchase them on November 4 and 8, 2016—undeniably after the *Bloomberg* article—raises independent barriers to Chicago Park's ability to demonstrate reliance on the so-called fraud. (*See* Dkt. No. 133 at 13-14.)

Chicago Park will, of course, dispute this analysis. But *that* highlights the problem for its class certification motion: reliance is an individual issue, and Chicago Park may be subject to unique defenses based on the timing of its purchases—rendering Chicago Park atypical under

---

[4] Regardless, any need to litigate the quality of the information to which Plaintiff (or Lombardia) had access is another issue that will set it apart from, for example, any mom-and-pop Endo stockholders who may also be class members. This is another reason Plaintiff is atypical under Rule 23.

Rule 23. *See In re Safeguard Scis.*, 216 F.R.D. 577, 582 (E.D. Pa. 2003) ("Where it is predictable that a major focus of the litigation will be on an arguable defense unique to the named plaintiff . . . then the named plaintiff is not a proper class representative.").

**Question 7. It appears undisputed that Park did not own Endo shares for the entirety of the proposed class period. Cite specific holdings for or against certification of class when the lead plaintiff did not continuously own the stock for portions of the alleged class period.**

The Court is correct: there is no dispute here that Chicago Park held Endo shares for only a brief portion of the class period. (*See Pelletier* AC, Ex. A.) As shown here, Chicago Park first purchased Endo shares in June 2016—approximately fifteen months into the two-year proposed class period—and sold them all two months later. Its remaining purchases were at the tail end of the proposed class period, and all after the first alleged corrective disclosure:




Courts frequently hold that class certification is inappropriate when the proposed class representative did not own the relevant stock throughout the class period. In a particularly analogous decision, *In re IMAX Secs. Litig.*, 272 F.R.D. 138, 155 (S.D.N.Y. 2010), the court denied the motion for class certification because the proposed class representative sold its entire interest in the issuer's stock prior to the first corrective disclosure and thus, the court held, its claims were not typical because it could not "establish loss causation—and, at a minimum, is subject to unique defenses which may threaten to become the focus of the litigation[.]" *Id.* Therefore, the court could not "certify a class with [lead plaintiff] as a class representative." *Id.*

This is essentially what happened here—Chicago Park owned no Endo shares prior to the first alleged corrective disclosure on November 3, 2016. (*See Pelletier* AC ¶¶ 259-263, Ex. A.)

Other courts have reached similar conclusions. *See In re Flag Telecom Holdings, Ltd., Sec. Litig.*, 574 F.3d 29, 42 (2d Cir. 2009) (vacating class certification to the extent class included "in-and-out" traders who sold their stock before the alleged corrective disclosures were made); *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11-cv-4209, 2013 WL 5815472, at *19 (S.D.N.Y. Oct. 29, 2013) (where proposed class representatives sold large portions of the securities at issue during the class period "[t]his fact alone defeats certification") (collecting cases); *Bensley v. FalconStor Software, Inc.*, 277 F.R.D. 231, 241 (E.D.N.Y. 2011) (similar).

In its reply brief in support of class certification, Chicago Park cited only one case in which a class was certified even though the lead plaintiff did not continuously own stock throughout the class period. *See In re Petrobras Sec. Litig.*, 312 F.R.D. 354 (S.D.N.Y. 2016). But there, the court found that lead plaintiff was not atypical in part because it suffered a sizable loss despite its in-and-out trading. *Id.* at 360. Here, Chicago Park appears to have *profited* from its sales prior to the November 3, 2016 disclosure, purchasing at prices between $14 and $17 per share in June 2016 and selling at more than $20 in August. (*See Pelletier* AC, Ex. A.) Although there are cases discussing when shareholders who only own their shares through a portion of a class period may serve as class representatives, Defendants are aware of—and Plaintiff has cited—no case, like this one, in which the proposed class representative owned zero stock for the vast majority of the class period, held zero stock at the time the fraud was supposedly revealed through a corrective disclosure, and then purchased stock after the fraud had been revealed.

Dated: November 5, 2020
New York, New York

Respectfully submitted,

**LATHAM & WATKINS LLP**

*/s/ Jeff G. Hammel*

James E. Brandt (admitted *pro hac vice*)
Jeff G. Hammel (admitted *pro hac vice*)
Thomas J. Giblin (admitted *pro hac vice*)
885 Third Avenue
New York, NY 10022
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
james.brandt@lw.com
jeff.hammel@lw.com
thomas.giblin@lw.com

**MORGAN, LEWIS & BOCKIUS LLP**
J. Gordon Cooney, Jr. (No. 42636)
Laura Hughes McNally (No. 310658)
1701 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5000
Facsimile: (215) 963-5001
gordon.cooney@morganlewis.com
laura.mcnally@morganlewis.com

*Counsel for Defendants*