# Exhibit A

## Highlighted Deposition Transcript of Alvin L. Polit, CPA

Page 1

```
 1           CONFIDENTIAL - ALVIN L. POLIT, CFA
 2               UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF PENNSYLVANIA
 3               CASE NO. 2:17-cv-05114-MMB
 4     ALEXANDRE PELLETIER,              :
       Individually and on Behalf        :
 5     of all Others Similarly           :
       Situated,                         :
 6              Plaintiffs,              :
                                          :
 7                   v.                   :
                                          :
 8     ENDO INTERNATIONAL PLC,            :
       RAJIV KANISHKA                     :
 9     LIYANAARCHCHIE DE SILVA,           :
       SUKETU P. UPADHYAY, and            :
10     PAUL V. CAMPANELLI,                :
                Defendants.              :
11     --------------------------    :
12
13          VIDEOTAPE DEPOSITION VIA ZOOM OF:
14               ALVIN L. POLIT, CFA
15           WEDNESDAY, AUGUST 12, 2020
16
17
18
19
20
21
22
23
24     REPORTED BY:
       SILVIA P. WAGE, CCR, CRR, RPR
25     JOB NO. 4185531
```

Page 2

```
1            CONFIDENTIAL - ALVIN L. POLIT, CFA
2
3
                    AUGUST 12, 2020
4                       1:41 P.M.
5        Videotape deposition via Zoom of ALVIN
6    L. POLIT, CFA, pursuant to agreement before
7    SILVIA P. WAGE, a Certified Shorthand Reporter,
8    Certified Realtime Reporter, Registered
9    Professional Reporter, and Notary Public for the
10   States of New Jersey, New York and Pennsylvania.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1         CONFIDENTIAL - ALVIN L  POLIT, CFA
2    A P P E A R A N C E S :
3
     BLEICHMAR FONTI & AULD, LLP
4    Attorneys for Lead Plaintiffs and the Class
     7 Times Square
5    Times Square Tower, 27th Floor
     New York, New York 10036
6    Jfonti@bfalaw com
     Tstoddard@bfalaw com
7    Ekubota@bfalaw com
     BY:  JOSEPH A  FONTI, ESQ
8    BY:  THAYNE STODDARD, ESQ
     BY:  EVAN KUBOTA, ESQ
9
10   LATHAM & WATKINS LLP
     Attorneys for Defendants
11   885 3rd Avenue, Suite 1000
     New York, New York  10022-4834
12   Gregory mortenson@lw com
     Thomas giblin@lw com
13   BY: GREGORY MORTENSON, ESQ
     BY: THOMAS GIBLIN ESQ
14
15   BURKE BURNS & PINELLI LTD
     Attorneys for the Deponent
16   70 West Madison Street, Suite 4300
     Chicago, Illinois 60602
17   (312) 541-8600
     Vpinelli@bbp-chicago com
18   BY:  VINCENT D  PINELLI, ESQ
19
20   A L S O   P R E S E N T :
21
     ROBERT BENIMOFF
22   CONCIERGE
23
     NOAH CONTE
24   VIDEOGRAPHER
25
```

Page 4

```
1       CONFIDENTIAL - ALVIN L  POLIT, CFA
2          I N D E X
3    WITNESS:  ALVIN L  POLIT, CFA        PAGE
4    EXAMINATION BY MR  MORTENSON          8
     EXAMINATION BY MR  FONTI            238
5
         E X H I B I T S
6
```



Veritext Legal Solutions

212-267-6868                www.veritext.com                516-608-2400



Page 6

```
 1        CONFIDENTIAL - ALVIN L. POLIT, CFA
 2                   -  -  -
 3          DEPOSITION SUPPORT INDEX
 4                   -  -  -
 5   Direction to Witness Not to Answer
         Page Line
 6
       17    11
 7     26     9
       70    25
 8    201    15
 9
     Request for Production of Documents
10       Page Line
11
12
     Stipulations
13       Page Line
14    237    25
      265    15
15    265    18
16
     Question Marked
17       Page Line
18
19
     Reservation
20       Page Line
21
22
     Motion to Strike
23       Page Line
24
25
```

Page 7

```
 1        CONFIDENTIAL - ALVIN L. POLIT, CFA
```

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400



Page 10

1          CONFIDENTIAL - ALVIN L. POLIT, CFA

4 (Pages 10 - 13)



Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400



Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



Page 22
1        CONFIDENTIAL - ALVIN L. POLIT, CFA

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



Page 26

1       CONFIDENTIAL - ALVIN L. POLIT, CFA

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400



Page 30
1          CONFIDENTIAL - ALVIN L. POLIT, CFA

Page 32
1          CONFIDENTIAL - ALVIN L. POLIT, CFA

7          If you made a decision to buy or sell
8    a certain stock as part of the international
9    equity value strategy, did that purchase or sale
10   of stock, in essence, flow to all of your
11   clients?
12         A.  Exactly.

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400



Page 34

1          CONFIDENTIAL - ALVIN L. POLIT, CFA

9          The order then to buy let's call it
10   3 percent allocation gets put into the system
11   across all the accounts.  We end up hitting send
12   and then that order -- all those orders end up
13   going to our internal traders.  And then the
14   internal traders work on how best to allocate
15   that to the external brokers.
16          And so, once they send those orders
17   out, the brokers will then execute or fill the
18   orders and then the fills will come through on
19   our system and then get uploaded into the
20   individual accounts.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400



Page 38

CONFIDENTIAL - ALVIN L. POLIT, CFA

3     Q.  And how did you -- as Portfolio
4  Manager for this strategy, how did you determine
5  "the true worth" of an enterprise, to use your
6  phrase?
7     A.  So the way I would do it and every
8  manager is different.  I am a what you call a
9  "value manager" and even within the value
10  spectrum, there are many different shades of
11  value.  There is relative value, but then there
12  is the other stream which is deep value.  Two
13  different ways to looking at --
14     Q.  I'm sorry, one second just to -- I'm
15  sorry.
16        Did you say valley, V-A-L-L-E-Y, or
17  value?
18     A.  Value, V-A-L-U-E.
19     Q.  Value, got it.  Okay.  Sorry to cut
20  you off.
21     A.  No worries.
22        Yeah, relative value, which is trying
23  to find companies that are relatively inexpensive
24  compared to the market, and then you have a deep
25  value manager that doesn't believe in relative

Page 39

CONFIDENTIAL - ALVIN L. POLIT, CFA

2  but rather believes more in the absolute
3  attractiveness of the name.
4        So I'm in that camp of the absolute
5  attractiveness of a name.  And so the way we
6  determine the cheapness or the attractiveness
7  would be that we would dig into historical
8  results, have a good assessment as to the key
9  profit drivers to profitability.  Also how peers
10  have been performing and then working in the
11  background and doing all the math with valuation
12  and then assessing what we believe the true worth
13  of an enterprise would be.
14     Q.  And "the true worth of an enterprise"
15  being reflected in its share price?
16     A.  It -- well, it typically is not, if
17  we're buying it.  And so the true worth could end
18  up being a hundred Euros but yet the market price
19  might be trading at 50 Euros.  And so, for us,
20  there is a potential for that -- for that gap to
21  narrow over time.
22     Q.  So it's your belief that the true
23  value -- the true value of an enterprise could be
24  reflected in its share price?
25     A.  Over time.

Page 40

CONFIDENTIAL - ALVIN L. POLIT, CFA

2     Q.  And you would seek out opportunities
3  where you felt that a name, a stock, was
4  undervalued?
5     A.  Correct.

11 (Pages 38 - 41)



Page 42

1     CONFIDENTIAL - ALVIN L. POLIT, CFA

Page 44

1     CONFIDENTIAL - ALVIN L. POLIT, CFA
2     I'd say 80, 90 percent valuation of
3  any business is derived on industry economics and
4  then that 10, 20 percent is more company
5  specifics.
6     So, in this instance, I would have
7  spent a lot of time in making sure I had an
8  appreciation for how the industry worked, whether
9  it's branded pharmaceuticals or generic
10 pharmaceuticals.
11    And then more often than not, there
12 is enough information there to then lead to you
13 pulling your calculator and Excel spreadsheets
14 and trying to assess what the value of the
15 enterprise is.
16   Q.  Okay.  And we're going to dig into
17 specifically in a little bit.  At this point I
18 just want to keep it a little more general, just
19 so I make sure I understand your process.
20    So, when you, to use your phrase,
21 pulled out the calculator, got into the
22 spreadsheet, did you calculate a, basically, a
23 threshold share price where you felt that a
24 company was worth purchasing?
25    MR. FONTI:  Objection.

Page 45

1     CONFIDENTIAL - ALVIN L. POLIT, CFA
2    A.  The value -- the job of the analyst
3  is to -- to the best of his ability -- is to
4  assess what they believe that true worth or what
5  we call the "intrinsic value" is of that company.
6    And so there isn't a range -- there
7  could be an range of outcomes and so we'll have a
8  discussion about what the potential ranges can
9  end up being.  But what we end up doing for
10 portfolio management purposes is we have to rely
11 on one number.  So the analyst might have come in
12 with a scenario analysis, well, if this happens
13 and this happens, these are the two different
14 valuations that can end up occurring.  You can't
15 really manage that from a portfolio perspective.
16 You have to work off one number.  So we'll have a
17 discussion about what is the best number to use
18 for portfolio management purposes.
19    At that point then, we do end up
20 taking a discount to that and we set what we call
21 our "buy limit."  So we don't end up paying more
22 then passed what that buy limit is.  And that buy
23 limit tends to be about a third discount from
24 that true worth of the enterprise.
25    But just to give you a little bit

14    In this case for Endo, it happened to
15 be me that did the work on it, that the -- the
16 sort of information that we ended up digging
17 up -- we don't rely on sell-side work whatsoever
18 or broker research, rather, we do things
19 independently.
20    So we would have dug up the
21 historical results, all the filings.  We would
22 have read through all the filings, any
23 PowerPoints.  At times we might end up having a
24 conversation with investor relations and then we
25 also take a look at peers.

12 (Pages 42 - 45)



1        CONFIDENTIAL - ALVIN L. POLIT, CFA
2    more clarity on that, if we believe the worth of
3    the enterprise is worth a hundred, then you --
4    we're not going to be willing to pay more than
5    $70 for it.
6        Q.  And those are price per share?
7        A.  The -- right, right, the hundred --
8    yeah, the example of hundred versus 70, right.
9        Q.  Okay.  And you mentioned you would
10   have a discussion about, you know, which scenario
11   to use.
12        Who was involved in those
13   discussions?
14        A.  So it would have been the entire
15   team.  It would have been -- team members I had
16   at that point in time would have been Jonathan
17   Veiga, V-E-I-G-A.  It would have been Burt
18   Whitson, W-H-I-T-S-O-N, and it would have been
19   David Lin, L-I-N, as in Nancy.

1        CONFIDENTIAL - ALVIN L. POLIT, CFA

5        Q.  Okay.  Were there stocks that -- were
6    most stocks purchased more than one time by
7    Lombardia as part of this strategy during the
8    time frame?
9        MR. FONTI:  Objection.
10       A.  I'd say generally, yes.
11       Q.  Do you have an average off the top of
12   your head of how many times those -- again,
13   referring to these 40 to 50 stocks -- on average
14   how many purchases were made for each of those?
15       MR. FONTI:  Objection.
16       A.  The -- I -- I'd only be able to give
17   you rough estimate.  It all would depend on the
18   volatility with any one particular name.
19        More often than not I would say we're
20   more averaging down on a name.  So we might have
21   bought something at $50.  If the fundamentals
22   haven't changed, price came down from that
23   perspective, it's cheaper than what it was at 50
24   and so, of course, we're going to end up buying
25   some more.  Those instances happen quite often.

13 (Pages 46 - 49)



Page 50

CONFIDENTIAL - ALVIN L. POLIT, CFA

1
2    So I would say on average we're
3    probably averaging down on a name a couple of
4    times, two to three times.
5        Q.  Okay.  You mentioned that you had
6    "discretionary authority" as Portfolio Manager.
7        What do you mean by that?
8        A.  So I was the one who had the
9    decision-making authority on what to buy and sell
10   for client accounts, no one else did.
11       Q.  And the authority to decide to buy
12   and sell, was that required for every trade for
13   your clients that you oversaw?
14       A.  The contracts would give the
15   investment manager the authority to initiate buys
16   and sells.
17       Q.  So, as an example, for every purchase
18   that the international equity value strategy made
19   during 2015 to 2017, did you yourself authorize
20   each purchase?
21       A.  Yes.

14 (Pages 50 - 53)



Page 54

1        CONFIDENTIAL - ALVIN L. POLIT, CFA

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400



Page 62

1         CONFIDENTIAL - ALVIN L. POLIT, CFA

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400



Page 66

1          CONFIDENTIAL - ALVIN L. POLIT, CFA

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



Page 70

CONFIDENTIAL - ALVIN L. POLIT, CFA

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



Page 74

1          CONFIDENTIAL - ALVIN L. POLIT, CFA

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



Page 78

1      CONFIDENTIAL - ALVIN L. POLIT, CFA

2    something out to Chicago Parks, Marquette would

Page 80

1      CONFIDENTIAL - ALVIN L. POLIT, CFA

23      Q.  Were you -- do you know if Chicago

24  Park was invested in strategies other than

25  international value equity at Lombardia?

Page 81

1      CONFIDENTIAL - ALVIN L. POLIT, CFA

2      A.  They were not.

3      Q.  So is it fair to say that you were

4  the only Portfolio Manager at Lombardia working

5  on the Chicago Park account?

6      MR. FONTI:  Objection.

7      A.  That is correct.

21 (Pages 78 - 81)



Page 82

1        CONFIDENTIAL - ALVIN L. POLIT, CFA

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



Page 86

1    CONFIDENTIAL - ALVIN L. POLIT, CFA
2

Page 87

1    CONFIDENTIAL - ALVIN L. POLIT, CFA

9        Q.  Who had authority to make trading
10   decisions at Lombardia on behalf of the Chicago
11   Parks account?
12       A.  I did.
13       Q.  Anyone else?
14       A.  No, no one else had had discretion.
15   Others might have been involved in the process,
16   but I had final discretion.

Veritext Legal Solutions
212-267-6868        www.veritext.com        516-608-2400

Page 90

1    CONFIDENTIAL - ALVIN L. POLIT, CFA



24 (Pages 90 - 93)



Page 94

1    CONFIDENTIAL - ALVIN L. POLIT, CFA

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



Page 98
1       CONFIDENTIAL - ALVIN L. POLIT, CFA

Page 99
1       CONFIDENTIAL - ALVIN L. POLIT, CFA
2           Q.  And do you agree that Lombardia was
3       appointed as a fiduciary under this agreement?
4           MR. PINELLI:  I'll object to the form
5       and foundation.
6           But you can answer, if you know.
7           A.  I haven't read the agreement, so I
8       don't know what's in it.  But, generally, these
9       agreements do end up laying out your roles of
10      fiduciary, which we're bound by.

26 (Pages 98 - 101)



Page 102

1          CONFIDENTIAL - ALVIN L. POLIT, CFA

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



Page 110
1        CONFIDENTIAL - ALVIN L. POLIT, CFA

29 (Pages 110 - 113)



Page 114

1        CONFIDENTIAL - ALVIN L. POLIT, CFA

Page 116

1        CONFIDENTIAL - ALVIN L. POLIT, CFA

5        Q.  Looking at, I think, it's the seventh
6   row down on this first page, do you see where it
7   says, "full discretion?" --
8        A.  Yes.
9        Q.  -- in the title column?
10       A.  Yes.
11       Q.  Is this what you were talking about
12  earlier when you were saying that you had
13  discretion to make the trades in the
14  international value equity strategy?
15       A.  There would be two elements to that.
16  One is, is the client providing the investment
17  manager with full discretion.  But then digging
18  in deeper, when I refer to "full discretion," I
19  had full discretion in managing the strategy at
20  the organization.  So there are two components of
21  discretionary that need to be defined.

30 (Pages 114 - 117)



Page 118

1          CONFIDENTIAL - ALVIN L. POLIT, CFA

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



Page 122

1          CONFIDENTIAL - ALVIN L. POLIT, CFA

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400



Page 126

CONFIDENTIAL - ALVIN L. POLIT, CFA

Page 128

1   CONFIDENTIAL - ALVIN L. POLIT, CFA
2   once that exercise was done, now it's a matter of
3   then taking it to the traders, and then the
4   traders would aggregate the whole thing because
5   you don't want to trade anyone differently from a
6   trading perspective.  Every client gets treated
7   the same.
8           And then they would take those orders
9   aggregated and then they would work on deciding
10  how to allocate them to the brokers.  But the
11  system would determine the number of shares, not
12  -- we wouldn't do it manually.

Page 127

1   CONFIDENTIAL - ALVIN L. POLIT, CFA
2           Q.  And so, without doing the math, of
3   that, approximately 525 million, the Chicago
4   Parks account contributed, approximately, 20
5   million?
6           MR. FONTI:  Objection.
7           A.  Yes.
8           Q.  Okay.  And so, when you implemented a
9   trade for the international value equity
10  strategy, how would you know how many shares to
11  give to Chicago Parks' accounts based on all
12  those numbers?
13          MR. FONTI:  Objection.
14          A.  The -- the way the system would work
15  is we'd work off percentages.  So, if we're
16  allocating at inception of a position 3 percent
17  weight to the entire portfolio, because we're
18  thinking about portfolio holistically, our system
19  then would take the price, the prior day's
20  closing price, and it would calculate what that
21  -- what that means.
22          Three percent allocation for this
23  size account means that that would be 2,000
24  shares, let's say.
25          We do that for every account and then

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



Page 130

1        CONFIDENTIAL - ALVIN L. POLIT, CFA

Veritext Legal Solutions
212-267-6868        www.veritext.com        516-608-2400



Page 134

1        CONFIDENTIAL - ALVIN L. POLIT, CFA

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



1       CONFIDENTIAL - ALVIN L. POLIT, CFA

1       CONFIDENTIAL - ALVIN L. POLIT, CFA

6       Every trade that you made on behalf
7  of Chicago Parks was at your discretion?
8       MR. FONTI:  Objection.
9      A. I just want to clarify.
10      So every order I put in -- because an
11  order is not a trade until it's filled.
12      So every order that went in, I ended
13  up authorizing.  There may have been at times
14  where because of some limits that might have been
15  imposed that the order may not have been filled
16  or executed.
17     Q. But you don't recall any times,
18  specifically, where an order was not executed.
19       MR. FONTI:  Objection.
20      A. I don't recall.  But it's not
21  unusual.
22     Q. Okay.  So then just differentiating
23  between the order that you authorized versus the
24  actual trading, for every trade that Lombardia
25  made on behalf of Chicago Park, you authorized

1       CONFIDENTIAL - ALVIN L. POLIT, CFA
2  the specific stock?
3      A. Yes.
4     Q. And same question, you authorized the
5  specific price?
6      A. I would have authorized the
7  instructions that went through.  I wouldn't have
8  been assured of the price.
9     Q. Did you give instructions about an
10  acceptable price range to your trading team?
11      A. It wouldn't have been a range.  It
12  would have been a limit.  So, if -- price is the
13  most important thing for me as an absolute value
14  manager, very price sensitive, so I'm not willing
15  to pay more than 70 cents on my estimate of a
16  dollar.

36 (Pages 138 - 141)



Page 142

1   CONFIDENTIAL - ALVIN L. POLIT, CFA

5      Q.  And was it you that authorized the
6   specific volume of shares to be acquired?
7      A.  In aggregate across all the accounts,
8   if I made the decision to buy or sell something,
9   it went to our traders and the answer would be,
10  yes, I would have been the one authorizing
11  activity on that name on our behalf.

37 (Pages 142 - 145)



Page 146

1     CONFIDENTIAL - ALVIN L. POLIT, CFA

Veritext Legal Solutions
212-267-6868      www.veritext.com      516-608-2400



Page 150

1        CONFIDENTIAL - ALVIN L. POLIT, CFA

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



Page 154

1    CONFIDENTIAL - ALVIN L. POLIT, CFA

11        But can you describe for me the types
12   of information that you considered in connection
13   with these Endo stock transactions?
14        MR. FONTI:  Objection.
15        A.  They would be the 10-Ks, the
16   quarterly filings, whatever PowerPoints the
17   company may have put together and any other
18   collateral they might have had available,
19   typically, on websites, a transcript on some of
20   the quarterly calls.  Those would be for company
21   specific.
22        And then we'd independently just
23   review peers.  So, for -- in this case, we likely
24   would have reviewed the Valiant business model,
25   Mylan, Teva, as well as some of the other large

Page 155

1    CONFIDENTIAL - ALVIN L. POLIT, CFA
2    Pharma companies before we'd even start to make
3    an assessment as to what we felt the worth of the
4    business was.
5        Q.  You mentioned "10-Ks" and "quarterly
6    filings."
7        Does that include financial
8    statements?
9        A.  Yes.

40 (Pages 154 - 157)



Veritext Legal Solutions
212-267-6868    www.veritext.com    516-608-2400



Page 162

CONFIDENTIAL - ALVIN L. POLIT, CFA

Page 164

CONFIDENTIAL - ALVIN L. POLIT, CFA

5    In this instance, we would have --
6  typical pattern here.  So you see the first two.
7  We would have bought the position in.  As it went
8  down in price, we would have bought more
9  averaging down.  But as the price goes up, we
10  tend to pare back and sell the position as it
11  hits our estimated intrinsic worth.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



Page 166

1       CONFIDENTIAL - ALVIN L. POLIT, CFA

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400



Page 170

1    CONFIDENTIAL - ALVIN L. POLIT, CFA

Page 173

1    CONFIDENTIAL - ALVIN L. POLIT, CFA
2        Q.  So can you -- do you recall what
3    triggered your decision to make an additional
4    purchase two weeks later?
5        MR. FONTI:  Objection, foundation,
6    form.
7        A.  Just looking at the price per share,
8    it's clearly that the price had fallen and
9    assuming the fundamentals hadn't changed, you'd
10    then want to end up owning more of it because
11    there was less downside and more upside given how
12    we look at things.

44 (Pages 170 - 173)



Page 174

1   CONFIDENTIAL - ALVIN L. POLIT, CFA

Page 176

1   CONFIDENTIAL - ALVIN L. POLIT, CFA
2   significantly, there's more downside and less
3   upside.  So we opted to rebalance and take some
4   chips off the table.

Page 175

1   CONFIDENTIAL - ALVIN L. POLIT, CFA

5       A.  No.  Every morning we can see what
6   the price changes are and, typically, we end up
7   taking rebalance and decisions to account that
8   morning after price changes.

20      Q.  Okay.  Let's talk about that next
21  trade, August 9th, 2016.
22          What do you recall about that trade?
23      A.  I don't recall the specifics around
24  it.  Although looking here it's clear -- excuse
25  me -- that because the price had jumped up

45 (Pages 174 - 177)

Page 178

1    CONFIDENTIAL - ALVIN L. POLIT, CFA

15        A.  Yes.  So the -- it's probably the
16   best example here of a recycling situation.  We
17   value the business much higher than the 16, $17
18   that we initiated back in June of '16.  The price
19   drops, we buy more.  Name goes up in price,
20   fundamentals haven't changed, so the value hasn't
21   changed.  We see it as more downside potential,
22   less upside potential.  We'd rather take that
23   capital and reallocate it somewhere else.
24        But then something might happen,
25   maybe there's another negative headline,

Page 180

1    CONFIDENTIAL - ALVIN L. POLIT, CFA

Page 179

1    CONFIDENTIAL - ALVIN L. POLIT, CFA
2    you see happening from this data?

7        So at -- so we sold in August for 24
8    and we would have re-initiated it back in
9    November.  And as the price went down, we would
10   have bought more, as you can see there.

Page 181

1    CONFIDENTIAL - ALVIN L. POLIT, CFA
2    something that hasn't altered our original
3    assessment.  And so, even though we don't -- we
4    don't have it in the portfolio anymore, it's
5    dropped down in price, we'll recycle it, meaning,
6    that we bought it before, we sold it and so now
7    we're going to buy it again.



46 (Pages 178 - 181)



Page 182

CONFIDENTIAL - ALVIN L. POLIT, CFA

Page 185

1    CONFIDENTIAL - ALVIN L. POLIT, CFA
2
3       Q.  Did you authorize the purchase of
4    Endo stock in response to this article?
5          MR. FONTI:  Objection.
6       A.  It wouldn't have been a response to
7    this article.  I would have authorized purchases
8    of Endo for fundamental reasons.

47 (Pages 182 - 185)



Page 186

1    CONFIDENTIAL - ALVIN L. POLIT, CFA

Page 188

1    CONFIDENTIAL - ALVIN L. POLIT, CFA

14       Q.  Given that the trading confirmation
15    that we're looking at, this portfolio statement,
16    Northern Trust trading statement, shows a trade
17    price of 16.595, taking those two things
18    together, do you have any reason to doubt that
19    the purchase of Endo shares on November 3rd, 2016
20    occurred between 2:10 p.m. and 2:11 p.m.?
21          MR. FONTI:  Objection.
22       A.  Well, I would.
23          So these -- these are not all filled
24    at the exact same time.  So it's not a big block
25    of 10,000 shares that you're going to get

Page 189

1    CONFIDENTIAL - ALVIN L. POLIT, CFA
2    executed within that point of time.  These are
3    done throughout the day.
4          So this 16.595 is an aggregation of
5    all fills that have been done throughout that
6    day.  Now, that could just be a coincidence that
7    the price ended up being right around the 57 and
8    61 that you mentioned.  But without looking at
9    the -- what we call the "prints," without the
10    specifics on the executions behind it, I'd say
11    that it's more likely that it occurred throughout
12    the day and not at that particular time period
13    that you indicated.

25          And that's the case for how all

48 (Pages 186 - 189)



Page 190

```
1        CONFIDENTIAL - ALVIN L. POLIT, CFA
2    orders work.  It's throughout the day, unless
3    you're buying a hundred shares and you can
4    execute that quickly.  But you can't buy several
5    hundred thousand shares within a couple minutes.
6        Q.  Taking into consideration every
7    document that you looked at today, are you able
8    to decipher from what we've looked at the times
9    at which the purchases were executed on
10   November 3rd, 2016?
11       MR. FONTI:  Objection.
12       A.  No.
```

49 (Pages 190 - 193)



Page 194

1        CONFIDENTIAL - ALVIN L. POLIT, CFA

[Lines 2-25 redacted]

Page 196

1        CONFIDENTIAL - ALVIN L. POLIT, CFA
2    firm did.  It would have been unusual.  They
3    wouldn't have been in the know with anything with
4    regarding Endo.  So I don't know for certainty.
5    But to the best of my recollection, I say no.
6        Q.  And, just to clarify, the answer you
7    gave earlier about your personal interaction with
8    Chicago Park, did you speak with Chicago Park in
9    the days before this trade at all?
10       A.  I wouldn't know.  I never kept a log
11   of when I met or spoke with them or there might
12   have been an e-mail exchange.
13           It is possible, but I wouldn't know.
14   I wouldn't be able to answer that with any
15   certainty.
16       Q.  And, just to make sure that the
17   record is clear, apologies for retreading grounds
18   here.
19           But, I believe, earlier you said that
20   you were certain that you didn't speak to anyone
21   at Chicago Park.
22           Was that answer related to my
23   question being about Endo specifically?
24       A.  Exactly, that's what I wanted to
25   clarify.  I apologize.

Page 195

1        CONFIDENTIAL - ALVIN L. POLIT, CFA

[Lines 2-9 redacted]

10       Q.  Do you recall speaking with anyone at
11   Chicago Park in the days before authorizing this
12   trade on November 3rd, 2016?
13       A.  No.  That I know for a fact, I did
14   not.
15       Q.  To your knowledge, did anyone else at
16   Lombardia speak with anyone at Chicago Park in
17   the days before this November 3rd purchase of
18   Endo stock?
19           MR. FONTI:  Objection.
20       A.  I'm sorry, just to clarify, it's
21   regarding Endo or just speaking with Chicago
22   Parks before this transaction took place?
23       Q.  Speaking about this -- about Endo.
24       A.  Got it.
25           I don't know if anyone else at the

Page 197

1        CONFIDENTIAL - ALVIN L. POLIT, CFA
2        Q.  Okay, okay.
3            So you're certain you didn't speak to
4    anyone at Chicago Park in the days leading up to
5    November 3rd about Endo specifically, you're
6    unsure whether or not you spoke to anyone at
7    Chicago Park in the days leading up to
8    November 3rd, 2016 in general; is that fair?
9        A.  Correct.
10           MR. FONTI:  Objection.
11       Q.  Let's go a little bit in between
12   then.
13           Do you recall speaking to anyone in
14   Chicago Park in the days leading up to
15   November 3rd, 2016 about the pharmaceutical
16   industry?
17           MR. FONTI:  Objection.
18       A.  I'd say, no, if it's -- that would be
19   unusual if I'm speaking in the portfolio context.
20   So I'd say, no.
21       Q.  Okay.  So same questions but replace
22   Chicago Park with Marquette.
23           Did you speak to anyone at in the
24   days leading up to November 3rd, 2016 in general?
25           MR. FONTI:  Objection.

50 (Pages 194 - 197)

Page 198

CONFIDENTIAL - ALVIN L. POLIT, CFA

1
2    A.  I wouldn't know as well.  I never
3    kept a log of Marquette meetings.
4    Q.  Did you speak to anyone at in the
5    days leading up to November 3rd, 2016 about the
6    pharmaceutical industry?
7    A.  It isn't unusual to talk about your
8    positioning in the portfolio and what you're
9    seeing.  Had I met with Marquette, it's very
10   likely that I would have given them my views on
11   what I was seeing and the value potential in that
12   space, but I wouldn't know for certain.
13   Q.  You don't recall any specific
14   conversations?
15   A.  I used to go to Chicago quite a bit,
16   probably once a quarter or several times a
17   quarter.  So I did meet with Marquette many
18   times.  And if I did meet with them around
19   November, if I had to bet, I probably did talk
20   about pharmaceutical exposure in the portfolio.
21   But I don't know for certain.
22   Q.  Do you recall having a specific
23   conversation with anyone at Marquette in the days
24   leading up to November 3rd, 2016 about Endo,
25   specifically?

Page 199

CONFIDENTIAL - ALVIN L. POLIT, CFA

1
2    MR. FONTI:  Objection.
3    A.  If I had a meeting with them and if
4    trade activity that you highlighted shows that we
5    made money, it was probably a conversation that
6    would have come up, talked to us about your fees
7    and why you sold, but I don't know for certain.
8    Q.  Okay.  So you have no recollection of
9    actually having a conversation with anyone at
10   Marquette in the days leading up to November 3rd,
11   but you can't rule it out entirely?
12   A.  Exactly, yeah.
13   Q.  Okay.  Did anyone at Marquette
14   suggest that you purchase Endo stock on
15   November 3rd on or around November 3rd, 2016?
16   MR. FONTI:  Objection.
17   A.  No.  I can say for certain that's --
18   you never hear that from consultants.
19   Q.  Okay.  Did you speak to anyone else
20   including attorneys in the days leading up to
21   November 3rd, 2016 about Endo stock?
22   MR. FONTI:  Objection, because it
23   calls for a privileged communication.
24   You can answer or not answer.
25   MR. MORTENSON:  I'm sorry, did you

Page 200

CONFIDENTIAL - ALVIN L. POLIT, CFA

1
2    say --
3    MR. PINELLI:  Hold up stop, stop
4    there.  Hold.
5    Can I have the question read back,
6    please.
7    (Whereupon, the question is read back
8    as follows:
9    "Question:  Did you speak to anyone
10   else including attorneys in the days leading up
11   to November 3rd, 2016 about Endo stock?")
12   MR. PINELLI:  Well, exclusive of any
13   conversations you had with attorneys for
14   Lombardia at that time, you can answer.
15   But you shouldn't answer any
16   communications you had with attorneys for
17   Lombardia, specifically.
18   A.  So the answer would end up being, no,
19   although let me qualify that.
20   Outside the team, it -- externally it
21   would have been, no.
22   Q.  Okay.  Let me just make sure I
23   understand.
24   And let's just limit it to attorneys
25   at this point for ease, for ease of reference at

Page 201

CONFIDENTIAL - ALVIN L. POLIT, CFA

1
2    this point.
3    Did you speak to any attorneys of
4    Lombardia's in the days leading up to
5    November 3rd, 2016?
6    Just answer yes or no.  I don't want
7    to know the substance of the conversation.
8    A.  2016?  I'd say the answer is, yes.
9    Q.  Did any of those conversations with
10   Lombardia's attorneys touch upon your specific
11   trading strategy?
12   MR. PINELLI:  I'm going to --
13   A.  No.
14   MR. PINELLI:  -- object.
15   [INSTRUCTION] I instruct you not to
16   answer any further about any conversations you
17   had with attorneys for Lombardia about your
18   trading strategy or anything else.
19   MR. MORTENSON:  I'll move on.
20   MR. PINELLI:  Okay.
21   Q.  Al, did you speak to -- so putting
22   aside Lombardia's attorneys --
23   MR. FONTI:  I'll just put on the
24   record that the prior answer is by no means a
25   waiver of any privilege.  I think you got the

51 (Pages 198 - 201)

Page 202

CONFIDENTIAL - ALVIN L. POLIT, CFA

1   answer you wanted, but by no means will the
2   Defendants argue that by Mr. Polit answering a
3   question that is in any way, shape or form a
4   waiver of the attorney-client privilege.
5        MR. MORTENSON:  I'm sorry, let me --
6   I didn't follow that entirely.
7        MR. FONTI:  We're not -- we don't
8   consider the answer Mr. Polit just gave to be a
9   waiver of attorney-client privilege, if that's
10  what you are getting at.
11       MR. MORTENSON:  Thank you.
12       Q.  Okay.  Now -- so putting aside now
13  Lombardia's lawyers, off to the side, did you
14  speak to any other attorneys in the days leading
15  up to November 3rd, 2016 about Endo?
16       A.  No.
17       Q.  Did you speak to in -- so now let's
18  reorient to no longer the days leading up but
19  November 3rd, 2016 and the days -- a few days
20  following that.  Let's say November 3rd through
21  November 7th, okay, just to put some numbers on
22  it.
23       MR. FONTI:  Greg, to the extent to
24  the class that -- to the extent he can these yes
25

Page 203

CONFIDENTIAL - ALVIN L. POLIT, CFA

1   or no, by no means are you going to assert that
2   the answers are a waiver of privilege.
3        MR. MORTENSON:  Agreed.
4        Q.  So same questions in the days --
5   November 3rd to November 7th, did you speak to
6   any non-Lombardia attorneys about Endo stock?
7        A.  November 3rd through November 7th?
8        Q.  Yeah in the days following
9   November 3rd.
10       A.  No.
11       Q.  Did you speak to anyone at Chicago
12  Park in the days following November 3rd about
13  Endo stock?
14       A.  I would have spoken to Chicago Parks
15  possibly.  But with regards to Endo, I'd say, no,
16  that's highly unusual.
17       Q.  Anyone at Marquette, did you speak to
18  anyone there in the days following November 3rd,
19  2016 about Endo stock?
20       A.  As part of their ongoing due
21  diligence on us and portfolio review, the
22  conversation may have come up given the activity
23  we had, but I wouldn't recall.
24       Q.  Would anyone else at Lombardia, to

Page 204

CONFIDENTIAL - ALVIN L. POLIT, CFA

1   your knowledge, have spoken to anyone about Endo
2   stock -- let me rephrase that.  Let me strike
3   that.
4        Would anyone else at Lombardia have
5   spoken to Chicago Park or Marquette about Endo
6   stock, to your knowledge?
7        MR. FONTI:  Objection.
8        MR. PINELLI:  Objection foundation.
9        A.  Not to my knowledge.
10       Q.  In between November 1st, 2016 through
11  April 2017, do you recall having a conversation
12  with any non-Lombardia attorneys about Endo
13  stock?
14       A.  No.
15       MR. FONTI:  Same agreement?
16       MR. MORTENSON:  Yeah.
17       Q.  Do you recall any conversations with
18  anyone at Chicago Park between November 1st, 2016
19  through April 2017, specifically, about Endo
20  stock?
21       A.  No, I don't recall.
22       Q.  Same question but for Marquette, do
23  you recall any specific conversation between
24  November 1st, 2016 through April 2017 with anyone

Page 205

CONFIDENTIAL - ALVIN L. POLIT, CFA

1   at Marquette, specifically, about Endo stock?
2        A.  You know, I'll give the same answer
3   before.  To the extent that I would have met with
4   them, it's likely that the pharmaceutical theme
5   would have come up and there were discussions and
6   Endo might have been mentioned.
7        Q.  But you don't recall anything
8   specifically?
9        A.  I don't.
10       Q.  Did anyone at Chicago Park between
11  November 1st, 2016 through April 2017 instruct
12  you to purchase Endo stock?
13       MR. FONTI:  Objection.
14       A.  No.
15       Q.  Did anyone else, anyone else between
16  November 1st, 2016 through April 2017 instruct
17  you to purchase Endo stock not including lawyers?
18       MR. FONTI:  Objection.
19       A.  No.
20       Q.  Did any non-Lombardia lawyers between
21  November 1st, 2016 through April 2017 instruct
22  you to purchase Endo stock?
23       MR. FONTI:  Same agreement?
24       MR. MORTENSON:  Same agreement.

52 (Pages 202 - 205)



**Veritext Legal Solutions**
212-267-6868                    www.veritext.com                    516-608-2400



Page 210

CONFIDENTIAL - ALVIN L. POLIT, CFA

10    Q.  But from November 1st, 2016 through
11  April 2017, do you recall any discussions with
12  Lombardia attorneys about Endo stock?
13        A.  None, no.
14        Q.  Okay.
15        MR. PINELLI:  Counsel, do you mind,
16  we've been going for a bit, can we take a short
17  break here?
18        MR. MORTENSON:  Yeah, sure.  How long
19  did you have in mind?
20        MR. PINELLI:  Just a five-minute.
21  You know, just a quick five-minute break or so.
22        MR. MORTENSON:  That's fine.
23        MR. FONTI:  How much time have you
24  got left, Greg?
25        MR. MORTENSON:  Hard to say.  I don't

Page 211

CONFIDENTIAL - ALVIN L. POLIT, CFA

 1
 2  know.  I need to review my outline.  I'll let you
 3  know.
 4        THE VIDEOGRAPHER:  Okay.  We are off
 5  the record at 3:58 p.m.
 6        (Recess taken 3:58 to 4:10 Pacific
 7  time.)
 8        THE VIDEOGRAPHER:  We are on the
 9  record at 4:10 p.m.
10        Q.  Al, we were talking earlier about the
11  trades on this chart, Exhibit A, which is D13.
12  And I was asking you some questions about whether
13  or not any individuals had instructed you to
14  purchase Endo stock.
15        Do you recall those questions?
16        A.  Yes.
17        Q.  I just want to make sure that I'm
18  clear.  Keeping in mind all those same questions,
19  we can dig through them again if you like, but
20  did anyone using a word less precise than
21  "instruct," did anyone suggest to you to purchase
22  Endo stock at anytime?
23        A.  No.
24        Q.  So now going back to this chart,
25  looking at the purchase November 8, 2018, do you

Page 212

CONFIDENTIAL - ALVIN L. POLIT, CFA

 1
 2  recall anything about that trade?
 3        A.  No.
 4        Q.  Do you recall why you authorized that
 5  trade?
 6        A.  Except for the price going down, I
 7  wouldn't have any other information.
 8        Q.  Any headlines that you recall that
 9  may have contributed to the price going down?
10        A.  No.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 214

1        CONFIDENTIAL - ALVIN L. POLIT, CFA



Veritext Legal Solutions
212-267-6868              www.veritext.com              516-608-2400



Page 218

1   CONFIDENTIAL - ALVIN L. POLIT, CFA

Page 221

1   CONFIDENTIAL - ALVIN L. POLIT, CFA

5       A.  It does.  The article came out in
6   '17.  The firm didn't actually completely shut
7   down until '18.  But I don't believe there are
8   anymore assets after '17.
9           Pertaining to your question, the firm
10   did not technically should down until sometime in
11   '18.
12       Q.  Understood.
13           And it's your recollection that you
14   left Lombardia in, approximately, April 2017?
15       A.  Early April of '17, correct.
16       Q.  Do you know why Lombardia shut down?
17       A.  The founder passed away in early
18   2015.  The organization was ill-equipped on
19   succession planning.  Consultants and clients
20   were uncomfortable with the leadership of the
21   organization combined with the US small cap
22   strategy was performing poorly.
23           Those all don't make a good recipe
24   for client confidence and so clients started
25   slowly pulling their money out.  And when I left

56 (Pages 218 - 221)



Page 222

1          CONFIDENTIAL - ALVIN L. POLIT, CFA
2     with my team in April of '17, that might have
3     been the last straw.  And everyone pulled their
4     money out after that.

Veritext Legal Solutions
www.veritext.com
212-267-6868                                              516-608-2400



Page 226

1       CONFIDENTIAL - ALVIN L. POLIT, CFA

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



Page 230

1          CONFIDENTIAL - ALVIN L. POLIT, CFA

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



Page 234

CONFIDENTIAL - ALVIN L. POLIT, CFA

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



Page 238

CONFIDENTIAL - ALVIN L. POLIT, CFA

**Veritext Legal Solutions**
212-267-6868          www.veritext.com          516-608-2400



Page 242

1      CONFIDENTIAL - ALVIN L. POLIT, CFA

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



Page 246

1          CONFIDENTIAL - ALVIN L. POLIT, CFA

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



Page 250
1        CONFIDENTIAL - ALVIN L. POLIT, CFA

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



Page 254

CONFIDENTIAL - ALVIN L. POLIT, CFA

Page 255

CONFIDENTIAL - ALVIN L. POLIT, CFA

8    Q.  And you testified previously that you
9  thought the transaction price of 16.60 is
10  actually an averaging of transactions that were
11  happening throughout the day?
12    A.  Correct, the fills.
13    Q.  Yes; of the same transaction?
14    A.  Exactly, yes.

65 (Pages 254 - 257)



Page 258

1    CONFIDENTIAL - ALVIN L. POLIT, CFA

15    Q.  Based on your experience, though, you
16  believe that order would have been filled
17  throughout the day and result in an average price
18  of 16.60?
19        MR. MORTENSON:  Objection.
20    A.  Correct.

66 (Pages 258 - 261)



Page 262

1        CONFIDENTIAL - ALVIN L. POLIT, CFA

Veritext Legal Solutions
www.veritext.com
212-267-6868                                              516-608-2400

Page 266

1    CONFIDENTIAL - ALVIN L. POLIT, CFA
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 267

1    CONFIDENTIAL - ALVIN L. POLIT, CFA
2    C E R T I F I C A T E   O F   R E P O R T E R
3    I, SILVIA P. WAGE, a Certified Shorthand
4    Reporter, Certified Realtime Reporter and Registered
5    Reporter, herby certify that the witness in the
6    foregoing deposition was by me duly sworn to tell
7    the truth, the whole truth, and nothing but the
8    truth in the within-entitled cause; that said
9    deposition was taken down in shorthand by me, a
10   disinterested person, at the time and place therein
11   stated, and that the testimony of the said
12   witness was thereafter reduced to typewriting, by
13   computer, under my direction and supervision;
14   that before completion of the deposition, review
15   of the transcript [X] was [ ] was not requested.
16   If requested, any changes made by the deponent
17   (and provided to the reporter) during the period
18   allowed are appended hereto.
19   I further certify that I am not of counsel
20   or attorney for either or any of the parties to
21   the said deposition, nor in any way interested in
22   _____ ad that I am not
23   _____ ies thereto.
24
25   License No. 30X100182700  dated: August 14, 2020

Page 268

1    ACKNOWLEDGMENT OF DEPONENT
2    I, Alvin Polit, do hereby certify
3    that I have read the foregoing transcript of my
4    testimony taken on 8/12/20, and further certify
5    that it is a true and accurate record of my
6    testimony (with the exception of the corrections
7    listed below):
8    Page   Line         Correction
9    _____|_____|_____|_____
10   _____|_____|_____|_____
11   _____|_____|_____|_____
12   _____|_____|_____|_____
13   _____|_____|_____|_____
14   _____|_____|_____|_____
15   _____|_____|_____|_____
16   _____|_____|_____|_____
17   _____|_____|_____|_____
18   _____|_____|_____|_____
19   _____|_____|_____|_____
20   _____|_____|_____|_____
21
                 _____
                        Alvin Polit
22
     SUBSCRIBED AND SWORN TO BEFORE ME
23   THIS _____ DAY OF _____, 20___.
24
     _____     _____
25   (NOTARY PUBLIC)      MY COMMISSION EXPIRES:

68 (Pages 266 - 268)

**[& - 2,000]**





2400

[3rd - account]                                                                                   Page 3



[account - alright]



[alright - answer]                                                      Page 5



[answer - assumptions] Page 6





**[bbp - brief]**                                                                Page 8



**[briefly - cautious]**                                          Page 9



[caveats - cheapest]





**[come - confidential]**

Page 12



[confidential - counsel]                                Page 13



[counsel - decide]

Page 14



**[decide - disappointing]**                                           Page 15



[discipline - e]                                                                Page 16









**[first - four]**                                                     Page 20





**[going - holdings]**                                           Page 22



**[holistically - initial]**                                                       Page 23



**[initially - items]**



[iterations - knowledge]                                                    Page 25



[known - letter]





**[look - market]**                                                                                   Page 28



**[market - models]**                                          Page 29



**[moment - new]**

























**[seen - single]**

Page 42









**[term - today]**





**[try - use]**







**[yellow - zoom]**

