## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALEXANDRE PELLETIER, Individually and On Behalf of All Others Similarly Situated, | Hon. Michael M. Baylson |
| Plaintiff, | No. 2:17-cv-05114-MB |
| - v. - | **CLASS ACTION** |
| ENDO INTERNATIONAL PLC, RAJIV KANISHKA LIYANAARCHCHIE DE SILVA, SUKETU P. UPADHYAY, AND PAUL V. CAMPANELLI | |
| Defendants. | |

## SUPPLEMENTAL MEMORANDUM IN FURTHER SUPPORT OF MOTION FOR CLASS CERTIFICATION AND JOINT MOTION FOR MACOMB TO INTERVENE

John S. Summers
Jonathan L. Cochran
**HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER**
One Logan Square, 27th Floor
Philadelphia, Pennsylvania 19103
Telephone: (215) 568-6200
Facsimile: (215) 568-0300

*Co-Counsel for the Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago and Proposed Intervenors Macomb County Employees' Retirement System and the 2015 Macomb County Intermediate Retirees Medical Benefits Trust; and Proposed Co-Counsel for the Class*

Joseph A. Fonti (admitted *pro hac vice*)
**BLEICHMAR FONTI & AULD LLP**
7 Times Square, 27th Floor
New York, New York 10036
Telephone: (212) 789-1340
Facsimile: (212) 205-3960

*Co-Counsel for the Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago and Proposed Intervenors Macomb County Employees' Retirement System and the 2015 Macomb County Intermediate Retirees Medical Benefits Trust; and Lead Counsel for the Class*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ........................................................................................................... 1

I.  RIGOROUS CONSIDERATION OF ALL RECORD EVIDENCE SUBMITTED
    BY THE PARTIES CONFIRMS THAT PARK SATISFIES  THE RULE 23
    REQUIREMENTS ................................................................................................ 4

    A.  Lead Counsel's Statements at the July 20, 2020 Hearing Were Accurate;
        Park's Motions to Quash Third-Party Subpoenas After the Close of Class
        Certification Briefing Were Made in Good Faith ..................................................... 4

    B.  Park Did Not Reverse Its Position Regarding Its November 3, 2016 Trade .......... 9

    C.  Requiring a Lead Plaintiff's Direct Reliance on Endo's Misstatements Is an
        Error of Law and Would Violate the PSLRA ........................................................ 14

    D.  The Suggestion That Park Is Not Typical of the Class Because It Did Not
        Own Endo Stock for the Entire Class Period Is Contrary to Law ......................... 18

    E.  Park's Intervention in the *MissPERS* Action Was Intended to Protect the
        Interest of Members of the Putative Class and Does Not Make Park Atypical
        or Inadequate as a Matter of Law .......................................................................... 19

II.  BUCKS COUNTY ERF IS INELIGIBLE TO BE LEAD PLAINTIFF,
     AND THE UNRELATED INDIVIDUALS ARE UNSUITABLE .............................. 20

    A.  The Court's Process for Selecting a Potential New Lead Plaintiff Is
        Contrary to the PSLRA and *Cendant* ................................................................... 21

    B.  Park Is Superior to Bucks County ERF and the Unrelated Individuals ............... 22

    C.  Any Change in Lead Plaintiff Would Be Prejudicial to the Class ........................ 24

CONCLUSION ............................................................................................................. 25

## **TABLE OF AUTHORITIES**

**Cases**

*Basic v. Levinson*, 485 U.S. 224 (1988)............................................................................ 15

*Hevesi v. Citigroup, Inc.*, 366 F.3d 70 (2d Cir. 2004) ....................................................23

*In re Arthrocare Corp. Sec. Litig.*,
    No. A-08-CA-574-SS, 2011 WL 13175766 (W.D. Tex. Aug. 30, 2011) ......................... 16

*In re Cendant Corp. Litigation*, 264 F.3d 201 (3d Cir. 2001)................................. passim

*In re Comput. Scis. Corp. Sec. Litig.*, 288 F.R.D. 112 (E.D. Va. 2012)............................ 19

*In re Data Access Systems Securities Litigation*,
    103 F.R.D. 130 (D.N.J. 1984) ..................................................................................... 18

*In re DVI, Inc. Sec. Litig.*, 639 F.3d 623 (3d Cir. 2011)..................................................... 15

*In re Herley Indus. Inc. Sec. Litig.*, 2010 WL 176869 (E.D. Pa. Jan. 15, 2010) .............. 21

*In re ICN/Viratek Sec. Litig.*,
    No. 87 CIV. 4296, 1996 WL 34448146 (S.D.N.Y. July 15, 1996)...................................17

*In re Laidlaw Sec. Litig.*,
    No. 91-CV-1829, 1992 WL 68341 (E.D. Pa. Mar. 31, 1992) .......................................... 18

*In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig.*,
    2013 WL 396117 (D.N.J. Jan. 30, 2013) ....................................................................... 10

*In re Petrobras Sec. Litig.*, 312 F.R.D. 354 (S.D.N.Y. 2016) ........................................... 19

*In re Scott Paper Co. Sec. Litig.*, 142 F.R.D. 611 (E.D. Pa. 1992).................................... 19

*In re Urban Outfitters, Inc. Sec. Litig.*,
    2016 WL 1043014 (E.D. Pa. Feb. 29, 2016) ...........................................................18, 19

*In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267 (S.D.N.Y. 2003)................................... 16

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
    328 F.R.D. 86 (S.D.N.Y. 2018)..............................................................................10, 19

*Peil v. Speiser*, 806 F.2d 1154 (3d Cir. 1986).............................................................14, 15

*Seidman v. Am. Mobile Sys., Inc.*, 157 F.R.D. 354 (E.D. Pa. 1994)................................. 18

*Villella v. Chemical & Mining Co. of Chile Inc.*,
    2018 WL 2958361 (S.D.N.Y. 2018) .............................................................................. 18

**Statutes**

15 U.S.C. § 78u-4 ................................................................................. 21, 23

**Other Authorities**

7 Newberg on Class Actions (5th ed.) ................................................. 19

**Rules**

Fed. R. Civ. P. 23 ...................................................................2, 19, 21, 23

Fed. R. Civ. P. 24 ............................................................................ 19, 23

Fed. R. Civ. P. 45 ...............................................................................7, 8

Lead Plaintiff Park and Proposed Intervenors Macomb respectfully submit this supplemental memorandum to address issues raised during the January 21, 2021 argument on lead plaintiff issues and in further support of their pending motion for class certification (ECF 116) and their joint motion for intervention and related relief (ECF 228).[1]

## INTRODUCTION

This case, pending since 2017, is at an inflection point.  On behalf of the Class and Lead Plaintiff Park, Lead Counsel Bleichmar Fonti & Auld LLP ("BFA") has analyzed over one million pages of documents, taken and defended multiple depositions, produced and responded to expert reports, and, with co-counsel Hangley Aronchick, stand ready to complete merits discovery and proceed to trial.  The Motion for Class Certification is ripe for decision, following extensive class certification discovery, full briefing, and additional submissions and hearings.

The Court's rigorous review has prompted multiple questions, submissions and telephone conferences, including most recently the January 21 Zoom conference.  Park, BFA and Hangley Aronchick embrace this review.  In equal measure, we understand the Court's commitment to perform that review under controlling Third Circuit precedent, and we believe that a full airing of the relevant facts and law should persuade the Court to certify the Class with Park, BFA and Hangley Aronchick serving as Lead Plaintiff, Lead Counsel and Co-counsel, respectively.

---

[1] Capitalized terms have the meanings stated in the Complaint (ECF 62) and the submissions of Park and Macomb in response to the Court's January 21, 2021 Order (ECF Nos. 268 and 269). Unless otherwise noted, all emphasis is added and all internal citations and quotation marks are omitted.

The Court's review has revealed its concerns about certifying the Class with Lead Plaintiff Park as the Class representative and Lead Counsel BFA as Class Counsel.  As will be demonstrated below, the answers to the Court's multiple rounds of questions over the past three months confirm that Park and BFA amply meet Rule 23's requirements.  We submit this Memorandum, in particular, because at the most recent January 21 Zoom conference the Court appears to have reached impressions of Lead Plaintiff and Lead Counsel that, respectfully, are not founded on record facts and controlling law.  This Memorandum, we believe, will be helpful to clarify the record and address in greater detail the Court's apparent concerns.

Section I addresses five areas the Court has raised in its questions and at the January 21 conference:

A.   Discovery issues relating to the July 20, 2020 ruling on Defendants' motion to compel and the Motions to Quash Defendants' post-class certification discovery subpoenas *duces tecum*;

B.   Park's representations regarding its November 3, 2016, purchase of Endo stock;

C.   The Court's stated preference for a lead plaintiff that can show direct reliance on Defendants' misstatements;

D.   Whether Park is not typical or adequate because it did not own Endo stock throughout the Class Period; and

E.   Whether Park is not typical or adequate because it sought to protect members of the putative *Pelletier* class by filing objections to a proposed settlement in another Endo securities fraud action.[2]

---

[2] Park promptly took up Defendants' January 21 offer to consider a stipulated Class definition to avoid any overlap with *MissPERS*, and awaits their response.  (*See* Exhibit 5, Jan. 26, 2021 Letter of Joseph Fonti to James Brandt.)  If Defendants stipulate to the Class definition, Park will dismiss the *MissPERS* appeal before a ruling on the class certification motion from this Court.

We respectfully submit that, once the record facts and controlling law are laid out, it is clearer than ever that Park and BFA should remain Lead Plaintiff and Lead Counsel for the requested, certified Class.

Section II goes one step further to address the Court's invitation to other potential plaintiffs and law firms to replace Lead Plaintiff and Lead Counsel.  In addition to the fact that there is no factual or legal basis to replace Park or BFA, the Court's invitation is problematic for several reasons.

*First*, it has led to something akin to a beauty contest, contrary to the process authorized by the PSLRA and the Third Circuit's controlling decision in *Cendant*.

*Second*, it has opened the door to potential error.  Although Bucks County ERF used an investment advisor like Park, it is time-barred and ineligible under the PSLRA's plain language.  The Unrelated Individuals also offer no alternative.  They are a lawyer-created group of three individuals, two of whom had not been accepted by Judge Savage.  Their February 1 submission, moreover, demonstrates that one of them invested in Endo at the behest of his accountant who was married to an Endo director at the time.

*Third*, inserting a new plaintiff with new counsel now would enormously prejudice the Class and (needlessly) buoy Defendants in their efforts to evade liability to the Class.  Park and Lead Counsel have spent more than 20,000 hours of attorney time on this case; along with new Co-Counsel, they are ready to proceed immediately with the next phases of this case, merits discovery and preparation for trial.  There would be inevitable inordinate duplication and delay if new counsel and new lead plaintiff were appointed.  This is a complicated case and Defendants would no doubt engage in a new round of exhaustive discovery.  In short, Defendants – not the Class – would benefit by swapping out Park and its counsel.

Accordingly, we respectfully request that the Court grant the Motion for Class Certification with the current Lead Plaintiff and Lead Counsel team remaining in place, and allow this matter to proceed promptly to trial.  Because of the high importance of these issues, we respectfully request that the Court grant argument at an in-person hearing.

## I.  RIGOROUS CONSIDERATION OF ALL RECORD EVIDENCE SUBMITTED BY THE PARTIES CONFIRMS THAT PARK SATISFIES THE RULE 23 REQUIREMENTS

Below, we carefully set out the evidence that addresses each of the Court's articulated concerns.

### A.  Lead Counsel's Statements at the July 20, 2020 Hearing Were Accurate; Park's Motions to Quash Third-Party Subpoenas After the Close of Class Certification Briefing Were Made in Good Faith

To respond accurately to the Court's pre-hearing questions and in preparation for the January 21 hearing, Mr. Summers undertook an extensive review, including interviewing four BFA lawyers and reviewing time sheets, documents, e-mails and transcripts.  As explained at the hearing and below, that review demonstrated (a) BFA filed the motions to quash in good faith because Defendants' subpoenas were late, *i.e.*, issued after Defendants filed their Opposition to the motion for class certification; and (b) Lead Counsel requested that Defendants agree to having motions to quash filed in the Eastern District of Pennsylvania but Defendants' counsel did not.  (Jan. 21 Trans. 47:18-19; 56:14-59:2.)

At the January 21 conference, the Court said:

> Mr. Fonti, you were on the record exactly six months ago, July 20, 2020.  I have the transcript here.  And <u>I made the statement then very clearly that in a securities case it's fundamental that the plaintiff has to produce all evidence about their</u>

<u>transactions in stock.  And you insisted several times that your</u>
<u>client had already done so.</u>

Now, what happened then after that, and Endo -- just give me a minute, but that's what you said.  That was a representation to the Court.  <u>And then what happened, although I didn't know about</u> <u>it at the time, that Endo then started serving subpoenas on certain</u> <u>stockbrokers.</u>  I presume they learned their identity from Mr. Polit or from some documents.  <u>And you filed five separate motions to</u> <u>quash in district courts throughout the United States, asking those</u> <u>judges, those federal judge[s], who knew nothing about this case, to</u> <u>quash those subpoenas.</u>  And <u>you did not once mention the fact that</u> <u>I, as the supervising judge on July 20th, had explicitly said that</u> <u>transactions were fundamental discovery in a case.</u>

What is your response, Sir?

(Jan. 21 Trans. 47:22-48:18.)

Respectfully, the Court's description reflects three misapprehensions.

<u>First</u>, the Court did not direct Park to produce "all evidence about their

transactions."  Instead, Your Honor directed Park to produce "all documents <u>they have</u>"

regarding the transactions.  (July 20 Trans. 19:1-8 (emphasis supplied).)  Specifically,

on July 20, 2020, the Court stated:

THE COURT: [...] I agree with the defendant that in a securities case, anybody who is a <u>plaintiff must produce all documents they</u> <u>have</u> showing their transactions in the stock of the defendant company.  There's no question about that.  And it doesn't matter to me how -- whether they've been buying and selling in and out and maybe at some point they didn't have any shares and so forth, but it is definitely relevant.  So I agree that the plaintiffs have to produce it.

(*Id.*)

On January 21, the Court appeared emphatic that its ruling was not limited to the

documents in Park's files:

Mr. Fonti:  Your honor, I don't think that -- You ordered us to produce everything we had.  We had done that.

5

> The Court:  No.  I didn't say -- I said more than that.  I said it's fundamental in a securities [case] that the plaintiff has to produce all their transactional records.

(Jan. 21 Trans. 52:4-10.)

Importantly, the Court's description is inaccurate in omitting the critical qualifier that Park produce only its documents:  "I agree with the defendant that in a securities case, anybody who is a plaintiff must produce all documents they have showing their transactions in the stock of a defendant company."  (July 20 Trans. 19:1-3.)

Mr. Fonti truthfully represented – on July 20 and in his follow-up July 22 letter – that Park had produced all of *its documents* showing Park's transactions in Endo stock.  Specifically, Mr. Fonti stated at the July 20 hearing:

> In short, there aren't additional documents *that we're withholding* on any grounds that bear on the transactions *that are in the possession of the lead plaintiff.*  I don't know what it is – what relief there is for Mr. Hammel, but *he has all of the documents that the client* – [interrupted by the Court].

(ECF 122, July 20 Trans. 18:4-9.)  Following the hearing, Mr. Fonti confirmed to Defendants' counsel what had been produced from Park's files and how those documents were identified:

> As you know, on July 9 and 15, 2020, Plaintiff produced the documents bearing Bates numbers […].  These include all documents *in Plaintiff's possession, custody, and control concerning* Plaintiff's transactions in Endo ordinary shares *that were identified from (1) Plaintiff's centralized files*, and (2) applying the final search terms that Defendants proposed (and Plaintiff accepted)—including the term 'Endo'—for the agreed-upon time period of January 1, 2013 through May 28, 2017."

(Exhibit 1, July 22, 2020 Ltr. to Jeff Hammel.)  Defendants took no issue.

Five months later (December 23, 2020), Defendants stated, "Chicago Park's counsel represented to the Court that it had produced *all* documents pertaining to its trades in Endo stock."  (ECF 237 at 6.)  That is not true.  As noted, Mr. Fonti made clear

at the July 20 hearing and on July 22 that he had produced documents that Park had in its files (and identified the sources); Mr. Fonti never represented that Park had produced documents from others' files.

   *Second*, Defendants did not, in either the many meet and confer conferences with Park's counsel, or in their motion to compel, challenge Park's objection to producing documents held by third parties.  Consistent with Park's objection, Defendants – well before July 20 – sought third parties' documents by subpoena, as Rule 45 requires. Almost a month before the July 20 hearing, Defendants served subpoenas *duces tecum* on (i) Park's investment manager Al Polit of Lombardia, and (ii) Park's investment consultant Marquette.[3]  (Exhibit 2, June 23, 2020 Notice of Issuance of Defendants' Subpoena to Marquette; Exhibit 3, June 23, 2020 Notice of Issuance of Defendants' Subpoena to Al Polit.)  Lead Counsel's understanding that it was only obligated to produce documents from Park's files is thus reinforced by the fact that Defendants had undertaken to collect documents concerning Park's trades in the possession of third parties such as Park's investment manager and consultant.

   *Third*, the Court's statement – coupled with Question 4(a) in the Court's January 15 Order (ECF 254) – concerning Park's motions to quash filed in September 2020 appears to charge Park's Lead Counsel with disobeying or attempting some end run around the Court's July 20 ruling, or otherwise avoiding Lead Counsel's obligations. Respectfully, there is no factual support for that criticism.

   To start, the question and Court's statement presumes that Lead Counsel filed the five motions in different districts, not this District, so that the judges addressing the

_____

   [3] Defendants' "chronology" omits that fact.  (ECF 237 at 6.)

motions would not know of Your Honor's ruling.  There is no factual basis for this.  As

Mr. Summers explained at the January 21 conference, Lead Counsel BFA advised

Defendants' counsel in writing over a week before filing the motions to quash that (a)

the motions should all be filed in the Eastern District of Pennsylvania; and (b) it would

oppose the subpoenas on the ground that they were late (*i.e.,* after Defendants'

opposition to class certification was filed):

> [W]e also request that Defendants consent to Plaintiff filing a
> ***single motion to quash in the Eastern District of***
> ***Pennsylvania***, given that all of these subpoenas were issued by
> Defendants and raise similar issues, yet require compliance around
> the country.

(Exhibit 4, Sept. 9, 2020, 5:10 p.m. E-mail of Thayne Stoddard; Jan. 21 Trans. 50:21-22

("[T]he motions to quash were filed on September 18th after extensive negotiations with

Defendants to try to get all five of those motions filed before Your Honor in Your Court

so that it could be resolved efficiently and in one fell swoop.").)

      In response to Park's suggestion to have all the motions heard in this District,

Defendants' counsel did not consent.  (*See* Exhibit 4.)  As Rule 45(d)(3)(A) requires,

Park therefore moved in the districts "where compliance is required."  There is therefore

no basis for the misimpression that Mr. Fonti somehow wanted to have the Motions to

Quash filed in multiple jurisdictions to avoid review by this Court.  In fact, the opposite

is true –Defendants' refusal to consent led to the filings in multiple Districts.

      To be sure, Mr. Fonti regrets having filed the motions to quash in light of the

Court's recent comments and the controversy the motions engendered.  While the

motions to quash were prompted by the sincere and good faith belief that the class

certification discovery record was closed by August 17, 2020, he regrets that he did not

just withdraw the objection.  Respectfully, however, none of this is a basis to replace Lead Plaintiff or Lead Counsel.

### B.    Park Did Not Reverse Its Position Regarding Its November 3, 2016 Trade

Defendants argue that Park is atypical because it purchased Endo shares after corrective articles were published and has called particular emphasis to Park's purchase of shares on November 3, 2016, the date of the partially corrective *Bloomberg* article.  In response to Park's detailed explanations of its trading, the Court criticized Park and Lead Counsel at the January 21 conference for having made a "180-degree turn in position" (Jan. 21 Trans. 59:3-60:2) regarding the timing of those purchases. Respectfully, a careful review of Park's statements regarding its purchases of Endo stock demonstrate that no such criticism is warranted.

To begin, Park has never concealed the facts regarding its purchase on November 3, 2016 or thereafter.  All of Park's Class Period transactions were disclosed in its initial PSLRA certification (ECF 11-6 at 5 of 5).  Additionally, Park openly acknowledged that it purchased Endo stock after the first disclosure, which was on November 3.  Specifically, at the lead plaintiff hearing before Judge Savage, the following exchange occurred:

> THE COURT: ***Did the Fund buy any shares after the first disclosure*** [referring to the November 3, 2016 *Bloomberg* article]?
>
> MR. BLEICHMAR: ***Yes, Your Honor.***
>
> THE COURT: Okay, and did you use that in your calculation?
>
> MR. BLEICHMAR: Yes, Your Honor.
>
> THE COURT: Go ahead.

9

(ECF 56-1 at 12:5-11.)[4]

Park has also always maintained that its post-disclosure purchases, including on November 3, do not raise any typicality concerns.  That is because well-settled law holds that purchases made after a partial corrective disclosure do not render Park atypical.[5] *See* ECF 152 at 18 of 37; *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 328 F.R.D. 86, 91–93 (S.D.N.Y. 2018) (rejecting challenge to plaintiff who made initial purchase after "a partial disclosure rather than a full correction"); *In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig.*, 2013 WL 396117, at *6–7 (D.N.J. Jan. 30, 2013) (purchases after corrective disclosure were mere "nuances" that did not defeat typicality).  Further, over 20 million shares changed hands on November 3, 2016 (ECF 174 at 10 of 13), so Park's trading is in no way unique.

Thus, Park's November 3 purchases—regardless of their specific timing—raise no cognizable issue regarding Park's typicality or adequacy.

Nonetheless, the Court has expressed concern that Park made a "180-degree turn in position" (Jan. 21 Trans. 59:3-60:2) regarding the timing of those purchases.

> The Court: [...]  Let me just say that we have been through extensive documents, and I have looked at them myself, and in my view, the Park papers initially said that the trade was made before the Bloomberg disclosure.  They then said they could not be sure, it could have been all during the day, and they subsequently conceded that it was – the trade was made after the Bloomberg disclosure. That's my recollection of the record.

---

[4] Because Park purchased Endo shares on November 4 and 8, 2016 (among other dates), irrespective of the precise timing of its November 3, 2016 trade, Park has never disputed that it purchased shares after that day's partial corrective disclosure.

[5] Park has also fully responded to any suggestion that it purchased shares to be a plaintiff in this case.  It absolutely did not do that.  (ECF 216 at 4-5 of 16.)

(*Id.* 62:19-63:1.)

The charge that a party has made a 180-degree turn in position is serious, requiring a thorough, fact-based response.  So there are no misunderstandings, we understand the Court to be saying:  (1) Park first said it purchased Endo stock on November 3 before the *Bloomberg* article, but (2) Park later expressed uncertainty, and (3) after a broker produced documents, Park conceded its purchases were made after the article.

A careful unpacking of the facts, respectfully, demonstrates that the charge is inconsistent with Park's and Lead Counsel's actual statements concerning the November 3 trades.

Let's start with what is involved with a trade.  There are multiple steps between the time a decision to purchase a security is made and when the purchase is completed.  Specifically, after a decision to purchase securities is made, the order is (1) entered with a third-party broker, (2) filled (usually through shares bought from multiple sellers), and (3) completed when the last fill takes place.  This process from the entry of an order to its completion often takes several minutes.  (*See* ECF 251 at 4 of 7.)  This means that an order is completed after the underlying purchase decision was made and after the order was entered.

So what has been said about Park's November 3 purchase of Endo stock?

- From its very first filings, Park acknowledged that it purchased Endo stock **on** November 3, the day *Bloomberg*'s article was published.  Park disclosed – accurately – its purchase at $16.60 per share on November 3.  (ECF 11-6 at 5 of 5.)  Park also said that the November 3 *Bloomberg* article was one of the corrective disclosures in the case.  (ECF 11-2 at 5-6 of 12.)

- On August 17, 2020, Defendants opposed class certification, arguing that "Park's purchases on [November 3] appear to have occurred **after** the article was published at 2:10:27 p.m." (ECF 133 at 19 of 30 (emphasis in

original).)  Defendants' argument rested solely on the $16.60 purchase price, which occurred after the article.

- In response, Park's September 18, 2020 Reply in Support of Class Certification stated: "Park's November 3 purchase order for thousands of Endo shares was entered and filled ***starting before*** the partially corrective *Bloomberg* article was released."  (ECF 149 at 9-10.)

Thus, Park has never disputed that its purchases were **completed** after the article.  Park's September 18 Reply made the different point that its November 3 transaction **started** before the article.  Park's September 18 statement about when the November 3 transaction started was based on the deposition testimony of Mr. Polit. When asked directly by Defendants' counsel whether he "authorize[d] the purchase of Endo stock in response to this article," Mr. Polit answered: "It wouldn't have been a response to this article.  I would have authorized purchases of Endo for fundamental reasons."  (ECF 216-1 at 185:3-8.)  Mr. Polit testified that he would have reviewed Endo's historical financial results, filings and presentations, and that he first invested in Endo in June 2016 based on a price he had set.  (*Id.* at 43:14-25; 164:5-11; 173:2-12.)

Defendants' counsel further directly asked Mr. Polit whether he had "any reason to doubt" that the November 3 purchase occurred between 2:10 and 2:11 PM, immediately after the article was published.  (ECF 216-1 at 188:18-20.)  Mr. Polit responded that he believed the $16.595 purchase price "is an aggregation of all fills that have been done throughout that day."  (*Id.* at 189:4-6.)  He then explained that "it's more likely that it occurred throughout the day and not at that particular time period that you indicated."  (*Id.* at 189:11-13.)

Importantly, Park did not dispute that its purchases were completed ***after*** the article; instead it sought to clarify when the transaction started.  Mr. Fonti asked Mr. Polit:

> Q. Is it fair to say that if you are correct that this is an average price of 16.60 that the fills of that one order were happening before 2:11 Eastern on November 3rd ***as well as after***?
>
> MR. MORTENSON: Objection.
>
> A. Without certainty, I can't tell you. But ***given my experience, it would have been done throughout the day***, some portion of the day, maybe not the entire day. It wouldn't have just been at one instant. The order would have been too large.

(ECF 216-1 at 257:8-24.)  Mr. Polit also acknowledged that the indicated price was "an averaging of transactions that were happening throughout the day," which resulted in an "average price."  (*Id.* at 255:8-14; 258:15-20; *see also* Jan. 21 Trans. 61:8-15.)

Park's statement in its Reply brief is fully supported by Mr. Polit's testimony, which remains the only direct evidence of when the transaction started.

Several weeks after Park's Reply, broker SWS produced SWS's trade confirmation of Park's November 3, 2016 purchase (ECF 251-10, 251-13), as well as other purchases. Those records show that Park's November 3 order was ***completed*** after the article. (ECF 251-10; *see also* ECF 251-13 & 251-14.)  Thus, those records do not contradict what Park had been saying about when the transaction ***started***.

Park further explained that the documents from other brokers are consistent with what Park has been saying because those records show that other trades regularly involved a delay of at least several minutes between when a purchase is entered and filled.  This, Park explained, is circumstantial evidence that the November 3 transaction

started before publication of the article —notwithstanding that the transaction was completed 97 seconds after the article was published.  (*See* ECF 251 at 4 of 7.)[6]

Accordingly, Park has never wavered from its statements to the Court that the November 3 purchase transactions started before the article.  Respectfully, therefore, this is no ground to criticize Park or Lead Counsel.

### C.    Requiring a Lead Plaintiff's Direct Reliance on Endo's Misstatements Is an Error of Law and Would Violate the PSLRA

The Court has also indicated the concern that an "ideal" lead plaintiff should be able to show direct reliance on Defendants' misstatements and is "somebody who invests based on their personal research and review, and who then calls a broker and discusses it" (Jan. 21 Trans. 38:14-39:19).  Apparently on that basis, the Court has suggested that Park, because it used an investment manager, is less than "ideal" and could be replaced.  (*See id*. 30:24-31:6.)  Respectfully, Supreme Court and Third Circuit precedent instruct otherwise.  No securities fraud plaintiff– not an ideal one or any one – need demonstrate direct reliance on Defendants' misstatements.

Circuit Judge Becker's Opinion in *Peil* – discussed at the January 21 hearing – instructs that the fraud on the market theory makes clear that a lead plaintiff need not show direct reliance on misstatements:

---

[6] Defendants criticize that Mr. Polit did not know when the order was placed and could not speak to the timing "with any certainty."  (ECF 133 at 19 of 30 (quoting testimony).)  That is no basis for criticism.  The trade took place nearly four years earlier. It is unsurprising that a professional investment manager could not recall the precise time of one of countless trades.  Indeed, there was nothing to make this trade any different from any other trades in Mr. Polit's mind.  He followed a value investment model and bought securities when they hit prices determined by his analysis of the security and underlying company.  It is therefore not surprising that he could not place and time the trade on November 3.

> This argument, however, misses the point of the fraud on the
> market theory, under which a plaintiff may prevail even if he was
> entirely unaware of the alleged misrepresentations. Under the fraud
> on the market theory, plaintiffs' reliance is not on defendants'
> fraudulent actions directly, but on the marketplace's reflection of
> the value of the stock.

*Peil v. Speiser*, 806 F.2d 1154, 1163 (3d Cir. 1986). Whether a class representative

"rel[ied] *directly* on defendants' misrepresentations" is "a fact that is not relevant under

the fraud on the market approach." *Id.* (emphasis in original). The Supreme Court

embraced this reasoning in *Basic v. Levinson*, concluding that requiring proof of direct

reliance "would place an unnecessarily unrealistic evidentiary burden on [a] plaintiff

who has traded on an impersonal market." 485 U.S. 224, 245 (1988).

For that reason, replacing Park based on its use of an investment manager or

concerns about direct reliance would be error. Requiring "eyeball reliance" or "personal

knowledge" to serve as lead plaintiff or class representative would be contrary to the

Supreme Court's decision in *Basic* and the Third Circuit's decision in *Peil* over three

decades ago. We are aware of no authority imposing such a requirement.

To replace Park on that basis would also conflict with the PSLRA's preference for

institutional investors like Park to serve as lead plaintiffs. *See*, *e.g.*, *In re Cendant Corp.*

*Litigation*, 264 F.3d 201, 243-44 (3d Cir. 2001). Indeed, institutional investors'

competencies and fiduciary obligations essentially require these investors to delegate

decisions about individual investments to outside investment managers. *In re DVI, Inc.*

*Sec. Litig.*, 639 F.3d 623, 640 n.25 (3d Cir. 2011) ("[I]nstitutional investors are likely to

use advisors.") (*quoting In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 282 (S.D.N.Y.

2003)) (internal brackets omitted).[7]  To impose a requirement or criterion that a lead plaintiff must have personally reviewed at-issue disclosures would effectively preclude service by the overwhelming majority of the PSLRA-preferred institutional investors.[8]

Significantly, no party in this dispute has supported the Court's emphasis on the personal knowledge of a Lead Plaintiff.  Defendants haven't. When asked for authority by the Court, Defendants conceded the related proposition that they "have not identified any Supreme Court or Third Circuit opinions addressing whether transacting through an investment manager necessarily deprives a prospective class representative of standing."  (ECF 237 at 1 (*citing In re Arthrocare Corp. Sec. Litig.*, No. A-08-CA-574-SS, 2011 WL 13175766, at *5 (W.D. Tex. Aug. 30, 2011) (institutional investors were actual purchasers despite using manager)).)  Our research has likewise uncovered no decision disqualifying a potential institutional lead plaintiff because its purchases and sales of stock were conducted by an outside manager with discretion to purchase and trade.[9]

---

[7] *See also* Stephen J. Choi & Jill E. Fisch, *On Beyond Calpers: Survey Evidence on the Developing Role of Public Pension Funds in Corporate Governance*, 61 Vand. L. Rev. 315, 323 (2008) ("A large percentage of public pension fund assets are managed externally. . . .  [O]n average, 84.2% of fund assets are managed externally."); Boston College Pension Research Group, ECF 252-2 (U.S. public pension plans used an average of 55 external asset managers in 2018); *id.* (noting that "the general trend over time has been toward external management" and that only about one-quarter of plans in the Public Plan Database were managing some assets internally as of 2018).

[8] Park has indisputably demonstrated the fraud on the market presumption on behalf of the Class and will do so again at trial.  Mr. Polit, who managed Park's investments in Endo securities at Lombardia, also testified that he did directly rely on Endo written statements, including its 10-Ks, quarterly filings, websites and financial statements.  (ECF 216-1 (Polit Tr.) at 154:11-155:9.)

[9] The Court also stated, "Park did not even get the ownership of the shares until after they had been purchased by Lombardia."  (Jan. 21 Trans. 31:5-6.)  Respectfully, that is incorrect and not a relevant consideration for the appointment of Lead Plaintiff.

Similarly, the investors now seeking to replace Park – Bucks County ERF and the Unrelated Individuals – do not contend that direct "eyeball" reliance or the use of investment managers is relevant to the selection of the lead plaintiff or the certification of the Class. To the contrary, Bucks County ERF used an investment manager, and its February 1 submission specifically states that Section 10(b) claims "do not require actual (or 'eyeball') reliance." (ECF 270 at 2 of 9.) And precisely like Park and Macomb, Bucks County ERF invokes the fraud on the market presumption of reliance under *Basic*. (*Compare* ECF 270 *with* ECF 268, 269.) Bucks County ERF's own use of an investment manager and identical theory of reliance confirms that there is no basis to displace Park. Moreover, unlike Park, Bucks County ERF provides no direct evidence of actual review of any of Defendants' alleged false statements. (*See supra* n.8.)

Finally, it is possible that the Court is concerned that the Class would be prejudiced if Defendants somehow established at trial that the lead plaintiff did not directly review Endo's false and misleading public statements. But the Class would not be prejudiced. If Defendants were to press that argument or attempt to introduce such evidence at trial, the Court could properly do what legions of other courts have done – exclude such evidence and reject the argument. Simply put, a lead plaintiff's direct, subjective reliance (or lack thereof) is inadmissible as irrelevant to class claims.[10]

---

Lombardia acquired the shares for Park, using Park's assets that at all times were in Park's custody rather than Lombardia's, and Park held title to the shares from the moment of purchase. (ECF 234 at 4 of 18.) Defendants have never disputed that Park is a "purchaser" under the securities laws. (*See* ECF 233 at 2 of 15.)

[10] We have previously advised the Court how this issue is addressed at trial. (*See* ECF 216 at 9 of 16 (providing excerpts of available jury instructions and pre-trial orders concerning timing of proof of lead plaintiff's transactions ***after*** the determination of class-wide liability).) *See also In re ICN/Viratek Sec. Litig.*, No. 87 CIV. 4296, 1996 WL 34448146, at *2 (S.D.N.Y. July 15, 1996) (holding that "[b]ecause the First Trial will

**D.    The Suggestion That Park Is Not Typical of the Class Because It Did Not Own Endo Stock for the Entire Class Period Is Contrary to Law**

During the January 21 hearing, the Court also expressed a concern that Park did not hold Endo shares until June 2016 and is therefore not an "ideal re-investor" (Jan. 21 Trans. 41:8-17). Respectfully, that too does not affect typicality.

For starters, Judge Savage appointed Park as Lead Plaintiff, knowing full well that Park did not hold Endo shares until June 2016. (ECF 11-5.)

Next, numerous courts in this District and elsewhere hold that a lead plaintiff need not own shares throughout a class period. For example, in *In re Urban Outfitters, Inc. Sec. Litig.*, 2016 WL 1043014, at *2 n.2 (E.D. Pa. Feb. 29, 2016), the court certified a class period from March 12, 2013 to September 9, 2013, notwithstanding that the lead plaintiff only purchased shares a month before the class period ended (and thus held no shares at all for the first five months). The court expressly rejected any requirement to have "a lead plaintiff for each day of the class period or the last day of the class period."

---

consider only class-wide issues, any testimony by the individual class representatives at the First Trial would be either ***irrelevant***, or marginally relevant but overly confusing to the jury"); *Villella v. Chemical & Mining Co. of Chile Inc.*, 2018 WL 2958361, at *8 n.5 (S.D.N.Y. 2018) (noting that "any individualized challenges to a putative class member's reliance will only be considered ***after*** a determination on liability"); *Cendant*, 264 F.3d at 243-44; *In re Laidlaw Sec. Litig.*, No. 91-CV-1829, 1992 WL 68341, at *5 (E.D. Pa. Mar. 31, 1992) ("Fraud-on-the-market ***obviates*** the need to prove direct, subjective reliance upon defendants' alleged misrepresentations by each class member in open market transactions since the market is interposed between the buyer and seller."); *cf. also Seidman v. Am. Mobile Sys., Inc.*, 157 F.R.D. 354, 362-63 (E.D. Pa. 1994) (Robreno, J.) ("[D]iffering types of reliance are present in almost every securities class action. [...] If defendants' argument were to prevail that factual differences of this nature were sufficient to defeat class certification, there could never be a class action of securities purchasers.") (*quoting In re Data Access Systems Securities Litigation*, 103 F.R.D. 130, 139 (D.N.J. 1984)). Bucks County ERF's February 1 submission similarly notes that courts routinely exclude evidence concerning lead plaintiffs' individual reliance, which is not relevant to the class claims and therefore inadmissible at the class-wide trial. (ECF 270 at 4-5 of 9.)

*Id.* Likewise in *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 328 F.R.D. 86, 91–93 (S.D.N.Y. 2018), the court certified the class where one lead plaintiff made his initial purchase after a *Wall Street Journal* article that appeared to be "only a partial disclosure rather than a full correction."

Finally, if this were a concern (which it respectfully should not be), it could be cured by adding Macomb under Rules 23 and 24 as Class Representative, which began its purchases in July 2015, just a few months after the Class Period commenced.[11]  *See also In re Scott Paper Co. Sec. Litig.*, 142 F.R.D. 611, 616 (E.D. Pa. 1992) (certifying class and holding lead plaintiff typical and adequate despite selling shares "before Scott's September 20, 1990 announcement which precipitated the drop in the price of Scott stock").  *See also In re Comput. Scis. Corp. Sec. Litig.*, 288 F.R.D. 112, 122-23 (E.D. Va. 2012) (uniqueness of lead plaintiff's trading practices does not affect typicality); 7 Newberg on Class Actions § 22:72 (5th ed.) (collecting cases); *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 360-61 (S.D.N.Y. 2016) (rejecting arguments that institutional investor was atypical due to post-disclosure purchases, "alternat[ing] between purchases and sales," and other issues).

### E.  Park's Intervention in the *MissPERS* Action Was Intended to Protect the Interest of Members of the Putative Class and Does Not Make Park Atypical or Inadequate as a Matter of Law

The Court has also expressed concerns regarding Park's intervention in *MissPERS* to protect the putative class's interests.  As was explained at the January 21 hearing, Park's objection was grounded in its fiduciary obligation to protect the interests

---

[11] Macomb will separately address MCMBT's joinder in the intervention motion in a forthcoming separate reply to Defendants' January 28 opposition.

of members of the alleged *Pelletier* class and its belief that *Pelletier*'s claims have different factual predicates and damages from those in *MissPERS*, and therefore are not susceptible to release in *MissPERS*.

That said, Park recognized the Court's concerns regarding potential complexity or confusion as to damages issues and proposed to Defendants a modified class definition to simply and efficiently exclude any shares that may have been the basis for a recovery in *MissPERS*. Park proposed its modified class definition on December 14, 2020 (ECF 216) and discussed it with the Court on January 21. (Jan. 21 Trans. 21-24.) The proposal fully addresses the Court's concerns by eliminating any overlap between class members or damages in *Pelletier* and *MissPERS* such that no further adjustment to the class period of March 2, 2015 to February 27, 2017 is necessary.

At the January 21 hearing, Defendants offered to "take a hard look" at Park's proposal. (Jan. 21 Trans. 21:17-20.) Park promptly took up Defendants' offer the next week and awaits their response. (*See* Exhibit 5, Jan. 26, 2021 Letter of Joseph Fonti to James Brandt.) If Defendants stipulate to the Class definition, Park will dismiss the *MissPERS* appeal before a ruling from this Court on the class certification motion.

## II.    BUCKS COUNTY ERF IS INELIGIBLE TO BE LEAD PLAINTIFF, AND THE UNRELATED INDIVIDUALS ARE UNSUITABLE

The pending motions to replace Lead Plaintiff and Lead Counsel should also be denied because (1) the PSLRA and *Cendant* prohibit such "beauty contests," (2) both Bucks County ERF and the Unrelated Individuals cannot be appointed on the merits, and (3) any change in Lead Plaintiff and Lead Counsel would be prejudicial to the Class.

### A.    The Court's Process for Selecting a Potential New Lead Plaintiff Is Contrary to the PSLRA and *Cendant*

In *In re Cendant Corp. Litigation*, Chief Judge Becker confirmed that the PSLRA's specific statutory criteria for selecting the lead plaintiff are exhaustive, meaning that courts are prohibited from evaluating and selecting lead plaintiffs on any other basis.  264 F.3d 201 (3d Cir. 2001).  The PSLRA requires that any lead plaintiff (1) timely move for appointment (here, by January 18, 2018); (2) have the "largest financial interest in the relief sought by the class"; and (3) make a *prima facie* showing that it satisfies the requirements of Rule 23.  15 U.S.C. § 78u–4 (a)(3)(B)(iii)(I); *Cendant*, 264 F.3d at 263-64.  The movant that satisfies all three criteria must be appointed as lead plaintiff absent "proof *by a member of the purported plaintiff class*" that such movant is inadequate or subject to unique defenses.  *Id.* at 268 (quoting with emphasis 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II)).

In describing these statutory requirements, Chief Judge Becker emphasized that "the question *is not* whether another movant might do a better job of protecting the interests of the class" and that the "inquiry *is not* a relative one."  *Id.* at 268 (emphasis in original).  The same "statutory guidelines governing the initial appointment of a lead plaintiff must be satisfied by any substitute lead plaintiff."  *In re Herley Indus. Inc. Sec. Litig.*, 2010 WL 176869, at *3 (E.D. Pa. Jan. 15, 2010).

Contrary to these requirements, the Court appears to be considering Bucks County ERF and the Unrelated Individuals in a kind of "beauty contest" to make a relative assessment of the strength of each candidate.  Respectfully, this departs from settled law in two related respects.

First, the PSLRA and *Cendant* bar such a "relative" inquiry, 264 F.3d at 268, particularly after Park has vigorously advanced the Class's claims for over two-and-a-half years.  Neither the Unrelated Individuals nor Bucks County ERF has contested that Park is typical and adequate, has fully protected the Class's interests, and will continue to do so.  Indeed, Bucks County ERF has stated that it does *not* seek to be substituted as lead plaintiff and has only intervened because of the concerns raised by the Court *sua sponte*.  (*See* ECF 258-1 at 2 of 3.)  Further, Bucks County ERF agrees with Park that neither the use of investment advisors nor the lack of direct reliance on Defendants' misstatements is a bar to service as lead plaintiff.  (Jan. 21 Trans. 43:24-15.)  These points of commonality confirm that Park is typical and adequate.

Second, neither the PSLRA nor Rule 23 permits consideration of the criteria the Court has invoked to search for the "ideal" plaintiff.  (Jan. 21 Trans. 38:14-39:19.)  Replacing an institutional lead plaintiff like Park in favor of someone "who invests based on their personal research and review, and who then calls a broker and discusses it" (*id.* 38:14-39:19), would be contrary to Supreme Court and Third Circuit precedent, as well as the PSLRA, as explained above.

## B.    Park Is Superior to Bucks County ERF and the Unrelated Individuals

Even if the Court were not barred from evaluating the relative merits of the applicants, the recent submissions confirm that Park is superior to both Bucks County ERF and the Unrelated Individuals.

Bucks County ERF is statutorily ineligible to serve as lead plaintiff.  It did not make a timely motion to be appointed lead plaintiff within 60 days of the published notice of the pendency of the action as required under the PSLRA.  The text of the

PSLRA requires this conclusion, as Judge Savage recognized in this case.  15 U.S.C. § 78u-4(a)(3)(A)(i)(II); ECF 57 at 3 of 15 ("[T]he person or group selected must either have filed the complaint or made a timely motion in response to the published notice of the pending class action.").[12]

The Unrelated Individuals, too, cannot possibly serve as Lead Plaintiff.  They are a classically disfavored lawyer-created "group" – two of whose members Judge Savage expressly declined to appoint in 2018 (ECF 57) – and do not meet the PSLRA's preference for institutional investors.  *See Cendant*, 264 F.3d at 266.  Moreover, while the Court has focused on Park's November 3, 2016 trades, the Unrelated Individuals' trading raises even more issues, including Dole's three purchases on November 3 and Wingard's repeated in-and-out trading (ECF 258 at 7-8 of 16).

Appointing the Unrelated Individuals would also open a Pandora's box of individual issues that do not exist for Park.  For example:

- Unrelated Individual Wingard revealed on February 1 that his "decision to invest in Endo stock was initially prompted by conversations in early 2016 with his accountant," who believed "the strength of the Company's operations left its stock well-positioned to rebound."  (ECF 267 at 2 of 3.)  Further, at the time Wingard admittedly "understood that his *accountant's wife worked for Endo as a director in the Company's sales and marketing department*."  (*Id.* (emphasis added).)

- While Wingard contends that he did not "understand his accountant to be privy to any" material non-public information—although the accountant's wife "worked for Endo as a director" during the Class Period (*id.*)— Defendants surely would seize on these issues in attacking Wingard's typicality and adequacy as a proposed class representative.

---

[12] The PSLRA's 60-day time limit, 15 U.S.C. § 78u-4(a)(3)(A)(i)(II), does not affect Macomb because it only applies to lead plaintiffs, while Macomb intervenes to seek appointment as an additional Class representative under Rules 23 and 24.  *See Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 83 (2d Cir. 2004) ("[T]he PSLRA does not in any way prohibit the addition of named plaintiffs to aid the lead plaintiff in representing a class.").

- The Unrelated Individuals' statements about their reliance are extremely general and raise further questions.  For instance, Dole claims to have "specifically relied upon statements to the effect that Endo had a 'diversified' product portfolio" (*id.*), but such statements are not among those the Court found actionable here.

- As another example, Dole states that his investment decision was "informed by his review of the information regarding Endo presented in the 'News and Events' feed associated with his Fidelity online brokerage account."  (*Id.*)  While he asserts that the "feed" from Fidelity "would have included" Endo press releases (*id.*), this vague assertion over four years after the fact would be another fertile area for Defendants to probe.

Accordingly, neither of the two suitors present viable Lead Plaintiff alternatives to Park.

### C.    Any Change in Lead Plaintiff Would Be Prejudicial to the Class

Park and Lead Counsel have spent three years—and over 20,000 hours of attorney time—diligently investigating and uncovering Defendants' fraud to develop a full-fledged trial strategy.  Document discovery was to close on December 18, 2020 and fact depositions on January 28, 2021.  The class certification motion is also fully briefed.  What remains is a ruling on the motion and then (assuming certification) final merits discovery and a Class-wide trial.

Defendants' opposition to Park and Lead Counsel, we suppose, is understandable.  Park and Lead Counsel have been successful in establishing evidence of wrongdoing at the highest levels of Endo.  They now have partnered with Hangley Aronchick and this team is ready to finalize merits discovery and prepare for trial.

What better way to try to derail or delay the inevitable than to try to decapitate the leadership of the Class?  A new Lead Plaintiff and Lead Counsel would be unprepared to lead the case, having played no role in the development of this case over the past several years.  A new Lead Plaintiff would also open wide the door to

Defendants' likely protracted discovery of a new lead plaintiff, and then a do-over on the class certification briefing.

Respectfully, not only would the law not allow replacing Park and Lead Counsel with Bucks County ERF or the Unrelated Individual Investors, but it would ill serve the class by installing a party and counsel not versed in this case and delaying Defendants' ultimate day of reckoning.

## CONCLUSION

For the reasons set forth above, as well as those included in Park's and Macomb's prior submissions, the motion for class certification should be granted, Park and BFA should remain in place as Lead Plaintiff and Lead Counsel, and Hangley Aronchick appointed as Co-Counsel for the Class, and Macomb should be granted leave to intervene as additional Class representatives.

DATED: February 3, 2021                    Respectfully submitted,

**HANGLEY ARONCHICK SEGAL**          **BLEICHMAR FONTI & AULD LLP**
**PUDLIN & SCHILLER**

 /s/  John  S.  Summers                         /s/  Joseph A. Fonti
John S. Summers                            Joseph A. Fonti (admitted *pro hac vice*)
Jonathan L. Cochran                        Javier Bleichmar (admitted *pro hac vice*)
One Logan Square, 27th Floor               7 Times Square, 27th Floor
Philadelphia, Pennsylvania 19103           New York, NY 10036
Telephone: (215) 568-6200                  Telephone: (212) 789-1340
Facsimile: (215) 568-0300                  Facsimile: (212) 205-3960
                                           jfonti@bfalaw.com
                                           jbleichmar@bfalaw.com

*Co-Counsel for the Park Employees' and*    *Co-Counsel for the Park Employees' and*
*Retirement Board Employees' Annuity*       *Retirement Board Employees' Annuity*
*and Benefit Fund of Chicago and*           *and Benefit Fund of Chicago and*
*Proposed Intervenors Macomb County*        *Proposed Intervenors Macomb County*
*Employees' Retirement System and the*      *Employees' Retirement System and the*
*2015 Macomb County Intermediate*           *2015 Macomb County Intermediate*
*Retirees Medical Benefits Trust; and*      *Retirees Medical Benefits Trust; and Lead*
*Proposed Co-Counsel for the Class*         *Counsel for the Class*

**KEHOE LAW FIRM, P.C.**
John A. Kehoe
Two Penn Center Plaza
1500 JFK Boulevard, Suite 1020
Philadelphia, PA 19012
Telephone: (215) 792-6676
jkehoe@kehoelawfirm.com

*Additional Counsel for the Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago*