**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ALEXANDRE PELLETIER**, Individually and On Behalf of All Others Similarly Situated, <br><br>       **v.** <br><br> **ENDO INTERNATIONAL PLC, RAJIV KANISHKA LIYANAARCHCHIE DE SILVA, SUKETU P. UPADHYAY, AND PAUL V. CAMPANELLI** | **CIVIL ACTION** <br><br> **NO. 17-cv-5114** |

Baylson, J.                                                                                   **February 4, 2021**

### <u>MEMORANDUM RE: LEAD PLAINTIFF AND LEAD COUNSEL</u>

**I.      <u>Introduction</u>**

At this litigation's core, plaintiffs allege that Endo International and its executives misled investors regarding the source and resilience of record profits from their generics division while concealing unsustainably non-competitive pricing behavior and government investigations. Plaintiffs argue that they therefore paid artificially high prices for Endo shares and were injured when the truth of Endo's behavior came to light, popping the pricing bubble.

During three years of litigation and three supervising judges, the prospective lead plaintiff, Park Employees' Annuity and Benefit Fund of Chicago ("Park"), and class counsel Bleichmar, Fonti & Auld LLP ("BLA"), had moved for class certification under Rule 23, but issues concerning their leadership role must be resolved.

The present opinion will focus on Park and BLA's (collectively, "Park/BLA")[1] continuing to represent the prospective class.   Throughout discovery and class certification briefing,

---

[1] This Memorandum will detail the concerns of the Court from briefs and the hearings that have taken place over the last six months.  Although Park is the Lead Plaintiff and BLA is the Lead Counsel, the Court cannot separate one from the other and obviously because of attorney-client

Park/BLA have acted in ways that have undermined their important roles in this case and the class' interests will be better served by new leadership taking the reins.  Four issues are paramount:

- **Representations About the Timing of Park's Acquisition of Endo Shares:** At issue is the precise time when Park acquired Endo's shares on November 3, 2016, as to whether this acquisition was before or after what is asserted to have been a "corrective disclosure" at 2:00 p.m. on that date.  Park/BLA repeatedly assured the Court that Park purchased Endo shares before the corrective disclosure.  But Park/BLA also acted to avoid production of documents that would, eventually, contradict that assurance.  Even worse, Park/BLA did so by violating this Court's discovery order and not disclosing it to other judges, while briefing motions to quash filed in other courts.  It was only after months of these statements and court-ordered discovery that Park/BLA finally disclosed that they had been misleading the Court: the purchase was completed <u>after</u> the corrective disclosure.

- **Lombardia's Role:** Park/BLA used questionably misleading language in its papers to obscure the role of Park's investment advisor as the sole decisionmaker in the Endo acquisition process.  This information is potentially relevant and should have been made clear by counsel.

- **State Court Intervention:** Park/BLA have threatened the settlement of a related state court class action under dubious legal theories, triggering a potentially years-long delay in finalizing that settlement.  They have recently — and belatedly —

---

privilege, the Court is not entitled to inquire into the communications the client and law firm had with each other.  Because the Court is concluding that both Park and BLA must be disqualified, there is no need to separate the conduct of both, or to inquire whether one was more responsible than the other.

amended their proposed class definition to remove any arguable basis for continued involvement in the state court appeals process but have not indicated an intention of withdrawing that appeal.

- **Park's Typicality:** Park purchased its first relevant shares of Endo <u>after</u> the first corrective disclosure, and Park held those shares for only four months while seeking to represent a two-year window of Endo stockholders.  This short ownership period creates concerns about Park's typicality that may damage the class' interests at trial.

To avoid the risk that Park/BLA' damaged credibility or potential inadequacy could harm the class, the Court will disqualify Park and BLA and will replace them as lead plaintiff and class counsel.

## II.      Core Allegations

The Amended Complaint alleges that Endo artificially inflated its revenues in the generic pharmaceuticals market through unsustainable, noncompetitive pricing practices.  Despite this inflation being untenable in the long-term, Endo allegedly mislead its investors into believing that its profitability would continue.  In doing so, it allegedly obscured both the true facts of its heightened profits as well as government investigations into its pricing.  As a result, investors purchased Endo stock at a premium.  When this alleged scheme and investigations became public, the stock price dropped, causing material financial harm to Endo's relevant stockholders.

## III.     Procedural History and Key Representations

### a.  Commencement of Litigation

Alexandre Pelletier filed the original complaint against Endo in November 2017, ECF 1, originally overseen by Judge Padova.  In January 2018, the case was transferred to Judge Savage, who was overseeing another securities class action against Endo.  ECF 12.  Pursuant to the PSLRA, Judge Savage found Park to be the appropriate lead plaintiff based on the PSLRA's preference for

institutional investors and Park's significant financial losses, comparable to those of the alternative lead plaintiffs.  ECF 57 at 15.  He simultaneously appointed BLA as class counsel.  Id.  His opinion assumed  Park/BLA' adequacy and typicality.  Id. at 3.

Park/BLA filed an amended complaint on behalf of the class, alleging two counts: (1) price-fixing conspiracy and (2) misleading stockholders through material misrepresentations and/or omissions.  ECF 62.  The case was then reassigned back to Judge Padova, who recused himself, leading to the case's assignment to this Court in September 2019.  ECF 75.  Following briefing and oral arguments on Endo's Rule 12 motion, the Court dismissed price-fixing claims against Endo in February 2020, but otherwise denied the motion to dismiss and permitted plaintiffs' other claim to proceed.  ECF 93.  Pelletier v. Endo Int'l PLC, 439 F. Supp. 3d 450 (E.D. Pa. 2020).

### b.  Discovery Disputes

On the first day of discovery, March 2, 2020, Endo requested "Documents showing the date, time, price, and/or quantity" of transactions in Endo stock.  ECF 111-2 at 9.  Endo sought this information to clarify what has become an important question in this litigation:  whether Park's November 3, 2016 purchase of Endo shares occurred before or after the first alleged corrective disclosure that was published on the same day.  Park/BLA objected to the request a month later, calling it overly broad, unduly burdensome, and irrelevant.  ECF 111-4 at 11.

On June 12, 2020, Endo moved to compel Park/BLA' production of documents, including those relevant to the timing of stock purchases.  ECF 111.

Park/BLA produced documents by July 9, 2020, revealing the names of Park's brokers, but the production still omitted any indication of purchase timing.  ECF 237 at 7.  Park's Investment Management Agreement, however, required its investment advisor Lombardia to "maintain and make available to [Park]" any information including "the date and time of each transaction."  Id.

Endo notified Park/BLA of this deficiency on July 14, 2020, but Park/BLA' next production on the following day again contained no evidence of transaction times.  Id.

### c. July 2020 Discovery Hearing

On July 20, 2020, this Court held a hearing on both parties' motions to compel, including Endo's search for documentation of Park's purchase timing.  Park/BLA told the Court that they had produced all documents regarding stock purchase timing: "In short, there aren't additional documents that we're withholding on any grounds that bear on the transactions that are in the possession of the lead plaintiff."  ECF 122 at 18.

The Court concluded that documents regarding the time and date of Park's purchases of Endo shares were relevant and must be produced:

> I agree with the defendant that in a securities case, anybody who is a plaintiff must produce all documents they have showing their transactions in the stock of a defendant company.  There's no question about that.  And it doesn't matter to me how — whether they've been buying and selling in and out and maybe at some point they didn't have any shares and so forth, but it is definitely relevant.  So I agree that the plaintiffs have to produce it.

Id. at 19 (emphasis added).  This Court further held that Park would bear the burden of showing timely stock ownership and ordered production of documents to that effect, even if it needed to seek out that information itself:

> Well, I'm going to order you to do that.  Okay?  Because I got to tell you, when it comes to summary judgment or when it comes to class certification, you're going to have to produce that and show that your client has owned this stock at all relevant times.  So it's not burdensome to require you to come up with that documentation.

Id. at 20 (emphasis added);[2] see also id. at 19 (holding that satisfying this evidentiary and production burden "is essential").

The Court effectuated these holdings through an order on July 22, 2020.  ECF 125.

---

[2]  This Court clearly required Park to provide purchase timing documentation, even if in the hands of its custodians or brokers.

After the Court directed this production, Park/BLA reiterated their belief that the defendants "have all the documents that the client has that bear [on purchase timing]." Id. at 19. Park/BLA did not mention that their records were incomplete as to purchase timing. They did not recognize any duty to provide those documents. Nor did Park/BLA mention that Park could readily access additional documentation through its investment advisors or brokers.

### d. Park Depositions

On July 23, 2020, Endo took its Rule 30(b)(6) deposition of Park. Park's Executive Director informed Endo that he believed that Park's document custodian, Northern Trust Corporation, might possess evidence of Park's purchase timing. ECF 237 at 7–8.

Additionally, on August 12, 2020, Endo took the deposition of Alvin Polit, who was an investment manager at Park's now-defunct investment company, Lombardia. See ECF 216-1 (Polit Deposition).

Endo sought confirmation of the timing of Park's November 3, 2016 share purchase, but Polit was unable to give a definite purchase time without seeing more documentation:

> Q: Taking into consideration every document that you looked at today, are you able to decipher — from what we've looked at — the times at which the purchases were executed on November 3rd, 2016?
>
> A: No.

Id. at 50. Polit testified that "it's more likely" that the purchases began before the article's publication, as purchases often occur throughout the day rather than as a singular block purchase, but he could not be certain without looking at additional documentation. Id. at 49. Polit named two former Lombardia employees who were likely responsible for maintaining Park's trading records. Id. at 24.

### e.  Class Certification Briefing

Contemporaneously with these discovery issues, Park/BLA had filed their motion to certify the class in June 2020.  ECF 116.  Endo opposed on August 17, ECF 133, five days after the Polit deposition and four days before serving the first subpoena on Park's brokers, discussed below. Park/BLA and Endo each filed one additional brief in support of their positions on class certification.  ECF 152, 171.

Endo, among other challenges to class certification, argued that Park was not a typical plaintiff, because there was an outstanding factual question as to whether Park's November 3, 2016 purchase occurred before or after the alleged corrective disclosure.  ECF 133 at 13.

Park/BLA replied emphatically that Park's purchase occurred before the article's publication:

> Defendants also <u>grossly misstate the facts</u> by asserting that Chicago Park's November 3, 2016 "purchases appear to have <u>occurred after the article was published</u> at 2:10:27 p.m."  Chicago Park's purchases on November 3, 2016 began before the article was published and occurred throughout the day . . . .  [Endo's] claim that "uncertainty" calls for "further discovery" is frivolous.

ECF 152 at 17 (emphasis added).  Park/BLA made this statement to the Court on September 18, 2020.

### f.  Motions to Quash

Following the depositions, during class certification briefing, and still seeking evidence that this Court ruled to be "highly relevant" and "essential," Endo sent five subpoenas between August 21 and September 2, 2020 to Park's stockbrokers, Northern Trust, and the two Lombardia recordkeepers.  These subpoenas directed the production of all documents and communications in

the recipients' possession regarding Park's purchase of Endo shares in the class period.  See, e.g., Park v. Endo, No. 20-mc-103 (E.D. Pa. Sept. 18, 2020), ECF 4-1 at 3–4.[3]

One of these brokers, SWS, intended to comply with the subpoena, but it informed Endo that it would no longer do so after being contacted by Recipients, who "asked [SWS] to defer compliance with the subpoena."  ECF 237 at 7 (Endo's characterization of events).

Park/BLA moved to quash all five of the subpoenas in the other jurisdictions, claiming that such discovery was untimely and sought irrelevant information.  In doing so, Park/BLA brought the issue in front of four other federal district judges throughout the country.  Park/BLA did not provide notice to this Court of their intention to block execution of Endo's subpoenas.

In their briefs supporting the motions to quash, Park/BLA argued that Endo's subpoenas were "irrelevant" and "would merely duplicate the facts that have already been developed in discovery."  No. 20-mc-103, ECF 3, at 6.  Park/BLA did not in any inform the judges to whom all these motions were assigned, that this Court had previously ruled that such information was "highly relevant," discoverable, and "essential" in the present litigation.[4]

_____

[3] These cases were eventually consolidated in the Eastern District of Pennsylvania.  Their E.D. Pa. docket numbers and initial filing jurisdictions are:
- No. 20-mc-102  (from S.D.N.Y.)
- No. 20-mc-103  (from S.D.N.Y.)
- No. 20-cv-5263 (from S.D. Cal.)
- No. 20-cv-6103 (from N.D. Ill.) (two motions to quash)

The briefing on these subpoenas is identical in relevant respects.  The Court will cite to Docket No. 20-mc-103 as an example.

[4] A judge's definitive discovery ruling should generally be followed in subpoena proceedings, much like under the "law of the case" doctrine.  See Kennedy v. Basil, No. 18-cv-2501, 2019 WL 2343153, at *4 (S.D.N.Y. June 3, 2019) (denying motion to quash for lack of subject matter jurisdiction where source court had already found subject matter jurisdiction satisfied); cf. Williams v. Runyon, 130 F.3d 568, 573 (3d Cir. 1997) ("[T]he law of the case doctrine 'expresses the practice of courts generally to refuse to reopen what has been decided.'") (citation omitted).  When serving as a member of the Advisory Committees on Evidence and Civil Rules, the undersigned strongly urged a Rule 45 amendment to require the party moving for relief to notify the Court where the principal case was pending of a motion to quash filed in another district, but

In its reply to Endo's opposition brief, in which Endo correctly informed these judges of this Court's prior discovery ruling, Park/BLA misleadingly argued that Endo was "selectively quot[ing] Judge Baylson's remarks" because he otherwise denied the discovery motion.  No. 20-mc-103, ECF 16, at 3.  Park/BLA then doubled down, arguing that "The Timing Of The November 3, 2016 Transactions Is Legally And Factually Irrelevant."  Id. at 6.[5]  Park/BLA reiterated their assurance that "Park's purchases that day began before the article was published," and that Endo's attempt to verify this timing through discovery "borders on frivolous."  Id. at 7.

On October 22, 2020, this Court ordered the parties to confirm the exact timing of Park's November 3, 2016 stock purchase.  ECF 169.  A week later, Park consented to allow SWS to produce evidence.  ECF 237 at 9.  On November 2, 2020, SWS produced a document confirming that Park's purchase was executed after the publication of the Bloomberg article.  Id.

All the district courts in which the motions to quash had been filed referred the motions to quash to this Court, which reviewed and denied three of them between November 6 through 12, 2020; the remaining two motions were voluntarily withdrawn.  In its Order, this Court reiterated its prior holding:  "the precise time of certain trades in the stock of Defendant Endo may be relevant on some of the class action issues and/or substantive issues."  No. 20-mc-103, ECF 22 at 1.

### g.  Park/BLA' Disclosure of Park's Purchase Timing

For the first time, on November 5, 2020, Park/BLA informed this Court that "Park's November 3, 2016 purchase was consummated . . . 97 seconds after the Bloomberg article was published." ECF 174 at 6 (emphasis added).  Park/BLA provided this information only after one

---

this amendment has not taken place.  Perhaps the scenario discussed in this case might prompt this amendment in the near future.

[5] In the recent January 21, 2021 hearing, discussed infra, Park/BLA stated that they sought to quash the subpoenas primarily on timeliness grounds, ECF 262 at 52–53, which is inconsistent with their briefing.

of Park's brokers produced transaction records in response to Endo's subpoenas on November 3, 2020, ECF 174-1, and the Court had specifically ordered them to confirm purchase timing on October 22, 2020, ECF 169.

### h.  Class Certification Hearing

The Court held a class certification hearing on December 9, 2020.  ECF 213.  Among other issues, the Court discussed that of credibility — BLA's credibility after making misstatements to the Court and Park's credibility in future testimony before a future jury.  Id. at 29, 30.  Park/BLA proposed a new co-lead plaintiff to address issues of purchase timing, id. at 32, which they later did, alongside proposal of co-class counsel,  ECF 228 (proposing addition of Macomb County Employees' Retirement System and Hangley, Aronchik, Segal, Pudlin & Schiller).

### i.  Recent Court Orders

The Court has issued several orders since the hearing, directing Endo, Park/BLA, and non-parties (those who have moved to be considered as new or replacement lead plaintiffs) to address concerns about class certification and Park/BLA' adequacy.  See ECF 212, 218, 238, 239, 241, 254.

Following the December 9 hearing, the Court directed Park/BLA to clarify their previous misstatements regarding purchase timing.  ECF 218.  Park/BLA confirmed that their sole basis for claiming its November 3, 2016 purchases occurred before the corrective disclosure came from the Polit Deposition.  ECF 234 at 11.[6]  But they also confirmed that:

> [N]either Park nor Lead Counsel knew the specific timing of the November 3, 2016 purchases until the Court's October 22, 2020 questions.  Information about timing was not in Park's possession, custody or control, and the records of Lombardia (which ceased operations in 2017) were unavailable.

---

[6] Park/BLA relied on Polit's testimony that "it's more likely that [the purchase] occurred [before the article's publication" and that he believed the pricing reflected purchases "throughout the day." Id.

Id. at 10–11 (emphasis added).  Park/BLA thereby confirmed that they had made their pre-October 2020 statements to the Court (including those in the motions to quash and class certification briefing) without knowing the specific timing that they claimed.

In an effort to finally determine purchase timing and the parties' responsiveness to the relevant production orders, the Court directed Park/BLA and Endo to provide copies of all Park transaction documents for Endo stocks in their possession (including those received from third-party subpoenas) and identify the source of those documents.  ECF 239.

Park/BLA' response to the order confirmed that they did not know the timing of the November 3, 2016 purchases until the subpoena responses in November 2020 — the only time-specific documents for those purchases came from a subpoenaed broker.  ECF 251 at 4.  While Park/BLA reiterated the argument that the purchases began earlier in the day, they conceded that no records show the start time of the stock purchases.  Id. at 5.[7]

### j.  January 2021 Hearing

On January 21, 2021, the Court held a hearing with Park/BLA, Endo, and prospective lead plaintiffs.  ECF 262.  Among other discussed issues, the Court specifically questioned Park/BLA regarding their July 2020 statement that they had produced all transaction timing documents in Park's possession and their failure to mention the July 2020 court order in thei motions to quash.  Id. at 50–56.

First, Park/BLA confirmed that, as of the July 2020 hearing, Park had only one additional document in its possession regarding stock purchases, which they immediately produced after the

---

[7] As discussed below regarding the mechanism by which Park acquired stocks, it is clear that its investment manager would not have transferred any shares to Park's account until after the completion of the purchase, regardless of start time.  See infra Section IV(a).

hearing.  Id. at 49.  They did not, however, reach out to third parties, like Northern Trust or its brokers, to request clarifying documents.  Id. at 54–56.

Second, Park/BLA took the position that the July 2020 court order, which "require[d] [Park/BLA] to come up with that documentation" to show "that your client has owned this stock at all relevant times,"  ECF 122 at 20, did not apply to documents not in Park's direct possession.  ECF 262 at 52.  Park/BLA also told the Court that their motions to quash did not seek to suppress the discovery as irrelevant, but, instead, objected on timeliness grounds.  Id. at 52–53 ("The reason why we made the motion to quash was because Defendants were too late.").  Nonetheless, it is clear that Park/BLA relied heavily on relevance issues in their attempt to quash the discovery.  See No. 20-mc-103, ECF 3 at 2 (Park/BLA' motion to quash brief arguing that "the requested documents are wholly irrelevant").

The Court confirmed that it was considering replacement of the class' Park/BLA, but it did not take a final position.  ECF 262 at 65.

## IV.  Other Issues

Although Park/BLA' misdirection regarding Park's purchase timing is alarming, the Court also notes two other concerns with Park/BLA' execution of their roles:  obscuring Lombardia's role as sole decisionmaker for Park's stock purchases and obstructing execution of a settlement in a related state court class action.

### a.  Lombardia's Role

Park/BLA only recently confirmed the nature of Park's investor conduct to the Court.  Park relied, completely, on its investment manager, Lombardia, to decide on and execute trades in Endo stock on its behalf.  In his August 2020 deposition, Polit outlined the level of control Lombardia exercised over Park's investments and, inversely the lack of control Park exercised.  ECF 216-1.  As Polit explained, Lombardia was an active investor — an investment manager that attempted to

seize on short-term market pricing inefficiencies for its clients' benefit.  Id. at 11.  It exercised complete discretion over Park's account.  Id. at 15.  Park had no input into the decision to purchase Endo shares.  When it decided to purchase stocks for Park, Lombardia would send an order to one or several stockbrokers, who, in turn, would purchase the stocks in Park's name.  Id. at 11.  After completion of the purchase, Lombardia would transfer the stocks to the corresponding clients' account.  Id.

Park/BLA made no mention of Lombardia in their initial briefs seeking appointment as lead counsel in 2017, repeatedly referring to its client Park as the "purchaser."  See generally ECF 11-2, 15, 17, 37.  Nor did they mention Lombardia in the Amended Complaint that Park/BLA filed on behalf of the class in 2018.  ECF 62.  Park/BLA did not begin disclosing Lombardia's level of control directly to the Court until responding to direct questions from the Court in December 2020, after extensive briefing and oral arguments regarding class certification.  ECF 216.  Park/BLA continue to represent Park as the purchaser of the Endo shares, ECF 234 at 1–2, dismissing Lombardia's role as both factually and legally inconsequential.[8]

### b.  State Court Intervention

A closely related securities class action against Endo had settled in Pennsylvania state court.  See Public Employees' Retirement System of Mississippi v. Endo et al. ("MissPERS"), No. 2017-02081-MJ (Pa. Ct. Com. Pl., Mar. 3, 2020) ("MissPERS Opinion").  There, the plaintiff class challenged Endo's statements in connection with its June 2015 secondary public offering, alleging that Endo misled investors about unsustainably front-loading sales to inflate short-term profitability.  The plaintiff class and Endo reached a $50 million settlement to release "any and

---

[8] Under federal law, standing extends to a person or entity which acquires shares "in connection with" a purchase or sale.

all" claims for investors who bought Endo shares from June 5–10, 2015 at a specific offering price and/or directly from Endo.

This six-day window, importantly, falls within the 729-day class period initially proposed in Pelletier.  Based on the potential overlap in the class members, Park/BLA moved to intervene in MissPERS challenge the proposed settlement on behalf of hypothetical overlapping Pelletier class members.

Judge Griffith approved the class settlement, simultaneously denying Park/BLA' motion to intervene and challenge the settlement.  In doing so, Judge Griffith found, first, that Park/BLA could not properly intervene in the litigation and, second, that the proposed settlement lawfully released any Pelletier-related claims.

In denying the motion to intervene, Judge Griffith rejected Park/BLA' theory that Park had standing to challenge the settlement on behalf of an unidentified overlapping class.  Park therefore had no right to object to the settlement under an individual interest in the litigation nor a class-based theory for intervening.

Next, Judge Griffith ruled that the settlement constituted a lawful release of "any and all" claims arising from certain purchases of Endo shares, including those that might have otherwise provided a basis for recovery in the present litigation.  He concluded that any overlapping class members had adequate representation in the state court litigation.   He also concluded that MissPERS and Pelletier had identical factual predicates, which may result in participating in the settlement in one case to release claims in the other as a matter of law.  Finally, he noted that, although all MissPERS members received adequate warning that the settlement might release their

claims in other litigations, none objected to the settlement.[9]  This indicated that any overlapping class members believed they had adequate representation in settlement negotiations <u>and</u> that they desired to settle "any and all" securities claims against Endo, possibly including those at issue in <u>Pelletier</u>.

Park/BLA appealed to the Pennsylvania Superior Court.  They did not propose an amended class definition in <u>Pelletier</u> to accommodate the <u>MissPERS</u> release or Judge Griffith's order at that time.  They would not propose such an amendment for the better part of a year.

This appeal to the Superior Court is still pending and is likely delaying the <u>MissPERS</u> class members from receiving their settlement funds.  There is no timeline under which the Superior Court must issue a decision, nor a way to predict the timeframe.  If either party decides to appeal that decision to the Pennsylvania Supreme Court, the delay and uncertainty would only be further compounded.  All in all, Park/BLA's appeal could delay the <u>MissPERS</u> class members from realizing the fruits of the settlement for years.

In the present litigation, Park/BLA initially proposed a class definition which would have wholly enveloped the <u>MissPERS</u> settlement class.  Such a proposed class may have made sense at the beginning of this litigation, which occurred well before the <u>MissPERS</u> settlement, but Park/BLA continued to propose this definition months after the <u>MissPERS</u> settlement was approved.  To defend the overlap, Park/BLA asked this Court to rule that the <u>MissPERS</u> settlement did not release <u>Pelletier</u> claims — <u>in direct violation of the state court's holding</u> that it did release them.

---

[9] Judge Griffith's opinion also provided another basis for denying Park's motion to intervene, premised on the speculative nature of an overlapping class, an issue on which this Court takes no position at this time.

For example, in their class certification briefing, Park/BLA told this Court that <u>MissPERS</u> is "a state court case which involves <u>wholly different factual allegations and claims</u>." ECF 153 at 11. Six months earlier, Judge Griffith had found the exact opposite: "While the actions rely on different misstatements and conduct, we do not concur that this results in different factual predicates." <u>MissPERS</u> Opinion at 12. Park/BLA did not discuss or disclose Judge Griffith's contrary holding in briefing, and a conclusion in their favor might have violated the Rooker-Feldman doctrine[10] and the sovereignty of the state court system.

Meanwhile, Park/BLA only recently proposed successive class definitions, attempting to ensure that the <u>Pelletier</u> class would no longer overlap with the <u>MissPERS</u> class, proposing a concession to the <u>MissPERS</u> release nearly a year after the settlement was approved. In doing so, Park/BLA eroded its initial basis for seeking intervention in <u>MissPERS</u> — it no longer represents any overlapping class members. ECF 234 at 2 (Park/BLA's assurance that the "revised Class is readily ascertainable and carves out all dates and all Endo shares eligible for recovery in the State Court Action").

Nonetheless, Park/BLA confirmed at the January 2021 hearing that they will not withdraw from the appeal unless or until this Court certifies the newly proposed class, prolonging execution of the <u>MissPERS</u> settlement further. ECF 262 at 17.

## V.   <u>Park's Ownership of Endo Shares</u>

As Park/BLA initially proposed the class period, it would include any Endo stock purchasers for a <u>729-day period</u>.[11] ECF 116 at 6. Park owned legally relevant Endo shares for

---

[10] Under the <u>Rooker–Feldman</u> doctrine, a district court is precluded from entertaining an action . . . if the relief requested effectively would reverse a state court decision or void its ruling." <u>Taliaferro v. Darby Twp. Zoning Bd.</u>, 458 F.3d 181, 192 (3d Cir. 2006) (citations omitted).
[11] The most recent amended proposal is for 723 days as an attempt to avoid overlap with the <u>MissPERS</u> settlement class.

about one-seventh of that period. What is more, it is now clear that it acquired those shares only <u>after</u> the first corrective disclosure on November 3, 2016, and it continued to acquire more shares throughout the class period.

Lombardia first bought about 11,500 Endo shares on behalf of Park in June 2016, but it then sold all of those shares again in August 2016.  These shares are not relevant to the present litigation.[12]  After those sales, Park owned no Endo shares through November 3, 2016.

Lombardia's next purchase of a tranche of Endo shares for Park occurred on November 3, 2016 — the same day as <u>Bloomberg</u> published an article which may warrant a finding of the beginning of the disclosures of Endo's potential legal liability.  Park acquired over 10,000 Endo shares minutes after the article was published.

Park, by and through Lombardia, continued to purchase additional Endo shares through the end of the proposed class period, controlling nearly 50,000 shares by February 2017.  It sold all its shares by February 17, 2017, ten days before the end of the proposed class period.

**VI.**   <u>**Legal Standard**</u>

Under the PSLRA, at the outset of a class action, the court must appoint "the most adequate plaintiff" to serve as the lead plaintiff prior to class certification.   <u>In re Cendant Litig.</u>, 264 F.3d 201, 222 (3d Cir. 2001).  Simultaneously, the court reviews and weighs approval of the lead plaintiff's choice of class counsel for the litigation.  <u>Id.</u>

The Court itself "plays the important role of protector of the absentee[ class member]s' interests"; its decision to appoint a lead plaintiff and class counsel to advocate for them places a "fiduciary" burden on the Court to ensure that their interests receive adequate representation.  <u>In</u>

---

[12]  Shares bought and sold "before disclosures of the relevant misrepresentation are not included in recoverable loss."  ECF 57 (Savage Opinion) at 4.

re Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 784 (3d Cir. 1995). "[I]f, as the litigation progresses, circumstances warrant that the Court revisit its decision . . . 'regarding appointment of lead plaintiff and lead counsel[,] [the decision] may be re-opened.'" Smith v. Antares Pharma, Inc., No. 17-8945, 2018 WL 3611067, at *4 (D.N.J. July 27, 2018) (citing Z-Seven Fund, Inc. v. Motorcar Parts & Accessories, 231 F.3d 1215, 1218 (9th Cir. 2000)). Indeed, courts have a continuing duty to reconsider leadership roles if concerns arise about adequately serving the class. In re Herley Indus., Inc., No. 06-2596, 2010 WL 176869, at *2 n.2 (E.D. Pa. Jan. 15, 2010) (Sanchez, J.); accord Z-Seven Fund, 231 F.3d at 1219 ("Ordering [reconsideration of potentially inadequate class Park/BLA] would be consistent with the district court's continuing duty to see that a class is adequately represented.") (emphasis original).

Ordering reconsideration requires only that the Court finds that adequacy concerns may threaten the best interests of the class; it is a lower threshold than a final conclusion of inadequacy. See, e.g., Z-Seven Fund, 231 F.3d at 1218–19 (reconsideration would be appropriate if "lead plaintiff appointed originally might turn out to be an inadequate class representative") (emphasis added); see also In re Terayon Commc'ns Sys., Inc., No. 00-1967, 2004 WL 413277, at *9–10 (N.D. Cal. Feb. 23, 2004) ("probable" conflict and "speculate[d]" credibility concerns justified reconsideration of class Park/BLA). Although the facts of these cases are different, their principles apply.

Concerns about the credibility of Park/BLA are particularly grave given the Court's fiduciary-like duty to the absent members of the class. Park/BLA continuing may significantly impair a class' likelihood of success on even the most meritorious of claims, assuming a class is certified. In a case alleging defendants' misrepresentations to the public, a jury may, in turn, hold

18

plaintiffs to an exacting standard of forthrightness.  And where the Court must rely on Park/BLA'

honesty to speak on behalf of the class, issues of credibility cut to the core of adequacy.

## VII.   <u>Decision</u>

Park/BLA have raised sufficient red flags here that the Court must order their replacement

in this litigation, for the benefit of the alleged class.  Absent class members deserve adequate

representation, which Park/BLA had failed to provide.  Replacement of the class' leadership will

allow the litigation to proceed with better leadership so that if a class is certified, it will have a

better chance of enjoying its day in court.  This Court is not making any predictions of how the

claim of liability will be determined.

It is not impossible to determine where this behavior originated, whether from attorney or

client.  Nor does it matter in this context, where the lead plaintiff and the lead counsel are, in many

ways, responsible for each other's conduct.  Both bear responsibility, and both should be replaced.

Most significantly, the need to replace Park/BLA is clear based on their representations to

this Court, many of which as noted above, were incorrect or misleading.  Park/BLA clearly failed

to ascertain the exact timing of Park's acquisition and misrepresented that lack of knowledge as if

it were a certainty.  More seriously, an inference arises they deliberately misled this Court as to

purchase timing.  Either raises concerns about Park/BLA' ability to adequately represent the class.

Furthermore, Park/BLA attempted to suppress discovery in other jurisdictions to secure

facts that this Court held to be relevant and producible, away from this Court's supervision.

Park/BLA's attempt to do so <u>without informing the local courts</u> of this Court's prior ruling on the

matter — even trying to cover up the explicit ruling of the Court — is very serious lapse of candor,

if not worse.

Park/BLA also obfuscated the role of Lombardia as the sole decisionmaker in Park's stock purchases.  This distinction is legally relevant — a plaintiff who purchases shares must show that it relied on the defendant's misrepresentations or omissions (through a reliance on the market theory[13] or otherwise); one that relies on a third-party advisor must show that its <u>investment advisor</u> relied on those misrepresentations or omissions.  <u>See, e.g.</u>, <u>In re Advance Auto Parts, Inc. Sec. Litig.</u>, No. 18-212, 2020 WL 6544637, at *5 (D. Del. Nov. 6, 2020) ("A class representative's use of an investment advisor, even one that has complete discretion, does not <u>automatically</u> render it atypical." . . . ; analyzing investment advisor's reliance on the market).  Indeed, part of a defendant's case may rely on disputing reliance; revealing facts about the actual purchaser is vital to the ability to make that defense.

Park/BLA' actions have prevented the state court litigants from receiving their desired class action settlements, which could result in years of delay.  To the extent that Park/BLA' most recent proposed definition removes any overlap and permits execution of the <u>MissPERS</u> settlement, the Court is concerned that Park/BLA failed to pursue this step on their own accord months ago, for the good of the <u>MissPERS</u> class members.  Indeed, Park/BLA informed the Court that they will not dismiss its appeal at least until this Court certifies a class definition, which could take months to resolve.

Park/BLA briefs regarding the <u>MissPERS</u> litigation shows evidence of the same fundamental and crucial effort to mislead judges in different courthouses, just as Park/BLA did not tell other judges about this Court's ruling on discoverability, Park/BLA told this Court

---

[13] This theory establishes a rebuttable presumption that, "whenever [a plaintiff-investor] buys or sells stock at the market price, his 'reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b–5 action.'" <u>Halliburton Co. v. Erica P. John Fund, Inc.</u>, 573 U.S. 258, 268 (2014) (quoting <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 247 (1988)).

something completely contrary to the state court's holding as to the scope of the MissPERS settlement's release.

Finally, Park's purchase timing raises concerns of conflict with pre-disclosure purchasers, which, combined with the Court's other reservations about Park's representations made through its counsel, justify replacing Park as lead plaintiff. Where a lead plaintiff made its initial acquisition after a corrective disclosure, it may have a change in incentives, including to minimize the price impact of pre-purchase disclosures and maximize recovery on its own later-bought shares. See In re Loewen Grp. Inc. Sec. Litig., 233 F.R.D. 154, 163–64 (E.D. Pa. 2005) (O'Neill, J.).[14]  This incentive could be stronger in cases such as this one, where there are very few alleged corrective disclosures over which loss causation is divided.

The Court may elect to replace a lead plaintiff who acquired stocks only after the disclosure simply to avoid the concern about conflict with pre-disclosure purchasers. In Kanefsky v. Honeywell Int'l Inc., the court examined a proposed plaintiff who first "purchased shares . . . after the first corrective disclosure." No. 18-15536, 2020 WL 2520669, at 83 n.4 (D.N.J. May 18, 2020). Based on the timing, "the Court fores[aw] problems arising at the class certification stage" and directed plaintiffs to replace or supplement the lead plaintiff. Id.

This case presents similar future issues that should be avoided. Park, a post-disclosure stockholder, may not be an adequate representative for all of the pre-disclosure stockholders, many of whom would have been injured by misrepresentations made over a year before Park acquired any Endo shares. The specter of inadequacy, whether from perverse incentives to downplay the

---

[14] Judge O'Neill did not exclude these late purchasers because he held that the larger interest of representatives is in showing widespread fraud regardless of purchase date. In doing so, however, he relied on the guidance of other lead plaintiffs to "balance any conflicts [the late purchasers] may have." In contrast, Park is a standalone lead plaintiff in this litigation.

effects of the <u>Bloomberg</u> article or a short-term stockholder's inability to represent long-term stockholders, concerns the Court and justifies Park's replacement.

## VIII.   **Replacing Park/BLA**

Considering the totality of circumstances stated above and in light of the above concerns with Park/BLA' continued service in this litigation, the Court will remove them and reopen the lead plaintiff and lead counsel appointment.  See <u>In re Herley Inds. Inc.</u>, No. 06-2596, 2010 WL 176869, at *3 (E.D. Pa. Jan. 15, 2010) (Sanchez, J.) (detailing one process for replacing lead plaintiff under PSLRA).

Lead plaintiff and lead counsel owe a fiduciary duty to the members of the class under the PSLRA.  See <u>In re Cendant Corp. Litig.</u>, 264 F.3d 201, 273–74 (3d Cir. 2001) (Either must "be trusted to fulfill its duties to the class under the PSLRA.").  The Court recognizes Congress' preference for institutional investors as more-likely-adequate lead plaintiffs under the PSLRA, ECF 57 at 15 (citing <u>In re Cendant Corp. Litig.</u>, 264 F.3d 201, 273–74 (3d Cir. 2001)), but Park is unable to adequately perform its role, and other institutional investors have come forward who do not have the "baggage" discussed throughout this opinion.[15]

Endo has argued that the Court may not consider the substitution of any new lead plaintiff, as the statute of limitations has now expired on the original claim, citing <u>China Agritech v. Resh</u>, 138 S.Ct. 1800 (2018).  See ECF 253 at 18–23.  In <u>China Agritech</u>, the Supreme Court addressed whether class action tolling principles applied to initiation of a new class action on the same claim:

> What about a putative class representative, like Resh, who brings his claims as a new class action after the statute of limitations has expired? Neither decision so much as hints that tolling extends to otherwise time-barred class claims. We hold

---

[15] Indeed, it is a "legitimate substantive reason" to permit a new lead plaintiff where doing so is necessary "to protect the interests of the putative class" from a potentially inadequate lead plaintiff. <u>In re Cigna Corp. Sec. Litig.</u>, No. 02-8088, 2005 WL 3952802, at *1 (E.D. Pa. Feb. 23, 2005) (Baylson, J.) (adding new lead plaintiffs over three years into a securities class action).

that American Pipe does not permit a plaintiff who waits out the statute of limitations to piggyback on an earlier, timely filed class action.

138 S.Ct. at 1806.  The Third Circuit has analyzed this holding only once, applying it to a situation where the plaintiff asked the court to toll the statute of limitations for a new class action. See Blake v. J.P. Morgan Chase Bank NA, 927 F.3d 701, 709 (3d Cir. 2019) ("China Agritech is clear and unequivocal: courts may not toll new class actions under American Pipe, period.").

Neither China Agritech nor Blake addressed a situation like this one, where a court seeks to add new lead plaintiffs to an ongoing class action after the statute of limitations has run.  Courts in this circuit and around the country, however, have ruled that China Agritech does not bar a court from doing so:

> China Agritech does not prohibit American Pipe tolling from applying in these circumstances to allow the addition or substitution of a named plaintiff in an ongoing putative class action following the expiration of the statute of limitations but prior to a decision on class certification."

Schultz v. Midland Credit Mgmt., No. 16-4415, 2019 WL 2083302, at *10 (D.N.J. May 13, 2019) (emphasis added); see also In re Allstate Corp. Sec. Litig., 966 F.3d 595, 615 (7th Cir. 2020) (seeing "no hint in the China Agritech opinion or its reasoning" that would "prohibit any addition or substitution of a new class representative within the original class action after the statute of limitations period would have run, but for American Pipe tolling").

"Substitution of a new named plaintiff to address the inadequacy of a class representative [is] a routine feature of class actions [and] lies within the district court's discretion."  In re Brewer, 863 F.3d 861, 876 (D.C. Cir. 2017); see also Goodman v. Lukens Steel Co., 777 F.2d 113, 124 (3d Cir. 1985) (directing the district court to "explore the possibility of intervention by qualified class" representatives where proposed lead plaintiffs were inadequate).  Indeed, it is a "legitimate

substantive reason" to permit a new lead plaintiff where doing so is necessary "to protect the interests of the putative class" from a potentially inadequate lead plaintiff.[16]

The Court has found reason to do so now, and it will consider the potential lead plaintiffs and their suggestions of class counsel to determine which can best serve this class under the PSLRA going forward, if a class is certified.

Based on filings which took place in late December of 2020, and the hearing which took place on January 21, 2021, this Court is prepared to designate as Lead Plaintiff the Bucks County Employees Retirement Fund, and its principal counsel, Lawrence F. Stengel, Esquire, as Lead Counsel.[17]

The Court will also designate individual clients of the Pomerantz firm, Alexandre Pelletier, Nathan Joseph Dole, and Lane(?) A. Wingard, as co-lead Plaintiffs and the Pomerantz firm as co-lead Counsel.

The Court will designate another firm, located in Philadelphia, to work with the others.

The Court will require the firm of Bleichmar, Fonti & Auld to cooperate fully with new Lead Counsel, including full access to its attorney-work product, documents and electronically stored information related to this case, which it secured while serving as lead counsel.  Prompt cooperation will be essential in reviewing any fee petition that may be filed by the Bleichmar, Fonti & Auld firm at the conclusion of the case, assuming there is a settlement or a recovery on behalf of the class.

---

[16] Considering opera metaphors, bad behavior can lead to tragedy.  Iago's deceit about Desdemona's handkerchief and Rigoletto's bungled kidnapping—both led to very tragic results. Park/BLA's behavior should also face consequences—removal, although not tragic, is justified.

[17] As well known to this Court and the legal community, Mr. Stengel has been a distinguished judge, and Chief Judge of this Court, and previously served as a judge of the Court of Common Pleas of Lancaster County, and is now with the firm of Saxton Stump.

In this connection, the Court discloses two short telephone conversations with Mr. Stengel in determining Mr. Stengel's availability to serve as Lead Counsel, and that he would undertake the responsibility along with other law firms designated as co-lead counsel.  The Court envisions Mr. Stengel being in charge of making assignments for additional discovery, briefing, strategy, and any settlement discussions, and if necessary, a trial.  However, the bulk of the day-to-day work may be assigned to the other firms designated as co-lead Counsel.

The Court notes that it is selecting three additional individuals represented by the Pomerantz firm as co-lead Plaintiffs because, based on their disclosures to this Court, they were actively involved personally, or through their personal relationships with investment advisors and stock brokers, and making decisions for the purchase or sale of Endo stock.  Notwithstanding that Congress expressed a preference for institutional investors serving as lead plaintiffs, this Court believes that having an institutional investor such as the Bucks County Fund (the beneficiaries of which are located within this district), as the Lead Plaintiff, but three individuals serving as co-lead Plaintiffs, would provide a broad range of testimony going to the merits of the claim.  All of this is stated without prejudice to the defenses of Endo.

The Court also notes that, although it may be unusual for a district judge to look after the interests of a putative class, this is required by the PSLRA and the discussions with Mr. Stengel were necessary to establish the appropriate leadership in this case, given the very unusual set of circumstances discussed above.  Knowing Mr. Stengel for many years, this Court is quite sure that his performance as Lead Counsel will be a benefit to a class, whether win, lose, or draw.

O:\CIVIL 17\17-5114 Pelletier v Endo Intl\17cv5114 Memorandum re lead counsel and lead plaintiff.docx