**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ALEXANDRE PELLETIER**, Individually and On Behalf of All Others Similarly Situated**,** <br><br> **v.** <br><br> **ENDO INTERNATIONAL PLC, RAJIV KANISHKA LIYANAARCHCHIE DE SILVA, SUKETU P. UPADHYAY, AND PAUL V. CAMPANELLI** | **CIVIL ACTION** <br><br> **NO. 17-cv-5114** |

Baylson, J.                                                                                        May 20, 2021

<u>**MEMORANDUM RE: CLASS CERTIFICATION**</u>

**Table of Contents**

I.  Introduction ........................................................................................................ 4

II.  Procedural History and Key Allegations ................................................ 5

    a.  Pelletier Files the Initial Complaint ....................................................... 5

    b.  Court Appoints Initial Lead Plaintiff ..................................................... 5

    c.  New Lead Plaintiff Files Amended Complaint ...................................... 6

        i.  Alleged False or Misleading Statements ........................................ 7

        ii.  Arguments Regarding False or Misleading Statements ................. 11

        iii.  Alleged Disclosures and Related Arguments ................................. 12

    d.  Motion to Dismiss Granted as to Price-Fixing Theory but Otherwise Denied ... 15

    e.  State Court Oversees MissPERS Litigation and Settlement .............................. 17

    f.  Parties Commence Initial Class Certification Briefing ....................................... 18

    g.  Parties Dispute Ongoing Discovery Motions ..................................................... 19

    h.  Court Replaces Lead Plaintiffs ............................................................................ 19

    i.  Parties Renew Class Certification Briefing ......................................................... 21

III.    Plaintiffs' Remaining Claims................................................................. 22

    a.    Anticompetitive versus Noncompetitive............................................. 22

    b.    Government Subpoenas........................................................................ 23

    c.    Remaining Alleged Misstatements...................................................... 26

IV.    Legal Standard for Class Certification .................................................. 26

V.    Key Precedential Opinions .................................................................... 27

    a.    Basic Inc. v. Levinson ........................................................................ 27

    b.    Halliburton I — Erica P. John Fund, Inc. v. Halliburton Co. ............ 28

    c.    In re DVI Securities Litigation............................................................ 29

    d.    Amgen Inc. v. Conn. Retirement Plans & Trust Funds ...................... 30

    e.    Halliburton II — Halliburton Co. v. Erica P. John Fund, Inc. ........... 30

VI.    Shifting Burdens under the Basic Presumption ..................................... 31

VII.    Expert Reports........................................................................................ 33

    a.    Plaintiffs' Initial Report (ECF 116-5) ................................................ 33

    b.    Defendants' Opposition Report (ECF 133-6) ..................................... 33

    c.    Plaintiffs' Reply Report (ECF 152-1) ................................................ 34

VIII.    Class Definition and Claims to be Given Class Treatment................... 35

IX.    Parties' Contentions ............................................................................... 36

    a.    Defendants' Arguments....................................................................... 36

        i.    Challenges to Class Leadership...................................................... 36

        ii.    Challenges to the Class Definition ................................................. 37

        iii.    Challenges to the Basic Presumption ............................................ 38

        iv.    Challenges to the Classwide Damages Model................................. 38

    b.    Plaintiffs' Arguments ......................................................................... 38

        i.    Challenges to Class Leadership...................................................... 38

    ii.    Challenges to Class Definition ........................................................ 39

    iii.    Challenges to the Basic Presumption ............................................. 40

    iv.    Challenges to the Classwide Damages Model................................. 40

X.    Analysis for Issues of Class Certification .............................................. 40

    a.    Class Leadership ....................................................................... 41

    i.    Conflicts of Interest: Bucks (Lead Plaintiff) and Pomerantz and Robbins Geller (Co-Lead Counsel) ........................................................................... 41

    ii.    Unique Defenses: Bucks (Lead Plaintiff)........................................ 43

    iii.    Adequacy and Typicality:  Pelletier and Dole (Co-Lead Plaintiffs) .............. 44

    b.    Class Definition................................................................................. 47

    i.    Class Period does not Prevent Certification .................................... 47

    ii.    Amending the Proposed MissPERS Carveout.................................. 49

    iii.    Amending to Avoid Fail-safe Concerns .......................................... 50

    c.    Predominance Under the Basic Presumption ....................................... 52

    i.    Context of the Parties' Arguments on Basic .................................... 54

    ii.    Market Efficiency and the Prima Facie Basic Presumption ........................... 57

    iii.    Which Disclosures are Relevant for Class Certification ................................. 59

    iv.    Rebuttal of the Basic Presumption .................................................. 65

    d.    Classwide Damages Model not Relevant at this Stage ........................................ 70

XI.    Conclusion ............................................................................................ 70

EXHIBIT 1........................................................................................................ 72

EXHIBIT 2........................................................................................................ 73

EXHIBIT 3........................................................................................................ 84

## I.    **Introduction**

This securities class action alleges corporate misrepresentations. The issue is whether facts common to the class "predominate" over individual issues.  In the opera world, misrepresentations are common, whether Mozart's ingenious disguises of Papagena in the Magic Flute and Despina in Cosi Fan Tutte but do not impact any class and are quickly remedied.  However, tragedies can involve class impact.  Consider Verdi's Don Carlo, where Spain's King Philip, in an effort to secure a treaty between Spain and France, usurps the engagement of his son, the title character Don Carlo, to the French princess Elizabeth, who must instead marry Phillip. However, it soon appears that Phillip uses this treaty to tighten his dictatorial grip on the Flemish people, and they surely represent a class. The issue of whether Phillip's domination over the Flemish people "predominates" over the more dramatic but individualized ensuing palace intrigues can be debated.

Plaintiffs have invoked the Private Securities Litigation Reform Act ("PSLRA") to allege that Endo and the Individual Defendants artificially inflated Endo's revenues in the generic pharmaceuticals market through unsustainable, noncompetitive pricing practices and relied on these price increases as part of its strategic plan.  Unilateral price inflation is inherently unsustainable, especially in an industry like pharmaceutical generics where the sellers compete only on price.  When making noncompetitive price increases, participation in the market lasts only as long as the other sellers also raise their prices.  Each seller risks being undercut by any competitor and losing all revenue from the market.

Through a series of alleged misrepresentations, Endo attributed its revenue growth to other factors and obscured the extent to which it relied on these short-term noncompetitive practices.  See below, Section II(c) (discussing the alleged misrepresentations and disclosures).  In doing so,

Plaintiffs argue that Defendants misled the public into believing that Endo had the potential for long-term profitability, affecting Endo's stock prices.

Plaintiffs have moved for class certification. After substantial briefing, the Court is persuaded that this proposed class, with minor modifications, satisfies the elements of Rule 23 and will GRANT the motion to certify.

## II. Procedural History and Key Allegations

### a. Pelletier Files the Initial Complaint

The class action was initiated by Alexandre Pelletier in November 2017. ECF 1. The initial complaint alleged that Defendants made material misrepresentations and omissions in connection with Endo's participation in a price-fixing conspiracy to inflate generic pharmaceuticals' profitability, including attribution of this profitability to sustainable sources instead of its purportedly "true" source (collusion).

### b. Court Appoints Initial Lead Plaintiff

Pursuant to the PSLRA, Judge Savage (then the presiding judge over this matter) considered appointment of the lead plaintiff for the prospective class — the contenders were Pelletier, a pair of individual investors (Nathan Dole and Wayne Wingard), and one institutional investor (Park Employees' Annuity and Benefits Fund of Chicago ("Park")). The PSLRA requires that the Court consider a "presumptive lead plaintiff," who is the entity with the "the largest financial interest" in the litigation that also timely moved for appointment and satisfies Rule 23's adequacy and typicality requirements. The Court could then consider other factors to rebut whether the presumptive lead plaintiff should lead the class.

Judge Savage appointed Park as the lead plaintiff, finding that Park had approximately the same financial interest in this litigation as Dole and Wingard but "the preference for appointing institutional investors" favored selection of Park. Pelletier v. Endo, 316 F. Supp. 3d 846, 855 (E.D.

Pa. 2018) (Savage, J.) ("<u>Pelletier I</u>") (also at ECF 57). In his opinion, he noted that there was "no dispute" that Park satisfied the adequacy and typicality elements for a class action and did not undertake an independent evaluation of those issues. <u>Id.</u> at 848.

Judge Savage recused himself after his opinion. The case was then transferred to Judge Padova, who recused himself before issuing any definitive ruling. The case was then assigned to the undersigned.

### c. New Lead Plaintiff Files Amended Complaint

Plaintiffs, through Park, filed the Amended Complaint on behalf of the prospective class in August 2018. ECF 62. In summary, Plaintiffs alleged that Defendants were engaged in noncompetitive pricing in the generics market, through a price-fixing agreement with Endo's purported competitors and, in the alternative, by unilaterally inflating prices above the market level for increased profits. Plaintiffs claim that Defendants misled investors through a series of public statements regarding this pricing scheme that inflated Endo's stock prices and injured the plaintiff class when the scheme collapsed.

The best introduction to the alleged facts is a timeline of the statements and related claims as alleged in the Amended Complaint. Plaintiffs rely on eleven sets of statements — alleging six false or misleading sets of statements, three so-called "partial corrective disclosures" that disclosed some relevant information but misled on other bases, and two "corrective" disclosures (one of which is a third-party publication). [1]

---

[1] That <u>Bloomberg</u>, not Endo, was the source of this information is not relevant to this analysis. A statement may be considered as a disclosure where it allegedly disclosed new information to the public, and it need not come from the defendant-company. <u>See</u> <u>Utesch v. Lannett Co., Inc.</u>, 385 F. Supp. 3d 408, 425 (E.D. Pa. 2019) (Beetlestone, J.) (considered disclosures can include announcements of government investigations and news articles); <u>see also</u> <u>Grigsby v. Bofl Holding,</u>

Exhibit 1 to this opinion contains a chart summarizing each statement date's corresponding allegations from the Amended Complaint. Exhibit 2 includes each statement as quoted in the Amended Complaint, as well as citations to the docket where the parties have provided the whole source document and references to Plaintiffs' related theories. Exhibit 3 is a chart showing Endo's stock price throughout the proposed class period.

      i.   <u>Alleged False or Misleading Statements</u>[2]

<u>March 2, 2015</u>: The proposed class period begins with Endo's 2014 Annual Report on Form 10-K and investor earnings call, announcing the company's 2014 year-end results. Endo announced a 140% increase in the generics division's adjusted income since 2013, despite experiencing "intense competition from other generic drug manufacturers." ECF 62 at ¶ 50. Endo attributed this profitability to various other aspects of its business model, including its participation in markets that functionally excluded foreign competition, "launch[ing] new generic products in a timely and cost-efficient manner," and significant acquisitions. <u>Id.</u> at ¶¶ 189–91.

<u>May 11, 2015</u>: Endo filed its Q1 2015 10-Q and had its related investor call regarding Q1 2015 earnings. <u>Id.</u> at ¶ 193. These announced that Endo's reported generics' adjusted income increased 149% relative to the same period the prior year and primarily attributed the increase to an acquisition, new product launch, and increased demand overall. <u>Id.</u> at ¶ 194. When asked for specifics during the investor call, Endo refused to confirm which products would be seeing price

---

<u>Inc.</u>, 979 F.3d 1198, 1205–06 (9th Cir. 2020) (newspaper article could qualify as disclosure for PSLRA litigation).

[2] Plaintiffs also allege that Defendants made false or misleading statements in their Sarbanes-Oxley certifications by signaling that their SEC forms did not contain false or misleading statements or omissions. ECF 62 at ¶¶ 187, 193, 197, 200, 203, 210, 214, 217.

increases and said any profits from those increases would not occur until "late 2015 and into 2016." Id. at ¶ 53.

May 18, 2015: Endo announced its agreement to acquire Par Pharmaceuticals, which would become Endo's generics division, and held an investor call. Id. at ¶ 195. Par's purchase price was very high — Endo had to purchase Par by issuing $3.6 billion in shares. Id. at ¶ 57. Opening the investor call, Upadhyay stated, in part:

> Growth across both Companies resulted from a combination of volume, new products, prudent pricing strategies and accretive acquisitions. In addition to impressive revenue growth, both Companies have realized meaningful margin gains since 2011 as a result of greater manufacturing efficiencies, favorable mix and through the optimization of pricing across a more specialized product portfolio.

Id. at ¶ 196.

August 10, 2015: Endo filed its Q2 2015 10-Q and held the related earnings call. Id. at ¶ 197. Endo reported a 39% increase in generics' adjusted income relative to the same period the prior year, primarily attributing the increase to acquisitions, new product launches, and increased demand overall. Id. at ¶ 198. During the call, an analyst asked for more information regarding pricing in the generics market. De Silva replied:

> We are prudent and opportunistic when we take price increases and not all controlled substances lend themselves to price increases. It all depends on the competitive set and the supply-demand situation in the market at any given time. However, we have a very broad portfolio so we have at least 700 SKUs that we market and manage and at any given quarter we do have opportunities to take price and this second quarter was no different.

Id. at ¶ 199.

November 5 and 9, 2015: On November 5, 2015, Endo announced its Q3 financial results, an increase of 28% in generics' adjusted income relative to the prior year and held an earnings call. Id. at ¶¶ 200–01. On November 9, 2015, Endo filed its Q3 2015 10-Q, formally reporting those results. Id. at ¶ 200. Endo primarily attributed its increased income to acquisitions, new

product launches, and increased demand overall.  Id. at ¶ 201.  It expressly disavowed any reliance on price increases because such increase "don't last very long" in a competitive market.  Id. at ¶ 66.

On the call, an analyst asked why Endo was able "to take advantage of certain pricing opportunities where other competitors" could not.  Id. at ¶ 202.  De Silva answered:

> The controlled substance space has been one where there's been events that allow for price increases, like the oxycodones or the hydrocodones, and the small products are an area where oftentimes the supply-demand dynamics are such that there are opportunities for pricing, because many of these don't last very long, and they are temporary, but net-net they contribute to Qualitest growth.

Id.

February 29, 2016:  Endo filed the 2015 10-K, issued a release, and held an earnings call regarding Q4 2015 and FY 2015 financial results.  Id. at ¶ 203.  Endo reported an 81% increase in generic segment revenues from Q4 2014 to Q4 2015 and a 60% increase in generics' adjusted income from FY 2014 to FY 2015.  Id. at ¶ 204.  Endo's 2015 10-K stated that it "face[d] intense competition from other generic drug manufacturers," id. at ¶ 205, and made frequent comments about "operat[ing] in a highly competitive industry," id. at ¶ 208.  Endo primarily attributed its increased earnings to acquisitions, new product launches, and increased demand overall.  Id. at ¶ 204.  The 10-K also stated:

> Our primary strategy is to compete in the generic product market with a focus on high-value, first-to-file or first-to-market opportunities, regardless of therapeutic category, and products that present significant barriers to entry for reasons such as complex formulation, regulatory or legal challenges or difficulty in raw material sourcing. . . .

And

> Newly introduced generic products with limited or no other generic competition typically garner higher prices. At the expiration of the exclusivity period, other generic distributors may enter the market, resulting in a significant price decline for the drug. Consequently, the maintenance of profitable operations in generic pharmaceuticals depends, in part, on our ability to select, develop and launch new

generic products in a timely and cost-efficient manner and to maintain efficient, high quality manufacturing capabilities.

Id. at ¶¶ 206, 207.

The 10-K also revealed that federal prosecutors had subpoenaed members of the generics industry about pricing practices, but it did not mention that Endo had received one of those subpoenas in December 2015 and was subject to government scrutiny. Id. at ¶ 209.

May 5 and 6, 2016: Endo filed its Q1 2016 10-Q on May 6, 2016, following its announcement of earnings and an investor call the day before, and reported a 15% increase in generics' adjusted income from the prior year. Id. at ¶ 210. Endo attributed this growth as "primarily due to the Par acquisition," which, in turn, was "partially offset by a decrease resulting from competitive pressure on commoditized generic products and charges to increase excess inventory reserves of approximately $18 million at our U.S. Generic Pharmaceuticals segment due to the underperformance of certain products." Id. at ¶¶ 211–12.

During the earnings call, Campanelli attributed these changes to normal market forces:

First, we have seen a steep and rapid price erosion caused by pair consolidation that has been more even profound than anticipated. Second, coupled with this consolidation and new payer environment, competitors are taking aggressive pricing actions to gain market share. Third, there's been a rapid erosion of the pain segment driven by three things: one, continued market contraction; two, increased competitive capacity and pressure; and three, while still too early to judge the full impact, we believe the recently issued CDC guidelines will continue to put pressure on an already soft pain market. Fourth, there's been a recent and marked acceleration of FDA approval for generic products. Fifth and finally, delays in expected FDA actions related to our 505(b)(2) products means that we have yet to see the anticipated removal of unapproved competitive products from the market.

Id. at ¶ 212. Similarly, De Silva attributed decreased generics growth to "continued pricing and competitive pressures on our commoditized and pain products." Id. at ¶ 213.

August 8 and 9, 2016: Endo filed its Q2 2016 10-Q on August 9, 2016, following its announcement of earnings and an investor call the day before, and reported a 47% increase in

generics' adjusted income from the prior year.  Id. at ¶¶ 214–15.  Endo attributed this increase as "primarily due to the Par acquisition" but noted countervailing impacts from increased generics competition and charges to excess inventory reserves from underperforming products.  Id. at ¶ 215.

November 8, 2016:  Five days after Bloomberg published an article revealing a government investigation into generic pharmaceuticals' pricing practices, see below (discussing November 3, 2016 disclosure), Endo filed its Q3 2016 10-Q and held an investor call on November 8, 2016.  ECF 62 at ¶ 217.  Endo reported a 29% increase in generics' adjusted income from the prior year.  Id. at ¶ 218.  Endo also announced, however, that its legacy generics business had decreased 20% from just the prior quarter, Q2 2016.  Id. at ¶ 83.

Endo attributed the increase as "primarily due to the Par acquisition" but attributed negative effects to increased generics competition, an "evolved consortium structure," and charges to excess inventory reserves from underperforming products.  Id. at ¶¶ 83, 218–19.

ii.   Arguments Regarding False or Misleading Statements

As alleged, Defendants made false or misleading statements where they obscured and misattributed the role that noncompetitive pricing, whether through an illegal agreement or parallel pricing practices, played in Endo's income.  For example, the Amended Complaint frequently uses similar or identical language to the below, when describing falsity:

> These statements that Endo faced "intense competition" from other generic drug manufacturers were false and misleading because Endo did not compete on price with other generic manufacturers in several generic drug markets in which Defendants made and sustained very large price increases and, for certain drugs, Defendants ceded market share to existing manufacturers and to new entrants to avoid competition that would drive down the inflated prices. . . . As an independent and separate basis for falsity, the statements failed to disclose that Endo was engaged in an illegal agreement to fix prices, rig bids, and allocate markets for generic drugs.

ECF 62 at ¶ 188.

The allegedly false or misleading statements include Defendants' specific comments about the state of competition or specific competitors in the generics market. Plaintiffs allege that these statements were false or misleading as well, since they claim that the market was not in a state of competition (or, where Endo did report increasing competition, misleadingly attributed it to other market forces). This misattribution of revenue also existed where Endo made statements about sources of profitability, business models, or pricing strategy because Endo allegedly did not reveal that its revenue relied at least partially on noncompetitive pricing.

Additionally, Plaintiffs alleged that Endo's comments regarding the government investigation into the generics market were misleading because they downplayed the scope of the investigation and Endo's potential liability, including vague initial statements that the subpoena was sent only to "a pharmaceutical company" despite Endo itself being a recipient of the subpoena months beforehand. See Section III(b) (discussing subpoenas). By downplaying the government investigations, Endo obscured the extent to which noncompetitive pricing factored into its own business model and how government scrutiny would impair its ability to sustain increased generics prices.

### iii. Alleged Disclosures and Related Arguments

Plaintiffs also claim that statements on February 29, 2016; May 5 and 6, 2016; November 3, 2016; November 8, 2016; and February 28 and March 1, 2017 constituted "corrective disclosures," by increasingly rectifying the misrepresentations or omissions from the previous statements.[3]

_____

[3] Plaintiffs did not use the explicit term "corrective disclosure" in their Amended Complaint, but have categorized them as such in more recent briefing, beginning with class certification briefing. Additionally, Plaintiffs argue the February 29, 2016; May 5 and 6, 2016; and November 8, 2016

February 29, 2016:  In its 2015 10-K, Endo stated that there was "increased public and governmental scrutiny of the cost of drugs, especially in connection with price increases following companies' acquisitions of the rights to certain drug products."  ECF 62 at ¶ 209.  Endo also disclosed that "U.S. federal prosecutors recently issued subpoenas to a pharmaceutical company seeking information about its drug pricing practices, among other issues," warning that "future profitability could be negatively affected" and Endo "may" face pricing pressure as a result of this increased scrutiny or potential new regulation.  Id.

As alleged, Endo did not reveal that it was one of the subpoenaed companies or that it knew the government scrutiny would likely lead to a collapse in its noncompetitive pricing practices.

May 5 and 6, 2016:  In the Q1 2016 10-Q and related earnings call, Defendants informed investors of disappointing financial results, linking them to increasing competition in the generics market.  Id. at ¶¶ 74–75, 212–13.  Endo also disclosed for the first time that it had received a subpoena from the Connecticut attorney general, requesting information about Endo's pricing practices, but Endo did not disclose any potential impacts the investigation could have on Endo's alleged pricing scheme.  Id. at ¶¶ 74, 244.

While these disclosures provided investors with some warning of future potential losses, Endo attributed the increasing competitive pressure to normal market forces rather than scrutiny into its noncompetitive pricing and gave little detail as to whether Endo faced any potential liability (if any) from the government investigation.

statements each contain both false or misleading information and "corrective" information.  See, e.g., ECF 318 at 9.  The Court uses the term "corrective disclosure" only for purposes of reference but does not embrace the term's implications.

November 3, 2016:  On November 3, 2016, <u>Bloomberg</u> published an article entitled "U.S. Charges in Generic-Drug Probe to Be Filed by Year End." <u>Id.</u> at ¶ 81.  The article stated, for the first time publicly,  that both the federal government and a coalition of state attorneys general were pursuing civil and criminal actions against "more than a dozen" pharmaceutical companies, including Endo.[4]  <u>Id.</u>  The potential charges in question largely oriented around antitrust or collusive behavior, and <u>Bloomberg</u> reported that "the first charges could emerge by the end of the year." <u>Id.</u>

Plaintiffs argue that the <u>Bloomberg</u> article revealed significant government scrutiny of pricing practices throughout the generics market.  Although the core investigation was into antitrust violations, Plaintiffs nonetheless contend that the scrutiny necessarily prevented Endo from all other forms of noncompetitive behavior, e.g., parallel pricing, because of increasing government oversight.  Through the revelation of the government investigation, the public learned that Endo and its peers may have drawn profits from artificially inflated drug prices and that the bubble could soon collapse.  The article did not, however, mention the extent of Endo's potential liability (if any) or of Endo's potential losses from price collapses.

November 8, 2016:  During its November 8, 2016 disclosures, Endo largely reiterated similar information as in the August 9, 2016 disclosures.  But this later date also included more tangibly troubling signs, as Endo reported a <u>20% decrease</u> in legacy generics' revenue compared to the prior quarter.  <u>Id.</u> at ¶ 83.  Following such a sharp decrease in revenue from some of the company's core products, Plaintiffs allege that Endo partially revealed its collapsing pricing model, triggered by public and governmental scrutiny, although Endo continued to misattribute

_____

[4] The article referred to Endo's generics arm, Par Pharmaceuticals, by name.

these losses to "normal market dynamics like 'higher than anticipated pressure from the consortiums' and 'the impact of new competition.'" Id.

February 28 and March 1, 2017: Endo released its Q4 2016 8-K on February 28, 2017 and its 2016 10-K on March 1, 2017. Id. at ¶ 264. As discussed in the expert reports, however, "Endo beat analysts' 2016 earnings estimates by 10.5%." ECF 152 at 27. On the other hand, Endo's reported generics' adjusted income dropped 23% from Q4 2015 to Q4 2016 and 30% from FY 2015 to 2016. ECF 62 at ¶ 264.

Endo also projected a $3.5 billion impairment charge, writing off the value of the company's goodwill, almost $3 billion of which was attributable to "to the permanent decline in the value of Endo's U.S. Generics business segment." Id. Endo attributed the 40% decrease in its generics goodwill to reduced cash flow, in turn stemming from increased pricing pressure. Id. It also projected a drop of about $1 billion in generics revenue for the upcoming 2017 year, resulting in an "earnings per share" decrease from about $6 to about $3.60. Id.

Based on these negative revelations, Plaintiffs argue, Endo fully revealed the extent of its pricing scheme and lost all inflated profits and goodwill that it had received through the scheme. In other words, Plaintiffs argue that this disclosure fully corrected Endo's prior misrepresentations and warrants this Court certifying the prior day (February 27, 2017) as the last of the proposed class period.

**d. Motion to Dismiss Granted as to Price-Fixing Theory but Otherwise Denied**

Defendants moved to dismiss the Amended Complaint in September 2018. ECF 63 (additional briefing at ECF 66, 69). The case was transferred to the undersigned, who heard oral arguments on the motion to dismiss in September 2019, about one year after it was initially filed and one week after sending the parties a list of key questions and issues to discuss. ECF 75, 82, 84. After argument, the Court directed the parties to file supplemental briefs regarding discussed

issues, which they did in October 2019. ECF 89, 90. In February 2020, the Court granted Defendants' motion to dismiss in part and denied it in part. Pelletier v. Endo, 439 F. Supp. 3d 450 (E.D. Pa. 2020) (Baylson, J.) ("Pelletier II") (also at ECF 93).

Pelletier II focused on three main challenges to Plaintiffs' allegations: whether there was a price-fixing conspiracy, whether there were misrepresentations or omissions regarding an noncompetitive pricing strategy, and whether Defendants had scienter. Id. at 455. In considering these issues, the opinion categorized Plaintiffs' claims into "Claims Premised on Price-Fixing Allegations" and "Remaining Claims."

For the former claims, the Court found that Plaintiffs' claimed misrepresentations or omissions regarding a price-fixing conspiracy were "not sufficient to proceed" past the pleadings stage. Id. at 463. A claim under this theory required allegations to support three elements: (1) members of an industry moved their pricing in parallel, (2) the members were aware of each other's conduct and that awareness played a role in their decision-making, and (3) there are some "plus factors" that suggest the existence of some agreement between competitors. Id. at 464 (citing In re Drywall Antitrust Litig., 163 F. Supp. 3d 175 (E.D. Pa. 2016) (Baylson, J.)).

Plaintiffs alleged the first and second elements but failed to allege the third — evidence of an agreement:

> Concerning Endo's alleged concealment of its participation in a price fixing allegation, Lead Plaintiff has merely alleged parallel pricing. Lead Plaintiff has adequately alleged that Endo and the other competitors were conscious of each other's prices and factored that into their own pricing decisions. But there are no allegations to establish the "plus factors" as required. Thus Lead Plaintiff's allegations are insufficient to proceed on their "agreement to fix prices" theory.

Id. Without allegations to satisfy all three elements, the Court dismissed with prejudice Plaintiffs' claims to the extent that they relied on the theory that Defendants made false or misleading statements regarding an "agreement to fix prices." Id.

The Court next examined Plaintiffs' "remaining claims":

> [T]he Court turns to Lead Plaintiff's theory that Defendants' statements about market conditions, sources of revenue, and pricing decisions were misleading even in <u>the absence of a price-fixing conspiracy</u>. Having reviewed the statements, the Court concludes that Lead Plaintiff has sufficiently alleged that Defendants' statements were misleading. Those statements <u>purported to inform investors about the competitive environment, the sources of their generics revenue, or the basis of their pricing decisions</u>, but obscured or omitted material information about the same topics. If these allegations prove true, the statements were misleading.

<u>Id.</u> at 466. The Court denied the motion to dismiss as it pertained to these "remaining claims," <u>id.</u>, and went on to rule that Plaintiffs had sufficiently alleged scienter for all Defendants. <u>Id.</u> at 469.

Plaintiffs' surviving theory, therefore, was that Defendants misled investors about relevant market conditions. Those conditions include statements regarding noncompetition and its effects on product prices — indeed, the Court found that Plaintiffs adequately alleged parallel pricing behavior — but Plaintiffs could not continue to rely on the theory that Defendants formed an <u>agreement</u> with other members of the market to enforce that noncompetition.

### e. State Court Oversees <u>MissPERS</u> Litigation and Settlement

Concurrent to much of this litigation, a Pennsylvania state court supervised a closely related securities litigation against Endo, <u>Public Employees' Retirement System of Mississippi v. Endo et al.</u>, No. 2017-02081-MJ (Pa. Ct. Com. Pl.) ("<u>MissPERS</u>"), filed in Chester County before Judge Griffith. There, the plaintiff class challenged Endo's statements in connection with its June 2015 secondary public offering to raise funds for Endo's acquisition of Par, alleging that Endo misled investors about unsustainably front-loading sales to inflate short-term profitability. The plaintiff class and Endo reached a $50 million settlement to release "any and all" claims for investors who bought Endo shares from June 5–10, 2015 at a specific offering price and/or directly from Endo. The <u>MissPERS</u> settlement, therefore, would release some claims for Endo stock

purchasers during the proposed class period at issue in <u>Pelletier</u>.  <u>See</u> Section X(b)(ii) (discussing overlap with <u>MissPERS</u> litigation).

Park intervened to challenge the <u>MissPERS</u> settlement, purportedly on behalf of overlapping class members whose claims could fall under either case's class definition.  But Judge Griffith denied Park's motion to intervene and approved the settlement even after considering Park's arguments.  Park appealed the opinion, further delaying execution of the settlement.  <u>See</u> ECF 133-4 (state court's <u>MissPERS</u> opinion); ECF 272 at 13–16 (discussing <u>MissPERS</u> case history).

### f.  Parties Commence Initial Class Certification Briefing

Plaintiffs, still represented by the appointed lead plaintiff Park, moved for class certification in June 2020.  ECF 116.  Defendants opposed on several grounds, arguing (1) Park's intervention in <u>MissPERS</u> created a conflict with overlapping class members; (2) Park's trading activity rendered it atypical, including making its first relevant Endo purchase immediately after the publication of the <u>Bloomberg</u> article; (3) Plaintiffs' damages model was flawed; and (4) a price increase at the close of the proposed class period defeated Plaintiffs' ability to satisfy predominance of class issues.  ECF 133.  The last argument challenged the <u>Basic</u> presumption, discussed further below, which enables proposed securities class actions to satisfy Rule 23(b)(3)'s predominance requirement with a showing that the stock market reflected price impact when the defendant allegedly disclosed corrective information.

Plaintiffs responded to each argument, notably contending that (1) Park's state court intervention was in service of, rather than in conflict with, class interests and (2) its share purchases occurred <u>before</u> the <u>Bloomberg</u> disclosure.  ECF 152.  They also rejected Defendants' predominance challenge by arguing that there was price impact for <u>five disclosures</u>.  <u>Id.</u>

Defendants were granted leave to file a sur-reply, in which they argued that Plaintiffs could not contend that there were five disclosures, having interpreted the Amended Complaint and prior arguments to mean that the only relevant disclosures were the <u>Bloomberg</u> article and the February 28 and March 1, 2017 statements. ECF 172. Defendants therefore moved to strike Plaintiffs' reply brief and the related expert findings. ECF 176.

The parties filed expert reports regarding the application of the <u>Basic</u> presumption with the initial motion to certify, the opposition brief, and the reply brief. <u>See</u> Section VII (discussing expert reports). Defendants did not submit an expert report with their sur-reply.

### g. Parties Dispute Ongoing Discovery Motions

Throughout class certification briefing, the parties also litigated several motions to quash, through which Park attempted to stop Defendants from pursuing discovery into Park's purchase records from Park's investment advisors. <u>See</u> ECF 272 at 8, 8 n.3 (discussing motions to quash). These proceedings began in the recipients' jurisdictions but were eventually consolidated in this Court. <u>Id.</u> at 8. Park had argued that the discovery was irrelevant, without informing the recipient courts that this Court previously ruled that such information was "highly relevant," discoverable, and "essential" in this case. <u>Id.</u> Once consolidated, this Court denied the motions to quash, and Defendants were permitted to discover Park's trade records of Endo purchases. <u>Id.</u> at 9. From this discovery, the Court learned that Park had misrepresented its initial purchase timing — Park's first relevant purchase of Endo shares did not occur until <u>after</u> the publication of the <u>Bloomberg</u> article. <u>Id.</u>

### h. Court Replaces Lead Plaintiffs

This Court heard oral arguments on class certification, but it began to focus on the narrower issues of Park's (and its counsel's) suitability to continue in their leadership roles. Putting the larger issue of class certification aside, the Court directed further arguments into Park's suitability,

ECF 272 at 10–12 (summarizing briefing), and entertained motions from other members of the proposed class seeking to assume a lead plaintiff role.  See ECF 228, ECF 243, ECF 247.

The Court addressed this question with an order and opinion in February 2021 replacing lead plaintiff and lead counsel.  Pelletier v. Endo, No. 17-5114, 2021 WL 398495 (E.D. Pa. Feb. 4, 2021) (Baylson, J.) ("Pelletier III") (also at ECF 272).

The first reason for the Court's action was the revelation that Park had misled the Court regarding Park's purchase timing — despite claiming to have purchased its Endo shares before the Bloomberg article, the trades were not executed until after the publication.  Id. at *11.  Worse, Park's attempts to suppress the related discovery undermined the Court's trust in Park, a crucial element to the ability to adequately represent absent class members.  Id.  Additionally, Park had obfuscated the role of its investment advisor in its purchase decision, and its attempt to prevent execution of the MissPERS settlement in state court placed it at odds with the interests of overlapping class members.  Id. at *11–12.  While declining to take a final position on Park or its counsel's adequacy, the Court found that these were sufficient concerns that the best interests of the class required appointment of new class leadership.  Id. at *12.

The Court next turned to the issue of who would assume the lead plaintiff role.  It reviewed the factors initially examined in Pelletier I for a PSLRA lead plaintiff and found that it would be in the best interests of the class for Bucks County Employees Retirement Fund ("Bucks") to take over the lead plaintiff role.  Id. at *14.  The Court also appointed Pelletier, Dole, and Wingard (the previously considered lead plaintiffs from Pelletier I) to serve as co-lead plaintiffs so that adequacy and typicality would not further obstruct the class' interests.[5]  Id.  The Court also appointed

_____

[5] Wingard has since withdrawn from his role as co-lead plaintiff.  ECF 316.

Lawrence Stengel, Esq. of Saxton Stump as Lead Counsel, with the Pomerantz Law Firm ("Pomerantz") and Robbins, Geller, Rudman & Dowd ("Robbins Geller") as co-lead counsel. ECF 273 (accompanying order).[6]

### i. Parties Renew Class Certification Briefing

Following the replacement of lead plaintiffs and lead counsel, the Court returned to the issue of class certification. The Court held a hearing in February 2021 to address scheduling for the remainder of class certification briefing. ECF 302.

Plaintiffs filed their supplemental brief in March 2021, largely reiterating the prior briefing's arguments. ECF 305. Defendants opposed, reiterating their prior arguments but raising new arguments concerning the adequacy and typicality of lead plaintiffs and lead counsel. ECF 315. Plaintiffs responded in support of certification again in April 2021, ECF 318, 320,[7] bringing to a close nearly a year of briefing.

In the meantime, the Court denied Defendants' still-pending motion to strike, ECF 176, which had challenged Plaintiffs' ability to assert five disclosures. ECF 301. In its February 2021 ruling, the Court held that:

> [The disclosures from] February 29, 2016; May 5, 2016; and November 8, 2016 . . . are not improperly discussed . . . in the Plaintiffs' Reply Brief but should have been raised in a different manner. Whether the events that took place on these dates are "corrective disclosures" or evidence of "fraud," is a possible factual issue to be considered by the Court as to class certification and/or a jury at the trial of this case.

------

[6] Park and its attorneys, Bleichmar Fonti & Auld LLP, moved to stay the proceedings to certify for an appeal, ECF 295, which this Court denied, ECF 297. They also sought a writ of mandamus, ECF 2, No. 21-1386 (3d Cir.), which the Third Circuit denied, ECF 11, No. 21-1386 (3d Cir.).

[7] In ECF 322, Defendants moved to strike Individual Plaintiffs' reply in support of class certification, at ECF 320, for not complying with the Court's scheduling order limiting the length of filings. Nonetheless, the Court finds good reason to consider Individual Plaintiffs' arguments in response, and will DENY Defendants' motion to strike.

Id.  Additionally, Bucks, on behalf of the prospective class, confirmed that it withdrew the class' objection to the MissPERS settlement and proposed a MissPERS carveout in the class definition to prevent double recovery.  ECF 305 at 2.

## III.    Plaintiffs' Remaining Claims

Before examining Plaintiffs' motion for class certification, the Court will further address which alleged misrepresentations and related claims survived the motion to dismiss, where the Court dismissed all claims stemming from a price-fixing theory but allowed Plaintiffs to proceed on their remaining claims.  See Section II(d).

In the motion to dismiss, the Court permitted Plaintiffs to continue on their allegations that were independent of price-fixing theories.  Pelletier II, 439 F. Supp. 3d at 466.  The surviving claims are those that allege misrepresentations or omissions regarding one or more of the following issues, which the Court detailed in Pelletier II: (1) Market Conditions, (2) Sources of Revenue, (3) Pricing Decisions (and the bases for making those decisions) and (4) Competitive Environment.

### a.  Anticompetitive versus Noncompetitive

A key distinction between the dismissed claims and the surviving claims is the distinction of price-fixing conspiracy versus noncompetitive pricing.  In the former, competitors have an anticompetitive agreement that limits trade, in this case, by agreeing to inflate prices.  In the latter, a competitor acts on its own, although, often, its competitors will also unilaterally raise their prices.  Price-fixing is illegal; noncompetitive pricing is not.  But a noncompetitive pricing strategy is unusual because of its risks and unsustainability — at any point, a competitor could reduce its prices below that inflated price point and dominate the market.  This is especially true in the generics industry, where the product is effectively identical throughout the market by law.

Plaintiffs' claims that Endo allegedly misled its investors about its reliance on a risky noncompetitive pricing model were not dismissed from the case. But the Court had dismissed those relying on an anticompetitive price-fixing agreement.

The gist of these surviving allegations, as summarized by Plaintiffs' counsel, is that

> Defendants represented to the investing public that Endo was "not relying on price increases for its strategic plan," that Endo had "not been dependent on pricing," and that the Company does not "count on pricing." Instead, Defendants represented that Endo's growth was the result of "volume and mix and not driven by net price." These allegations "do not turn on whether the Defendants' conduct included illegal agreements under the antitrust laws.

ECF 325 (quoting Amended Complaint) (cleaned up).

### b. Government Subpoenas

One "grey" area remains from Plaintiffs' theory of the case, despite their frequent restatement: the relevance of Endo receiving state and federal subpoenas probing anticompetitive and noncompetitive pricing. While Endo was under no blanket obligation to disclose these subpoenas to its investors, Plaintiffs assert Endo had the duty to discuss them honestly once it raised the matter.

As alleged, in December 2015, a coalition of state attorneys general, led by Connecticut, issued a subpoena and interrogatories to Endo, regarding pricing and market allocation in the generics market. ECF ¶¶ 13, 67. Similarly, in December 2014, the U.S. Department of Justice subpoenaed Par (which was shortly thereafter acquired as the generics arm of Endo) concerning anticompetitive drug pricing. Id. at ¶ 47.

In February 2016, Endo disclosed that "federal prosecutors recently issued subpoenas to a pharmaceutical company seeking information about its drug pricing practices, among other issues . . . ." Id. at ¶ 209. Endo did not disclose that it was one of those subpoena recipients. Indeed,

Endo did not reveal the receipt of the Connecticut subpoena until May 2016. Id. at ¶ 74.[8] Plaintiffs argue that these subpoenas "sounded the death knell" for Defendants' price inflation due to increasing government scrutiny. Id. at ¶ 68.

Having served as a U.S. Attorney in this district, I have significant knowledge as to prosecutorial strategy in issuing grand jury subpoenas, which warrant a very neutral approach by a court in ruling on the implications of a corporation or person's receipt of a grand jury subpoena. In the first place, most prosecutors investigating one or more participants in a particular industry will issue subpoenas to all participants in that market. Doing so permits discovery of key information from all "players" in the industry (including their pricing, competition, marketing, or extraterritorial affairs), but it also avoids singling out any individual recipient as being suspected of wrongdoing. This second factor is important — industry-wide subpoenas help avoid "tipping off" the prosecutor's potential target.

In the background of this strategy is the important fact that grand juries' subpoenas and proceedings are secret. Rule 6 of the Federal Rules of Criminal Procedure governs the secrecy of grand jury subpoenas in the federal criminal justice system; many states have similar provisions. These rules keep grand jury proceedings sealed, including the work of prosecutors and the testimony in front of the grand jury. However, there is no requirement of secrecy by a recipient of a grand jury subpoena. For the reasons stated above, receipt of a subpoena does not, in and of itself, mean that the recipient has been or is suspected of participating in any criminal activity.

_____

[8] The Amended Complaint does not allege when Endo disclosed the federal subpoena, but the public learned of it on or before November 3, 2016, when the federal subpoena was discussed in the Bloomberg article. Id. at ¶ 14.

Nonetheless, news of a grand jury subpoena may often lead to public suspicion of the recipient's liability.

There is no Supreme Court or Third Circuit precedent holding that the mere receipt of a grand jury subpoena is a reportable event for publicly traded corporations. And to create such a duty based on the receipt of a grand jury subpoena in this case would be a grave error. See also Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd., 432 F. Supp. 3d 131, 167 (D. Conn. 2019) (defendants "were not under a duty to disclose" the subpoenas at issue in this case).

The fact remains that neither Endo nor any of its officers or employees have been indicted in the ongoing, highly publicized criminal investigation into price-fixing in the generic industry. The grand jury investigating generic pricing may still be functioning and may, in the future, pursue Endo. But, for the present, this Court gives no weight to the standalone fact that Endo received a grand jury subpoena.

In a securities law context, however, at least one court has held that a company's obligation to correct false and misleading statements includes where those statements address the receipt of subpoenas. See In re BioScrip, Inc. Sec. Litig., 95 F. Supp. 3d 711, 727 (S.D.N.Y. 2015) (plaintiffs alleged an actionable misrepresentation where the defendants purportedly misled investors about receiving a subpoena).

Reviewing the allegations here, Plaintiffs argue that Endo's vague statement in February 2016 that "a pharmaceutical company" received a subpoena misled the public into believing that the subpoenaed company was not Endo, which they allege was not true. Although the Court rejects any reliance on the grand jury subpoenas as determinative for class certification, the alleged misstatements may be raised at trial.

### c. Remaining Alleged Misstatements

The Court has reviewed Plaintiffs' allegations in the Amended Complaint, the parties' arguments, and the Court's own statements of surviving issues above and in the motion to dismiss opinion. Almost all of Plaintiffs' allegations regarding misrepresentations asserted a theory of liability consistent with Plaintiffs' remaining claims. Exhibit 2 to this opinion includes key information about each alleged misrepresentation, including which of these four bases the misrepresentation appears to address. Based on the plain text of the allegations in the Amended Complaint, Paragraphs 209, 212, 213, 216, and 219, are wholly reliant on the existence of "anticompetitive price increases" stemming from a price-fixing agreement. Because they rely only on a theory of liability that this Court dismissed previously, Plaintiffs cannot continue to rely on those allegations in this litigation.[9]

## IV.  **Legal Standard for Class Certification**

Plaintiffs have moved for class certification under Federal Rule 23(b)(3). For certification under Rule 23(b)(3), the proposed class must meet six elements:

> (1) the class must be so numerous that joinder of all members is impracticable (numerosity); (2) there must be questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class (typicality); and (4) the named plaintiffs must fairly and adequately protect the interests of the class (adequacy of representation, or simply adequacy) . . . [(5)] common questions of law or fact predominate (predominance), and [(6)] the class action is the superior method for adjudication (superiority).

In re Lamictal Direct Purchaser Antitrust Litig., 957 F.3d 184, 190 (3d Cir. 2020) (emphasis added)).

---

[9] With the remaining alleged misrepresentations, however, the Court does not consider its classifications in Exhibit 2 to restrict Plaintiffs' own classification of their allegations in the remainder of this litigation.

To certify a class, the Court must "conduct a 'rigorous analysis' of the evidence and arguments presented" for each of these elements. Id. at 190–91.

> That involves three key aspects. First, the court must find that the requirements of Rule 23 are met and any factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence. Second, the court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits. Third, the court must consider all relevant evidence and arguments, including expert testimony, whether offered by a party seeking class certification or by a party opposing it.

Id. at 191 (cleaned up). Only once this analysis is complete can the Court certify the class.

## V.     Key Precedential Opinions

One of the lynchpin issues in this motion is Plaintiffs' ability to demonstrate the predominance of common issues. "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 453 (2016) (citation omitted). The difference is whether "the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, classwide proof." Id. (cleaned up). The Court's decision on this issue is largely controlled by five precedential cases regarding predominance in securities class actions.

### a.  Basic Inc. v. Levinson, 485 U.S. 224 (1988)

In Basic, the Supreme Court established a key doctrine in securities class actions: the Basic presumption (also known as the "presumption of reliance"). For class certification in a securities case under Section 10(b) and Rule 10b-5, the plaintiffs must show that the class members relied on the defendant's false or misleading statements. Basic, 485 U.S. at 243. But "[r]equiring proof of individualized reliance from each member of the proposed plaintiff class" would "effectively" make certification impossible under Rule 23(b)(3)'s predominance requirement. Id. at 242.

Instead, the Supreme Court defined a functional presumption to facilitate litigation: "where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed." Id. at 247.

If successfully invoked (and if not rebutted), the Basic presumption enables certification by showing that the class collectively relied on the stock market's ability to evaluate stocks' worth by incorporating all relevant public information. An efficient market would incorporate all of the defendant's allegedly false or misleading statements, so purchasers of that stock indirectly relied on the challenged statement. Such a framework allows a prospective class to demonstrate reliance on a classwide basis, making it suitable for certification. See below, Section VI (discussing burdens of proof for the Basic presumption).

In addition to establishing the Basic presumption, this case held also that the court may not delve into whether the challenged statements were actually false or misleading at the class certification stage. Basic, 485 U.S. at 242. "[T]he falsity or misleading nature of the . . . [challenged] public statements" is a "common question" to be resolved on the merits. Id.

**b. Halliburton I — Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804 (2011)**

In Halliburton I, the Supreme Court further lightened securities plaintiffs' obligations for class certification. To invoke the presumption, plaintiffs still must demonstrate the predominance of "transaction causation," i.e., "whether an investor relied on the misrepresentation in the first place, either directly or presumptively through the fraud-on-the-market theory." Halliburton I, 563 U.S. at 812. But defendants could not attempt to rebut Basic by arguing the lack of "loss causation." Id. at 813.

"Loss causation, by contrast [to transaction causation], requires a plaintiff to show that a misrepresentation that affected the integrity of the market price also caused a subsequent economic

loss." Id. at 812 (emphasis in original). Halliburton I therefore precluded defendants from challenging Basic by arguing "that a subsequent loss may have been caused by factors other than the revelation of a misrepresentation." Id. at 813.

### c. In re DVI Securities Litigation, 639 F.3d 623 (3d Cir. 2011)

In DVI, the plaintiffs alleged that a healthcare finance company misled the public about its ability to satisfy debt obligations and thereby inflated its stock prices. 639 F.3d at 628. The district court certified the class under Rule 23(b)(3), and defendants appealed the court's finding of predominance, specifically predominance of reliance under Basic. Id. at 630–31.

On appeal, the Third Circuit agreed with the district court that the plaintiffs had demonstrated market efficiency and, therefore, the Basic presumption. Id. at 635–36. Regarding market efficiency, both courts gave weight to the Cammer factors, see Section X(c)(ii) (discussing the Cammer factors), and to defendant's stock listing on an "open and developed" securities market like the NYSE that is "well suited for application" to the Basic presumption. Id. at 634–35.

Defendants also argued that there was no market efficiency because, while most price reactions occurred within the same day, "DVI's stock price sometimes took up to two days to incorporate new information." Id. at 635. Both courts rejected this argument: market efficiency "do[es] not require that public information be absorbed instantaneously" and "[t]hat some information took two days to affect the price does not undermine a finding of efficiency." Id.

The DVI court also examined defendants' arguments to rebut the Basic presumption. Much of that discussion hinged on proof of materiality, which the Supreme Court later abrogated. See below (discussing Amgen). But it also recognized that "evidence introduced by a defendant at the class certification stage demonstrating an allegedly corrective disclosure did not move the market — that there was no market impact . . . — may in some circumstances rebut the

presumption of reliance and in turn defeat predominance." Id. at 639 (emphasis added). This is, in many ways, Defendants' central argument in opposition to class certification at present.

### d. **Amgen Inc. v. Conn. Retirement Plans & Trust Funds**, 568 U.S. 455 (2013)

The Supreme Court returned to the Basic presumption in Amgen. There, the defendants attempted to rebut the Basic presumption for class certification by arguing that the plaintiffs bore the burden of showing materiality — that a reasonable investor would find the omitted or misrepresented facts to be significant in their purchasing decisions. 568 U.S. at 467. If a statement is immaterial, defendants claimed, then it could not have affected the stock price by definition. Id. at 466–67. The Amgen court disagreed, holding that materiality is subject to classwide proof and, therefore, "plaintiffs are not required to prove materiality at the class-certification stage." Id. at 468. Indeed, the court should not permit defendants to present evidence of immateriality before class certification. Id. at 481.[10]

### e. **Halliburton II** — **Halliburton Co. v. Erica P. John Fund, Inc.**, 573 U.S. 258 (2014)

Halliburton II is the most recent Supreme Court opinion regarding the Basic presumption. Although Amgen and Halliburton I prohibited consideration of loss causation and materiality at the class certification stage, Halliburton II clarified that defendants could still bring in "direct evidence" to challenge Basic, which may entail some evidence common to those prohibited issues. 573 U.S. at 281. Defendants could challenge Basic through "price impact" evidence — "evidence that the misrepresentation did not in fact affect the stock price." Id. at 279. If the defendants can

---

[10] This narrowly abrogated DVI to the extend DVI held that "plaintiff need not prove materiality before class certification, but defendant may present rebuttal evidence on the issue." Amgen, 568 U.S. at 465 (summarizing DVI's holding). DVI otherwise remains good law and is the Third Circuit's most recent precedential case to significantly discuss the application of Basic.

show an absence of price impact "that severs the link between the alleged misrepresentation" and

the plaintiffs' reliance on the market, the <u>Basic</u> presumption "does not apply." <u>Id.</u> at 281–82.

## VI.    <u>Shifting Burdens under the Basic Presumption</u>

To successfully invoke the <u>Basic</u> presumption,

> a plaintiff must make the following showings to demonstrate that the presumption of reliance applies in a given case: (1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed.

<u>Halliburton II</u>, 573 U.S. at 268.  In doing so, plaintiffs must satisfy the court's "rigorous market

efficiency analysis," which "may, in some cases, include weighing conflicting expert testimony

and making factual findings."  <u>DVI</u>, 639 F.3d at 633.

But <u>Basic</u> created only a <u>rebuttable</u> presumption.  The defendant, in turn, can seek to rebut

it through "[a]ny showing that severs the link between the alleged misrepresentation and" the

plaintiff's purchase.  <u>Halliburton II</u>, 573 U.S. at 269.  "[F]or example, if a defendant could show

that the alleged misrepresentation did not, for whatever reason, actually affect the market price,

. . . then the presumption of reliance would not apply."  <u>Id.</u>  Defendants typically attempt to rebut

through either front-end evidence — showing that the alleged misrepresentations did not affect the

stock price — or back-end evidence — focusing on the allegedly curative effects of disclosures.

<u>In re Chi. Bridge & Iron Co. N.V. Sec. Litig.</u>, No. 17-1580, 2020 WL 1329354, at *3 (S.D.N.Y.

Mar. 23, 2020).

Rebutting the presumption requires the defendant to satisfy the burden of persuasion by a

preponderance of the evidence.  <u>See</u> <u>In re Allstate Corp. Sec. Litig.</u>, 966 F.3d 595, 610 (7th Cir.

2020) ("the burden of persuasion, not production, to rebut the <u>Basic</u> presumption shifts to

defendants") (joined by now-Justice Barrett); <u>accord</u> <u>Waggoner v. Barclays PLC</u>, 875 F.3d 79, 101

(2d Cir. 2017) ("[D]efendants seeking to rebut the <u>Basic</u> presumption must demonstrate a lack of

price impact by a preponderance of the evidence at the class certification stage rather than merely meet a burden of production."). [11] Placing the rebuttal's burden of persuasion with the defendant is consistent with <u>Halliburton II</u>'s requirement that the defendant must make a "showing that severs the link between the alleged misrepresentation and" the plaintiff's purchase — i.e., some non-negligible contrary showing. 573 U.S. at 269.

In addressing both the prima facie <u>Basic</u> presumption and its rebuttal, the Court may not consider arguments about loss causation or materiality. <u>Id.</u> at 265, 282. But evidence related to those issues is not per se excluded: the Court must consider that evidence if relevant to price impact (but <u>only</u> to the extent it is relevant to price impact). <u>Allstate</u>, 966 F.3d at 608.

Defendants must have the opportunity to raise this issue at the class certification stage and can prevent class certification if successful. <u>Halliburton II</u>, 573 U.S. at 284. If invoked and unrebutted, the <u>Basic</u> presumption will satisfy the predominance element of class certification as it applies to Section 10(b)'s reliance requirement. <u>Id.</u> at 268. But, if the defendant then makes a showing that is "sufficient to rebut" the presumption, the class can no longer rely on it to satisfy predominance. <u>Id.</u> at 269.

---

[11] The Third Circuit has not directly addressed this issue in a precedential opinion, but courts within this Circuit have required the defendant to bear the "daunting" burden of rebutting the presumption. <u>W. Palm Beach Police Pension Fund v. DFC Glob. Corp.</u>, No. 13-6731, 2016 WL 4138613, at *14 (E.D. Pa. Aug. 4, 2016) (Schiller, J.); <u>see also</u> <u>Vizirgianakis v. Aeterna Zentaris, Inc.</u>, 775 F. App'x 51, 53 (3d Cir. 2019) ("plaintiffs do not have the burden to prove price impact (or lack thereof)"). The Supreme Court has heard arguments in <u>Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System</u>, No. 20-222, in part to address the question of whether securities defendants bear the burden of persuasion to rebut or the lesser burden of production. The Court will comply with any and all precedent once issued, but, in its absence, will require Defendants to satisfy the burden of persuasion for rebuttal.

## VII. **Expert Reports**

In addition to the parties' briefs and arguments in hearings, in front of the Court now are three expert reports, each concerning the applicability of the <u>Basic</u> presumption.[12]  The first dealt with market efficiency and <u>Basic</u>'s prima facie case.  <u>See</u> below, Section X(c)(ii).  The latter two dealt with Defendants' attempts to rebut the prima facie case through an examination of disclosures, including which disclosures should be considered.  <u>See</u> below, Section X(c)(iii)–(iv).

### a. **Plaintiffs' Initial Report (ECF 116-5)**

In the first, filed along with Plaintiffs' initial motion to certify, Plaintiffs' expert argued that Endo's stock traded on an efficient market during the class period.  To do so, he individually analyzed eight factors on which courts frequently rely in analyzing market efficiency.  He concluded each factor weighed in favor of market efficiency, and Plaintiffs argued that this supported a conclusion that they had invoked the prima facie case under <u>Basic</u>.

### b. **Defendants' Opposition Report (ECF 133-6)**

Defendants' opposition report attempted to rebut the <u>Basic</u> presumption through a "back-end" challenge: by purportedly demonstrating that the disclosures did not produce a price impact, Defendants argued that the Endo market was not responsive to the challenged statements.  Their arguments center around two events: the November 3, 2016 <u>Bloomberg</u> article and Endo's statement on February 28, 2017 (the day after the close of the class period).  According to Defendants, the <u>Bloomberg</u> article, which announced the existence of a price-fixing investigation

---

[12] Plaintiffs' expert, Dr. Zachary Nye, submitted an Initial Report, ECF 116-5, and a Reply Report, ECF 152-1.  Between those reports, Defendants' expert, Dr. Douglas Skinner, submitted an Opposition Report, ECF 133-6.  Defendants filed a sur-reply.  ECF 172.  At that point, the Court had adequate expert testimony to proceed on this issue and ordered a close to expert reports in relation to the class certification motion.  ECF 300.

in the generics industry, did not disclose anything related to Plaintiffs' surviving claims following the motion to dismiss. Defendants argued the Court could not consider the Bloomberg article.

For the February 28, 2017 disclosure, Defendants' expert found a company-specific, statistically significant price increase for the day, when Plaintiffs' theory of disclosure suggested a price decline should have happened on an efficient market. They argued this was the only relevant disclosure and that the lack of price impact rebutted the Basic presumption.

### c. Plaintiffs' Reply Report (ECF 152-1)

At its core, Plaintiffs' reply report asserts that their case theory relied on five disclosures: February 29, 2016; May 5 and 6, 2016; November 3, 2016; November 8, 2016; and February 28 and March 1, 2017, with the first, second, and fourth disclosures being partially corrective "half-truths."

Plaintiffs' expert found statistically significant price drops for the first four of these five disclosures. Plaintiffs also argued that the Bloomberg article was relevant to their surviving claims.

For the final disclosure, Plaintiffs made two contentions. First, they argued that the Court should consider the two-day window of February 28 and March 1, 2017, contending that the second day provided additional information that contextualized the first day's statements. Plaintiffs' expert found a price decrease (albeit a non-significant one) when looking at the two-day window and a significant price decrease if viewing March 1 in isolation. Second, they argued that the February 28, 2017 stock price increased, but did so less than would be expected given the announcement of unexpected growth on the same day.

In summary, the parties' experts reached the below conclusions regarding each of the purported disclosures, which the Court will discuss further in Section X(c).

| | Disclosure date(s) | Price Reaction | |
|---|---|---|---|
| | | Pls.' Expert – Nye | Defs.' Expert – Skinner |
| 1 | Feb. 29, 2016 | Significant drop | No opinion |
| 2 | May 5 and 6, 2016 | Significant drop | No opinion |
| 3 | Nov. 3, 2016 | Significant drop | No opinion |
| 4 | Nov. 8, 2016 | Significant drop | No opinion |
| 5 | Feb. 28, 2017 | No opinion | **Significant increase** |
| | Mar. 1, 2017 | Significant drop | Significant drop "under, at least, a couple of model specifications" |
| | Feb. 28 and Mar. 1, 2017 (measured jointly) | Non-significant drop | Price increased or dropped depending on model, neither was statistically significant |

## VIII.  <u>Class Definition and Claims to be Given Class Treatment</u>

Plaintiffs propose the following class definition for class certification:

All persons and entities who purchased or otherwise acquired the ordinary shares of Endo from March 2, 2015 through February 27, 2017, inclusive (the "Class Period") and were damaged thereby.

Excluded from the Class are

(i) Defendants and any affiliates or subsidiaries thereof;

(ii) present and former officers and directors of Endo and its subsidiaries or affiliates, and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. §229.404, Instructions (1)(a)(iii) & (1)(b)(ii));

(iii) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof;

(iv) any entity in which any Defendant has or has had a controlling interest;

(v) Endo's employee retirement and benefits plan(s); and

(vi) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding five categories.

Also excluded from the Class are claims released in the settlement in <u>Public Employees' Retirement System of Mississippi v. Endo International plc, et al.</u>, No. 2017-02081-MJ (Ct. Com. Pl. Chester Cnty., Pa.) pursuant to the Notice of Pendency of Class Action, Proposed Settlement, and Motion for Attorneys' Fees

and Expenses issued in that case by Order of the Court of Common Pleas of Chester County, Pennsylvania.

ECF 305-2 at 1.

The claims to receive class treatment are: Count I — violation of Section 10(b) of the Exchange Act of 1934 and Rule 10b-5, against all Defendants; and Count II — violation of Section 20(a) of the Exchange Act, against the Individual Defendants. The Court will consider these claims to the extent they rely on Plaintiffs' surviving theories for liability, as discussed above in Section III.

## IX.    Parties' Contentions

### a.  Defendants' Arguments

Defendants' arguments against class certification fall roughly into four categories: class leadership (on adequacy and typicality grounds), the viability of the class definition, application of the Basic presumption, and the classwide damages model. Defendants do not dispute that the proposed class satisfies numerosity, commonality, or superiority elements for certification.

#### i.    Challenges to Class Leadership

Defendants contend that all lead plaintiffs and two of the three firms in the lead counsel role are inadequate, atypical, or both. Below is a summary of Defendants' contentions for each.

##### A.  Bucks (Lead Plaintiff)

First, Bucks is a retirement fund that holds savings and investments for employees of the Bucks County municipal government. The governing entity of Bucks County ("the County") is a named plaintiff in an opioid-related class action against Endo subsidiaries and a wide array of other pharmaceutical companies. Defendants contend that Endo's liability in opioid litigation is far greater than Endo's assets, so Bucks will have "divided loyalty" if forced to apportion Endo's

assets between recovery in the two litigations, should both prove successful. That conflict with this litigation's class could make Bucks inadequate.

Second, because Bucks did not enter this litigation until after the statute of limitations had expired on the original claims, Defendants argue that Bucks is subject to a unique statute of limitations defense — an argument this Court has previously rejected — and that Bucks lacks the "diligence" required to satisfy adequacy.

### B. Pomerantz and Robbins Geller (Co-Lead Counsel)

Defendants argue that Pomerantz and Robbins Geller, each of whom represent other plaintiffs suing Endo in opioid-related class actions, are also conflicted and inadequate, as they may face a scenario where the different litigations require apportionment of a limited pool of Endo funds. Defendants do not challenge the adequacy of Mr. Stengel or his firm, Saxton Stump.

### C. Pelletier and Dole (Co-Lead Plaintiffs)

First, Defendants argue that Pelletier and Dole's trading activity renders them inappropriate lead plaintiffs, as Pelletier bought his first Endo shares only ten days before the close of the proposed class period and Dole continued to purchase Endo shares after the purported disclosures began. Defendants contend that these post-disclosure purchases make Pelletier and Dole atypical and subject to unique defenses.

Second, relying on excerpted testimony from Pelletier and Dole's depositions, Defendants argue that the two are so unfamiliar with this litigation that they cannot serve as adequate lead plaintiffs.

### ii. Challenges to the Class Definition

Defendants challenge the end date to Plaintiffs' proposed class period, arguing that "no one, except [Plaintiffs] in trying to plead a claim, concluded that any 'anticompetitive scheme' was revealed that day." ECF 133 at 20.

In a footnote, Defendants next argue that Plaintiff's proposed class definition is unviable. They contend that the carve-out for the MissPERS settlement is "incorrect." ECF 315 at 10 n.11. The carveout excludes "claims released in the settlement in [MissPERS]." Defendants argue that the carveout should exclude all MissPERS class members "unless and to the extent they have claims they can show are based on other shares." Id.

Finally, in the same footnote, Defendants argue that the class definition is an impermissible fail-safe definition and cannot be certified.

### iii. Challenges to the Basic Presumption

Defendants dispute that Plaintiffs have satisfied the prima facie case for the Basic presumption by challenging the efficiency of the market for Endo stock. The bulk of their arguments, however focus on rebutting that presumption through, first, showing that Endo's stock price rose in response to the final disclosure (arguing that "severs the link" between the disclosures and the market's response) and, second, challenging the remaining disclosures as improperly asserted and irrelevant.

### iv. Challenges to the Classwide Damages Model

Defendants argue that Plaintiffs' proposed methodology for calculating classwide damages is flawed, so Plaintiffs cannot satisfy predominance.

### b. Plaintiffs' Arguments

### i. Challenges to Class Leadership

### A. Bucks (Lead Plaintiff)

Plaintiffs dispute Defendants' characterization of Bucks as conflicted by noting that Bucks (the Pelletier Lead Plaintiff) is a distinct organization from Bucks County (the government entity), arguing that "neither has any financial interest in the other's lawsuits." ECF 318 at 2. Additionally, Bucks contests that there could be a functionally limited pool of assets that would

divide its loyalties, as the opioid-related claims are asserted against (1) fifteen non-Endo defendants with hundreds of billions of dollars in collective assets and (2) distinct Endo subsidiaries that may or may not share common assets with this litigation's Defendants.

Plaintiffs also reject Defendants' arguments stemming from Bucks' late entry to this litigation, as this Court has already denied Defendants' statute of limitations defense and Plaintiffs believe attacks on Bucks' diligence in their Lead Plaintiff role are without merit.

B.  Pomerantz and Robbins Geller (Co-Lead Counsel)

Plaintiffs argue that Pomerantz and Robbins Geller are not conflicted for the same reasons as Bucks — neither firm is likely to face a limited pool of assets in their Endo-related claims, so there is no cognizable conflict of interest.

C.  Pelletier and Dole (Co-Lead Plaintiffs)

Plaintiffs argue that Pelletier and Dole are neither atypical nor inadequate based on their purchase timing.  In their defense, Plaintiffs cite to caselaw that post-disclosure purchases do not render a lead plaintiff inappropriate, as post-disclosure purchases can be consistent with reliance on the market's ability to assimilate corrective information.

Additionally, Plaintiffs dispute Defendants' characterization of Pelletier and Dole's deposition testimony as "out-of-context snippets," ECF 320 at 2, and argue that the two satisfy the Third Circuit's low threshold for a class representative's required knowledge of the litigation.

ii.  Challenges to Class Definition

Plaintiffs argue that their class definition addresses all of Defendants' challenges but do not dedicate much of their briefs to these issues.  Nonetheless, Plaintiffs contend that the class definition is typical for securities litigation and merits certification here.

iii.    Challenges to the Basic Presumption

Plaintiffs argue that the Court can and should consider all five disclosures that they have identified, arguing that, at the class certification stage, "the alleged disclosure need only relate to, concern, or be linked to a specific alleged misrepresentation."  ECF 305 at 7.  According to Plaintiffs, the price impact of four of the five disclosures is undisputed; the sole remaining issue is the final disclosure.  While Defendants argue that Endo's stock price <u>increased</u> at the close of the class period (the final disclosure), Plaintiffs counter that (1) there was confounding good news announced that day and the stock increased <u>less than would be expected</u>; (2) analyzing the final disclosure as a two-day period shows the price <u>decreased</u> at the close of the class period; and (3) Defendants bear the burden of disputing price impact for the <u>entire</u> class period, so rebuttal of only one disclosure is insufficient to rebut the whole <u>Basic</u> presumption.

iv.    Challenges to the Classwide Damages Model

Plaintiffs contend that, even if Defendants are correct in challenging their damages model, the requirement of a workable classwide damages methodology at the class certification stage does not exist outside of antitrust litigation.

**X.    <u>Analysis for Issues of Class Certification</u>**

As summarized above, Defendants have raised a litany of challenges to class certification. These challenges fall roughly into four categories: (1) Class Leadership, (2) Class Definition, Predominance under the <u>Basic</u> Presumption, and (4) the Classwide Damages Model.  While many of Defendants' arguments raise significant issues with which Plaintiffs will need to contend in later stages of this litigation, the Court nonetheless largely agrees with Plaintiffs at this stage.  With minor alterations to the class definition to reflect discussion from a recent hearing, the Court will GRANT Plaintiffs' motion to certify this class.

### a. Class Leadership

Defendants have raised a laundry list of purported adequacy and typicality challenges to each lead plaintiff and most of the proposed class counsel. None of these contentions preclude class certification.

> i. <u>Conflicts of Interest: Bucks (Lead Plaintiff) and Pomerantz and Robbins Geller (Co-Lead Counsel)</u>

"A conflict concerning the allocation of remedies amongst class members with competing interests can be fundamental and can thus render a representative plaintiff inadequate." <u>Dewey v. Volkswagen Aktiengesellschaft</u>, 681 F.3d 170, 184 (3d Cir. 2012). Some courts have found such a conflict to exist where the class counsel or lead plaintiff is pursuing a separate litigation against the class' defendant and both judgments would come from a limited pool of assets. <u>See, e.g.</u>, <u>Byrd v. Aaron's, Inc.</u>, No. 11-101, 2017 WL 4326106, at *13 (W.D. Pa. Aug. 4, 2017); <u>see also</u> William B. Rubenstein, <u>Newberg on Class Actions</u> § 19:24 (5th ed. 2020). "A conflict that is unduly speculative, however, is generally not fundamental" and would not preclude certification. <u>Dewey</u>, 681 F.3d at 184. Such a conflict must be "material and presently manifest — rather than merely trivial, speculative, or contingent on the occurrence of a future event." <u>Byrd</u>, 2017 WL 4326106, at *13. Additionally, a conflict may "not necessarily prevent certification" if there are "sufficient structural protections to ensure that the interests of the class will be adequately represented despite the conflict." <u>Dewey</u>, 681 F.3d at 185.

Defendants contend that Endo has only a limited pool of assets that may be overwhelmed by this and other litigations. They argue that Bucks, Pomerantz, and Robbins Geller are each involved in other litigations and, if successful, may bear conflicts of interest in apportioning Endo's assets between litigants. The Court disagrees, as the "limited fund scenario" appears too

speculative to prevent class certification, and this case has adequate "structural protections" to prevent those harms should they manifest.

Defendants argue that Bucks is functionally indistinct from the government entity Bucks County ("the County"), which is suing two Endo subsidiaries in opioid-related litigation. Additionally, Robbins Geller represents plaintiffs in other opioid-related cases, and Pomerantz represents plaintiffs in a different securities class action against Endo. Defendants contend the opioid litigations could cost Endo "billions of dollars," even though Endo itself has a market capitalization of $1.44 billion, ECF 315 at 5, and approximately $70 million remaining on its liability insurance. ECF 328 at 7. Nonetheless, Endo has not shown the non-speculative existence of a limited pool of assets here, nor has it shown that such a limited pool would create fundamental conflicts that would preclude certification here.

First, the opioid litigations that create the risk of overwhelming Endo's assets also include numerous leaders in the pharmaceutical industry as co-defendants, constituting a significantly larger pool of assets than Endo as a standalone entity. Unless Endo is the only defendant found liable in those cases, it is unlikely that it would bear such a cost alone. Additionally, the County has sued two of Endo's subsidiaries but not Endo (the defendant here). Endo has made no showing that it would be obligated to cover its subsidiaries' prospective losses in the County's suit. Based on these considerations, the Court does not believe that there is a significant, non-speculative risk of a conflict of interest at this time.

Second, the County is a distinct entity from Bucks (the lead plaintiff here). Bucks is a retirement fund for the employees of the County, certainly, but the entities are legally distinct and owe fiduciary duties to distinct groups. ECF 318 at 2. A judgment in favor of the County in the opioid litigation would provide funds for more government services to its constituents. A

judgment in favor of Bucks in this case would provide funds for larger retirement benefits for retired employees. The legal distinction and separate priorities for these two entities do not suggest that the County's interest will create a conflict of interest for Bucks.

Third, the Court is confident that there are "sufficient structural protections" to protect the interests of class members from Defendants' proposed conflicts of interest. Dewey, 681 F.3d at 185. This case has three lead plaintiffs and three class counsel (led by Mr. Stengel, whose experience as a former judge in this Court and in state court is relevant, and for whom Defendants do not contend there is any conflict of interest). Part of the Court's previous reason for appointing a coalition for class leadership here was to "rel[y] on the guidance of other lead plaintiffs to 'balance any conflicts [the other representatives] may have.'" Pelletier III, 2021 WL 398495, at *12 n.14 (quoting In re Loewen Grp. Inc. Sec. Litig., 233 F.R.D. 154, 163–64 (E.D. Pa. 2005) (O'Neill, J.) (granting class certification)). The Federal Rules ensure that any settlement of this litigation will require the Court's approval. See Mortimer v. Diplomat Pharm. Inc., No. 19-1735, 2019 WL 3252221, at *6 (N.D. Ill. July 19, 2019) (presence of co-counsel and requirement of court approval "ameliorated" "any potential conflict created by [counsel's] representation of both classes"). In the presence of these structural protections, the Court does not find there are any non-hypothetical conflicts of interests that render Bucks, Pomerantz, or Robbins Geller inadequate.

    ii.   Unique Defenses: Bucks (Lead Plaintiff)

A lead plaintiff may be atypical if "the representative is subject to a unique defense that is likely to become a major focus of the litigation." In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 598 (3d Cir. 2009) (cleaned up). "To defeat class certification, a defendant must show some degree of likelihood a unique defense will play a significant role at trial." Beck v. Maximus,

Inc., 457 F.3d 291, 300 (3d Cir. 2006). "If a court determines an asserted unique defense has no merit, the defense will not preclude class certification." Id.

Defendants contend that Bucks is subject to two unique defenses based on its recent entry into this years-old litigation. According to Defendants, (1) Bucks is time-barred from joining this litigation and (2) Bucks' late entry demonstrates a lack of "diligence" required to serve as a lead plaintiff. Neither convinces the Court that Bucks is atypical.

Under the first argument, Defendants argue that Bucks' claims were not tolled under the American Pipe doctrine, citing China Agritech v. Resh, 138 S. Ct. 1800 (2018). Therefore, they argue, Bucks' entry into the litigation as lead plaintiff after the statute of limitations had run was time-barred. The Court previously rejected this argument and gave its reasons for doing so. See Pelletier III, 2021 WL 398495, at *13 ("Neither China Agritech nor Blake addressed a situation like this one."). It need not address it again here.

Under the second argument, Defendants argue that "[a] class representative must represent a class capably and diligently," In re NFL Players Concussion Injury Litig., 821 F.3d 410, 430 (3d Cir. 2010), and a late entrant to a litigation is not diligent. In doing so, Defendants rely on China Agritech again, for the proposition that "a would-be class representative who commences suit after expiration of the limitation period, however, can hardly qualify as diligent . . . ." 138 S. Ct. at 1808. But, again, China Agritech discussed a different issue — a litigant attempting to begin a new class action after the statute of limitations — and does not apply here. Bucks has proven itself a very diligent representative since joining this litigation, partaking in briefing and continuing the discovery process, and the Court finds no merit to the second purported "unique defense."

    iii.    Adequacy and Typicality:  Pelletier and Dole (Co-Lead Plaintiffs)

Defendants raise two challenges to Pelletier and Dole as co-lead plaintiffs.

First, they argue that both individual plaintiffs purchased their shares late in the class period — Pelletier bought his first shares only ten days before the end of the class period and Dole bought tranches of Endo stock before and after the alleged disclosures — and did so after the public allegedly started becoming aware of Endo's pricing practices. Their late purchases, Defendants argue, render the two lead plaintiffs atypical, inadequate, and subject to unique defenses. ECF 315 at 7.

Defendants assert that there is a risk of conflicts in class representation, relying on language from Pelletier III, in which the Court removed Park in part because of its late purchases in the class period:

> Where a lead plaintiff made its initial acquisition after a corrective disclosure, it may have a change in incentives, including to minimize the price impact of pre-purchase disclosures and maximize recovery on its own later-bought shares.

2021 WL 398495, at *12.

The case now is distinguishable from what it was in Pelletier III. Park was "a standalone plaintiff in this litigation" that purchased its first relevant Endo shares at the same time or immediately following an alleged corrective statement. Id. at *10, *12 n.14. Now, there are three proposed lead plaintiffs, one of whom owned its shares throughout the class period. "In contrast" to Park's situation in Pelletier III, where there are multiple lead plaintiffs, the Court may "rel[y] upon the guidance of other lead plaintiffs to 'balance any conflicts the late purchasers may have.'" Id. at *12 n.14. Additionally, the Court specifically noted that Park's removal was not based solely on the grounds of its purchase timing; it did so only when "combined with the Court's other reservations about Park[]." Id. at *12. Pelletier and Dole's purchase timing does not give rise to conflict of interest concerns.

Nor do these late-period purchases demonstrate atypicality or inadequacy. Defendants argue, as a bright-line rule, that post-disclosure purchases render a lead plaintiff inappropriate.

ECF 315 at 7–8 (quoting In re Safeguard Scientifics, 216 F.R.D. 577, 582–83 (E.D. Pa. 2003) (Joyner, J.) (proposed lead plaintiff who "increased his holdings in Safeguard stock even after public disclosure of the alleged fraud" was subject to unique defenses)). But Safeguard is in the minority, as most courts have held that post-disclosure purchases are consistent with a buyer's reliance on the market. See, e.g., Roofer's Pension Fund v. Papa, 333 F.R.D. 66, 76–77 (D.N.J. 2019) (rejecting bright-line rule that a lead plaintiff's post-disclosure purchases prevent certification); see also Feder v. Elec. Data Sys. Corp., 429 F.3d 125, 137–38 (5th Cir. 2005) (The argument "that purchases of a company's stock after the disclosure of alleged fraud defeats typicality . . . is not generally accepted.").

This Court agrees with the majority view. Investors frequently purchase stocks in response to price decreases, doing so does not make them atypical or subject to unique defenses. "Tak[ing] advantage of lower prices" is "a common investment strategy," not an atypical one. See Roofer's Pension Fund, 333 F.R.D. at 77. In contrast, a court may find atypicality where, for example, the post-disclosure purchase is connected to evidence that the investor was not relying on the market, which could lead to unique defenses in terms of reliance on the market. Id. Defendants have presented no individual evidence supporting the conclusion that Pelletier or Dole did not rely on the market. Pelletier and Dole's purchase histories do not support a conclusion of atypicality or inadequacy.

In a second line of attack, Defendants contend that Pelletier and Dole have negligible knowledge or involvement in this litigation and argue they cannot serve as lead plaintiffs. ECF 315 at 8–9.

Rule 23 requires that "a class representative fairly and adequately protect the interests of the class." New Directions Treatment Serv. v. City of Reading, 490 F.3d 293, 313 (3d Cir. 2007).

To do so, "[a] class representative need only possess a minimal degree of knowledge necessary to meet the adequacy standard." Id. Defendants argue that Pelletier and Dole fail even that low threshold, citing their own characterizations of Pelletier and Dole's deposition testimony for the proposition that neither has engaged with or is aware of key information of this litigation. ECF 315 at 8–9.

Having reviewed their testimony, the Court rejects this argument. While neither individual plaintiff is as aware of the litigation or the legal issues involved as a well-prepared lawyer would be, that is not the standard. "[A]ll that is required" is that the lead plaintiff engage in the litigation and "show[] a basic understanding of the facts and claims underlying this litigation." W. Palm Beach, 2016 WL 4138613, at *10. Both Pelletier and Dole have done so, and the Court finds them typical and adequate for the purposes of class certification.

**b. Class Definition**

Defendants have raised three challenges to the proposed class definition. First, they argue that the end date to the class period is inappropriate because Defendants did not reveal any purported scheme relevant to Plaintiffs' theory of the case. Second, they challenge the sufficiency of Plaintiff's language in the class definition, arguing that it fails to exempt claims that were released in a related settlement in the state court system's MissPERS class action. Finally, they challenge the class definition as being an inappropriate "fail-safe" definition. The Court will address each in turn.

i. Class Period does not Prevent Certification

A class period ends when the truth is fully revealed to stockholders. See Semerenko v. Cendant Corp., 223 F.3d 165, 181 (3d Cir. 2000) (defendant "may not be held liable to members of the Class who purchased shares" "after the curative statement was issued"); see also In re Signet Jewelers, No. 16-6728, 2019 WL 3001084, at *19 (S.D.N.Y. July 10, 2019) ("In a securities fraud

class action, 'courts are required to cut off the class period on the date of a statement or event that cures the market.'").

Plaintiffs do not identify any disclosure that directly addressed Endo's purported reliance on noncompetitive pricing or that renounced its prior statements, nor is that required at this stage in the proceedings.  See Pearlstein v. Blackberry Ltd., No. 13-7060, 2021 WL 253453, at *18 (S.D.N.Y. Jan. 26, 2021) (a disclosure need not "take the form of a 'flashing neon light,' with an explicit message stating that it is intended to cure an earlier fraudulent statement, in order for it to qualify as corrective.").

Plaintiffs simply argue that that the public "finally [became] aware of the true financial condition and value of Endo's generics business" after the February 28 and March 1, 2017 disclosure.  ECF 62 at ¶¶ 265–66.  The parties contest when and if Defendants fully corrected for any alleged misrepresentations.  During class certification, however, "a class period should not be cut off if questions of fact remain as to whether the disclosures completely cured the market."  In re Worldcom Inc. Sec. Litig., 219 F.R.D. 267, 307 (S.D.N.Y. 2003); see also Freeland v. Iridium World Commc'ns, Ltd., 233 F.R.D. 40, 43–44 (D. Mass. 2019) (limiting the class period would require "ventur[ing] too deeply into the merits of a case in deciding whether to certify a class"); In re Scientific-Atlanta Inc. Sec. Litig., 571 F. Supp. 2d 1315, 1345 (N.D. Ga. 2015) (declining to shorten class period at class certification where "substantial question exists" as to which disclosure was "fully curative").

The Court will review those arguments at the proper time.  They do not warrant denial of class certification.  This Court will "remain free to modify the class period so as to terminate on an earlier date" if later developments render such a decision appropriate.  Scientific-Atlanta, 571 F. Supp. 2d at 1345 n.21.

ii.    Amending the Proposed MissPERS Carveout

The settlement in the <u>MissPERS</u> litigation, discussed in Section II(e), released "any and all" claims against Endo "arising out of" or "traceable" to Endo's June 5, 2015 offering, "including all claims that were asserted or could have been asserted" in the <u>MissPERS</u> class action.  <u>See</u> ECF 133-4 (<u>MissPERS</u> opinion) at 11.  As defined by the settlement, parties could no longer assert any claims arising out of their purchase of Endo shares that were purchased or acquired during the period from June 5, 2015 through June 10, 2015 (1) at the offering price of $83.25 and/or (2) directly from the defendants.  <u>Id.</u> at 6.

In their proposed class definition, Plaintiffs have attempted to carve out any claims that were released in the <u>MissPERS</u> settlement, recognizing the Court's concerns about the risk of double recovery.  During a hearing discussing class certification, the Court sought clarification from Plaintiffs on this issue, asking whether the language in the proposed definition exempts "a shareholder who was eligible to make a claim in the <u>MissPERS</u> case but did not."  ECF 328 at 12:20–14:8.  Plaintiffs first agreed that the class definition should exclude any recovery for shares whose related claims were released in the <u>MissPERS</u> settlement regardless of whether the purchaser actually collected under the settlement.  <u>Id.</u>  Next, they explained a hypothetical — an Endo stockholder who purchased two sets of Endo shares, one "traceable" to the secondary offering as defined by the <u>MissPERS</u> settlement and another that was not but gives rise to a compensable claim in the <u>Pelletier</u> litigation.  <u>Id.</u>  Plaintiffs stated that all claims from this stockholder's first set of stocks were released in <u>MissPERS</u>, but the second set could still provide a basis for recovery in <u>Pelletier</u>, should Plaintiffs succeed on the merits or reach a settlement.  <u>Id.</u>

After this discussion, Defendants conceded that the parties "don't really disagree in concept."  <u>Id.</u>

"Courts possess the authority to limit or modify class definitions in order to provide the precision needed for class certification." Chedwick v. UPMC, 263 F.R.D. 269, 272 (W.D. Pa. 2009); see also Gates v. Rohm & Haas Co., 265 F.R.D. 208, 234 (E.D. Pa. 2010) (Pratter, J.) ("a court has the inherent power and discretion to redefine and modify a class in a way which allows maintenance of an action as a class action").

To ensure that the class definition reflects the parties' intended meaning, the Court will make both a modification and a clarification now. As proposed, the MissPERS carveout states: "Also excluded from the Class are claims released in the settlement in [MissPERS] . . . ." The Court will supplement that language: "Also excluded from the Class are claims released in the settlement in [MissPERS], *regardless of whether the purchaser/acquirer has sought compensation under the related settlement . . . .*"

Additionally, the Court will certify the class with the understanding that the MissPERS carveout does not remove from this litigation all persons who own or owned shares subject to the MissPERS settlement. Instead, the MissPERS carveout simply precludes otherwise-included Pelletier class members from seeking damages or asserting claims in this case to the extent those claims were released in MissPERS. Plaintiffs' discussed hypothetical buyer, therefore, can still seek damages in this litigation for the second tranche of Endo stock.

    iii.   Amending to Avoid Fail-safe Concerns

A class is fail-safe if it is "defined so that whether a person qualifies as a member depends on whether the person has a valid claim." Smith v. Vision Solar LLC, No. 20-2185, 2020 WL 7230975, at *5 (E.D. Pa. Dec. 8, 2020) (Baylson, J.) (cleaned up). Although the Third Circuit has not opined whether fail-safe classes can be certified, fail-safe classes may be "impermissible"

because "a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment."  Id.

Plaintiffs' proposed class definition is "All persons and entities who purchased or otherwise acquired the ordinary shares of Endo [during the Class Period] and were damaged thereby [subject to exclusions]."  Defendants argue that this is an impermissible fail-safe class. [13]

Defendants support this argument only by citing to a case that says "[t]he language 'and were damaged thereby' may raise 'fail-safe' class definition concerns."  ECF 315 at 10 n.11.

But courts in this circuit regularly certify class definitions in securities litigations that employ the near-identical formula of "All persons and entities who purchased or otherwise acquired the ordinary shares of [the defendant] during the Class Period and were damaged thereby [subject to exclusions]."  See e.g., Pope v. Navient Corp., No. 17-8373, 2021 WL 926611, at *5 (D.N.J. Mar. 11, 2021) ("class members will be readily ascertainable" under this definition); In re Celgene Corp. Sec. Litig., No. 18-4772, 2020 WL 8870665, at *12–13 (D.N.J. Nov. 29, 2020) (certifying same definition formula); In re Adv. Auto Parts, Inc. Sec. Litig., No. 18-212, 2020 WL 6544637, at *1 (D. Del. Nov. 6, 2020) (same) ; Vrakas v. U.S. Steel Corp., No. 17-579, 2019 WL 7372041, at *1 n.1 (W.D. Pa. Dec. 31, 2019) (same); Marsden v. Select Med. Corp., 246 F.R.D. 480, 483 (E.D. Pa. 2007) (Joyner, J.) (same).

Defendants have identified no reason why Plaintiffs' proposed class definition here, functionally identical to those certified in the above-listed opinions, is uncertifiable.  Nonetheless, to ensure that there are no ongoing concerns regarding the language of "and were damaged

---

[13] Defendants raise this objection in only two sentences in a footnote, ECF 315 at 10 n.11, but the Court nonetheless will address their concerns.

thereby," the Court will remove that language from the class definition.  Gruber v. Gilbertson, 16-9727, 2019 WL 4439415, at *9 n.4 (S.D.N.Y. Sept. 17, 2019) (removing "and were damaged thereby" from a proposed definition to avoid "fail-safe" class definition concerns where "the language appears unnecessary").

### c. Predominance Under the __Basic__ Presumption

The bulk of class certification briefing deals with the parties' contentions regarding the __Basic__ presumption, specifically the expert testimony concerning price impact or lack thereof.  As explained above, see Section VI, the __Basic__ presumption permits a proposed securities class to satisfy Rule 23's predominance requirement for the issue of reliance.  If Plaintiffs demonstrate that there is an efficient market imputing all public information into Endo's stock price, the Court can assume that all stock purchasers directly or indirectly relied on that public information (including any of the Defendants' allegedly false or misleading statements).

In the landmark Hydrogen Peroxide decision, the Third Circuit directed district courts that are weighing class certification to consider all relevant issues under Rule 23, even if that requires addressing the overlapping merits of a claim.  In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 316–17 (3d Cir. 2008).  Because these district courts have "no reason to decline to resolve relevant [merit] disputes," id. at 316, many opinions have evaluated the case's merits while adjudicating the issue of predominance.  Particularly in securities cases, the substantive issues are very important in considering predominance under __Basic__ (and in defendants' obligation to rebut that presumption if invoked).

For example, in this case, Endo's stock price continuously declined throughout the proposed class period.  This is distinct from most securities cases where, as a result of the alleged false statements, the stock price increases significantly and, when the truth is fully disclosed, the

stock price decreases. Defendants have continually emphasized Endo's downward trajectory as evidence that there was no misrepresentation or fraud.

In considering class certification here, the relevant merits issues are those concerning the nature of the industry involved — the generic pharmaceutical industry. Generic drugs compete with each other, with the branded product (with an expired patent), and, perhaps, with other drugs with similar properties. Although it may seem unlikely that one generic can charge a higher price than the same generic from a different manufacturer, being functionally identical products, it is certainly possible that differences in marketing, distribution, or cost-saving measures could enable such a practice. Plaintiffs allege that Endo did so, without some offsetting measure to justify its price increases.

As discussed above, the Court may consider these facts in determining predominance, but it must not decide whether the alleged misrepresentations were indeed false, partially true, or completely true. Nor may it rely on whether Plaintiffs suffered any "loss causation" from buying Endo shares during the proposed class period. Judges must adhere to this perhaps-fuzzy distinction. Nonetheless, in this case, the predominance factors are quite obvious from Endo's public statements and the overall characteristics of the market.

Determining whether Plaintiffs have satisfied predominance through <u>Basic</u> requires considering three questions. First, have Plaintiffs satisfied the prima facie case for <u>Basic</u>? If so, the Court must, next, ascertain which alleged disclosures it may consider for Defendants' burden to rebut the presumption and, finally, decide whether Defendants have satisfied that burden. Before addressing those questions, however, the Court will review the background of these issues as they have been discussed in this case.

i. <u>Context of the Parties' Arguments on Basic</u>

To make the determination as to predominance under <u>Basic</u>, the Court must rely on the facts of this case, whether disputed or undisputed, and does so by relying principally on Plaintiffs' allegations in the Amended Complaint, as supplemented on the record after discovery.

In their initial class certification brief, Plaintiffs focused on demonstrating that the market for Endo shares was efficient, aiming to invoke the <u>Basic</u> presumption. Defendants did not dispute the invocation of the presumption in their opposition, but they attempted to rebut that showing by focusing on the lack of price impact. They did so by focusing on "corrective disclosures," purportedly showing that, as allegedly corrective information entered the market, Endo's stock prices did not respond in any meaningful way. This raised the now-contentious issue of corrective disclosures, which are otherwise functionally irrelevant to class certification.

There is no dispute that Plaintiffs' have relied on certain facts and characterizations that were not made in the Amended Complaint. Defendants object to Plaintiffs' categorization of Endo statements on February 29, 2016; May 5 and 6, 2016; and November 8, 2016 as "partial corrective disclosures," which they did not allege in their Amended Complaint. As discussed below, the Court will permit Plaintiffs to rely on these statements as disclosures.

Plaintiffs' arguments regarding the purported disclosures are summarized as follows. See also Section II(c)(iii) above (detailing alleged disclosures).

<u>February 29, 2016</u>: Endo acknowledged "increased public and governmental scrutiny of the cost of drugs," as well as a federal investigation into pharmaceutical pricing practices. Endo warned that it "may" face future pricing pressure as a result of this scrutiny, despite being aware that the scrutiny would likely lead to a collapse in price inflation.

May 5 and 6, 2016:  Endo linked disappointing financial results with increased generics competition, although Endo attributed this competitive pressure to normal market forces rather than an end to noncompetitive inflation.

November 3, 2016:  Bloomberg (not Endo) published an article revealing government investigations of the pharmaceutical industry, largely centered around possible antitrust violations. The article mentioned Endo as potentially being exposed.  The article signaled increasing likelihood that Endo's pricing model would collapse from heightened competition.

November 8, 2016:  Endo reported a 20% decrease in legacy generics' revenue compared to the prior quarter.  While Endo disclosed the fragility of its pricing model, it attributed these losses to normal market forces.

February 28 and March 1, 2017:  Endo disclosed continuing income losses in the generics market and decreased economic outlooks in that market for the future.  Additionally, Endo projected a $3.5 billion write-down of the company's goodwill, acknowledging "the permanent decline in the value of Endo's U.S. Generics business segment."

Plaintiffs to do not appear to be abandoning the broader allegations that they made in their Amended Complaint, particularly as to the merits, but the parties focus on invoking or rebutting the Basic presumption using these disclosures.  During a motion for class certification, whether a public statement is a misrepresentation, partially corrective disclosure, or fully corrective disclosure is not of paramount significance; the relevant issue as to predominance is whether the market did or did not react to that statement.[14]  See Basic, 485 U.S. at 242 ("the falsity or

_____

[14] There is extensive evidence in the record, mostly placed there by Defendants, that the statements on which Plaintiffs rely were not false or misleading, but were a fair representation of the market.

misleading nature of the . . . public statements" should be resolved on the merits); <u>DVI</u>, 639 F.3d at 638 ("demonstrating that misleading material statements or corrective disclosures did not affect the market price of the security defeats the presumption of reliance for the entire class").  But an overwhelming focus on the direction of price impact can become improper where the rebutting party shifts the argument to one of loss causation.  See <u>Halliburton I</u>, 563 U.S. at 812 (loss causation arguments, which are inappropriate for class certification, focus on whether a statement "affected the integrity of the market price [i.e., price impact, and] <u>also</u> caused a subsequent economic loss") (emphasis in original).

Although the Supreme Court and other courts have noted that a stock price's movement (or lack of movement) is relevant in the examination of the <u>Basic</u> presumption, movements in the stock price itself should not be given exaggerated weight in determining predominance.  In the first place, the public statements of a company are of much greater importance because they came from the company itself.  The stock price, on the other hand, can be reflective of many things, not merely the company's statements or actions.  Similarly, contemporaneous analyst reports, although based on analysts' experience with the company's history and practices, can carry weight but cannot be blamed on the company itself.  Very often, the stock price will move — whether up or down — based on countless external factors.  As Judge Scirica said in <u>DVI</u>:

> Although a drop in a security's price may be a result of the correction of a previous misrepresentation, it may also have been caused by "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events."

639 F.3d at 632 (quoting <u>Dura Pharm. Inc. v. Broudo</u>, 544 U.S. 336, 343 (2005)).

---

These contentions go to the merits of the case, and cannot be the grounds for the Court to ignore the <u>Basic</u> presumption.

The important point for predominance during class certification is that the statements were made publicly and there is evidence of price impact. Because the issue of "correctness" can be misleading in the context of class certification, the Court generally refers to the February 29, 2016; May 5 and 6, 2016; November 3, 2016; November 8, 2016; and February 28 and March 1, 2017 statements simply as "disclosures" throughout this opinion.

  ii. Market Efficiency and the Prima Facie Basic Presumption

A plaintiff invokes a prima facie Basic presumption of reliance by showing "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." Halliburton II, 573 U.S. at 268.

Defendants do not dispute the first, second, or fourth elements.

They dispute only the third prong, market efficiency, relying on a prominent test for market efficiency from Cammer v. Bloom, 711 F. Supp. 1264, 1286–87 (D.N.J. 1989). Cammer proposed five factors to consider in evaluating market efficiency in a securities litigation; the fifth factor is "showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." Id. at 1287. A typical cause-and-effect relationship would show stock prices rising after a misrepresentation and prices dropping after a disclosure. Defendants argue, based on their expert's report, that the opposite happened here and Plaintiffs have not established a prima facie case under Basic. See ECF 328 at 7:13–24. The Court disagrees for several reasons.

First, Endo trades on major stock exchanges, including NASDAQ, which is frequently held to be a standalone basis for finding market efficiency. See, e.g., DVI, 639 F.3d at 634 ("the listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding

of market efficiency"); <u>W. Palm Beach</u>, 2016 WL 4138613, at *12 (collecting cases); <u>Roofer's Pension Fund</u>, 333 F.R.D. at 80 n.8 ("Third Circuit courts have consistently found that the NYSE is an efficient market for stock traded thereon."); <u>see also</u> ECF 328 at 8:5–11 (Defendants conceding that "anybody [can] come in and buy or sell . . . Endo stock").

Second, Plaintiffs' expert studied legally accepted indicators of market efficiency and found each <u>Cammer</u> factor (and three non-<u>Cammer</u> factors) supported the prima facie <u>Basic</u> presumption. In contrast, Defendants' expert failed to make any <u>Cammer</u>-specific findings — Defendants' failed to address <u>Cammer</u> in their opposition. Instead, Defendants' opposition brief and its expert support focused solely on rebutting the prima facie <u>Basic</u> case. Without facts or expert testimony to provide contrary explanations, the Court finds Plaintiffs' expert credible on the issue of market efficiency for purposes of class certification.

Third, Defendants are incorrect in arguing that Plaintiffs failed to satisfy the fifth <u>Cammer</u> factor for this stage. The fifth <u>Cammer</u> factor requires showing a "cause and effect relationship between [disclosures] and an immediate response in the stock price." <u>Cammer</u>, 711 F. Supp. at 1287. Plaintiffs' expert found that statistically significant, Endo-specific price reactions occurred after five of eight Endo financial disclosures during the class period. ECF 116-5 at ¶¶ 50, 51.

Defendants respond that some of those price reactions were in the opposite direction as they would expect. Defendants' argument is, essentially, that the market incorporated the information in an unpredictable way, not that the market did not incorporate it. Public disclosures can contain significant amounts of information that could justify confounding price movements; the reasons for their direction is more appropriately dissected at the merits stage. It is indeed possible that, had Endo not made the allegedly false statements, its stock would have moved more or in a different direction than it actually did, but Endo does not attempt to disentangle these

effects. Plaintiffs' expert, however, provided evidence that the stock market reacted to disclosure of new information in a timely manner, and Defendants have not convinced the Court to disregard that evidence. Plaintiffs have satisfied the fifth <u>Cammer</u> factor.

Finally, Defendants have not disputed any of the other <u>Cammer</u> factors, and, as a matter of law, the fifth <u>Cammer</u> factor alone does not nullify the other factors. <u>W. Palm Beach</u>, 2016 WL 4138613, at *12 ("Courts have rejected the idea that the fifth <u>Cammer</u> factor is necessary to establish market efficiency."). For all of these reasons, the Court finds that Plaintiffs have established market efficiency and, therefore, invoked a prima facie <u>Basic</u> presumption for the purposes of class certification.

    iii.   <u>Which Disclosures are Relevant for Class Certification</u>

To rebut the <u>Basic</u> presumption, a defendant may present "evidence that the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock." <u>Halliburton II</u>, 573 U.S. at 280. Defendants have chosen to do so here by arguing that Endo's stock price did not respond to the alleged disclosures, but the parties differ over which disclosures may be considered.

Plaintiffs assert that the Court should examine five disclosures: February 29, 2016; May 5 and 6, 2016; November 3, 2016 (<u>Bloomberg</u>); November 8, 2016; and February 28 and March 1, 2017. Defendants argue that the Court may consider only February 28, 2017; they raise several issues with the other dates, which the Court will address in turn.

    A.  <u>February 29, 2016; May 5 and 6, 2016; and November 8, 2016</u>

Defendants argue that the Court may not consider these three alleged disclosures because (1) they were not identified as disclosures in the Amended Complaint, (2) considering "new" disclosures would expand the class definition after the close of the statute of limitations, (3) including these "new" disclosures would violate a settlement from the <u>SEB</u> litigation

59

(explained below), (4) including these disclosures would create class conflicts, and (5) these disclosures "profoundly reshaped" Plaintiffs' case and their inclusion would be "manifestly prejudicial" to Defendants. ECF 315 at 17–20.

Improperly Asserted: Defendants have strongly resisted this Court considering these purported disclosures because they were not identified as such until Plaintiffs' reply to class certification. Prior to that filing, Plaintiffs had chiefly categorized these statements as misrepresentations, although the allegations in the Amended Complaint had referred to them as "half-truth" or alluded to corrective content in the statements. This contention by Defendants must be rejected. "The purpose of discovery," of which there has been a large amount in this case, "is to allow a broad search" for information "which may aid a party in the preparation or presentation of his case." Fed. R. Civ. P. 26 advisory committee's note to 1946 amendment. In doing so, the parties may expand on what has been pleaded in the complaint or answer. See, e.g., Kostovetsky v. Ambit Energy Holdings, LLC, 242 F. Supp. 3d 708, 719 (N.D. Ill. 2017) ("[P]lacing meat on the bones of the fraud alleged in the complaint . . . is consistent with the design of the Federal Rules, which contemplate that additional facts and evidence will emerge in discovery to help plaintiffs flesh out their claims.").

Defendants are not prejudiced by Plaintiffs' additional factual contentions regarding "corrective disclosures" because they are no more than the fruits of discovery and, most importantly, Plaintiffs are relying on statements made by Endo or Endo personnel. The Court

permitted a sur-reply to Plaintiffs' arguments, and Defendants cannot claim they are surprised or unfairly prejudiced by them.[15]

The Court began addressing Defendants' "improperly asserted" challenge in a prior order, finding that these dates were "not improperly discussed by Plaintiffs" in their class certification briefing and Plaintiffs could rely on this theory as the fruits of discovery. ECF 301 at 1. The Court saw "no need to amend the Complaint" anew to address these dates, id.; such a requirement would only delay this litigation without benefit. Nonetheless, the Court reserved the second half of the challenge: "whether the events that took place on these dates are 'corrective disclosures' . . . [is] a possible factual issue to be considered by the Court as to class certification and/or a jury at the trial of this case." Id.

The relevance and import of a disclosure will stand or fall based on classwide evidence, the Court has only a limited role in answering that question at class certification. See Tyson, 577 U.S. at 475 ("When, as here, the concern about the proposed class is a fatal similarity — an alleged failure of proof as to an element of the plaintiffs' cause of action — courts should engage that question as a matter of summary judgment, not class certification.") (cleaned up). For class certification, the Court should determine only whether the disclosure contains new information "that need only relate to, concern, or be linked to a specific alleged misrepresentation." Pearlstein, 2021 WL 253453, at *18 (cleaned up). "There is no requirement that the disclosure take a particular form or be of a particular quality, such that it be a mirror image tantamount to a confession of fraud." Id.

---

[15] Additionally, Defendants had notice of the misrepresentations that Plaintiffs alleged since the Amended Complaint, and the Court has permitted the parties to file extensive briefing on class certification issues over the past year.

Plaintiffs have argued convincingly that each of these purported disclosures satisfies this standard, see ECF 305 at 11–12, and Defendants have not argued to the contrary.[16] Because these statements are considered disclosures at this stage and because they were not "improperly" raised in class certification briefing, the Court rejects Defendants' arguments that it may not consider these dates as disclosures for the present motion.

Statute of Limitations: Defendants' arguments concerning the statute of limitations incorrectly conflate inclusion in the class with the ability to seek damages under the class' claims. The assertion of "new" disclosures does not introduce new members to the proposed class. The prospective class has remained largely consistent since the Amended Complaint — it has always included Endo stock purchasers from a fixed time period who were injured by the alleged misrepresentations. The alleged misrepresentations have not changed since the Amended Complaint. Considering additional dates as disclosures may alter which class members have compensable claims, but it does not change who had claims as a class member in the first instance. Consideration of these disclosures does not add anyone new into the class and, therefore, does not violate the statute of limitations.[17]

----

[16] The Court also rejects Defendants' contention that Plaintiffs cannot rely on these statements as "partial corrective disclosures" — statements that reveal some element of the alleged fraud but conceal its impact or other elements of the fraud. The public statements on these dates contained significant amounts of information, it would be a vast oversimplification to rule, as a matter of law, that all of that information must have been either corrective or false/misleading.

[17] Defendants' cited cases are readily distinguishable from this case. See Supreme Auto Transport, LLC v. Arcelor Mittal USA, Inc., 902 F.3d 735, 742 (7th Cir. 2018) (refusing to allow expansion of product liability case to include class claims from "a vast array" of new products); Berkery v. Verizon Commc'ns, Inc., No. 15-1085, 2015 WL 6599694, at *3 (E.D. Pa. Oct. 29, 2015) (McHugh, J.) (individual's erroneous belief that he was part of a pending class' definition did not toll his claims).

SEB Litigation: Defendants argue that these "new" disclosures cannot be asserted because Endo has already been released from liability for all Exchange Act claims during the class period except for those initially asserted in this litigation. ECF 336 at 8–9. The discussed settlement occurred in SEB v. Endo, No. 17-3711 (E.D. Pa.) ("SEB"). In SEB, Judge Savage approved a settlement that released all Exchange Act claims against Endo from November 30, 2012 to June 8, 2017. ECF 336-1 ("SEB settlement") at 7, 12–13 (¶ 1(j), (rr)). Because that class period includes the entirety of the class period at issue in this litigation, the SEB settlement explicitly stated that it did not release "any of the claims currently asserted" in Pelletier. Id. at 12–13 (¶ 1(rr)). Judge Savage then enjoined the assertion of any claim that was released through the SEB settlement. ECF 336-2.

Defendants argue his injunction precludes the "new" assertion of these disclosures. But, for the same reason as discussed above regarding the statute of limitations, Plaintiffs are not asserting new claims. The claims have always been those arising from the same list of alleged false or misleading statements or omissions that were detailed in the Amended Complaint, and the SEB settlement did not release those claims. Since Plaintiffs have not added new claims since the Amended Complaint, the SEB settlement does not prevent Plaintiffs from asserting their theory of the case here.

Class Conflicts: Defendants' argument that considering these dates would create conflicts within the class fares no better. Lead plaintiffs in securities class actions are often entrusted with balancing the interests of purchasers over different periods. Lead Plaintiff Bucks has owned Endo shares throughout the class period and the Court appointed two co-lead plaintiffs in part to "balance any conflicts" between purchasers. See Pelletier III, 2021 WL 398495 at *12 n.14. Without a specific showing to suggest a conflict here, Defendants' argument fails.

For all of the above reasons, the Court will consider February 29, 2016; May 5 and 6, 2016; and November 8, 2016 as disclosures under the Basic presumption.

B.  November 3, 2016 (Bloomberg Article)

Defendants argue that the Court may not consider the November 3, 2016 Bloomberg article as a disclosure, contending that it provided corrective information only about "Plaintiffs' claims about price-fixing [that] are out of the case."  ECF 315 at 13.

Defendants are correct that the primary concern of the Bloomberg article is the government investigation of a purported price-fixing conspiracy and that the Court has dismissed claims arising from price-fixing theories in this case. But the Court's inquiry does not end here.  As previously discussed, the relevant test for whether a disclosure may be considered "corrective" for class certification is whether that disclosure provides new information that is "related to" the alleged misrepresentation.  See Pearlstein, 2021 WL 253453, at *18.

News from a third party of a previously undisclosed investigation concerning generic pricing necessarily contained new, possibly relevant information concerning Endo's market conditions, sources of revenue, pricing decisions, or competitive environment.  The article disclosed, for the first time, that the government was investigating whether the generics market had been artificially inflating prices.  While the article examined the issue through the lens of a purported price-fixing conspiracy, Plaintiffs assert it nonetheless also disclosed a significant threat to Endo's pricing model — even in the absence of price-fixing.  If true, which the Court does not assume, the article disclosed that Endo's competitors may have had new incentives to undercut generics prices to evade the government's attention.  Where the competitors are all locked in a stand-off over who can sustain the price inflation, government investigations likely heighten the risk that someone will flinch and bring the price crashing back down.  Such a price drop, which

Plaintiffs allege eventually happened, is arguably consistent with Plaintiffs' theory of the risks of noncompetitive price increases.

The article therefore included new information —the government was scrutinizing generic manufacturers' pricing practices — that was possibly related to Endo's alleged misrepresentations regarding pricing and competition. This satisfies the limited inquiry that the Court may undertake for now.

iv. Rebuttal of the Basic Presumption

Having found that Plaintiffs have established their prima facie case for the Basic presumption, the Court now turns to Defendants' burden to rebut it. Defendants attempt to do so by showing that Endo's stock price did not react to the asserted disclosures ("back-end" evidence). The Court will consider five disclosures: February 29, 2016; May 5 and 6, 2016; November 3, 2016; November 8, 2016; and February 28 and March 1, 2017.

Defendants have noted that the overall market trajectory of Endo's stock values over the class period is unusual for a securities litigation. In an archetypical securities fraud case, stock prices would rise (or remain steady) throughout the alleged misrepresentations, only to drop when the alleged disclosures reveal the harsher reality of the company's finances. Here, by contrast, Endo's stock price dropped significantly before most of the disclosures. As shown in Exhibit 3, the per-share stock price was about $90 at the beginning of the class period, about half that price before the first disclosure, and under about $30 between the second disclosure and the end of the class period.[18]

_____

[18] Additionally, the Court notes that, aside from the short-term impacts discussed by the experts, Exhibit 3 indicates that the February 29, 2016 disclosure occurred in the middle of a precipitous drop in Endo's stock prices, while the May 5 and 6, 2016 and the November 8, 2016 disclosures

This unusual price path will likely have significant importance when this case transitions to the merits stage. Plaintiffs may, for example, have difficulty demonstrating loss causation from the alleged misrepresentations. The Court may not consider these questions now. See Halliburton I, 563 U.S. at 813. Instead, the Court must limit its consideration of these disclosures to issues of price impact and Defendants' burden in rebutting Basic.

Plaintiffs' expert found Endo-specific drops in stock prices following the alleged disclosures on February 29, 2016, ECF 152-1 (Reply Report) at ¶ 22 n.61 (18.5% drop); May 5 and 6, 2016, id. at ¶ 24 n.70 (37.4% drop); November 3, 2016, id. at ¶ 10 n.14 (15.5% drop); and November 8, 2016, id. at ¶ 27 n.79 (7.6% drop). Each of these price drops were statistically significant to at least a 95% confidence interval. Defendants' expert, on the other hand, offered no testimony as to the price impact of the first four disclosures. ECF 152-6 (Skinner Dep.) at 55:9–16 (Defendants' expert looked only at the February 28 and March 1, 2017 disclosure). The price impact for these four disclosures is therefore unrebutted.

The remaining disclosure, according to Plaintiffs, occurred over two days: February 28 and March 1, 2017. Defendants, however, argue that the Court should not consider this disclosure as a two-day event, as an efficient market should impute relevant information into a stock's price "in a matter of minutes." ECF 133 at 21 n.6. Viewing February 28 in isolation, Endo's stock price increased, id. at 20, a figure that Plaintiffs do not dispute. Based on this argument, Defendants claim they have rebutted Basic for the entire class period or, at least, for the final alleged disclosure.

---

occurred right before Endo's stock price faced a large upswing. These are issues that the parties will have to grapple with on the merits, when the parties must shift the focus to loss causation.

Plaintiffs respond that (1) a two-day window is appropriate because the second day provided new information as context to the first and there was a price drop over the two-day window (although not statistically significant), (2) the February 28 price increase was <u>less than expected</u> given the simultaneous impact of Endo positive announcement, and (3) the Court must view market efficiency in the aggregate instead of isolating individual disclosures.

The Court will first assess the appropriateness of viewing the final disclosure as a two-day event. Second, it will assess Defendants' argument regarding February 28, in isolation. Finally, the Court will address Defendants' burden in rebutting <u>Basic</u> throughout the whole class period.

    A. <u>Price Impact Under the Two-day Window</u>

There is no per se rule against considering a two-day period in assessing whether a disclosure had a price impact; indeed the Third Circuit has held that use of a two-day window is compatible with applying <u>Basic</u>:

> Because a perfectly efficient market is not attainable, we do not require that public information be absorbed instantaneously. . . . Here, the District Court found most of the information was incorporated into the price within one day. That some information took two days to affect the price does not undermine a finding of efficiency.

<u>DVI</u>, 639 F.3d at 635 (cleaned up) (discussing market efficiency); <u>see also</u> <u>Halliburton II</u>, 573 U.S. at 271–72 (the Supreme Court has not "adopt[ed] any particular theory of how quickly and completely publicly available information is reflected in market price") (quoting <u>Basic</u>, 485 U.S. at 248 n.28). While most public information <u>should</u> be absorbed into an efficient market quickly, the related price impact may occur more slowly where clarifying or contextualizing information is disclosed later.

Defendants have not convinced the Court that it should focus only on the February 28 statements. On February 28, Endo warned investors of "a change in pricing expectations" and "a change in the value derived from estimated future pricing levels," as well as an impairment of

other intangible assets due to "certain market conditions impacting the commercial potential of definite and indefinite-lived intangible assets." ECF 152 at 25. On March 1, as Plaintiffs argue, Endo specifically confirmed the link for the first time between the intangible asset impairment charge of $507.2 million and high price erosion in the generics market. Id. According to Plaintiffs' theory of the case, the March 1 disclosure finally confirmed that the impairment charge occurred because Endo could no longer rely on price inflation. This connecting information, if proven true, may have provided successive clarifying information to the February 28 disclosure. Defendants have not convinced the Court to disregard March 1's impact at this time.

Plaintiffs argue that, viewing the final disclosure over the two-day period, there was a negative price impact, albeit with minimal statistical significance. ECF 152-1 at ¶ 66 (4.2% price drop but with only 58% confidence level). Using two different models, Defendants' expert found either a price increase or a price decrease over the same two-day window, but neither finding was statistically significant. ECF 133-6 at ¶ 54, ¶ 54 n.105. Defendants bear the burden of rebutting the Basic presumption. And viewing the totality of their evidence regarding the two-day window, Defendants' lack of a statistically significant finding cannot rebut the Basic presumption.

B. Price Impact When Viewing February 28 in Isolation

Defendants contend that the Court should view February 28, 2017 in isolation, where their expert found a statistically significant, Endo-specific price increase. ECF 133-6 at ¶ 36 (8.0% at 95% confidence interval). Plaintiffs do not contest the numerical findings but respond that the Court must factor in the complicating effects from Endo's simultaneous announcement of positive information — "Endo beat analysts' 2016 earnings estimates by 10.5%." ECF 152 at 27. Without the disclosure on February 28, Plaintiffs argue, "Endo's share price would have gone up more." Id. Despite acknowledging the contemporaneous good news, Defendants' expert did not attempt

to isolate the effects of this positive information from Endo's stock price movement for the day. ECF 152-1 at ¶ 40.

Price movements can be a complicated issue where a public statement contains significant amounts of information.  See DVI, 639 F.3d at 632 ("Although a drop in a security's price may be a result of the correction of a previous misrepresentation, it may also have been caused by 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events.'").  Indeed, it would functionally defang Basic if a defendant-company could always rebut it by waiting to announce corrective information until it had offsetting good news.

The Court is not convinced that there was no negative price impact of the alleged disclosure.  Defendants bear the burden of showing the lack of price impact, and, without specific evidence or expert testimony isolating out the two different price effects, the Court cannot determine that the February 28 price increase was not less than would have occurred without the purported disclosure on that date.  The price movement on February 28 does not rebut the Basic presumption.

C.  Viewing the Entirety of the Class Period

Even further, Defendants have failed to satisfy their burden in rebutting Basic if viewed throughout the class period.  Setting aside Defendants' dispute regarding price impact for the final disclosure, Defendants have failed to rebut Plaintiffs' showing of negative price impact on each of the other four disclosure dates.  Rebutting Basic requires the defendant to show that the market was not efficiently imputing material public information.  Contesting one date out of many does not show that the market was inefficient or that stock purchasers were not relying on the market to perform its role.  Rebuttal must require more than that, and Defendants have failed to satisfy that burden.

Because Plaintiffs have satisfied the prima facie <u>Basic</u> presumption and Defendants have failed to rebut it; Plaintiffs have satisfied the predominance requirement for class certification under Rule 23(b)(3).

### d. Classwide Damages Model not Relevant at this Stage

Defendants argue that Plaintiffs have failed to "identif[y] a damages model consistent with its theories of liability." ECF 133 at 15. Quoting <u>Comcast Corp. v. Behrend</u>, 569 U.S. 27 (2013), Defendants argue that the Court cannot certify a class if the plaintiff cannot "proffer 'a model' of damages that 'measure[s] only those damages attributable to th[e] theory' that plaintiff alleges." <u>Id.</u> But <u>Comcast</u> applies only to antitrust cases:

> <u>Comcast</u> held that an antitrust litigation class could not be certified because the plaintiffs' damages model did not demonstrate the theory of antitrust impact that the district court accepted for class-action treatment. . . . A close reading of the text above makes it clear that the predominance analysis was specific to the antitrust claim at issue.

<u>Neale v. Volvo Cars of N.A., LLC</u>, 794 F.3d 353, 374 (3d Cir. 2015). Because "it is a misreading of <u>Comcast</u> to interpret it as precluding certification under Rule 23(b)(3) in any case where the class members' damages are not susceptible to a formula for classwide measurement," <u>id.</u> at 375 (cleaned up); <u>accord</u> <u>W. Palm Beach</u>, 2016 WL 4138613, at *14 (<u>Comcast</u> did not create a bar to certification for non-antitrust cases), the Court will not preclude certification on those grounds here.

## XI.  <u>Conclusion</u>

For the reasons explained above, and based on the Court's finding that the proposed class, lead plaintiffs, and class counsel satisfy the standards of Rule 23(a) and 23(b)(3), the Court will GRANT Plaintiffs' motion to certify the class with the following class definition:

> All persons and entities who purchased or otherwise acquired the ordinary shares of Endo from March 2, 2015 through February 27, 2017, inclusive (the "Class Period").

Excluded from the Class are

(i) Defendants and any affiliates or subsidiaries thereof;

(ii) present and former officers and directors of Endo and its subsidiaries or affiliates, and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. §229.404, Instructions (1)(a)(iii) & (1)(b)(ii));

(iii) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof;

(iv) any entity in which any Defendant has or has had a controlling interest;

(v) Endo's employee retirement and benefits plan(s); and

(vi) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding five categories.

Also excluded from the Class are claims released in the settlement in <u>Public Employees' Retirement System of Mississippi v. Endo International plc, et al.</u>, No. 2017-02081-MJ (Ct. Com. Pl. Chester Cnty., Pa.), regardless of whether the purchaser/acquirer has sought compensation under the related settlement, pursuant to the Notice of Pendency of Class Action, Proposed Settlement, and Motion for Attorneys' Fees and Expenses issued in that case by Order of the Court of Common Pleas of Chester County, Pennsylvania.

An appropriate order follows.

## EXHIBIT 1

| Statement Date | Alleged Type of Statement | Discussion in Am. Compl. (ECF 62) |
| :---: | :---: | :---: |
| March 2, 2015 | Misrepresentation | ¶¶ 50–51; 187–192 |
| May 11, 2015 | Misrepresentation | ¶¶ 53–54; 193–194 |
| May 18, 2015 | Misrepresentation | ¶¶ 56–58; 195–196 |
| August 10, 2015 | Misrepresentation | ¶¶ 59–60; 197–199 |
| November 5 and 9, 2015 | Misrepresentation | ¶¶ 65–66; 200–202 |
| February 29, 2016 | Partial Disclosure | ¶¶ 69–73; 203–209 |
| May 5 and 6, 2016 | Partial Disclosure | ¶¶ 74–75; 210–213 |
| August 9, 2016 | Misrepresentation | ¶¶ 76–79; 214–216 |
| November 3, 2016 (<u>Bloomberg</u> article) | Disclosure Third Party Publication | ¶¶ 81–82; 260–263 |
| November 8, 2016 | Partial Disclosure | ¶¶ 83; 217–220 |
| February 28 and March 1, 2017 | Final Disclosure | ¶¶ 84; 264–266 |

**EXHIBIT 2**

| Am. Compl. | Disclosure Date(s) | Full Document on ECF[19] | Quoted Language | Corresponding Theory of the Case[20] |
|---|---|---|---|---|
| 187 | 3/2/2015 | 204-3 at 14-15 | [The related SEC form did] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading. | 1, 2, 3, 4 |
| 188 | 3/2/2015 | 204-3 at 6 | In the generic pharmaceutical market, we face intense competition from other generic drug manufacturers, brand name pharmaceutical companies through authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. In the market for generic pharmaceuticals, our competitors, including Actavis, Teva, Mylan Technologies Inc., and Sandoz, Inc., vary depending on product category and dosage strength…. | 1, 4 |

---

[19] Page numbers are from the PDF page as viewed from ECF. An exhibit index is also available at ECF 204-2.

[20] These Categories are (1) Market Conditions, (2) Sources of Revenue, (3) Pricing Decisions (and the bases for making those decisions), and (4) Competitive Environment. See Section III (Plaintiffs' Remaining Claims).

| | | | | |
|---|---|---|---|---|
| 189 | 3/2/2015 | 204-3 at 6 | Our business model continues to focus on being a low cost producer of products in categories with high barriers to entry and lower levels of competition. Our U.S. Generic Pharmaceuticals segment is focused in categories where there are fewer challenges from lowcost operators in markets such as China and India, with approximately 36% of our generic product portfolio being comprised of controlled substances, which cannot be manufactured offshore and imported into the U.S. In addition, approximately 7% of our generic product portfolio is made up of liquids, which are uneconomical to ship to the U.S.…. | 1, 2, 4 |
| 190 | 3/2/2015 | 204-3 at 7 | As competition from other generic products increases, selling prices for all participants typically decline. Consequently, the maintenance of profitable operations in generic pharmaceuticals depends, in part, on our ability to select, develop and launch new generic products in a timely and cost efficient manner and to maintain efficient, high quality manufacturing relationships. | 1, 2, 3, 4 |
| 191 | 3/2/2015 | 204-3 at 11 and 204-4 at 6 | [2014's Adjusted Income increased] primarily due to the Boca and DAVA acquisitions, the May 2014 launch of our authorized generic of Lidoderm and certain pricing increases. [And] Growth in our US Generics business this quarter benefited from the additions of Boca Pharmacal and DAVA Pharmaceuticals. Sales of LIDODERM AG were a strong source of new growth as well. | 2, 3 |
| 192 | 3/2/2015 | 204-4 at 8 | [W]hile we cannot plan for them, we will maintain our opportunistic approach to supply and demand imbalances that lead to volume and price opportunities for US Generics. | 1, 3 |

| 193 | 5/11/2015 | 204-5 at 8-9 | [The related SEC form did] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading. | 1, 2, 3 |
|---|---|---|---|---|
| 194 | 5/11/2015 | 204-5 at 6 and 204-6 at 6 | [The Q1 2015 Adjusted Income increased] primarily due to the DAVA acquisition, the May 2014 launch of our authorized generic of Lidoderm and overall increases in demand. [And] First-quarter results benefited from the acquisition of DAVA Pharmaceuticals which closed in August 2014, and the partial quarter contribution of Boca Pharmacal, which was acquired in February of 2014. Sales of LIDODERM AG were a strong source of new growth, as well. | 2, 3 |
| 196 | 5/18/2015 | 204-7 at 8 | Growth across both Companies resulted from a combination of volume, new products, prudent pricing strategies and accretive acquisitions. In addition to impressive revenue growth, both Companies have realized meaningful margin gains since 2011 as a result of greater manufacturing efficiencies, favorable mix and through the optimization of pricing across a more specialized product portfolios. | 1, 2, 3 |
| 197 | 8/10/2015 | 204-8 at 9-10 | [The related SEC form did] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading. | 1, 2, 3, 4 |
| 198 | 8/10/2015 | 204-8 at 7 and 204-9 at 7 | [The Q2 2015 Adjusted Income increased] primarily due to the DAVA acquisition, the May 2014 launch of our authorized generic of Lidoderm  and overall increases in demand. [And] Our year-to-date 2015 results primarily benefit from organic growth and a number of value creating acquisitions as well as Lidoderm AG which was a strong source of growth as well. | 2, 3 |

| | | | | |
|---|---|---|---|---|
| 199 | 8/10/2015 | 204-9 at 13 | Q: "First, just on the generic pricing environment, can you just elaborate a little bit more there … ? I know one of your competitor[s] said some cautious comments last week and just interested in how you are seeing the pricing environment play out in that part of the market?" A: We are prudent and opportunistic when we take price increases and not all controlled substances lend themselves to price increases. It all depends on the competitive set and the supply-demand situation in the market at any given time. However, we have a very broad portfolio so we have at least 700 SKUs that we market and manage and at any given quarter we do have opportunities to take price and this second quarter was no different. | 1, 2, 3, 4 |
| 200 | 11/5-9/2015 | 204-10 at 14-15 | [The related SEC form did] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading. | 2, 3 |
| 201 | 11/5-9/2015 | 204-10 at 9 and 204-11 at 8 | [The Q3 2015 Adjusted Income increased] primarily due to the DAVA acquisition, the May 2014 launch of our authorized generic of Lidoderm and overall increases in demand. [And] Our year-to-date 2015 results primarily benefited from organic growth, including new product launches and a number of value creating acquisitions. | 2, 3 |
| 202 | 11/5-9/2015 | 204-11 at 16 | The controlled substance space has been one where there's been events that allow for price increases, like the oxycodones or the hydrocodones, and the small products are an area where oftentimes the supply-demand dynamics are such that there are opportunities for pricing, because many of these don't last very long, and they are temporary, but net-net they contribute to Qualitest growth. | 2, 3 |

| 203 | 2/29/2016 | 204-13 at 18-19 | [The related SEC form did] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading. | 1, 2, 3, 4 |
|---|---|---|---|---|
| 204 | 2/29/2016 | 204-12 at 4 and 204-13 at 9 | [The Q4 2015 Adjusted Income increase was] primarily attributable to growth from the addition of sales from the Company's September 2015 acquisition of Par, as well as underlying growth of certain products. [And the 2015 Adjusted Income increased] primarily due to the DAVA and Par acquisitions and the resulting incremental adjusted income from continuing operations before income tax. In addition, adjusted income from continuing operations before income tax increased as a result of new product launches and an increase in demand for generic pain products. | 2, 3 |
| 205 | 2/29/2016 | 204-13 at 5 | In the generic pharmaceutical market, we face intense competition from other generic drug manufacturers, brand name pharmaceutical companies through authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. In the market for generic pharmaceuticals, our competitors, including Teva Pharmaceutical Industries (Teva), Mylan, Inc. (Mylan), and Impax Laboratories, Inc. (Impax), vary depending on product category and dosage strength…. | 1, 4 |
| 206 | 2/29/2016 | 204-13 at 5 | Our primary strategy is to compete in the generic product market with a focus on high-value, first-to-file or first-to-market opportunities, regardless of therapeutic category, and products that present significant barriers to entry for reasons such as complex formulation, regulatory or legal challenges or difficulty in raw material sourcing…. | 1, 2, 4 |

| | | | | |
|---|---|---|---|---|
| 207 | 2/29/2016 | 204-13 at 5 | Newly introduced generic products with limited or no other generic competition typically garner higher prices. At the expiration of the exclusivity period, other generic distributors may enter the market, resulting in a significant price decline for the drug. Consequently, the maintenance of profitable operations in generic pharmaceuticals depends, in part, on our ability to select, develop and launch new generic products in a timely and cost efficient manner and to maintain efficient, high quality manufacturing capabilities. | 1, 2, 3, 4 |
| 208 | 2/29/2016 | 204-13 at 6 | We operate in a highly competitive industry. The pharmaceutical industry is intensely competitive, and we face competition in our branded and generic pharmaceutical business and our medical devices business. In addition to product development, safety, efficacy, commercialization, marketing and promotion, other competitive factors include product quality and price, reputation, service and access to scientific and technical information. Many of our competitors, including Abbott, Allergan, Purdue, Jazz, Shire, Horizon, Mallinckrodt, Teva, Mylan, and Impax, among others, may have greater resources than we do. It is possible that our competitors may make greater research and development investments and that their new products may make our products or technologies uncompetitive or obsolete. If we fail to compete successfully, our business, results of operations, financial condition and cash flows could be materially adversely affected. | 1, 2, 3, 4 |

| | | | | |
|---|---|---|---|---|
| 209 | 2/29/2016 | 204-13 at 7 | We may experience pricing pressure on the price of our products due to social or political pressure to lower the cost of drugs, which would reduce our revenue and future profitability. … Recent events have resulted in increased public and governmental scrutiny of the cost of drugs, especially in connection with price increases following companies' acquisitions of the rights to certain drug products. In particular, U.S. federal prosecutors recently issued subpoenas to a pharmaceutical company seeking information about its drug pricing practices, among other issues, and members of the U.S. Congress have sought information from certain pharmaceutical companies relating to post-acquisition drug-price increases. Our revenue and future profitability could be negatively affected if these inquiries were to result in legislative or regulatory proposals that limit our ability to increase the prices of our products. Pressure from social activist groups and future government regulations may also put downward pressure on the price of drugs, which could result in downward pressure on the prices of our products in the future. | Dismissed as Dependent on Allegations of Price-Fixing Conspiracy |
| 210 | 5/5-6/2016 | 204-15 at 8-9 | [The related SEC form did] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading. | 2, 4 |
| 211 | 5/5-6/2016 | 204-15 at 6 | [The Q1 2016 Adjusted Income increased] "primarily due to the Par acquisition on September 25, 2015," which in turn was "partially offset by a decrease resulting from competitive pressure on commoditized generic products and charges to increase excess inventory reserves of approximately $18 million at our U.S. Generic Pharmaceuticals segment due to the underperformance of certain products." | 2, 4 |

| | | | | |
|---|---|---|---|---|
| 212 | 5/5-6/2016 | 204-16 at 5-6 | First, we have seen a steep and rapid price erosion caused by pair consolidation that has been more even profound than anticipated…. Second, coupled with this consolidation and new payer environment, competitors are taking aggressive pricing actions to gain market share…. Third, there's been a rapid erosion of the pain segment driven by three things: one, continued market contraction; two, increased competitive capacity and pressure; and three, while still too early to judge the full impact, we believe the recently issued CDC guidelines will continue to put pressure on a already soft pain market…. Fourth, there's been a recent and marked acceleration of FDA approval for generic products…. Fifth and finally, delays in expected FDA actions related to our 505(b)(2) products means that we have yet to see the anticipated removal of unapproved competitive products from the market. | Dismissed as Dependent on Allegations of Price-Fixing Conspiracy |
| 213 | 5/5-6/2016 | 204-16 at 5 | [Decreased performance in Endo's generics business] was driven by continued pricing and competitive pressures on our commoditized and pain products. | Dismissed as Dependent on Allegations of Price-Fixing Conspiracy |
| 214 | 8/9/2016 | 204-19 at 8-9 | [The related SEC form did] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading. | 2, 3, 4 |
| 215 | 8/9/2016 | 204-19 at 6 | [The Q2 2016 Adjusted Income increased] "primarily due to the Par acquisition on September 25, 2015," which in turn was "partially offset by a decrease resulting from competitive pressure on commoditized generic products and charges to increase excess inventory reserves of approximately $26 million at our U.S. Generic Pharmaceuticals segment due to the underperformance of certain products." | 2, 3, 4 |

| | | | | Dismissed as Dependent on Allegations of Price-Fixing Conspiracy |
|---|---|---|---|---|
| 216 | 8/9/2016 | 204-20 at 5 | [Endo's generics business was negatively affected by] consortium pricing pressures and competitive generic entrants. | |
| 260-263 | 11/3/2016 | 204-21 | "U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion, a fresh challenge for an industry that's already reeling from public outrage over the spiraling costs of some medicines. […] The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said. […] While attention so far has been focused mainly on branded drugs, which are more expensive, the Justice Department probe is now bringing the generics industry into the fray. […] While the government may bring the first cases by the end of December, the situation is fluid and timing could slip, according to the people. […] Generic drug companies are also contending with a civil price-fixing investigation by Connecticut Attorney General George Jepsen. Jepsen is seeking to lead a group of states to probe the industry, which could result in cases seeking damages, according to people familiar with the matter. […] Mylan and Par have said they've been asked about doxycycline." | (Disclosure) 1, 2, 3, 4 |
| 217 | 11/8/2016 | 204-22 at 8-9 | [The related SEC form did] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading. | 2, 3, 4 |

| | | | | |
|---|---|---|---|---|
| 218 | 11/8/2016 | 204-22 at 6 | [The Q3 2016 Adjusted Income increased] "primarily due to the Par acquisition on September 25, 2015," which in turn was "partially offset by a decrease resulting from competitive pressure on commoditized generic products and charges to increase excess inventory reserves of approximately $42 million at our U.S. Generic Pharmaceuticals segment due to the underperformance of certain products." | 2, 3, 4 |
| 219-220 | 11/8/2016 | 204-23 at 5 | [Endo's generics business was negatively affected by] higher than expected consortium pricing pressures, evolved consortium structure, and certain competitive generic entrants late in the quarter. | Dismissed as Dependent on Allegations of Price-Fixing Conspiracy |

| | | | | |
|---|---|---|---|---|
| 264-266 | 2/28-3/1/2016 | 204-24 | "Company reports $3.5 billion of asset impairment charges in fourth-quarter 2016 associated with the write-down of goodwill and intangible assets primarily related to the Company's Generics reporting unit […] Company expects 2017 revenues to range from $3.45 billion to $3.60 billion […] Company expects 2017 Adjusted EBITDA from $1.50 billion to $1.58 billion […] Generics base business decreased 23 percent compared to fourth-quarter 2015; this decrease resulted from continued pricing pressure due to increased competition, particularly among Solid Oral Immediate Release (IR) products […] The impairment charge was driven by a reduction in the expected future cash flows in the Generics reporting unit primarily due to a change in pricing expectations partly driven by an expected increased level of competition and increased buying power from the continued consolidation of the generic business customer base. These charges are primarily due to industry and competitive pressures in the sector, which resulted in a reduction of the Generics reporting unit's fair value […] In addition to the Company's goodwill assessment, the Company also incurred pretax, non-cash intangible asset impairment charges in the fourth-quarter of approximately $830.3 million, including: $507.2 million and $285.5 million in our U.S. Generic Pharmaceutical and International Pharmaceutical segments, respectively, resulting from certain market conditions impacting the commercial potential of definite and indefinite-lived intangible assets." | (Disclosure) 1, 2, 3, 4 |

**EXHIBIT 3**



Source: ECF 315-3. Defendants prepared this chart for the Court's review. The Court includes this document for reference only and does not adopt Defendants' categorization of the referenced statements.

O:\CIVIL 17\17-5114 Pelletier v Endo Intl\17cv5114 Memorandum Opinion re Class Certification.docx